# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

WALT DISNEY PARKS AND RESORTS U.S., INC.,

      Plaintiff,

v.

RONALD D. DESANTIS, in his official capacity as
Governor of Florida; MEREDITH IVEY, in her
official capacity as Acting Secretary of the
Florida Department of Economic Opportunity;
MARTIN GARCIA, in his official capacity as
Board Chair of the Central Florida Tourism
Oversight District; MICHAEL SASSO, in his
official capacity as Board Member of the
Central Florida Tourism Oversight District;
BRIAN AUNGST, JR., in his official capacity as
Board Member of the Central Florida Tourism
Oversight District; RON PERI, in his official
capacity as Board Member of the Central
Florida Tourism Oversight District; BRIDGET
ZIEGLER, in her official capacity as Board
Member of the Central Florida Tourism
Oversight District; and JOHN CLASSE, in his
official capacity as Administrator of the Central
Florida Tourism Oversight District,

      Defendants.

Case No.
4:23-cv-00163-MW-MJF

# FIRST AMENDED COMPLAINT

# FOR DECLARATORY AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................1

PARTIES.....................................................................................................7

JURISDICTION AND VENUE ........................................................................10

FACTUAL BACKGROUND.............................................................................11

    A.    THE REEDY CREEK IMPROVEMENT DISTRICT HAS BENEFITED
          FLORIDA AND ITS RESIDENTS FOR DECADES ........................................11

    B.    OVER A MULTI-YEAR PROCESS, DISNEY AND THE DISTRICT
          COMPLETE THE COMPREHENSIVE PLAN 2032 ......................................14

    C.    DISNEY PUBLICLY COMMENTS ON HOUSE BILL 1557..........................17

    D.    GOVERNOR DESANTIS AND THE LEGISLATURE DISSOLVE
          THE REEDY CREEK IMPROVEMENT DISTRICT .......................................20

    E.    GOVERNOR DESANTIS AND THE LEGISLATURE RECONSTITUTE
          AND SEIZE CONTROL OF THE DISTRICT ...............................................31

    F.    AMID INCREASING RETALIATORY STATE ACTION, DISNEY AND
          RCID EXECUTE TWO LONG-TERM LAND USE CONTRACTS
          AFTER PUBLICIZED AND OPEN HEARINGS ...........................................38

          1.    Development Contracts, Generally...........................................38

          2.    The District's Publicized And Open Hearings ........................41

          3.    The Contract Terms ................................................................44

    G.    GOVERNOR DESANTIS REPLACES ELECTED RCID BOARD MEMBERS
          WITH CFTOD POLITICAL APPOINTEES WHO EXECUTE THE
          RETRIBUTION CAMPAIGN AND DECLARE "VOID"
          DISNEY'S LAND USE CONTRACTS .......................................................47

    H.    GOVERNOR DESANTIS AND THE LEGISLATURE VOID THE
          CONTRACTS BY STATUTE AND EXPAND THE RETRIBUTION
          CAMPAIGN..........................................................................................59

i

FIRST CAUSE OF ACTION:  CONTRACTS CLAUSE VIOLATION ...............65

SECOND CAUSE OF ACTION:  TAKINGS CLAUSE VIOLATION.................69

THIRD CAUSE OF ACTION:  DUE PROCESS CLAUSE VIOLATION ...........71

FOURTH CAUSE OF ACTION:  FIRST AMENDMENT VIOLATION............73

FIFTH CAUSE OF ACTION:  FIRST AMENDMENT VIOLATION.................75

PRAYER FOR RELIEF ...........................................................................78

Plaintiff Walt Disney Parks and Resorts U.S., Inc. ("Disney" or the "Company"), the owner and operator of the Walt Disney World Resort ("Walt Disney World") in Central Florida, alleges in support of its First Amended Complaint for Declaratory and Injunctive Relief as follows:

## INTRODUCTION

> "*[T]his all started, of course, with our parents' rights bill*."
> —Governor Ronald D. DeSantis, May 5, 2023.

1.     For more than half a century, Disney has made an immeasurable impact on Florida and its economy, establishing Central Florida as a top global tourist destination and attracting tens of millions of visitors to the State each year. People and families from every corner of the globe have traveled to Walt Disney World because of the unrivaled guest experience it provides and the deep emotional connection that generations of fans have with Disney's timeless stories and characters.

2.     A targeted campaign of government retaliation—orchestrated at every step by Governor DeSantis as punishment for Disney's protected speech—now threatens Disney's business operations, jeopardizes its economic future in the region, and violates its constitutional rights.

3.     The State's actions over the last two weeks are the latest strikes.  At the Governor's bidding, the State's oversight board has purported to "void" publicly noticed and duly agreed development contracts, which had laid the

foundation for billions of Disney's investment dollars and thousands of jobs.  Days later, the State Legislature enacted and Governor DeSantis signed legislation rendering these contracts immediately void and unenforceable.  These government actions were patently retaliatory, patently anti-business, and patently unconstitutional.  But the Governor and his allies have made clear they do not care and will not stop.  The Governor recently declared that his team would not only "void the development agreement"—just as the State has now done, twice—but also planned "to look at things like taxes on the hotels," "tolls on the roads," "developing some of the property that the district owns" with "more amusement parks," and even putting a "state prison" next to Walt Disney World.  "Who knows?  I just think the possibilities are endless," he said.

4.      Disney regrets that it has come to this.  But having exhausted efforts to seek a resolution, the Company is left with no choice but to file this lawsuit to protect its cast members, guests, and local development partners from a relentless campaign to weaponize government power against Disney in retaliation for expressing a political viewpoint unpopular with certain State officials.

5.      Disney is enormously proud of the foundational role it has played in creating Central Florida's tourism industry.  The Reedy Creek Improvement District ("RCID" or the "District"), Disney's local governing jurisdiction, was integral to its success from the beginning—in 1967.

6.   Fast forward five decades, and Disney today is an unparalleled engine for economic growth in the State.  Among other distinctions, Disney is one of Central Florida's largest taxpayers, with more than $1.1 billion paid in state and local taxes last year.  Disney is also one of the largest employers in the State, with more than 75,000 cast members.

7.   The State of Florida has flourished in the years since Walt Disney himself surveyed many acres of swampland in 1963 and dreamed the possibility of Walt Disney World.  Florida's elected officials have long understood how consequential Disney is to the State's economy and future, just as Disney has sought to be a constructive, responsible, and charitable Florida resident.

8.   Governor DeSantis and his allies paid no mind to the governing structure that facilitated Reedy Creek's successful development until one year ago, when the Governor decided to target Disney.  There is no room for disagreement about what happened here:  Disney expressed its opinion on state legislation and was then punished by the State for doing so.

9.   Governor DeSantis announced that Disney's statement had "crossed the line"—a line evidently separating permissible speech from intolerable speech—and launched a barrage of threats against the Company in immediate response.  Since then, the Governor, the State Legislature, and the Governor's handpicked local government regulators have moved beyond threats to official

action, employing the machinery of the State in a coordinated campaign to damage Disney's ability to do business in Florida.  State leaders have not been subtle about their reasons for government intervention.  They have proudly declared that Disney deserves this fate because of what Disney said.  Indeed, just days ago, reaffirming the unequivocal intent of his retribution campaign and trumpeting its perceived success, Governor DeSantis openly celebrated:  "Since our skirmish last year, Disney has not been involved in any of those issues.  They have not made a peep."

10.     This is as clear a case of retaliation as this Court is ever likely to see.

11.     At the Governor's behest, the State Legislature first voted to dissolve the long-standing RCID, then ultimately voted to give near-complete control of RCID to the Governor himself.  As the Florida representative who introduced the Reedy Creek dissolution bill declared to the Florida House State Affairs Committee:  "You kick the hornet's nest, things come up.  And I will say this: You got me on one thing, this bill does target one company.  It targets The Walt Disney Company."

12.     Disney has never wanted a fight with the Florida government.  The Company sought to de-escalate the matter for nearly a year, trying several times to spark a productive dialogue with the DeSantis Administration.  To no avail.

13.     Amid great uncertainty about the lengths to which the State would go to keep punishing Disney for its views, RCID and the Company gave public notice,

4

in January 2023, that they would enter into contracts to secure future development for the District and Walt Disney World—contracts that implemented a comprehensive plan for the District that the DeSantis Administration itself had found compliant with Florida law months earlier.

14.     Through the development plan and implementing contracts, Disney set huge goals for itself and laid foundations for spectacular economic growth in Central Florida.  Disney plans to invest over $17 billion in Walt Disney World over the next decade.  The Company estimates that those investments will create 13,000 new Disney jobs in that same 10-year time period.

15.     Big goals aside, these contracts are land use agreements between a developer and its local regulator.  They are similar in character to contracts between other developers and special districts to fix long-term development rights and obligations, thereby facilitating the certainty needed to ensure investment and effective commercial progress.  Contrary to misunderstandings and mischaracterizations by some government leaders, they do not undermine the newly constituted Central Florida Tourism Oversight District ("CFTOD" or the "District") board's ability to govern and exercise authority, including by imposing taxes, exercising the power of eminent domain, approving or disapproving building permit applications (including for the projects carried out pursuant to the

development agreement), building roads, providing emergency services, or issuing bonds.

16.     Moreover, nothing about these contracts was a surprise:  They were discussed and approved after open, noticed public forums in compliance with Florida law.  And in the very same legislation that replaced the elected board governing Disney with board members picked by the Governor, the State Legislature reaffirmed the enforceability of all prior contracts, including those here.

17.     Disney takes seriously its responsibility to shareholders, employees, and the many residents and local businesses in Central Florida whose livelihoods depend on Walt Disney World.  And Disney now is forced to defend itself against a State weaponizing its power to inflict political punishment.

18.     It is a clear violation of Disney's federal constitutional rights—under the Contracts Clause, the Takings Clause, the Due Process Clause, and the First Amendment—for the State to inflict a concerted campaign of retaliation because the Company expressed an opinion with which the government disagreed.  And it is a clear violation of these rights for the CFTOD board and the State Legislature to declare CFTOD's own legally binding contracts void and unenforceable.  Disney thus seeks relief from this Court in order to carry out its long-held business plans.

19.     Disney finds itself in this regrettable position because it expressed a viewpoint the Governor and his allies did not like.  Disney wishes that things could have been resolved a different way.  But Disney also knows that it is fortunate to have the resources to take a stand against the State's retaliation—a stand smaller businesses and individuals might not be able to take when the State comes after them for expressing their own views.  In America, the government cannot punish you for speaking your mind.

**PARTIES**

20.     Walt Disney Parks and Resorts U.S., Inc. is a Florida corporation with its principal place of business in Orange County, Florida.  Disney owns and operates Walt Disney World in Central Florida.  Guests from around the world visit to enjoy a Disney vacation, where family members of all ages laugh, play, and learn together.

21.     Defendant Ronald D. DeSantis is the Governor of Florida.  Governor DeSantis called on the Legislature to pass bills to punish Disney for its speech— among others, a bill dissolving the Reedy Creek Improvement District ("RCID" or the "District"), and another installing a Governor-selected oversight board.  He signed into law Senate Bill 4C (2022) and House Bill 9B (2023) and appointed the members of the newly constituted Central Florida Tourism Oversight District ("CFTOD" or the "District") board, Disney's local regulator.  Fla. Const., art. IV,

§ 1; Senate Bill 4-C, Fla. Laws ch. 2022-266 (amending Fla. Stat. § 189.0311) ("Senate Bill 4C"); House Bill 9-B, Fla. Laws ch. 2023-5 ("House Bill 9B"); Fla. Laws ch. 2023-5 ("CFTOD Charter") § 4(1).  He also signed into law Senate Bill 1604 (2023), legislation voiding the contracts at issue here.  Senate Bill 1604, Fla. Laws ch. 2023-31 ("Senate Bill 1604").  He is sued in his official capacity.

22.    Defendant Meredith Ivey is the Acting Secretary of the Florida Department of Economic Opportunity.  Acting Secretary Ivey serves as the head of the Florida Department of Economic Opportunity.  Fla. Stat. § 20.60(2).  The Florida Department of Economic Opportunity is authorized by statute to maintain the Official List of Special Districts, which includes all special districts in Florida.  Fla. Stat. § 189.061(1)(a), (2); *see id.* § 189.012(1).  The Secretary of the Florida Department of Economic Opportunity is appointed by the Governor, reports to the Governor, and serves at the pleasure of the Governor.  Fla. Stat. § 20.60(2).  She is sued in her official capacity.

23.    Defendant Martin Garcia is the Chair of the Central Florida Tourism Oversight District board.  The board is CFTOD's governing body, has "controlling authority over the district," and exercises the District's statutory powers.  *See* CFTOD Charter § 4(1).  Chair Garcia was appointed by the Governor.  *Id.*  He is sued in his official capacity.

24.     Defendant Michael Sasso is a member of the Central Florida Tourism Oversight District board.  Sasso was appointed by the Governor.  He is sued in his official capacity.

25.     Defendant Brian Aungst, Jr. is a member of the Central Florida Tourism Oversight District board.  Aungst was appointed by the Governor.  He is sued in his official capacity.

26.     Defendant Ron Peri is a member of the Central Florida Tourism Oversight District board.  Peri was appointed by the Governor.  He is sued in his official capacity.

27.     Defendant Bridget Ziegler is a member of the Central Florida Tourism Oversight District board.  Ziegler was appointed by the Governor.  She is sued in her official capacity.

28.     Defendant John Classe is the District Administrator of the Central Florida Tourism Oversight District.  The CFTOD board appoints the District Administrator and can remove him by vote at any time.  *See* CFTOD Charter § 4(6)(b).  The District Administrator is "in charge of the day-to-day operations of the district subject to the board of supervisor's direction and policy decisions."  *Id.* He is sued in his official capacity.

**JURISDICTION AND VENUE**

29.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331

and 1343 because this action arises under the United States Constitution and

federal law.

30.     This Court has authority to grant relief under the Declaratory

Judgment Act, 28 U.S.C. §§ 2201, 2202, and 28 U.S.C. § 1343(a) and 42 U.S.C.

§ 1983.

31.     In addition, this Court has authority to issue injunctive relief under the

All Writs Act, 28 U.S.C. § 1651.

32.     This Court's jurisdiction is properly exercised over Defendants in

their official capacities, as Disney is seeking declaratory and injunctive relief only.

*Ex parte Young*, 209 U.S. 123 (1908).

33.     This Court has personal jurisdiction over Defendants, and venue is

proper in this District pursuant to 28 U.S.C. § 1391, because a substantial part of

the events giving rise to this claim occurred in this District.

34.     There is an actual and justiciable controversy between Disney and

Defendants, of sufficient immediacy and concreteness relating to the parties' legal

rights and duties to warrant relief under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201

and 2202, because Senate Bill 4C, House Bill 9B, CFTOD's April 26, 2023

legislative findings and declaration that Disney's contracts are "void and

10

unenforceable" (the "Legislative Declaration"), and Senate Bill 1604 constitute a

present and continuing infringement of Disney's constitutional rights.

## FACTUAL BACKGROUND

**A.    THE REEDY CREEK IMPROVEMENT DISTRICT HAS BENEFITED FLORIDA AND ITS RESIDENTS FOR DECADES**

35.    In 1963, Walt Disney looked down on acres of undeveloped Central

Florida land from an airplane seat and saw potential.  Disney quickly acquired title

or options for over 27,000 acres of land, comprising roughly 43 square miles in

Central Florida.

36.    In 1966, the State created the Reedy Creek Drainage District, which

allowed Disney, the largest landowner, to begin the effort of draining and

reclaiming land so that actual site construction would be possible.  The following

year, the Florida Legislature expanded the scope of the district's authority,

establishing the Reedy Creek Improvement District.  *See* Fla. Laws ch. 67-764

("Reedy Creek Enabling Act").

37.    In the Reedy Creek Enabling Act, the Legislature recognized that "the

economic progress and well-being of the people of Florida depend in large

measure upon the many visitors and new residents who come to Florida," Reedy

Creek Enabling Act at 4, and, to that end, the Legislature granted RCID powers,

functions, and authorities necessary to foster "a recreation-oriented community"

that would "enable enterprises" to "undertake" "a broad and flexible program of

experimentation and development." *Id.* at 5.  RCID was tasked with "provid[ing]

for the reclamation, drainage and irrigation of land," "water and sewer systems and

waste collection and disposal facilities," "public transportation and public

utilities," and "streets, roads, [and] bridges." *Id.*  The Legislature determined that

the purposes of the act could not "be realized except through a special taxing

district having the[se] powers." *Id.* at 6.

38.     In 1968, the State of Florida challenged RCID's power to issue

drainage bonds. *See State v. Reedy Creek Improvement Dist.*, 216 So. 2d 202 (Fla.

1968).  The State argued that, because Disney was the largest landowner in RCID,

the water control improvements funded by the bonds would impermissibly put

public funds to a private purpose. *Id.* at 205.  The Florida Supreme Court rejected

the challenge, finding that RCID served a *public* purpose.  In particular, it

concluded that the purpose of RCID was "essentially and primarily directed toward

encouraging and developing tourism and recreation for the benefit of citizens of

the state and visitors to the state generally." *Id.* at 205-206.

39.     The Florida Supreme Court also confirmed that the Legislature had

properly established RCID, explaining that "the Legislature in the exercise of its

plenary authority may create a special improvement district encompassing more

than one county and possessing multi-purpose powers essential to the realization of

a valid public purpose." *Id.* at 206.  The Court further emphasized that while

RCID's powers over land use and economic development were broad, they were not "commensurate in scope with those characteristic of a local municipal government" and were not "a mere subterfuge to avoid the creation of a municipality." *Id.* at 206.

40.     In the decades that followed, RCID has played a critical role in providing vital services for tourism in Central Florida.  RCID enforces building codes, provides emergency services, and offers utilities—subject to the oversight of state and federal regulators.  Under state law, special district board meetings are open to the public and districts provide reasonable notice of and produce minutes of each meeting; these records are open for public inspection.  *See* Fla. Stat. § 286.011(1), (2).  In a 2004 report, Florida's Office of Program Policy Analysis & Government Accountability concluded that RCID was meeting "the public purpose expressed in its special act[.]"[1]

41.     Today, the area formerly governed by RCID (now governed by CFTOD) encompasses approximately 25,000 acres of land and covers portions of Orange and Osceola Counties.  The District employs hundreds of employees responsible for stewarding the land consistent with environmental regulations and

---

[1]     OFF. PROG. POL'Y ANALYSIS & GOV'T ACCOUNTABILITY, CENTRAL FLORIDA'S REEDY CREEK IMPROVEMENT DISTRICT HAS WIDE-RANGING AUTHORITY 9, Report No. 04-81 (Dec. 2004), https://oppaga.fl.gov/Documents/Reports/04-81.pdf.

public safety.  The District has built 134 miles of roadways and 67 miles of

waterways.  It has managed 60,000 tons of waste.  It recycles 30 tons of aluminum,

paper, steel cans, cardboard, and plastic containers every year.  It uses thousands of

vendors, suppliers, and contractors to provide a high level of public services for

visitors.

42.    Disney is the primary landowner in the District and, as a result, is its

largest taxpayer.  For the 2022 fiscal year, Disney-owned land constituted 87.7%

of the total taxable assessed value within the District.[2]

43.    Like many other special districts in Florida, RCID board members

were, until recently, elected on the basis of property ownership within the District.

As RCID's largest landowner and taxpayer, Disney naturally had substantial input

into RCID's acquisition of property, development of transportation facilities,

operation of public utilities, and issuance of revenue bonds, among other things.

Disney, since the beginning, was the primary contributor to the unprecedented

success of RCID's development objectives.

**B.    OVER A MULTI-YEAR PROCESS, DISNEY AND THE DISTRICT COMPLETE THE COMPREHENSIVE PLAN 2032**

44.    Under Florida's Community Planning Act, a special improvement

district is required to adopt a "comprehensive plan" that guides future growth and

---

[2]    REEDY CREEK IMPROVEMENT DISTRICT, ANNUAL FINANCIAL REPORT 51 (Feb. 7, 2022), https://www.rcid.org/document/2021-rcid-annual-financial-report.

development.  *See* Fla. Stat. §§ 163.3161(8), 163.3177.  Comprehensive plans

include elements addressing affordable housing, transportation, infrastructure,

conservation, recreation and open space, intergovernmental coordination, and

capital improvements.  *See id.* § 163.3177(6).  Florida law also requires that special

districts review their comprehensive plan every seven years to determine whether

amendments are necessary.  *See id.* § 163.3191(1).

45.     The current comprehensive plan is the RCID Comprehensive Plan

2032 ("Comprehensive Plan").  RCID and Disney began collaborating years ago,

in 2018, to settle on the amendments captured in the Comprehensive Plan.  Among

other things, the Comprehensive Plan details maximum development limits, down

to the square foot, through 2032 for hotels, office space, retail and restaurants, and

theme parks.

46.     On May 25, 2022, RCID held a public hearing on the Comprehensive

Plan.  At that hearing, RCID's Planning and Engineering team advised that the

contemplated amendments would bring RCID's Comprehensive Plan up to 2032.

After discussing questions from the board and soliciting public comments—there

were none—the board unanimously approved the Comprehensive Plan.[3]  The City

---

[3]     Minutes of Meeting, Reedy Creek Improvement District Board of
Supervisors Meeting (May 25, 2022), *available at* https://www.rcid.org/about/
board-of-supervisors-2/ (last accessed May 8, 2023).

Councils of Bay Lake and Lake Buena Vista had each unanimously approved the Comprehensive Plan the day before.

47.     Shortly thereafter, on June 2, 2022, RCID submitted the Comprehensive Plan to the State's Department of Economic Opportunity for review.  By letter dated July 15, 2022, the Department confirmed that it had "reviewed the amendment in accordance with the state coordinated review process set forth in Section 163.3184(2) and (4), Florida Statutes" and had "determined that the adopted amendment meets the requirements of Chapter 163, Part II, F.S. for compliance."[4]  The Department thereby determined that, among the many other legal requirements it satisfied, the Plan properly set forth "the principles, guidelines, standards, and strategies for the orderly and balanced future economic, social, physical, environmental, and fiscal development of the area that reflects community commitments to implement the plan and its elements."  Fla. Stat. § 163.3177(1).

48.     By statute, an "affected person" can file a challenge to a plan amendment.  A petition challenging a comprehensive plan amendment must be filed within 30 days after the plan amendment is adopted.  *See* Fla. Stat.

---

[4]     REEDY CREEK IMPROVEMENT DISTRICT, CITY OF BAY LAKE, & CITY OF LAKE BUENA VISTA, RCID COMPREHENSIVE PLAN 2032 (effective July 15, 2022), https://www.rcid.org/wp-content/uploads/2023/02/2032-RCID-Comprehensive-Plan.pdf (last accessed May 8, 2023).

§ 163.3184(5)(a).[5]  No petition was filed, and the Comprehensive Plan became effective on July 15, 2022.

### C.   DISNEY PUBLICLY COMMENTS ON HOUSE BILL 1557

49.    The Florida Legislature passed the Parental Rights in Education Act ("House Bill 1557") in March 2022.[6]

50.    The public discussion before and after the bill's passage was robust not only in Florida, but across the country.  Commentary came from all corners, including "leaders of global corporations" and "editorial boards of major newspapers."[7]

51.    As a Florida corporation and taxpayer with tens of thousands of Florida-based employees, Disney took an interest in the bill.  On March 9, the then-CEO of Disney's parent company, The Walt Disney Company, called Governor DeSantis personally to express the Company's concern.

---

[5]    *See also* FLORIDA DEPARTMENT OF ECONOMIC OPPORTUNITY, TIME FRAME AND PROCEDURES FOR A CITIZEN CHALLENGE TO A COMPREHENSIVE PLAN AMENDMENT, https://floridajobs.org/community-planning-and-development/programs/community-planning-table-of-contents/time-frame-and-procedures-for-a-citizen-challenge-to-a-comprehensive-plan-amendment.

[6]    Committee Substitute for House Bill 1557 (2022), Fla. Laws ch. 2022-22 (amending Fla. Stat. § 1001.42).

[7]    Matt Lavietes, *Here's What Florida's 'Don't Say Gay' Bill Would Do and What It Wouldn't Do*, NBC NEWS (Mar. 16, 2022), https://www.nbcnews.com/nbc-out/out-politics-and-policy/floridas-dont-say-gay-bill-actually-says-rcna19929.

52.     Governor DeSantis recounts thinking that "it was a mistake for Disney to get involved" and telling Disney's then-CEO, "'You shouldn't get involved[;] it's not going to work out well for you.'"[8]

53.     On March 10, Governor DeSantis's campaign sent an email accusing "Woke Disney" of "echoing Democrat propaganda."[9]

54.     Walt Disney World issued the following statement shortly thereafter: "To ALL who come to this happy place, welcome.  Disney Parks, Experiences and Products is committed to creating experiences that support family values for every family, and will not stand for discrimination in any form.  We oppose any legislation that infringes on basic human rights, and stand in solidarity and support our LGBTQIA+ Cast, Crew, and Imagineers and fans who make their voices heard today and every day."[10]

---

[8]     Kimberly Leonard, *Florida Gov. Ron DeSantis Said He Warned Disney Not to Get Involved in Schools Debate: 'It's Not Going to Work Out Well for You,'* BUSINESS INSIDER (June 8, 2022), https://www.businessinsider.com/desantis-says-he-told-disney-to-stay-out-of-dont-say-gay-fight-2022-6.

[9]     Cortney Drakeford, *'Woke Disney' Trends After Gov. Ron DeSantis Attacks Company for Freezing Campaign Donations*, INT'L BUS. TIMES (Mar. 12, 2022), https://www.ibtimes.com/woke-disney-trends-after-gov-ron-desantis-attacks-company-freezing-campaign-donations-3435110.

[10]    Andrew Krietz, *Disney Releases Statement As DeSantis Prepares To Sign Bill Limiting Teachings About Sexual Orientation, Gender*, WTSP (Mar. 22, 2022), https://www.wtsp.com/article/news/politics/disney-florida-desantis-statement-bill/67-170f27d3-eee4-4fb1-ab70-01c73828834a.

55.     Governor DeSantis signed House Bill 1557 into law on March 28. That day, The Walt Disney Company issued a statement expressing its views that the legislation "never should have been signed into law," that its "goal as a company is for this law to be repealed by the [L]egislature or struck down in the courts," and that The Walt Disney Company "remains committed to supporting the national and state organizations working to achieve that."[11]

56.     On March 29, Governor DeSantis said that he thought The Walt Disney Company's March 28 statement had "crossed the line" and pledged "to make sure we're fighting back" in response to Disney's protected speech.[12]

57.     Governor DeSantis's memoir attacked Disney's speech and petitioning activity for expressing the wrong viewpoint.  "In promising to work to repeal the bill," he asserted, "the company was pledging a frontal assault on a duly enacted law of the State of Florida."  As a consequence of its disfavored speech and petitioning, he declared, "[t]hings got worse for Disney."[13]

---

[11]     Press Release, The Walt Disney Company, Statement From The Walt Disney Company on Signing of Florida Legislation (Mar. 11, 2022), https://thewaltdisneycompany.com/statement-from-the-walt-disney-company-on-signing-of-florida-legislation/.

[12]     David Kihara, *DeSantis Says Disney 'Crossed the Line' in Calling for 'Don't Say Gay' Repeal*, POLITICO (Mar. 29, 2022), https://www.politico.com/news/2022/03/29/desantis-disney-dont-say-gay-repeal-00021389.

[13]     Ron DeSantis, THE COURAGE TO BE FREE, ch. 12 (2023).

58.     The Governor promptly began his campaign of punishment.

**D.     GOVERNOR DESANTIS AND THE LEGISLATURE DISSOLVE THE REEDY CREEK IMPROVEMENT DISTRICT**

59.     On March 30, State Representative Spencer Roach disclosed for the first time that the Legislature was considering dissolving RCID and announced, "If Disney wants to embrace woke ideology, it seems fitting that they should be regulated by Orange County."[14]  Governor DeSantis had been orchestrating the move behind the scenes.  As he recounts it in his memoir, "I needed to be sure that the Legislature would be willing to tackle the potentially thorny issue involving the state's most powerful company.  I asked the House Speaker, Chris Sprowls, if he would be willing to do it, and Chris was interested. 'OK, here's the deal,' I told him.  'We need to work on this in a very tight circle, and there can be no leaks. We need the element of surprise—nobody can see this coming.'"[15]

60.     On March 31, Governor DeSantis quickly affirmed Representative Roach's statement, saying publicly, "[W]e're certainly not going to bend a knee to woke executives in California.  That is not the way the state's going to be run."[16]

---

[14]     Fatma Khaled, *Disney at Risk of Losing Its Own Government in Florida*, NEWSWEEK (Apr. 1, 2022), https://www.newsweek.com/disney-risk-losing-its-own-government-florida-1693955.

[15]     DeSantis, THE COURAGE TO BE FREE, *supra* note 13, ch. 12.

[16]     Brandon Hogan, *Florida Gov. DeSantis Discusses Potential for Repeal of Disney's Reedy Creek Act*, CLICKORLANDO (Mar. 31, 2022), https://www.clickorlando.com/news/local/2022/03/31/florida-gov-desantis-

61.     On April 19, Governor DeSantis suddenly called for the Legislature to expand a special session that had been scheduled to address redistricting.  The new purpose of the session was to attack Disney by targeting just the handful of Florida's more than one thousand independent special districts that were created before the passage of the 1968 Florida Constitution, like RCID.[17]

62.     Governor DeSantis conjured other rationales for the bill, including to "ensure that [independent special districts] are appropriately serving the public interest" and to "consider whether such independent special districts should be subject to the special law requirements of the Florida Constitution of 1968" that "prohibit[] special laws granting privileges to private corporations."

63.     These rationales did not make sense.  Only six independent special districts that were created before 1968 had not been reconstituted in the intervening years.  Of those, RCID was the only district closely connected to a specific corporation.  And, in Governor DeSantis's memoir, he admitted that he "found" that there was this "handful of other districts" that "also deserved scrutiny" only *after* his "staff worked with the legislative staff in the House" to target Disney.[18]

---

discusses-potential-of-repeal-of-disneys-reedy-creek-act.

[17]     *See* Proclamation, Governor Ron DeSantis (Apr. 19, 2022), https://www.flgov.com/wp-content/uploads/2022/04/Proclamation.pdf.

[18]     DeSantis, THE COURAGE TO BE FREE, *supra* note 13, ch. 12.

64.     When considered against the substance of the legislation, the pretext became especially transparent.  The bill did nothing either to "ensure that [independent special districts] are appropriately serving the public interest" or "consider whether such independent special districts should be subject to the special law requirements of the Florida Constitution of 1968" that "prohibit[] special laws granting privileges to private corporations."  Instead, under the bill, districts created before 1968 were preemptively scheduled for dissolution *before* the Legislature undertook any analysis to determine whether the districts were serving the public interest, and before any determination as to whether they were subject to the special law requirements of the 1968 Florida Constitution at all.  Had the Legislature undertaken that analysis, it would necessarily have found that RCID served the public interest, as the Florida Supreme Court had already confirmed, *see Reedy Creek Improvement Dist.*, 216 So. 2d at 205-206, and further that RCID was not subject to the 1968 Florida Constitution's prohibition on special privileges granted to private corporations, *see id.* (rejecting as "untenable" the claim that the Reedy Creek Enabling Act's provisions were "oriented to serve primarily the benefit of that particular private enterprise").

65.     On April 20, Governor DeSantis sent a fundraising email warning that "Disney and other woke corporations won't get away with peddling their

unchecked pressure campaigns any longer" and that he would "not allow a woke

corporation based in California to run our state[.]"[19]

66.    The campaign against Disney raced forward.  The very same morning

that Governor DeSantis issued his proclamation expanding the special session,

identical bills were introduced in the Florida House and Senate providing for the

dissolution of RCID.  Florida House Bill 3C and Florida Senate Bill 4C each

provided that "any independent special district established by a special act prior to

the date of ratification of the Florida Constitution on November 5, 1968, and which

was not reestablished, re-ratified, or otherwise reconstituted by a special act or

general law after November 5, 1968, is dissolved effective June 1, 2023."[20]

67.    House sponsor Representative Randy Fine immediately announced:

"Disney is a guest in Florida.  Today we remind them.  @GovDeSantis just

expanded the Special Session so I could file HB3C which eliminates Reedy Creek

---

[19]    A.G. Gancarski, *Ron DeSantis Dunks on Disney in Donor Pitch*, FLORIDA
POLITICS (Apr. 20, 2022), https://floridapolitics.com/archives/517962-ron-desantis-
dunks-on-disney-in-donor-pitch; *Florida's Governor Has Signed a Bill To Strip
Disney World's Self-Government.  Here's What That Means*, ASSOCIATED PRESS
(Apr. 22, 2022), https://www.kcra.com/article/disney-world-self-government-
explained/39786585.

[20]    Senate Bill 6C, a bill removing an exemption for theme parks from a state
law governing social media platforms, was introduced that same day and quickly
passed in both chambers.  Jennifer Kay, *DeSantis Set to Sign Bill Closing Disney
Loophole in Tech Law*, BLOOMBERG LAW (Apr. 21, 2022), https://news.bloomberg
law.com/us-law-week/desantis-set-to-sign-bill-closing-disney-loophole-in-tech-
law.

Improvement District, a 50 yr-old special statute that makes Disney to [sic] exempt from laws faced by regular Floridians."[21]

68.     That same day, Representative Fine said to the Florida House State Affairs Committee: "You kick the hornet's nest, things come up.  And I will say this:  You got me on one thing, this bill does target one company.  It targets The Walt Disney Company."[22]

69.     Governor DeSantis's memoir describes the attack on Disney with pride:  "Nobody saw it coming, and Disney did not have enough time to put its army of high-powered lobbyists to work to try to derail the bill.  That the Legislature agreed to take it up would have been unthinkable just a few months before.  Disney had clearly crossed a line in its support of indoctrinating very young schoolchildren in woke gender identity politics."[23]

70.     The legislative process for Senate Bill 4C was highly unusual.  When in the past the Florida Legislature had dissolved a special district, the bills enacting the dissolution typically specified the plan for governance and management of

---

[21]     Rep. Randy Fine (@VoteRandyFine), TWITTER (Apr. 19, 2022, 10:04 AM), https://twitter.com/VoteRandyFine/status/1516417533825454083.

[22]     Hearing on HB 3C Before the Fla. H.R. State Affairs Comm., Special Session 2022C (Apr. 19, 2022) (remarks by Representative Randy Fine, sponsor of HB 3C, companion bill to SB 4C, starting at 1:13:00), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8085.

[23]     DeSantis, THE COURAGE TO BE FREE, *supra* note 13, ch. 12.

district assets and obligations, including bond debt, after dissolution.  *See, e.g.*,

Community & Military Affairs Subcommittee Bill Analysis, House Bill 4191, Fla.

Leg. (2011) (describing earlier legislation that dissolved South Lake Worth Inlet

District, transferred all property, assets, and debt to Palm Beach County and

clarified Palm Beach's rights and responsibilities as part of the transfer, and

required Palm Beach to establish an advisory committee to advise County

Commissioners on management of district's former territory); Atty. Gen'l Op. 97-

68 (Fla. A.G. Sept. 25, 1997), 1997 WL 592,445 (referring to special acts Chapter

91-346 and Chapter 94-429, which collectively dissolved the Port Everglades

Authority special district and transferred its operations and property to Broward

County).

71.     Senate Bill 4C, in stark contrast, described no plan for the disposition

of RCID's assets, operations, or obligations.  Nor did the bill address how RCID's

roughly $1 billion in municipal bond debt would be satisfied.[24]

72.     The legislative analysis accompanying the bill was cursory[25] and

provided no estimate of the full economic impact of dissolving RCID.  The

---

[24]     Danielle Moran, *Barclays Says to Buy Disney District Munis Amid DeSantis Feud*, BLOOMBERG (May 6, 2022), https://www.bloomberg. com/news/articles/ 2022-05-06/barclays-says-to-buy-disney-district-munis-amid-desantis-feud.

[25]     Lori Rozsa et al., *Florida Legislature Passes Bill Repealing Disney Special Tax Status*, WASH. POST (Apr. 21, 2022), https://www.washingtonpost.com/nation /2022/04/21/florida-legislature-passes-bill-repealing-disneys-special-tax-status.

analysis identified no constitutional issues raised by the legislation.  *See*

Committee on Community Affairs Bill Analysis, Senate Bill 4C, Fla. Leg. (2022).

73.    On April 20, the Senate passed Senate Bill 4C.  The House followed

suit, without legislative findings or a statement of purpose, the very next day, in a

session without debate that lasted under five minutes.[26]  Orange and Osceola

Counties did not have time to conduct their own analyses.[27]

74.    After the vote, Senator Joe Gruters said, "Disney is learning lessons

and paying the political price of jumping out there on an issue."[28]  The House bill's

sponsor, Representative Fine, proudly confirmed that the Legislature had "looked

at special districts" only because "Disney kicked the hornet's nest" by expressing a

disfavored political viewpoint.  "What changed," he said, was "bringing California

values to Florida."[29]  Christina Pushaw, then Governor DeSantis's press secretary,

---

[26]    Scott Powers, *Disney Government Dissolution Bill Approved Amid Chaos in House*, FLORIDA POLITICS (Apr. 21, 2022), https://floridapolitics. com/archives/ 518222-disney-government-dissolution-bill-approved-amid-chaos-in-house; Andrew Atterbury, *Florida Lawmakers Vote to Dismantle Disney's Special Privileges over 'Don't Say Gay'*, POLITICO (Apr. 21, 2022), https://www.politico. com/news/2022/04/21/florida-lawmakers-vote-to-dismantle-disneys-special-privileges-over-dont-say-gay-00026954.

[27]    Rozsa et al., *supra* note 25.

[28]    Jacob Ogles, *Joe Gruters, Despite Special Session Votes, Still Sees a Beautiful Tomorrow with Disney*, FLORIDA POLITICS (Apr. 22, 2022), https:// floridapolitics.com/archives/518669-joe-gruters-despite-special-session-votes-still-sees-a-beautiful-tomorrow-with-disney.

[29]    Sarah Whitten, *Florida Republicans Vote to Dissolve Disney's Special*

warned corporations that might consider expressing disfavored viewpoints, "Go woke, go broke."[30]

75.    On April 22, Governor DeSantis signed both Senate Bill 4C and Senate Bill 6C.  At the signing ceremony, he said, "For whatever reason, Disney got on that bandwagon.  They demagogued the bill.  They lied about it. …  Do you know what my view is?  I was very clear about saying 'You ain't influencing me. I'm standing strong right here.' …  We signed the bill.  And then, and incredibly, they say, 'We are going to work to repeal Parents' Rights in Florida.'  And I'm just thinking to myself, 'You're a corporation based in Burbank, California, and you're going to marshal your economic might to attack the parents of my state?'  We view that as a provocation and we are going to fight back against that."[31]

76.    Because the legislation was hastily enacted with no analysis or plan for disposition of RCID's assets or obligations—let alone daily operations— markets, constituencies, and RCID employees were concerned.

---

*District, Eliminating Privileges and Setting up a Legal Battle*, CNBC (Apr. 21, 2022), https://www.cnbc.com/2022/04/21/florida-set-to-dissolve-disneys-reedy-creek-special-district.html.

[30]    Christina Pushaw (@ChristinaPushaw), Twitter (Apr. 21, 2022, 5:31 PM), https://twitter.com/ChristinaPushaw/status/1517254737401458690; Rozsa et al., *supra* note 25.

[31]    Governor Ron DeSantis, Remarks at Signing Ceremony for Senate Bill 4C (Apr. 22, 2022) (transcript available at https://www.rev.com/blog/transcripts/gov-desantis-holds-news-conference-in-south-florida-4-22-22-transcript).

77.     The same day the bill was signed, credit-rating agency Fitch Ratings placed RCID's approximately $1 billion in outstanding bond debt on "rating watch negative" based on "the lack of clarity regarding the allocation" of RCID's assets and liabilities.[32]

78.     Speculation spread that Orange and Osceola Counties would absorb RCID's expenses and debts.  Orange County Tax Collector Scott Randolph predicted that Orange County would be saddled with RCID's obligations "the minute that Reedy Creek is dissolved," resulting in a property tax increase of 20-25%.[33]  Senator Linda Stewart addressed this possibility:  "Turning it over to Orange County and Osceola County would create the largest property tax increase in our history.  We don't want that to happen.  Our residents do not want this to happen … This has not been well-thought-out."[34]  At the same press conference, Senator Randolph Bracy called the plan "hare-brained" and "irresponsible," while Senator Victor Torres criticized Governor DeSantis for "bragging about raising

---

[32]     Dara Kim, *Credit Agency Places 'Rating Watch Negative' On Disney Debt*, MIAMI HERALD (Apr. 23, 2022), https://www.miamiherald.com/news/politics-government/state-politics/article260684352.html.

[33]     Eric Levenson & Steve Contorno, *Ron DeSantis Says Ending Disney's Self-Governing Status Will be a 'Process.'  Here's What Might Happen Next*, CNN (Apr. 27, 2022), https://www.cnn.com/2022/04/27/us/reedy-creek-disney-whats-next/index.html.

[34]     *Central Florida Leaders Say Dissolving Reedy Creek Irresponsible, Not Well-Thought-Out*, WESH (May 3, 2022), https://www.wesh.com/article/dissolution-reedy-creek-improvement-district/39875725#.

taxes on one of the largest private companies in the state and saying government has a right to punish companies for their private business decisions."[35]

79.     On May 16, residents and taxpayers in Osceola County filed a lawsuit against Governor DeSantis, alleging that the dissolution of Reedy Creek would lead to $1 to $2 billion in increased taxes for residents of Central Florida.  *See* Complaint, *Foronda v. DeSantis*, No. 2022-009114-CA-01 (Fla. Cir. Ct. May 16, 2022).

80.     Despite the chaos, the legislation's biggest boosters doubled down on their support.  The House sponsor, Representative Fine, criticized Disney for taking a position on House Bill 1557 and warned that the Company, and others like it, are "now learning in Florida, there's a cost to doing that."[36]

81.     In a June 6 interview, Governor DeSantis recalled that he had warned Disney not to participate in the public debate:  "I though[t] it was a mistake for Disney to get involved and I told them, 'You shouldn't get involved[;] it's not going to work out well for you.'"[37]  Governor DeSantis said that he believed it was

---

[35]     Senator Linda Stewart, *Press Conference on Dissolution of Reedy Creek Improvement District with Senator Stewart, Senator Bracy, and Senator Torres*, FACEBOOK (May 2, 2022), https://www.facebook.com/SenatorLindaStewart/videos/1379985162424883.

[36]     Zach Weissmueller & Danielle Thompson, *The Death of Walt Disney's Private Dream City?*, REASON (June 1, 2022), https://reason.com/video/2022/06/01/the-death-of-walt-disneys-private-dream-city/.

[37]     *See* Leonard, *supra* note 8.

his role "as a leader" to "make sure people understand that [Disney] do[es] not run the state of Florida," adding that, "We're not going to have our leadership subcontracted out to a corporation with close ties to the [Chinese Communist Party] and that's based in Burbank, California."[38]

82.    During a September 15, 2022 speech, Governor DeSantis said of Senate Bill 4C:  "We took action" after Disney made "the mistake" of opposing the legislation.[39]

83.    For months, no plan for implementing Senate Bill 4C was released. As late as mid-September 2022, Governor DeSantis's press secretary told reporters, "We don't have an announcement to make at the moment [about RCID] but stay tuned."[40]

84.    Absent any plan addressing the scheduled dissolution of RCID, Disney and other stakeholders were left to guess at how Governor DeSantis and the

---

[38]    Jeremiah Poff, *DeSantis Blasts Disney's 'Stupid Activism' In Defiant Defense of Florida Parental Rights Law*, WASH. EXAMINER (July 15, 2022), https://www.washingtonexaminer.com/restoring-america/community-family/desantis-blasts-disneys-stupid-activism-in-defiant-defense-of-florida-parental-rights-law.

[39]    American Firebrand (@AmFirebrand), TWITTER (Sept. 15, 2022, 12:55 PM), https://twitter.com/FirebrandPAC/status/1570456289649508352 (remarks by Governor DeSantis at National Conservatism Conference).

[40]    Forrest Saunders, *GOP Lawmakers Expect 'Solution' for Disney's Reedy Creek District Soon*, WPTV (Sept. 13, 2022), https://www.wptv.com/news/political/gop-lawmakers-expect-solution-for-disneys-reedy-creek-district-soon.

Legislature might address the fallout.  Florida Division of Bond Finance Director J. Ben Watkins III speculated about "a successor district."[41]  But as of September 2022, high-ranking legislator Representative Daniel Perez admitted that the "timeline" for reaching a "solution" for RCID was "still uncertain."[42]

85.     The months-long failure to propose a plan for the dissolution of RCID threatened Disney's operations, investments, and development plans.  It also underscored the irregular process by which Governor DeSantis and the Legislature had voted to abolish the District.

### E.     GOVERNOR DESANTIS AND THE LEGISLATURE RECONSTITUTE AND SEIZE CONTROL OF THE DISTRICT

86.     In early October 2022, reports emerged that Governor DeSantis finally had developed a plan to seize control of Disney's governing body.  The Director of the Florida Division of Bond Finance revealed that Governor DeSantis would install "state appointees" on RCID's board.[43]  To accomplish this, Governor DeSantis would have the Legislature "create a successor agency" that would "function essentially unchanged" from the original RCID—except that the new

---

[41]     Danielle Moran, *Florida's Bond Chief Sees Disney District Being Re-Established*, BLOOMBERG (July 22, 2022), https://www.bloomberg.com/news/articles/2022-07-22/florida-s-bond-chief-sees-disney-district-being-re-established.

[42]     Saunders, *supra* note 40.

[43]     Gene Maddaus, *After 'Don't Say Gay,' a Weakened Disney Hopes to Limit the Damage*, VARIETY (Oct. 5, 2022), https://variety.com/2022/film/news/disney-desantis-reedy-creek-dont-say-gay-1235392328.

district would operate under the Governor's thumb, "cementing a political win for the governor."[44]

87.    Three months later, Governor DeSantis posted a notice to the Osceola County website indicating his "intent to seek legislation before the Florida Legislature" doing just that.[45]

88.    In a statement after the notice was published, the Governor's Communications Director confirmed that the new district's board would be "state-controlled" and heralded:  "The corporate kingdom has come to an end."[46]

89.    On January 31, 2023, a spokesperson for the Governor's Office announced that the Governor expected a special session of the Legislature the following week "on Reedy Creek and other items."[47]

---

[44]    *Id.*

[45]    *Florida Governor Ron DeSantis Reveals Plans for Reedy Creek Replacement*, DAPS MAGIC (Jan. 7, 2023), https://dapsmagic.com/2023/01/florida-governor-ron-desantis-reveals-plans-for-reedy-creek-replacement (last accessed May 8, 2023).

[46]    Richard Bilbao, *Breaking: 'State-Controlled Board' Envisioned to Replace Disney's Reedy Creek*, ORLANDO BUS. J. (Jan. 6, 2023), https://bizjournals.com/orlando/news/2023/01/06/breaking-disney-reedy-creek-desantis-florida.html.

[47]    Jeffrey Schweers, *Governor 'Anticipates' Special Session on Disney's Reedy Creek Next Week*, ORLANDO SENTINEL (Feb. 1, 2023), https://www.orlandosentinel.com/politics/os-ne-desantis-reedy-creek-special-session-20230201-pqtn2xz6wzf6bj5q6oz4s35u6y-story.html.

90.     Right on cue, just days later, the Florida Legislature convened a special session to introduce House Bill 9B.

91.     House Bill 9B was every bit the takeover that Governor DeSantis promised.  Section 2 of the bill reenacted RCID's charter but made key changes to consolidate power in the Governor.  Historically, the District had been governed by a board of supervisors that "exercise[d] the powers granted to the district."[48] Under RCID's charter, board members were chosen through an election in which all landowners in the District were allotted one vote per acre of land owned in the District.[49]  This structure—common in special districts for economic development throughout Florida—was no secret and was in place when Florida's Supreme Court long ago confirmed that RCID served a public purpose.  *See Reedy Creek Improvement Dist.*, 216 So. 2d at 205-206.

92.     House Bill 9B replaced that landowner-election process with a board handpicked by the Governor, subject to confirmation by the Florida Senate.[50] Once selected, board members could serve for up to 12 years.[51]  The bill excluded from board service any person who, in the last three years, had worked for any

---

[48]     Reedy Creek Enabling Act § 4(1).

[49]     *Id.* § 4(5).

[50]     CFTOD Charter § 4(1).

[51]     *Id.*

33

organization that owns a "theme park or entertainment complex" with at least one million annual visitors.[52] It also excluded any person with a relative who had done the same.[53]

93.    In one important respect, things remained unchanged:  The bill left RCID's financial and contractual obligations intact.  In particular, contracts that RCID entered before House Bill 9B's effective date would be unaffected, as the legislation made expressly clear.  Specifically, all preexisting contracts, debts, bonds, and other liabilities "shall continue to be valid and binding on the Central Florida Tourism Oversight District in accordance with their respective terms, conditions, and covenants."[54]  Underscoring the point, the bill added:  "The provisions of this act shall be liberally construed in favor of avoiding any events of default or breach under outstanding bonds or other instruments of indebtedness of the district's existing and legally valid contracts."[55]

94.    House Bill 9B prevented the District's dissolution, which had been set to occur on June 1, 2023 under Senate Bill 4C.  It reaffirmed the District's

---

[52]    *Id.* § 4(2) (citing Fla. Stat. § 509.013(9)).

[53]    *Id.*

[54]    *Id.* § 1; *see also* House Bill 9B § 1 ("The provisions of this act shall not affect existing contracts that the district entered into prior to the effective date of this act.").

[55]    House Bill 9B § 1.

continued existence under a new name, however:  the Central Florida Tourism

Oversight District.[56]

95.    House Bill 9B, like Senate Bill 4C, was a law designed to target

Disney and Disney alone.  It shifted the power to select the District's board from

the District's landowners, including its majority landowner, Disney, to the

Governor—to enable him to punish Disney for its protected speech about House

Bill 1557.  In comments to reporters on February 8, 2023, Governor DeSantis said

of House Bill 9B:  "There's a new sheriff in town and that's just the way it's going

to be."[57]

96.    The Legislature passed House Bill 9B within days of its special-

session introduction.[58]

97.    During the Florida Senate's February 10 floor session, Senator Doug

Broxson underscored what was plain from the start:  House Bill 9B was bare

retaliation for Disney's failure to be "apolitical." [59]  Senator Broxson was explicit

---

[56]    CFTOD Charter §1; House Bill 9B §7.

[57]    Julia Musto, *DeSantis vs. Disney: Florida Governor Declares 'There's a New Sheriff in Town'*, FOX BUSINESS (Feb. 8, 2023), https://www.foxbusiness.com/lifestyle/desantis-disney-florida-governor-new-sheriff-town.

[58]    Bill History of House Bill 9B (2023), *available at* https://www.flsenate.gov/Session/Bill/2023B/9B/?Tab=BillHistory (last accessed May 8, 2023).

[59]    Fla. Senate Floor Proceedings, Special Session 2023B (Feb. 10, 2023) (remarks by Senator Doug Broxson, starting at 1:05:00), https://www.flsenate.gov/Media/VideoPlayer?EventId=1_nty0d3lq-202302101200.

about the bill's retaliatory intent:  "We joined with the Governor in saying it was Disney's decision to go from an apolitical, safe 25,000 acres, and try to be involved in public policy. …  We're saying 'you have changed the terms of our agreement, therefore we will put some authority around what you do.'  And I gladly join the Governor in doing that."[60]

98.    On February 27, Governor DeSantis signed House Bill 9B into law. In a related news release, the Governor praised the legislation for ending the "corporate kingdom of Walt Disney World" and "placing the district into state receivership."[61]

99.    The very next day, Governor DeSantis published his book titled *The Courage to Be Free: Florida's Blueprint for America's Revival*.  To kick off the book's press tour, Governor DeSantis authored an opinion piece in The Wall Street Journal that explicitly connected House Bill 9B to Disney's speech about House Bill 1557.  Criticizing what he called "left-wing activists working at [Disney's] headquarters in Burbank," Governor DeSantis focused on Disney's opposition to

---

[60]    *Id.*

[61]    Press Release, Governor Ron DeSantis, *Governor Ron DeSantis Signs Legislation Ending the Corporate Kingdom of Walt Disney World* (Feb. 27, 2023), https://www.flgov.com/2023/02/27/governor-ron-desantis-signs-legislation-ending-the-corporate-kingdom-of-walt-disney-world; Attachment to Press Release, Governor Ron DeSantis, *Dissolving the Corporate Kingdom* (Feb. 2023), https://www.flgov.com/wp-content/uploads/2023/02/Dissolving-the-Corporate-Kingdom.pdf ("More on HB 9-B can be found here.").

Florida's House Bill 1557 and said:  "When corporations try to use their economic power to advance a woke agenda, they become political, and not merely economic, actors.  In such an environment, reflexively deferring to big business effectively surrenders the political battlefield to the militant left. …  Leaders must stand up and fight back when big corporations make the mistake, as Disney did, of using their economic might to advance a political agenda.  We are making Florida the state where the economy flourishes because we are the state where woke goes to die."[62]

100.   Indeed, Governor DeSantis has reaffirmed, again and again, that the State campaign to punish Disney for its speech about House Bill 1557 has been a coordinated and deliberate one from the start.  Disney's commentary on House Bill 1557 was, he claimed, a "declaration of war" and "a textbook example of when a corporation should stay out of politics."[63]

---

[62]   Ron DeSantis, *Why I Stood Up to Disney: Old-fashioned Corporate Republicanism Won't Do in a World Where the Left Has Hijacked Big Business*, WALL ST. J. (Mar. 1, 2023), https://www.wsj.com/articles/why-i-stood-up-to-disney-florida-woke-corporatism-seaworld-universal-esg-parents-choice-education-defa2506.

[63]   DeSantis, THE COURAGE TO BE FREE, *supra* note 13, ch. 12.

F.   **A**MID **I**NCREASING **R**ETALIATORY **S**TATE **A**CTION, **D**ISNEY **A**ND **RCID E**XECUTE **T**WO **L**ONG-**T**ERM **L**AND **U**SE **C**ONTRACTS **A**FTER **P**UBLICIZED **A**ND **O**PEN **H**EARINGS

101.   Despite the State's escalating retaliation, Disney sought de-escalation, including through several attempts to spark a productive dialogue with the DeSantis Administration.

102.   It was to no avail.  The threatening political action and rhetoric continued—and escalated further.

103.   So, amid great uncertainty, Disney and RCID sought to secure future development plans that had been mutually arranged.  They executed two agreements:  a Chapter 163 Development Agreement (the "Development Agreement") (*see* Exhibit A) and a Declaration of Restrictive Covenants (the "Restrictive Covenants") (*see* Exhibit B) (together, the "Contracts").

**1.   Development Contracts, Generally**

104.   Private developers face enormous risk.  They invest heavily in long-term projects that depend, for their viability, on stable government oversight and regulation.

105.   That is especially the case for Disney, and Disney's goals with the Contracts at issue in this case underscore the point:  The Company seeks to invest

up to $17 billion in capital and create roughly 13,000 new jobs in the region over the next decade.[64]

106.   Development and investment of this magnitude cannot effectively take place when it can be nullified or undermined at the whim of new political leadership.  Thus, because a development project often extends throughout several local or state administrations with potentially differing regulatory objectives, developers commonly rely on contract law to secure their investments over time.

107.   Florida understands this well.  Decades ago, the Legislature specifically authorized local governments to enter into contracts with private developers through the Florida Local Government Development Agreement Act ("Development Agreement Act").  Fla. Stat. §§ 163.3220-163.3243.

108.   In enacting the Development Agreement Act, the Legislature "f[ound] and declare[d]" that "[t]he lack of certainty in the approval of development can result in a waste of economic and land resources, discourage sound capital improvement planning and financing, escalate the cost of ... development, and discourage commitment to comprehensive planning."  Fla. Stat. § 163.3220(2).  The Legislature explained that its intent in enacting the Development Agreement

---

[64]   *Disney CEO Bob Iger Announces 17 Billion Investment*, Blog Mickey (Apr. 3, 2023), https://blogmickey.com/2023/04/disney-ceo-bob-iger-announces-17-billion-investment-13000-additional-jobs-at-walt-disney-world-over-next-decade.

Act was also to "encourage a stronger commitment to comprehensive and capital facilities planning, ensure the provision of adequate public facilities for development, encourage the efficient use of resources, and reduce the economic cost of development." *Id.* § 163.3220(3).  In the Legislature's own words, "This intent is effected by authorizing local governments to enter into development agreements with developers[.]" *Id.* § 163.3220(4).

109.   A restrictive covenant is another type of contract that facilitates efficient, productive, and profitable long-term land use.  Restrictive covenants are agreements between two parties by which one party agrees to refrain from using property in a particular manner, ultimately to the benefit of both parties.  Florida enforces restrictive covenants in order to provide "the fullest liberty of contract and the widest latitude possible in disposition of one's property." *Hagan v. Sabal Palms, Inc*., 186 So. 2d 302, 308 (Fla. Dist. Ct. App. 1966).

110.   As any prudent developer would do—and as many others have done, with no controversy—Disney used these tools to secure future development plans which the DeSantis Administration had already found compliant with Florida law in the Comprehensive Plan.  The Contracts followed public notices in the Orlando Sentinel—Orlando's primary newspaper with readership in the hundreds of thousands—and discussion at public hearings.

## 2.    The District's Publicized And Open Hearings

111.   On January 18, 2023, RCID issued its first public notice in the

Orlando Sentinel:  "NOTICE IS HEREBY GIVEN that the Reedy Creek

Improvement District will hold the first of two public hearings," on January 25,

2023, "on the intent to consider a development agreement, pursuant to Chapter

163, Florida Statutes," and the publication continued with specifics about the

contract terms.

112.   In accordance with the Orlando Sentinel notice, RCID considered the

Development Agreement at the January 25 public hearing.  As reflected in the

minutes of the January 25 meeting, attendees included representatives from WESH

2 News, the Orlando Sentinel, Channel 9 WFTV, Channel 6 WKMG, Telemundo,

and the Orlando Business Journal.[65]  The RCID District Administrator advised that

"the Board is being asked to consider a proposed development agreement between

the District and Walt Disney Parks and Resorts U.S., Inc. (Disney)."[66]  He

explained several key provisions of the Development Agreement, including that it

would "[v]est[] development entitlements in Disney as the owner of the vast

majority of the lands within the District and the master developer of the Walt

---

[65]    Minutes of Meeting, at p. 1, Reedy Creek Improvement District Board of
Supervisors Meeting (Jan. 25, 2023), *available at* https://www.rcid.org/about/
board-of-supervisors-2/ (last accessed May 8, 2023).

[66]    *Id*. at p. 6.

Disney World resort."[67]  The RCID board president asked if there were any public comments.  There were none.[68]

113.   After that discussion and opportunity for public comment, RCID gave notice that the matter would be on the agenda again for the next public meeting, set for February 8, 2023.  Two days after the first public hearing, RCID published that second notice in the Orlando Sentinel:  "NOTICE IS HEREBY GIVEN that the Reedy Creek Improvement District will hold the second and final of two public hearings," on February 8, 2023, "on the intent to consider a development agreement pursuant to Chapter 163, Florida Statutes," and again continuing with accompanying specifics about the contract terms.

114.   In accordance with that Orlando Sentinel notice, RCID considered the matter for a second time at the February 8 public hearing.  As reflected in the minutes, attendees again included representatives from several news outlets including WESH 2 News, Fox 35, the Orlando Sentinel, Channel 9 WFTV, Bloomberg, and the Orlando Business Journal.[69]

---

[67]     *Id.* at p. 7.

[68]     *Id.*

[69]     Minutes of Meeting, at p. 1, Reedy Creek Improvement District Board of Supervisors Meeting (Feb. 8, 2023), *available at* https://www.rcid.org/about/board -of-supervisors-2/ (last accessed May 8, 2023).

115.   The District Administrator advised that there had been no changes to the Development Agreement since its first reading at the previous meeting.[70]  He added that this February 8 meeting was the second of two public hearings required to approve the Development Agreement.[71]  The RCID board president asked if there were any public comments and there were none.[72]  Upon a motion to approve the Development Agreement, and a second to the motion, the RCID board unanimously approved it.[73]

116.   At the February 8 meeting, the District Administrator also requested board approval and authorization to sign a Declaration of Restrictive Covenants.[74] He explained that the Restrictive Covenants are "associated with the Chapter 163 Developer's Agreement."[75]  He then described several provisions of the Restrictive Covenants.[76]  The RCID board president asked if there were any public comments and, again, there were none.[77]  Upon a motion to approve the Restrictive

---

[70]   *Id*. at p. 2.

[71]   *Id.*

[72]   *Id.*

[73]   *Id.*

[74]   *Id.* at p. 4.

[75]   *Id.*

[76]   *Id.*

[77]   *Id.*

Covenants, and a second to the motion, the RCID board unanimously approved them.[78]

117.   Disney and RCID executed the Contracts that same day (February 8), and then recorded them in official county records.

### 3.   The Contract Terms

118.   The Contracts are interrelated, and each serves to the benefit of both Disney and the District for long-term development planning.

119.   Much has been mischaracterized about the intent and effect of the Contracts.  The Contracts do not undermine the CFTOD board's ability to exercise its limited governing powers.  Indeed, among other things, the CFTOD board maintains the ability to (i) impose ad valorem taxes, maintenance taxes, and utility taxes (including the power to enforce collection of taxes by tax liens and foreclosure); (ii) build, operate, and maintain roads; (iii) provide emergency services; (iv) exercise the power of eminent domain; (v) maintain and operate the extensive drainage and flood control system and other utilities; (vi) adopt, supplement and enforce codes regulating building safety, elevators, escalators and similar devices, the prevention of fire hazards, plumbing and electrical installations and the like; (vii) review and approve or disapprove building permit applications;

---

[78]      *Id.*

and (viii) issue general obligation bonds, revenue bonds, utility service tax bonds, and bond anticipation notes.

120.   Rather, the Contracts reflect, in significant part, confirmation of the Comprehensive Plan that had already been reviewed by RCID and the State in July 2022.

121.   The Development Agreement precludes Disney from using its land except as authorized in the Development Agreement, which permits Disney to use its lands within the District up to a defined maximum development program. Down to the square foot, the maximum development program specifies how much mixed-use commercial space for offices and retail/restaurants Disney can build through 2032.  The maximum development program also approves one additional major theme park and two additional minor theme parks for construction through 2032.  Finally, the maximum development program approves 14,000 additional keys for hotels and resorts.

122.   Thus, the maximum development program tracks the planning set forth in the Comprehensive Plan.  All development rights and entitlements, as established by the maximum development program, are vested in Disney.  The Development Agreement further provides that any proposed development utilizing the maximum development program must follow the development review and approval process defined in the District's land development regulations.

123.   The Development Agreement recognizes that the maximum development program will require new or expanded facilities in public infrastructure systems and requires that the District shall fund, design, and construct those public facilities.  Thus, with respect to any land owned by Disney that is needed for public facilities, Disney agrees to sell its land to the District (instead of the District having to go through condemnation proceedings) and agrees not to seek payment from the District in excess of the land's fair market value.

124.   Finally, as the Development Agreement recognizes, Disney and the District previously collaborated in the procurement of federal and state level environmental permits entitling RCID land to certain unique and beneficial development rights.  Specifically, Disney sought and received—primarily at Disney's expense—approvals governing the protection and relocation of threatened and endangered species and requisite mitigation for the same.  Disney similarly pursued and received approval of a comprehensive and forward-looking federal dredge and fill entitlement framework, creating a site-specific wetland credit mitigation bank via the acquisition, restoration, and perpetual management of what is now known as Disney's Wilderness Preserve and Mira Lago—again at Disney's expense.  Given all that, the Development Agreement confirms certain mitigation credits are vested in Disney and that Disney is solely entitled to use them.

125.   For long-term stability, the Development Agreement has a duration of 30 years from its effective date and may be extended.

126.   The Restrictive Covenants provide that the standards under which the District's properties exist as of the Restrictive Covenants' effective date shall be maintained.  Under the Restrictive Covenants, the exterior design, appearance, and exterior aesthetic qualities of any improvements to any portion of the District's properties are subject to Disney's prior review and comment, which Disney cannot unreasonably withhold, condition, or delay.

127.   In relation to the District's properties, the Restrictive Covenants provide that the District shall not use names or symbols associated with Disney without Disney's express prior written approval; use fanciful characters (such as Mickey Mouse) or other intellectual property in designs, symbols, or other representations created by Disney; sell or distribute merchandise, souvenirs, or other items referring to Disney Properties or other Disney properties or Disney logos or trademarks; or use, reproduce, sell, distribute, or display any work copyrighted by Disney.

### G.   GOVERNOR DESANTIS REPLACES ELECTED RCID BOARD MEMBERS WITH CFTOD POLITICAL APPOINTEES WHO EXECUTE THE RETRIBUTION CAMPAIGN AND DECLARE "VOID" DISNEY'S LAND USE CONTRACTS

128.   On February 27, 2023, the date Governor DeSantis signed House Bill 9B into law and three weeks after the Contracts were executed following public

notice and hearing, Governor DeSantis announced the names of the five

individuals he had selected to replace the elected members of the board.[79]

129.   When Governor DeSantis addressed what he was "looking for with

this board," he described, with a thinly veiled euphemism, staffing the board with

people who would censor Disney's speech and discipline the Company.[80]  As

Governor DeSantis put it, referring to Disney, "When you lose your way, you've

got to have people that are going to tell you the truth … So we hope they can get

back on."[81]

130.   Governor DeSantis also posited that the new board could stop Disney

from "trying to inject woke ideology" into children.[82]  As Governor DeSantis put

---

[79]   Press Release, Governor Ron DeSantis, *Governor Ron DeSantis Appoints Five to the Central Florida Tourism Oversight District* (Feb. 27, 2023), https://www.flgov.com/2023/02/27/governor-ron-desantis-appoints-five-to-the-central-florida-tourism-oversight-district.

[80]   WKMG News 6, *DeSantis Holds News Conference at Reedy Creek Fire Station*, YOUTUBE (Feb. 27, 2023), https://www.youtube.com/live/1FJR-dumaFY?t=2531 (last accessed May 8, 2023).

[81]   Ewan Palmer, *Ron DeSantis Makes Ominous Warning About Disney's Future Creative Control*, NEWSWEEK (Feb. 28, 2023), https://www.news week.com/ron-desantis-disney-board-florida-reedy-creek-1784261.

[82]   Jonathan Chait, *DeSantis Promises Florida Will Control Disney's Content: Right-Wing Board to Clamp Down on "Woke Ideology" in Cartoons*, NEW YORK MAG. (Mar. 1, 2023), https://nymag.com/intelligencer/2023/03/desantis-promises-florida-will-control-disney-content.html.

it, "I think all of these board members very much would like to see the type of entertainment that all families can appreciate."[83]

131.   The new members of the board sat for their first meeting on March 8, 2023.

132.   At that meeting, one board member suggested that two cities comprising Disney's property, Bay Lake and Lake Buena Vista, should be dissolved, despite the fact that the CFTOD board has no authority or mandate to dissolve the cities.  Another hinted at plans to make major changes but did not go into detail.  The board also approved hiring the same legal counsel that had advised Governor DeSantis's office on House Bill 9B.

133.   Following the meeting, Disney released the following statement, holding onto hope that, despite the board's origins and Governor DeSantis's directives, the board might be willing to forgo its mandate to punish Disney and focus instead on the economic welfare of the District:  "'The Reedy Creek Improvement District created and maintained the highest standards for the infrastructure for the Walt Disney World Resort.  We are hopeful the new Central Florida Tourism Oversight District will continue this excellent work and the new

---

[83]      *Id.*

board will share our commitment to helping the local economy continue to flourish and support the ongoing growth of the resort and Florida's tourism industry.'"[84]

134.   Unfortunately, CFTOD has embraced the Governor's express mission to punish Disney for expressing disfavored viewpoints.

135.   On March 29, 2023, CFTOD gathered for its second meeting.  At that meeting, CFTOD members claimed that they had just discovered the Contracts (which had been publicized in the press, read out at board meetings, and recorded in county records almost two months earlier).  The CFTOD's special counsel suggested that RCID should hire firms with a "deeper bench" going forward.  The next CFTOD meeting was scheduled for April 19.[85]

136.   On the evening of March 29, one board member denounced the "arrogance of @disney," warning that the Company has been "ignoring parents and allowing radicals to sexualize our children," and was "now ignoring Florida taxpayers by sneaking in a last minute sweetheart development agreement." Equating Disney's exercise of its rights under Florida law to enter long-term

---

[84]    Gabrielle Russon, *Report: New Disney Governing Board Looks at Hiring Special Counsel with Ties to Reedy Creek Law*, FLORIDA POLITICS (Mar. 8, 2023), https://floridapolitics.com/archives/593877-report-new-disney-governing-board-looks-at-hiring-special-counsel-with-ties-to-reedy-creek-law.

[85]    Agenda, Central Florida Tourism Oversight District Board of Supervisors Meeting (April 19, 2023), *available at* https://www.rcid.org/about/board-of-supervisors-2/ (last accessed May 8, 2023).

development agreements with Disney's exercise of its rights to speak on public issues, the same board member declared:  "Disney has once again overplayed their hand in Florida.  We won't stand for this and we won't back down."[86]

137.   A public narrative about these Contracts quickly formed around the idea that Governor DeSantis was "caught off guard" and "had the rug pulled from under him."[87]

138.   Governor DeSantis's allies, including a state representative and another CFTOD board member, in turn accused Disney of "trying to pass an 11th-hour deal in the middle of the night,"[88] and "sneaking in" the Contracts.[89]  Echoing their calls, Governor DeSantis himself subsequently claimed that the Contracts were "uncovered" and "last-minute."[90]

---

[86]   Bridget Ziegler (@BridgetAZiegler), TWITTER (Mar. 29, 2023, 9:36 PM), https://twitter.com/BridgetAZiegler/status/1641253049250336771 (last accessed May 8, 2023).

[87]   Alex Hammer & Emily Goodin, *'You Ain't Seen Nothing Yet': Humiliated DeSantis Vows to Hit Back at Disney after It Exploited Obscure 'Royal Clause' Loophole to Strip His New Reedy Creek Board of Its Power*, DAILY MAIL (Mar. 31, 2023), https://www.dailymail.co.uk/news/article-11922083/DeSantis-vows-not-Disney-fight-company-uses-royal-loophole.html.

[88]   Representative Fred Hawkins, Remarks at Governor's Press Conference (Apr. 17, 2023), https://thefloridachannel.org/videos/4-17-23-governors-press-conference (starting at 19:15).

[89]   Ziegler, *supra* note 86.

[90]   Letter from Governor Ron DeSantis to Chief Inspector General Melinda Miguel (Apr. 3, 2023); *see Florida Governor Ron DeSantis Orders Investigation of Disney Over Reedy Creek Agreement*, DAPS MAGIC (Apr. 3, 2023),

139.   None of this was true.  As explained, these Contracts followed public notice—in the Orlando Sentinel, no less—and public hearings.  But, despite the facts, the political story was set, and the retaliation only got worse.

140.   On April 3, Governor DeSantis lashed out at Disney by announcing the launch of a wide-ranging civil and criminal investigation.  Ostensibly triggered by the State's belated discovery of the Contracts, Governor DeSantis directed his Chief Inspector General Melinda Miguel to probe "[a]ny financial gain or benefit derived by Walt Disney World as a result of RCID's actions and RCID's justifications for such actions," "[a]ll RCID board, employee, or agent communications related to RCID's actions, including those with Walt Disney World employees and agents," and several other topics.  Governor DeSantis instructed Chief Inspector General Miguel to refer "[a]ny legal or ethical violations … to the appropriate authorities."[91]

141.   Three days later, on April 6, Governor DeSantis stated at a public event that Disney had "tried to pull a fast one."  He added, "They are not superior to the people of Florida … So come hell or high water we're going to make sure that policy of Florida carries the day.  And so they can keep trying to do things.

---

https://dapsmagic.com/2023/04/florida-governor-ron-desantis-orders-investigation-of-disney-over-reedy-creek-agreement/ (published copy of letter) (last accessed May 8, 2023).

[91]   *Id.*

But ultimately we're going to win on every single issue involving Disney I can tell you that. …  That story's not over yet.  Buckle up.  There's going to be more coming down the pike."[92]

142.   In the question-and-answer session that followed, Governor DeSantis said that Disney is "acting like somehow that they pulled one over on the state" and that, "now that Disney has reopened this issue, we're not just going to void the development agreement they tried to do, we're going to look at things like taxes on the hotels, we're going to look at things like tolls on the roads … We're going to look at things like developing some of the property that the district owns."[93]

143.   On April 7, addressing the Contracts, Governor DeSantis stated at a press conference, "Now that this has been reopened, all options are on the table. We need to make sure that people understand, whether you're an individual or you're a corporation, you don't get to play by your own rules ... I think Disney has always viewed itself as being exempt from that constitutional process.  Well, those days are over here in the state of Florida." Emphasizing his control over the

---

[92]   Gary Fineout, *'Buckle Up': DeSantis Escalates Disney Dispute, Eyes Hotel Taxes and Road Tolls*, POLITICO (Apr. 6, 2023), https://www.politico.com/news/2023/04/06/desantis-disney-hotel-taxes-toll-rodes-00090959.

[93]   Steven Lemongello & Skyler Swisher, *DeSantis: I'll Kill Reedy Creek Deal, Consider Hotel Taxes, Tolls for Disney World*, ORLANDO SENTINEL (Apr. 7, 2023), https://www.orlandosentinel.com/politics/os-ne-desantis-disney-void-reedy-creek-deal-20230407-5edgygdxb5hytdzyxztwxovzwa-story.html.

Legislature, he continued, "There will be additional legislative action taken in Tallahassee that will nullify what they tried to do at the 11th hour and then potentially, you know, arm the board with the ability to make sure that this is run appropriately."[94]

144.   On April 13, Governor DeSantis stated at a public event, "They're fighting us on this.  The media's acting like Disney getting out from under.  No, it's not going to happen. We'll have news on that next week.  So stay tuned.  There will be round two in terms of those fireworks." He added, "I don't care if Disney doesn't like it … they can take a hike."[95]

145.   Governor DeSantis conveyed his total control over the CFTOD board. Speaking on an Orlando radio program on April 17, Governor DeSantis warned

---

[94]   Ron DeSantis (@GovRonDeSantis), TWITTER (Apr. 7, 2023, 11:49 AM), https://twitter.com/GovRonDeSantis/status/1644366912200265729 (remarks at press conference in Marion County, starting at 36:48) (last accessed May 8, 2023).

[95]   *Governor DeSantis Delivers Keynote Speech at GOP Meeting of Butler County, Ohio*, YOUTUBE (Apr. 13, 2023), https://www.youtube.com/watch ?v=ygZTdVKMvvM (remarks by Governor DeSantis, at 10:04 & 28:50); A.G. Gancarski, *Ron DeSantis Promises 'Round 2' in Fight with Disney*, FLORIDA POLITICS (Apr. 13, 2023), https://floridapolitics.com/archives/603259-ron-desantis-promises-round-2-in-fight-with-disney.

that the CFTOD board would be meeting a few days later to "make sure Disney is held accountable."[96]

146.   On April 17, Governor DeSantis convened a press conference to discuss next steps in the campaign against Disney.  The steps included legislation and the Legislative Declaration by CFTOD.

147.   He described the legislation as a bill that would "make sure that people understand that you don't get to put your own company over the will of the people of Florida." Describing what his administration would do with land taken from Disney's control, he mused, "People are like: 'What should we do with this land?'  People have said, maybe create a state park, maybe try to do more amusement parks, someone even said, like, maybe you need another state prison. Who knows? I just think that the possibilities are endless[.]"[97]  Governor DeSantis

---

[96]   Steve Contorno, *DeSantis Threatens Retaliation over Disney's Attempt to Thwart State Takeover*, CNN (Apr. 17, 2023), https://www.cnn.com/2023/04/17/politics/desantis-disney-takeover-florida/index.html.

[97]   Ron DeSantis (@GovRonDeSantis), Twitter (Apr. 17, 2023, 12:57 PM), https://twitter.com/GovRonDeSantis/status/1648007909333417985 ("Governor DeSantis Provides an Update on Florida's Response to Disney," remarks at 9:14) (last accessed May 8, 2023); Emma Colton, *DeSantis Fires Back at Disney as Company Tries to 'Usurp' State Oversight*, Fox News (Apr. 17, 2023), https://www.foxnews.com/politics/desantis-fires-back-disney-company-tries-usurp-state-oversight.

warned, "I look forward to the additional actions that the state control board will implement in the upcoming days."[98]

148.   Representative Carolina Amesty took the podium after Governor DeSantis concluded his remarks.  She reiterated the connection between the threatened board actions and Disney's protected speech:  "Let it be known, across this great nation that here, in the free state of Florida, it is 'We the People,' not 'woke' corporations."[99]  Representative Amesty continued, "We all love Disney; however, you cannot indoctrinate our children.  Instead, they have turned Disney into this corporate PR arm of a small group of extremists who want to indoctrinate our children with radical gender ideologies that have no basis in science, common sense, or basic human decency."[100]  In conclusion, Representative Amesty warned, "As our great Governor has said, Florida is a place where woke goes to die."[101]

---

[98]   Press Release, Governor Ron DeSantis, *Governor Ron DeSantis Announces Legislative Action to Rebuke Disney's Last-Ditch Attempt to Defy the Legislature and the State of Florida* (Apr. 17, 2023), https://www.flgov.com/2023/04/17/governor-ron-desantis-announces-legislative-action-to-rebuke-disneys-last-ditch-attempt-to-defy-the-legislature-and-the-state-of-florida.

[99]   Ron DeSantis (@GovRonDeSantis), TWITTER (Apr. 17, 2023, 12:57 PM), https://twitter.com/GovRonDeSantis/status/1648007909333417985 (remarks of Representative Carolina Amesty, at 21:42-21:51) (last accessed May 8, 2023).

[100]   *Id.* at 22:03-22:23.

[101]   *Id.* at 23:43-23:49.

149.    At the conclusion of the press conference, Governor DeSantis stated, "Stay tuned.  We've got more coming up."[102]

150.    The Governor's office issued a press release later that day, announcing, "Disney's corporate kingdom is over," and that "the agreements will be nullified by new legislation that I intend to execute. … I look forward to the additional actions that the state control board will implement in the upcoming days."[103]

151.    The CFTOD met for its third meeting on April 19.

152.    At the meeting, CFTOD's outside counsel attacked Disney's exercise of development contract rights and proclaimed that Disney's "efforts are illegal, and they will not stand"—even though he acknowledged that it is "well established under Florida law that a development agreement and a restrictive covenant" are "contract[s]" and are "governed by the law of contract."[104]  CFTOD's counsel also

---

[102]    *Id.* (remarks of Governor DeSantis) at 33:27-33:32.

[103]    Press Release, Governor Ron DeSantis, *Governor Ron DeSantis Announces Legislative Action to Rebuke Disney's Last-Ditch Attempt to Defy the Legislature and the State of Florida* (Apr. 17, 2023), https://www.flgov.com/2023/04/17/ governor-ron-desantis-announces-legislative-action-to-rebuke-disneys-last-ditch-attempt-to-defy-the-legislature-and-the-state-of-florida/.

[104]    Transcript of Record, Central Florida Tourism Oversight District Board of Supervisors Meeting (Apr. 19, 2023) at 63:10; 71:5-8.

admitted that Disney "did publish notice … in the newspaper" before entering into the Development Agreement.[105]

153.   When the CFTOD chair asked CFTOD's counsel "what action he recommends that the board take," the board's special counsel recommended that the board move to direct counsel to prepare "a resolution" for consideration at the board's April 26 meeting that would (1) declare the Contracts void *ab initio*, (2) make findings of fact in support thereof, and (3) direct action as need to assert CFTOD's positions on these issues.  A motion in support of this action passed with unanimous support.[106]

154.   The same day, the board published the agenda for the April 26 meeting.  The agenda included a single item under "New Business," labeled "Approval of legislative findings regarding and declare the Development Agreement and Declaration of Restrictive Covenants entered into by Reedy Creek Improvement District and Walt Disney Parks and Resorts U.S. void *ab initio* and direction to litigation counsel regarding same."[107]

155.   On April 24, CFTOD published proposed "legislative findings" for its predetermined voiding of the Contracts.  The purported findings assert a

---

[105]   *Id.* at 67:25.

[106]   *Id.* at 117:4-15.

[107]   *Id.* at 117:16-21.

scattershot collection of alleged contract infirmities and then declare the Contracts to be "void and unenforceable."[108]

156.   Going further, the legislative findings and declaration attack the Comprehensive Plan, even though the State, itself, found the plan in compliance with Florida law months ago.  The legislative findings and declaration also target certain land development regulation amendments that were recently adopted. CFTOD gave no prior notice of its intent to void the Comprehensive Plan or the regulation amendments.

157.   The purpose and effect of this exercise of power is the same as the legislation and executive activity that has been deployed for over a year—to punish Disney for expressing a certain view.

158.   On April 26, just as CFTOD previewed it would do the week before, the CFTOD board unanimously approved the legislative findings and declaration, declaring that the Contracts were "void and unenforceable."

### H.   GOVERNOR DESANTIS AND THE LEGISLATURE VOID THE CONTRACTS BY STATUTE AND EXPAND THE RETRIBUTION CAMPAIGN

159.   During the same April 17 press conference in which he previewed the CFTOD's Legislative Declaration, *see supra* ¶¶ 146-149, Governor DeSantis

---

[108]   Meeting Package, Central Florida Tourism Oversight District Board of Supervisors (April 26, 2023), *available at* https://www.rcid.org/about/board-of-supervisors-2/ (4-26-23-BOS-Package.pdf) (last accessed May 8, 2023).

declared that the State would act directly as well:  he had worked with "both

leaders of the House and Senate" on a "bill that will be put out in the Florida

legislature that will make sure" that the Contracts "are revoked."[109]

160.   Senator Blaise Ingoglia also spoke.  He threatened, "I know this

Governor, and I know this Governor well, so I have a couple words for Disney:

'You are not going to win this fight.  This Governor will.'"[110]

161.   The next day, Senator Ingoglia delivered Governor DeSantis's

promised legislation—an amendment to Senate Bill 1604 that voided the

Contracts.[111]

162.   As emphasized by the statements of the Governor and his allies, the

amendment was drafted to target the Contracts specifically—and only the

Contracts.  It states:

> An independent special district is precluded from complying with the
> terms of any development agreement, or any other agreement for
> which the development agreement serves in whole or part as
> consideration, which is executed within 3 months preceding the
> effective date of a law modifying the manner of selecting members of

---

[109]   Ron DeSantis (@GovRonDeSantis), Twitter (Apr. 17, 2023, 12:57 PM),
https://twitter.com/GovRonDeSantis/status/1648007909333417985 ("Governor
DeSantis Provides an Update on Florida's Response to Disney," remarks at 6:26)
(last accessed May 8, 2023).

[110]   *Id.* (remarks of Senator Blaise Ingoglia) at 25:00-25:10.

[111]   Bill History of Senate Bill 1604 (2023), *available at* https://www.flsenate.
gov/Session/Bill/2023/1604 (last accessed May 8, 2023).

the governing body of the independent special district from election to appointment or from appointment to election.[112]

163.    Thus, under the legislation, the Contracts are immediately void and unenforceable, though CFTOD is ostensibly empowered to readopt them "within 4 months of taking office."[113]   Underscoring the State's coordinated efforts, in its Legislative Declaration executed the following week, CFTOD stated:  "[T]he Board has no desire to readopt or ratify [the Contracts]."[114]

164.    Senator Ingoglia called the amendment to Senate Bill 1604 a "reversion" of the Contracts, which he said RCID and Disney "put in place at the last second."[115]

165.    Representative Stan McClain introduced an identical amendment the same day, though the House bill was later tabled in favor of Senate Bill 1604.[116]  In discussions about his amendment to House Bill 439, Representative McClain

---

[112]    Senate Bill 1604, Fla. Laws ch. 2023-31 (adding subsection (7) to Fla. Stat. § 189.031).

[113]    *Id.*

[114]    Meeting Package, Central Florida Tourism Oversight District Board of Supervisors (Apr. 26, 2023), *available at* https://www.rcid.org/about/board-of-supervisors-2/ (4-26-23-BOS-Package.pdf) (last accessed May 8, 2023).

[115]    Jim Turner, *Bills to End Reedy Creek Agreement Approved, Move to Florida House and Senate*, ORLANDO WEEKLY (Apr. 19, 2023), https://www.orlando weekly.com/news/bills-to-end-reedy-creek-agreement-approved-move-to-florida-house-and-senate-34014881.

[116]    Bill History of House Bill 439 (2023), *available at* https://www.flsenate. gov/Session/Bill/2023/439/?Tab=BillHistory (last accessed May 8, 2023).

remarked:  "When problems arise, we fix them."[117]

166.   During the Florida House's May 3, 2023 floor session, multiple House members explicitly tied Senate Bill 1604 to the Contracts.  Representative Toby Overdorf stated, "[Disney] chose to break the law, and now we have to come back and re-write it one more time so that other special districts don't follow that bad example."[118]  Likewise, Representative William Robinson, Jr., speaking in favor of the bill, stated:  "Two of my most terrifying words are 'lame duck.'  And that's really what we're dealing with, right here.  A lame duck board that is saddling a new board with obligations. …  This development agreement has saddled the new board with obligations that the old board in a lame duck session was doing."[119]

167.   By May 4, both the Senate and the House had passed Senate Bill 1604.  One day later, May 5, Governor DeSantis signed the bill into law.

168.   Governor DeSantis and his allies have no apparent intent to moderate their retaliatory campaign any time soon.  Again, at the same April 17 press conference, *see supra* ¶¶ 146-149, Governor DeSantis announced ongoing efforts

---

[117]   John Kennedy, *Ron DeSantis Strikes Back at Disney: Republican-led Legislature Comes to Governor's Aid*, TALLAHASSEE DEMOCRAT (Apr. 19, 2023), https://www.tallahassee.com/story/news/politics/state/2023/04/19/desantis-disney-florida-lawmakers-join-fight-control/70130112007.

[118]   Fla. House Floor Session, May 3, 2023, at 2:11:40-2:11:52 (12:15 PM), *available at* https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8955 (Debate on CS/CS/SB 1604) (last accessed May 8, 2023).

[119]   *Id*. at 2:12:20-2:13:22 (remarks by Representative W. Robinson).

to give the State new authority to override safety inspections at Walt Disney

World, as well as to regulate Disney's monorail transportation systems.

Previewing the monorail legislation, Governor DeSantis falsely accused Disney of

"exempt[ing] the monorail from any safety standards or inspections."[120]

169.   Like clockwork, one week later, Senator Nick DiCeglie introduced the

monorail legislation as an amendment to a Senate transportation bill.  *See* Senate

Bill 1250 (2023), later substituted as House Bill 1305 (2023).  In what has now

become a familiar practice, the proposed amendment was precision-engineered to

target Disney alone, just as Governor DeSantis intended and previewed—imposing

state oversight over only those private monorail systems located "within an

independent special district created by local act which have boundaries within two

contiguous counties." *Id.*

170.   Disney is the only company affected by House Bill 1305.

---

[120]    Ron DeSantis (@GovRonDeSantis), TWITTER (Apr. 17, 2023, 12:57 PM),
https://twitter.com/GovRonDeSantis/status/1648007909333417985 ("Governor
DeSantis Provides an Update on Florida's Response to Disney," remarks at 8:12)
(last accessed May 8, 2023).

171.   Underscoring the point, Senator Geraldine Thompson warned that House Bill 1305 "reeks of retribution."[121]

172.   On May 2, the Senate passed House Bill 1305.  The House passed the bill as amended the next day.

173.   On May 5, 2023—at a press conference commemorating the end of the Florida legislative session, and the day he signed Senate Bill 1604 into law—Governor DeSantis was asked about his "handling of Reedy Creek."[122]  Without hesitation or prompt, Governor DeSantis admitted:  "[T]his all started, of course, with our parents' rights bill."[123]

174.   In a separate interview that same day, Governor DeSantis trumpeted the unequivocal intent and perceived success of his retribution campaign:  "Since our skirmish last year, Disney has not been involved in any of those issues.  They

---

[121]   Gabrielle Russon, *Senate Supports State Inspections of Disney World's Monorail, with 2 Republican Defections*, Florida Politics (May 2, 2023), https://floridapolitics.com/archives/608999-senate-supports-state-inspections-of-disney-worlds-monorail-with-2-republican-defections.

[122]   Ron DeSantis (@GovRonDeSantis), Twitter (May 5, 2023, 11:22 AM), https://twitter.com/GovRonDeSantis/status/1654506916473888768 ("Florida's 2023 Legislative Session Ends," remarks at 34:45-38:58) (last accessed May 8, 2023).

[123]   *Id.*

have not made a peep.  That, ultimately, is the most important, that Disney is not allowed to pervert the system to the detriment of Floridians."[124]

175.   Having exhausted all other options, Disney is left with no choice but to bring this Complaint asking the Court to stop the State of Florida from weaponizing the power of government to punish private business.

### FIRST CAUSE OF ACTION
### CONTRACTS CLAUSE VIOLATION
### (U.S. Const. art I, § 10, cl. 1, amend. XIV; 42 U.S.C. § 1983; Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202)

176.   Disney realleges and incorporates by reference paragraphs 1-175.

177.   Disney brings this first cause of action against all Defendants.

178.   CFTOD's and the State Legislature's abrogation of the Contracts violates Disney's rights under the U.S. Constitution, article I, section 10, clause 1, known as the "Contracts Clause."  The Contracts Clause provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts."

179.   The Contracts Clause prohibits local government entities from abrogating their own contracts with private entities.  *See*, *e.g.*, *Vicksburg Waterworks Co. v. City of Vicksburg*, 185 U.S. 65 (1902); *City of Walla Walla v. Walla Walla Water Co.*, 172 U.S. 1 (1898); *City of Los Angeles v. Los Angeles City*

---

[124]   NEWSMAX, *DeSantis talks Trump, Tucker, Disney and Biden in NEWSMAX exclusive*, YOUTUBE (May 5, 2023), https://www.youtube.com/watch?v=2UXm OkfeSAc (Governor DeSantis interview with John Bachman, at 0:05-3:52) (last accessed May 8, 2023).

*Water Co.*, 177 U.S. 558 (1900); *New Orleans Water-Works Co. v. Rivers*, 115 U.S. 674 (1885); *Murray v. City of Charleston*, 96 U.S. 432 (1877); *E & E Hauling, Inc. v. Forest Preserve Dist.*, 613 F.2d 675 (7th Cir. 1980); *Welch v. Brown*, 935 F. Supp. 2d 875 (E.D. Mich. 2013).   The Contracts Clause likewise bars a state from enacting laws that impair or abrogate local government contracts. *See U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 24 n.22 (1977); *Rorick v. Board of Comm'rs of Everglades Drainage Dist.*, 57 F.2d 1048, 1055 (N.D. Fla. 1932).   A law that impairs a government entity's own contracts with a private actor is especially suspect and hence subject to heightened judicial scrutiny.   *U.S. Trust Co.*, 431 U.S. at 25-26.

180.   The rights protected by the Contracts Clause are familiar to Florida law.   Indeed, the Florida Supreme Court has pronounced the "right to contract" to be "one of the *most sacrosanct rights* guaranteed by our fundamental law." *Chiles v. United Faculty of Fla.*, 615 So. 2d 671, 673 (Fla. 1993) (emphasis added).

181.   The Legislative Declaration and Senate Bill 1604 violate that most sacrosanct right and thus deprive Disney of its rights under the Contracts Clause. By declaring the Contracts void, the Legislative Declaration and Senate Bill 1604 purport to rescind Disney's rights and protections under contracts and to relieve CFTOD of any obligation to comply with its obligations under the Contracts or to pay damages for any breaches.

182.   The substantial—indeed, total—impairment of Disney's contract rights was not "necessary" to serve an "important" government interest, as required to survive Contracts Clause scrutiny.  *U.S. Trust Co.*, 431 U.S. at 25-26.  As alleged in this Complaint, the Contracts were abrogated as part of an explicit campaign of official government retaliation against Disney for expressing a viewpoint the Governor and Legislature disagreed with.  That objective is the opposite of important—it is categorically impermissible.

183.   Any other asserted reasons for abrogating the Contracts are pretextual.  RCID was fully empowered to enter into the Contracts.  Special districts commonly enter into contracts with developers, including special districts with governing structures defined by land ownership.  And the law establishing CFTOD expressly provides that all preexisting RCID contracts remain fully enforceable.  CFTOD Charter § 1.

184.   Just as in other long-term development contracts in other special districts, the Contracts here involve land-use rights and obligations, not sovereign or police powers that special districts are legally barred from delegating.  The Contracts establish Disney's rights concerning use of its own property and, as expressly authorized by RCID's charter, restrict CFTOD from using its own property for non-public purposes that interfere with Disney's development of its property.  Reedy Creek Enabling Act § 9 (authorizing RCID to subject its land to

"encumbrance").  In exchange, the Contracts restrict Disney's use of its own property to specified development purposes and obligate Disney to convey its property at fair market value when needed for public purposes.

185.   Neither CFTOD nor the Legislature has identified any legitimate reason or need to treat the Contracts differently from long-term development agreements entered into by developers in other special districts.

186.   Even if the State could articulate an "important" interest uniquely implicated by the Contracts that is not implicated by other special district development contracts, it cannot show that complete abrogation of the Contracts is "necessary" to serve any such interest.  Under the Contracts Clause, the government "is not free to impose a drastic impairment when an evident and more moderate course would serve its purpose equally well."  *U.S. Trust Co.*, 431 U.S. at 30-31.  An impairment of a contract thus is prohibited if "a less drastic modification would have permitted" the government to advance its purpose while allowing the contract to remain in place.  *Id.*  The State has not identified any important government interest justifying its abrogation at all, much less an important interest that cannot be satisfied by modifying some provision or provisions of the Contracts.

187.   CFTOD's and the State Legislature's decision to abrogate the Contracts completely, rather than pursue modification of whatever provisions

CFTOD or the State Legislature claims to be unlawful, underscores their motivation to punish Disney for its political speech rather than to operate as a good-faith counterparty in the continued development of the District.

188.   Disney is entitled to a declaration that abrogation of the Contracts violates Disney's rights under the Contracts Clause and that the Contracts remain in effect and enforceable.  Disney is further entitled to an order enjoining Defendants from enforcing the Legislative Declaration and Senate Bill 1604.

**SECOND CAUSE OF ACTION**
**TAKINGS CLAUSE VIOLATION**
**(U.S. Const. amend. V, amend. XIV; 42 U.S.C. § 1983;**
**Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202)**

189.   Disney realleges and incorporates by reference paragraphs 1-175.

190.   Disney brings this second cause of action against all Defendants.

191.   The Legislative Declaration and Senate Bill 1604 take Disney's property without providing just compensation, in violation of the Takings Clause of the Fifth Amendment to U.S. Constitution.  The Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend V.

192.   "Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid." *U.S. Trust Co.*, 431 U.S. at 19 n.16; *see also Lynch v. United States*, 292 U.S. 571, 579 (1934); *Contributors to Pennsylvania Hospital v. Philadelphia*, 245 U.S. 20 (1917).  Not all contract

rights necessarily qualify as "property" under the Takings Clause, and thus "the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking."  *Connolly v. PBGC*, 475 U.S. 211, 224 (1986).  But when a law overrides "substantive" contract rights in "specific" real property, the Clause's protections apply.  *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 590 (1935); *see Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922) (regulation overriding contractual right to mine land invalid under Takings Clause).

193.   The Contracts secure valuable substantive rights in specific property, *i.e.*, the parcels explicitly identified in the Contracts.  The Development Agreement, for example, grants Disney various long-term rights in the use and development of its land, consistent with the Comprehensive Plan found compliant with Florida law by the DeSantis Administration.  The Restrictive Covenants likewise protect Disney's rights to develop its land by limiting CFTOD's ability to use its adjacent lands in ways that damage or destroy Disney's development rights. *Cf. Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 713 (2010) (Scalia, J., concurring) ("when the government uses its own property in such a way that it destroys private property, it has taken that property").  The Legislative Declaration and Senate Bill 1604 expressly deprive Disney of those valuable rights in private property without making any payment to Disney in

exchange for the deprivation.  The Legislative Declaration and Senate Bill 1604 thus take Disney's property without just compensation.

194.   Disney is entitled to a declaration that the taking of Disney property rights without payment of just compensation violates the Takings Clause and that the property rights set forth in the Contracts remain in effect and enforceable. Disney is further entitled to an order enjoining Defendants from enforcing the Legislative Declaration and Senate Bill 1604.

**THIRD CAUSE OF ACTION**
**DUE PROCESS CLAUSE VIOLATION**
**(U.S. Const. amend. XIV; 42 U.S.C. § 1983;**
**Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202)**

195.   Disney realleges and incorporates by reference paragraphs 1-175.

196.   Disney brings this third cause of action against all Defendants.

197.   The Legislative Declaration and Senate Bill 1604 abrogate the Contracts without any rational basis and for only impermissible reasons, in violation of the Due Process Clause of the Fourteenth Amendments to the U.S. Constitution.  The Due Process Clause provides:  "[N]o person shall be … deprived of life, liberty, or property, without due process of law[.]"

198.   The Due Process Clause forbids any state or local entity from adopting any "arbitrary and irrational" legislative act affecting a person's state-created rights—including property interests.  *Kentner v. City of Sanibel*, 750 F.3d 1274, 1279-1280 (11th Cir. 2014); *see Lewis v. Brown*, 409 F.3d 1271, 1273 (11th

71

Cir. 2005).  In other words, "states must demonstrate that they are violating private interests only as necessary to promote state interests." *McKinney v. Pate*, 20 F.3d 1550, 1557 n.9 (11th Cir. 1994).

199.   The State cannot make that showing here.  As alleged in this Complaint, the Legislative Declaration purporting to abrogate the Contracts was not enacted for any legitimate state interest.  Nor was Senate Bill 1604.  They were instead enacted to further an official State campaign of retaliation against Disney for expressing a viewpoint that Governor DeSantis and his legislative allies disagree with.

200.   Further, the State does not and cannot demonstrate that complete abrogation of the Contracts is reasonably necessary to advance any state interest that could be legitimate.  The State cannot show that the Contracts are dissimilar in character to contracts between other developers and special districts to fix long-term development rights and obligations.  Nor can it show that the Contracts contradict any aspect of Comprehensive Plan found compliant by the State.  The State thus cannot identify a non-arbitrary, rational basis for singling out and voiding the Contracts.

201.   Disney is entitled to a declaration that the arbitrary and irrational voiding of the Contracts violates the Due Process Clause and that the Contracts

remain in effect and enforceable.  Disney is further entitled to an order enjoining

Defendants from enforcing the Legislative Declaration and Senate Bill 1604.

**FOURTH CAUSE OF ACTION**
**FIRST AMENDMENT VIOLATION**
**(U.S. Const. amend. I, amend. XIV; 42 U.S.C. § 1983;**
**Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202)**

202.   Disney realleges and incorporates by reference paragraphs 1-175.

203.   Disney brings this fourth cause of action against all Defendants.

204.   Disney's public statements on House Bill 1557 are fully protected by

the First Amendment, which applies with particular force to political speech.  *See*

*Citizens United v. Federal Election Commission*, 558 U.S. 310, 342 (2010).

Speech such as Disney's, on public issues and petitions to the government,

"occupies the core of the protection afforded by the First Amendment."  *McIntyre*

*v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995); *see also Warren v. DeSantis*,

__ F. Supp. 3d __, 2022 WL 6250952, at *4 (N.D. Fla. 2022) (First Amendment

protects speech "intended to influence public opinion and, in turn, any proposed

legislation").

205.   CFTOD's retaliatory interference with the Contracts, via the

Legislative Declaration and its predicates, has chilled and continues to chill

Disney's protected speech.  *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir.

2005) (discussing action that "would likely deter a person of ordinary firmness

from the exercise of First Amendment rights.")  So too has the State's retaliatory

73

interference through Senate Bill 1604.  This unconstitutional chilling effect is particularly offensive here due to the clear retaliatory and punitive intent that has motivated CFTOD's and the State Legislature's actions, at the Governor's directive.  *See Bailey v. Wheeler*, 843 F.3d 473, 486 (11th Cir. 2016) ("Our First Amendment demands that a law-enforcement officer may not use his powerful post to chill or punish speech he does not like.").

206.   Disney has a significant interest in its own contracts, which have been directly targeted by the Legislative Declaration and Senate Bill 1604.  Disney faces concrete, imminent, and ongoing injury as a result of the contractual impairment.

207.   CFTOD's and the Legislature's actions were motivated by retaliatory intent.  On April 17, Governor DeSantis warned that the CFTOD board would be meeting a few days later to "make sure Disney is held accountable."  Later that day, Governor DeSantis announced, "I look forward to the additional actions that the state control board will implement in the upcoming days."  He also said that he had worked with "both leaders of the House and Senate" on a "bill that will be put out in the Florida legislature that will make sure that" the Contracts "are revoked."  Governor DeSantis has let no doubt be harbored as to the impetus for his punishment.  He wrote in an article to promote his book, "When corporations try to use their economic power to advance a woke agenda, they become political, and not merely economic, actors. …  Leaders must stand up and fight back when big

corporations make the mistake, as Disney did, of using their economic might to advance a political agenda."

208.   There is no rational basis to invalidate the Contracts, and the purported justifications for doing so are pretextual.

209.   Because the Legislative Declaration and Senate Bill 1604 retaliate against Disney for its protected speech, Disney is entitled to a declaratory judgment that the Legislative Declaration and Senate Bill 1604 are unconstitutional and an order enjoining Defendants from enforcing them.

## FIFTH CAUSE OF ACTION
## FIRST AMENDMENT VIOLATION
### (U.S. Const. amend. I, amend. XIV; 42 U.S.C. § 1983;
### Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202)

210.   Disney realleges and incorporates by reference paragraphs 1-175.

211.   Disney brings this fifth cause of action against all Defendants.

212.   As discussed, Disney's public statements on House Bill 1557 are fully protected by the First Amendment, which applies with particular force to political speech.  *See McIntyre*, 514 U.S. at 346.

213.   The retaliatory reconstitution of Disney's governing body's structure through the enactments of Senate Bill 4C and House Bill 9B have chilled and continue to chill Disney's protected speech.  *See Bennett*, 423 F.3d at 1254.  This unconstitutional chilling effect is particularly offensive due to the clear retaliatory

and punitive intent that motivated the Governor's and the Legislature's actions.
*See Bailey*, 843 F.3d at 486.

214.   Disney has a significant interest in its governing body's composition
and structure, which has been directly targeted by the enactment of legislation
providing for its complete revision.  Disney faces concrete, imminent, and ongoing
injury as a result of CFTOD's new powers and composition.

215.   Senate Bill 4C and House Bill 9B were motivated by retaliatory
intent.  Governor DeSantis would not have promoted or signed, and the Legislature
would not have enacted either bill, but for their desire to punish Disney for its
speech on an important public issue.  *See Warren*, 2022 WL 6250952, at *2
(crediting "sources of information about the Governor's motivation" for
suspending a prosecutor, including a tweet from the Governor's press secretary and
comments during the Governor's announcement of the suspension).

216.   Governor DeSantis called on the Legislature to extend its special
session for the express purpose of enacting Senate Bill 4C the very day after
Disney made a statement about House Bill 1557.  He repeatedly and publicly
stated that he was "fight[ing] back" for Disney's criticism of House Bill 1557,
including at the bill-signing ceremony.  Key legislators publicly acknowledged that
Senate Bill 4C targeted Disney.

217.   The law's passage was highly irregular.  The bill was added to a special session convened for other purposes even though there was no emergency that would justify such rushed treatment:  RCID had existed for decades, and Senate Bill 4C did not propose dissolution until June 2023.  The bill passed only three days after identical bills were simultaneously introduced in the House and Senate.  There was no debate in the House.  Stakeholders did not have time to conduct their own analyses.  And no concrete plan to effectuate the dissolution of RCID, or address the ramifications of doing so, was proposed in the months following the legislation's hasty enactment.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.  Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.").

218.   The circumstances surrounding the passage of House Bill 9B reveal the same retaliatory targeting.  Again, a special session was convened and the Legislature passed the bill within days of its introduction.  During the Senate's floor session, Senator Doug Broxson confirmed that the bill was punishment for Disney failing to be "apolitical."  Senator Broxson said, "We joined with the Governor in saying it was Disney's decision to go from an apolitical, safe 25,000

acres, and try to be involved in public policy. ...  We're saying 'you have changed the terms of our agreement, therefore we will put some authority around what you do.'"  Governor DeSantis, in a recent article, gave the following context for House Bill 9B:  "When corporations try to use their economic power to advance a woke agenda, they become political, and not merely economic, actors … Leaders must stand up and fight back when big corporations make the mistake, as Disney did, of using their economic might to advance apolitical agenda."

219.   There are no rational bases for either Senate Bill 4C or House Bill 9B, and the purported justifications for both are pretextual.

220.   Because both pieces of legislation retaliate against Disney for its protected speech, Disney is entitled to a declaratory judgment that the laws are unconstitutional and an order enjoining Defendants from enforcing them.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court grant the following relief:

A.     Declare that the Legislative Declaration and Senate Bill 1604 are unlawful and unenforceable because they abrogate Disney's rights in violation of the Contracts Clause;

B.     Declare that the Legislative Declaration and Senate Bill 1604 are an unlawful taking of Disney's property rights without payment of just compensation in violation of the Takings Clause;

78

C.      Declare that the Legislative Declaration and Senate Bill 1604 are unlawful and unenforceable because they were an arbitrary and irrational voiding of the Development Agreement and Restrictive Covenants in violation of the Due Process Clause;

D.      Declare that the Legislative Declaration and Senate Bill 1604 are unlawful and unenforceable because they were enacted in retaliation for Disney's speech in violation of the First Amendment;

E.      Declare that the Contracts remain in effect and enforceable;

F.      Declare that Senate Bill 4C and House Bill 9B are unlawful and unenforceable because they were enacted in retaliation for Disney's political speech in violation of the First Amendment;

G.      Issue an order enjoining Defendants from enforcing the Legislative Declaration and Senate Bill 1604;

H.      Issue an order enjoining Defendants from enforcing Senate Bill 4C and House Bill 9B;

I.      Award Plaintiff its attorney's fees and costs; and

J.      Grant such other relief as this Court may deem just and proper.

Dated:  May 8, 2023                     Respectfully submitted.


ALAN SCHOENFELD                         DANIEL M. PETROCELLI
(*pro hac vice*)                        (*pro hac vice*)
New York Bar No. 4500898                California Bar No. 97802
WILMER CUTLER PICKERING                 O'MELVENY & MYERS LLP
  HALE AND DORR LLP                     1999 Avenue of the Stars
7 World Trade Center                    Los Angeles, CA 90067
250 Greenwich Street                    Tel. (310) 246-6850
New York, NY 10007                      dpetrocelli@omm.com
Tel. (212) 937-7294
alan.schoenfeld@wilmerhale.com          JONATHAN D. HACKER
                                        (*pro hac vice*)
                                        District of Columbia Bar
                                        No. 456553
ADAM COLBY LOSEY                        O'MELVENY & MYERS LLP
LOSEY PLLC                              1625 Eye Street, NW
Florida Bar No. 69658                   Washington, DC 20006
1420 Edgewater Drive                    Tel. (202) 383-5285
Orlando, FL 32804                       jhacker@omm.com
Tel. (407) 906-1605
alosey@losey.law                        STEPHEN D. BRODY
                                        (*pro hac vice*)
                                        District of Columbia Bar
                                        No. 459263
                                        O'MELVENY & MYERS LLP
                                        1625 Eye Street, NW
                                        Washington, DC 20006
                                        Tel. (202) 383-5167
                                        sbrody@omm.com


*Attorneys for Plaintiff Walt Disney Parks and Resorts U.S., Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on May 8, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I further certify that I will send the foregoing document and the notice of electronic filing to the following: by U.S. Mail, return receipt requested, and email, to John Guard, Chief Deputy Attorney General, john.guard@myfloridalegal.com, James Percival, James.Percival@ myfloridalegal.com, Henry Whitaker, Henry.Whitaker@myfloridalegal.com, and Daniel Bell, Daniel.Bell@myfloridalegal.com, Office of the Attorney General of the State of Florida, PL-01, Tallahassee, FL 32399-1050, by U.S. Mail, return receipt requested, and email, to Charles J. Cooper, ccooper@cooperkirk.com, Cooper & Kirk, PLLC, 1523 New Hampshire Ave., NW, Washington D.C., 20036, and by U.S. Mail, return receipt requested, to Eryka Washington-Perry, Central Florida Tourism Oversight District, 1900 Hotel Plaza Blvd., Lake Buena Vista, Florida, 32830.

ADAM COLBY LOSEY
LOSEY PLLC
Florida Bar No. 69658
1420 Edgewater Drive
Orlando, FL 32804
Tel. (407) 906-1605
alosey@losey.law
Counsel for Plaintiff Walt Disney
Parks and Resorts U.S., Inc.