## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

WALT DISNEY PARKS AND RESORTS U.S., INC.,

    *Plaintiff*,

    v.                            No. 4:23-cv-163-MW-MJF

RON DESANTIS, in his official capacity
as Governor of Florida, et al.,

    *Defendants*.

_____/

### DEFENDANTS' MOTION TO DISQUALIFY
### CHIEF JUDGE MARK E. WALKER

Defendants move to disqualify Chief Judge Mark E. Walker (the Court) under 28 U.S.C. § 455(a) because the Court's impartiality in this matter might reasonably be questioned. This case involves claims that Defendants retaliated against Walt Disney Parks and Resorts U.S., Inc. based on Disney's viewpoints. Yet two previous times, in two unrelated cases, the Court *sua sponte* offered "Disney" as an example of state retaliation. Those remarks—each derived from extrajudicial sources—were on the record, in open court, and could reasonably imply that the Court has prejudged the retaliation question here. Because that question is now before this Court, and because that question involves highly publicized matters of great interest to Florida's citizens, the Court should disqualify itself to prevent even the appearance of impropriety.

## BACKGROUND

**I.    The Court's Prior Comments About Disney**

### A.    *Link v. Corcoran*

In *Link v. Corcoran*, No. 4:21-cv-271-MW-MAF (N.D. Fla.), the plaintiffs moved for a preliminary injunction on the ground that the defendants—state education officials—would punish the plaintiffs for the results of their "intellectual freedom and viewpoint diversity" surveys. *Link*, DE75 at 4. The plaintiffs argued that "[g]overnment reprisal is not a speculative risk" because "Governor DeSantis and Commissioner Corcoran have practically promised retaliation against Plaintiffs' speech." *Id.* at 21.

At the preliminary-injunction hearing on April 1, 2022—amidst ongoing public speculation about the potential dissolution of Disney's hand-picked local government, the Reedy Creek Improvement District (RCID), DE25 at 19–20—this Court discussed justiciability and whether the plaintiffs had shown a reasonable fear of First Amendment retaliation. *Link*, DE91 at 15–24. Specifically, the Court questioned how the surveys alone posed a threat to the plaintiffs' speech, because the statute at issue did not specify any "punitive measures that will be taken" by the Legislature or any other government entity based on the survey results. *Id*. at 15–18. The Court then used the State's contemplated dissolution of Disney's special district as an example of retaliatory conduct:

THE COURT: . . . I don't understand how—it seems to me how you can say that threat, the chill, is reasonable when you've got to assume so many things. I mean, it requires you to assume the survey will show that liberal views are widespread on campus. You've got to assume the legislature will react by reducing their school funding and that the funding will directly harm those plaintiffs . . . aren't there too many inferential steps for me to make at this juncture to find the chill is reasonable?

MS. VELEZ: Your Honor, there's a lot to parse here. And the first that I want to draw the Court's attention back to is that we think that the inquiry and the asking is a harm in and of itself. That's under the *Baird* decision. But, of course, we're primarily attacking—

THE COURT: But in that case, though—again, I just can't let it go. In that case, though, isn't the reason why that chill would be reasonable is you knew who I am and you know what my responses are, so you can target me directly?

I mean, I've already ruled, and the Eleventh Circuit will do what it does, but, you know, in the UF professor case, the chill—they knew who they were targeting, and they could target individuals, and so there was—and had announced their intent to do so, per the head of the board of trustees. So, I mean, there was facts before the Court that would—didn't require you to make a—stack inferences, but there were facts before the Court from which such a reasonable fear could be adduced from the record, other than the assumption—well, let me ask you this.

What's in the record, for example—*is there anything in the record that says we are now going to take away Disney's special status because they're woke?* Is there anything in the record that says—that you put in the record that says we are going to slash the funding? We did, in fact, take away millions of dollars from school boards because they had the audacity to require their students to wear masks during a pandemic.

What sort of—and I'm not suggesting that would be determinative in this case, but is that even in the record to say, Well, Judge, here's what we've got in the record that shows these fears are well founded? Because, you know, Judge, if somebody says, I'm going to hit you with a baseball bat, take them at their word; they're going to hit you with a

baseball bat. They announced it, and . . . they've, in fact, done it in the past because here are the three people that just got hit with the baseball bat.

So what do we have in the record that would support such a finding?

MS. VELEZ: Well, Your Honor, I mean, of course, we think that we should take defendants at their word and everyone at their word. But, again, the larger point—

THE COURT: . . . What's in the record . . . that shows these very people have taken putative measures [or punitive measures][1] against those they've described as woke in other contexts?

*Id*. at 21–24 (emphasis added).

The Court thus contrasted the claims in *Link* (where the alleged retaliation was too speculative) with the State's "tak[ing] away Disney's special status because they're woke" (an example where retaliation supposedly was *not* speculative). The hearing at which the Court drew that comparison came a few days after legislators began publicly calling for the dissolution of Reedy Creek,[2] and just a day after the

---

[1] Although the transcript records the Court as saying "putative measures," this appears to be a minor transcription error. The phrase "punitive measures" fits the context better, and the Court used the phrase "punitive measures" just minutes earlier during the same discussion. *Link*, DE91 at 16.

[2] Spencer Roach, (@SpencerRoachFL), Twitter (Mar. 30, 2022, 6:46 AM), https://twitter.com/SpencerRoachFL/status/1509119958369902595.

Governor publicly refuted the idea that dissolving RCID would be "retaliatory."[3]
Those state-official remarks about RCID were widely reported in the news cycles
surrounding the *Link* preliminary-injunction hearing, as were many similar state-
ments.[4] And indeed, just a few weeks later, the State enacted Senate Bill 4C, which
dissolved RCID and five other special districts, effective June 1, 2023, unless the
Legislature took later action. *See* Ch. 2022-266, § 2, Laws of Fla.[5]

---

[3] *3/31/22 Governor's Press Conference on First Responder Bonuses*, at
15:05–17:41, The Florida Channel (Mar. 31, 2022), https://thefloridachan-
nel.org/videos/3-31-22-governors-press-conference-on-first-responder-bonuses.

[4] Rob Wile, *Magic no more? DeSantis questions Disney's special operating
city in Florida*, NBC News (Apr. 2, 2022), https://www.nbcnews.com/business/con-
sumer/reedy-creek-disney-world-special-district-history-desantis-rcna22551; An-
drew Mark Miller, *DeSantis broaches repeal of Disney World's special self-govern-
ing status in Florida*, Fox News (Mar. 31, 2022), https://www.foxnews.com/poli-
tics/desantis-on-disney-i-dont-support-special-privileges-in-law-because-a-com-
pany-is-powerful; Renzo Downey, *Gov. DeSantis backs ending Disney's 'special
privileges' as lawmakers threaten crackdown*, Florida Politics (Apr. 1, 2022),
https://floridapolitics.com/archives/513011-gov-desantis-backs-ending-special-
privileges-as-lawmakers-explore-disney-crackdown; Skyler Swisher, *DeSantis calls
for end to Disney's 'special privileges' in Florida*, Orlando Sentinel (Apr. 1, 2022),
https://www.orlandosentinel.com/2022/04/01/desantis-calls-for-end-to-disneys-
special-privileges-in-florida; Ariel Zilber, *DeSantis may revoke Disney's 'self-gov-
erning' status over 'Don't Say Gay' feud*, New York Post (Apr. 1, 2022), https://ny-
post.com/2022/04/01/desantis-may-yank-disneys-self-governing-status-in-dont-
say-gay-feud.

[5] *See also* Bill Analysis and Fiscal Impact Statement, Comm. on Cmty. Af-
fairs, The Florida Senate (Apr. 19, 2022), https://www.flsenate.gov/Ses-
sion/Bill/2022C/4C/Analyses/2022s00004C.pre.ca.PDF (listing the six special dis-
tricts affected).

**B.**    *Falls v. DeSantis*

On the same day that SB 4C became law, the plaintiffs in *Falls v. DeSantis*, No. 4:22-cv-166-MW-MJF (N.D. Fla.), similarly moved for a preliminary injunction based, in part, on the argument that the state-level defendants would take enforcement action against the plaintiffs' schools if the plaintiffs expressed opinions that violated the Individual Freedom Act,[6] thus chilling their speech. *See Falls*, DE4 at 49 ("[M]ost teachers and employers will choose to err on the side of caution and either avoid these topics altogether or espouse ideas with which Florida's conservative politicians agree, rather than risk discipline, loss of funding, or a lawsuit.").

At the preliminary-injunction hearing on June 21, 2022, this Court discussed the potential chilling effect of the State's enforcement action. *See Falls*, DE58 at 73–77. The Court summarized the plaintiffs' theory that their "speech [wa]s chilled [because the defendants] can, under existing regs, cut funding, and if your school is going to lose funding, then it would certainly create a chilling effect on a professor who doesn't want to be the source or cause of his school losing revenue." *Id*. at 75. The Court then brought up the example of school districts losing funding for imposing "mask mandates" during the pandemic as a reason why the risk of reduced funding for violating the IFA would not be "fanciful or farfetched." *Id*. at 76.

Turning to the defendants' counsel, the Court continued:

---

[6] Ch. 2022-72, § 2–3, Laws of Fla. (IFA).

THE COURT: Does it make any difference that in—just in recent history when schools or entities or organizations have not complied with what is demanded by Tallahassee that funding has been cut, for example, the face mask? Does that make it any less speculative and less conjectural?

MR. COOPER: Your Honor, I don't think so because we certainly concede that there is the possibility of that form of enforcement against the institutions, and that is, as you say, a recent example of that authority being exercised by the—I guess here, the Board of Governors.

THE COURT: *And then Disney is going to lose its status because—arguably, because they made a statement that run afoul—ran afoul of state policy of the controlling party.*

At what point do you stack so many examples where *punitive actions* are taken if you don't do what you are told that suddenly it no longer becomes conjectural and you pass that threshold so you can establish standing? It's no longer fanciful or conjectural.

*Id*. at 78–79 (emphasis added).

In other words, the Court cited "Disney . . . los[ing] its status" as among a pattern of "punitive actions" suggesting that other, future retaliation might not be speculative. That was just two months after the passage of SB 4C. *Id.; see* Ch. 2022-266, § 2.

## II.    Disney's Present Lawsuit

The Legislature ultimately did not allow SB 4C to dissolve RCID. It instead passed a new special law reestablishing the district under a new name—the Central Florida Tourism Oversight District (CFTOD)—and a significantly revised charter. *See* Ch. 2023-5, Laws of Fla. (HB 9B). The Governor signed HB 9B on February 27, 2023 and appointed new members to CFTOD's Board of Supervisors.

7

Disney then sued the Governor, the Secretary of the Department of Economic Opportunity, CFTOD's Board, and CFTOD's Administrator in this Court. *See* DE25. Disney seeks, among other relief, to invalidate and declare unconstitutional SB 4C and HB 9B because they were purportedly "motivated by retaliatory intent." *See id.* ¶ 215. According to Disney, "both pieces of legislation retaliate against Disney for its protected speech, [and so] Disney is entitled to a declaratory judgment that the laws are unconstitutional and an order enjoining Defendants from enforcing them." *Id.* ¶ 220. Many of the allegations feature quotes from elected officials who described Disney as being a "woke" corporation or having a "woke" ideology or viewpoint; indeed, the word "woke" appears more than a dozen times in the amended complaint. *See, e.g., id.* ¶¶ 53, 59, 60, 65, 69, 74, 99, 130, 148, 207, 218.

Days before Disney filed suit, this Court in a written order expressed (in the *Link* case) its views about political rhetoric directed at "woke" ideology, calling "woke" the "boogeyman of the day." *Link*, DE287 at 3.

## LEGAL STANDARD FOR DISQUALIFICATION

Under 28 U.S.C. § 455(a), a federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." "[T]he standard is whether an objective, fully informed lay observer would entertain significant doubt about the judge's impartiality." *Christo v. Padgett*, 223 F.3d 1324, 1333 (11th Cir. 2000).

The touchstone for recusal under Section 455(a) is "not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994). "The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988)). Thus, "any doubts must be resolved in favor of recusal." *Id.*; *see also Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988) ("It has been stated on numerous occasions that when a judge harbors any doubts concerning whether his disqualification is required he should resolve the doubt in favor of disqualification.").

## ARGUMENT

The Court's unprompted suggestion, on two separate occasions, that the State punished Disney by eliminating its "special status" gives an appearance of partiality that would lead a reasonable observer to question whether the Court is predisposed to ruling that the State retaliated against Disney. In both *Link* and *Falls*, this Court cited, on the record, various examples of purportedly retaliatory acts committed by the State "in other contexts," and both times the Court referred to the loss of Disney's unique "status" as a prime example. *E.g.*, *Link*, DE91 at 21–24; *Falls*, DE58 at 78–79. Both times, the Court even associated the State's Disney-related actions with potential First Amendment protected activity—being "woke" (*Link*) and making "a

9

statement that . . . ran afoul of state policy of the controlling party" (*Falls*). The Court's comments thus could reasonably be understood to reflect that the Court has prejudged Disney's retaliation theory here, and therefore create "significant doubt[s] about the [Court's] impartiality" in this important matter. *Christo*, 223 F.3d at 1333.

The Court's comments seemingly reflect its opinion on whether the State punished Disney's speech by revoking Disney's "special status." That the Court made such statements gives the impression, at a minimum, that it has "an uncommon interest and degree of personal involvement in the subject matter" such that "a reasonable person would harbor a justified doubt as to [the Court's] impartiality." *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993); *see also Parker*, 855 F.2d at 1524. And indeed, given the "rarity of [these kinds of] public statements, and the ease with which they may be avoided," it is even "more likely that a reasonable person will interpret such statements as evidence of bias." *In re Boston's Children First*, 244 F.3d 164, 170 (1st Cir. 2001).

There is no mistaking the import of the Court's statements. In *Link*, the Court asked counsel point blank whether she had evidence that the Legislature had "taken putative [or punitive] measures against those they've described as woke in other contexts," like anything "say[ing] we are now going to take away Disney's special status because they're woke." *Link*, DE91 at 23–24. And in *Falls*, the Court, in pon-

10

dering whether the State had taken "so many . . . punitive actions" that it was rea-sonable to believe that the State would soon take another, stated that "Disney is go-ing to lose its status because—arguably, because they made a statement that run afoul—ran afoul of state policy of the controlling party." *Falls*, DE58 at 78. The Court even offered that Disney could be among the "many examples where punitive actions are taken if you don't do what you are told." *Id*. Whether Defendants took punitive action against Disney based on speech is a principal issue here.

True, the Court did qualify its statement in *Falls* with the term "arguably," but that does little to quell a reasonable perception that the Court may have prejudged Disney's retaliation theory. *See Franklin v. McCaughtry*, 398 F.3d 955, 961 (7th Cir. 2005). In *Franklin*, for example, a trial judge had referred to Franklin—a defendant alleged of committing additional crimes while released on bail—as "an example" for why a different defendant should not be released on bail. *Id*. On habeas review, the Seventh Circuit held that the trial judge appeared "actually biased" given that he had cited "Franklin as an example" of an "indigent prisoner[]" who had committed more crimes while on bail, even though Franklin had not yet been adjudged guilty of those additional crimes. *Id*. at 961–962. Nor was the Seventh Circuit swayed that the trial judge had attached the qualifying term "alleged" to Franklin's crimes:

> In context, despite the judge's use of the magic word "alleged" in the memorandum, the inference is irresistible that the judge was pointing

to Franklin as the latest such incorrigible criminal, even though Frank-
lin's trial had not yet taken place. This is powerful circumstantial evi-
dence that [the judge] had pre-judged Franklin's case.

*Id.* at 961.

The same inference of bias and prejudgment is "irresistible" here. As in
*Franklin*, this Court in *Falls* cited the State's treatment of Disney as an example of
retaliatory motive. And as in *Franklin*, it does not matter that the Court used the
magic word "arguably" to qualify its suggestion that "Disney is going to lose its
status because . . . they made a statement" that "ran afoul of state policy of the con-
trolling party." *Falls*, DE58 at 78; *Franklin*, 398 F.3d at 961.[7]

Simply put, when a matter garners substantial "public attention," "even am-
biguous comments may create the appearance of impropriety that § 455(a) is de-
signed to address." *In re Boston's Children First*, 244 F.3d at 170. After all, concerns
about the "appearance of partiality . . . stem[] from the real possibility that a judge's
statements may be misinterpreted *because of* the[ir] ambiguity." *Id.* (emphasis

---

[7] If the Court's courtroom commentary leaves any question as to the propriety
of disqualification, the Court's characterization of "woke" as the "boogeyman of the
day" answers it. The Court's "boogeyman" statement appeared not in a spontaneous
bench statement, but rather in the Court's written final order of dismissal in the *Link*
case, published days before this lawsuit was filed. *Link*, DE287 at 3. Throughout its
amended complaint, Disney highlights remarks by the Governor and others about
Disney as "woke" and cites those remarks as evidence to support its unlawful retal-
iation claim. The Court's reference to the woke "boogeyman" in *Link* enhances the
reasonable impression that the Court agrees with Disney's characterizations.

added). The Court's comments, at the very least, remain "sufficiently open to mis-interpretation" to "create [an] appearance of partiality." *Id*.

Finally, disqualification is especially appropriate here because the Court's comments "stem from extrajudicial sources" and were "focused against a party [in] the proceeding." *Hamm v. Members of Bd. of Regents*, 708 F.2d 647, 651 (11th Cir. 1983); *see also Liteky*, 510 U.S. at 551 (parties need not establish "pervasive bias" where a judge's comments about a party are rooted in extrajudicial sources). None of the parties in *Link* or *Falls* had mentioned the State's relationship with "Disney" at either hearing in which this Court *sua sponte* offered them as examples of state retaliation. We have found no mention by any of the parties of these subjects in any of their pleadings. Thus, the Court's understanding of what was happening to Disney (losing its "status")—as well as the Court's suggestion of Defendants' motives ("because they're woke"; "because they made a statement that . . . ran afoul of state pol-icy of the controlling party")—must have originated from an extrajudicial source. In fact, in *Link*, the Court stated—seconds after its suggestive comments about Dis-ney—that some of its commentary from the bench may stem from "what I know because I read the local newspaper." *Link*, DE91 at 26.

*       *       *

For these reasons, "an objective observer would reasonably doubt" that De-fendants "would be treated impartially" before this Court. *United States v. S. Fla.*

13

*Water Mgmt. Dist.*, 290 F. Supp. 2d 1356, 1361 (S.D. Fla. 2003). That recusal standard is critical to our judicial process, and this Court has recused itself consistent with that standard before. In *Kelly v. Davis*, No. 3:10-cv-392-MW/EMT, 2015 WL 5442789, at *9 (N.D. Fla. Aug. 24, 2015), plaintiffs' counsel moved to disqualify the Court based on unfounded and irresponsible allegations that the Court had improper *ex parte* conversations with his wife, an attorney with a firm only tangentially connected to a client in the case. The Court properly denied the plaintiffs' motion for disqualification based on counsel's "ungentlemanly, unprofessional, and completely unfounded attacks on [his] wife's character." *Id.* at *8. Nonetheless, the Court still recused itself because it "[was] concerned about [its] ability to completely set aside [its] initial reaction to this motion." *Id.* at *9. As the Court noted, even though it was confident that it would "fairly resolve whatever issues needed to be resolved to conclude t[he] case," "close questions should be resolved in favor of recusal." *Id.*

So too here. As the Court noted in *Kelly*, "[a] good judge should engage in self-reflection in determining whether to remain on a case." *Id.* The Court's prior statements at least raise a substantial question about whether the Court will resolve this matter fairly. And in a case garnering as much "public attention" as this one, *In re Boston's Children First*, 244 F.3d at 170, a "close question" like this "should be resolved in favor of recusal," *Kelly*, 2015 WL 5442789, at *9.

14

## CONCLUSION

For the above reasons, the Court should recuse itself and order that the case be reassigned to another judge.

Dated: May 19, 2023

Respectfully submitted,

ASHLEY MOODY
  *Attorney General of Florida*

*/s/ Charles J. Cooper*
CHARLES J. COOPER
(BAR NO. 248070DC)
DAVID H. THOMPSON*
PETER A. PATTERSON*
MEGAN M. WOLD*
JOSEPH O. MASTERMAN
(FBN 1004179)
JOHN D. RAMER*

**COOPER & KIRK, PLLC**
1523 New Hampshire Ave., N.W.,
Washington, D.C. 20036
(202) 220-9600
*ccooper@cooperkirk.com*

*/s/ Jason Gonzalez*
PAUL C. HUCK JR. (FBN 968358)**
ALAN LAWSON (FBN 709591)**
JASON GONZALEZ (FBN 146854)

**LAWSON HUCK GONZALEZ, PLLC**
215 S. Monroe St., Ste. 320
Tallahassee, FL 32301
*jason@lawsonhuckgonzalez.com*

*Counsel for the CFTOD Board and Administrator*

*/s/ John Guard*
JOHN GUARD (FBN 374600)
  *Chief Deputy Attorney General*
JAMES H. PERCIVAL (FBN 1016188)
  *Chief of Staff*
HENRY C. WHITAKER (FBN 1031175)
  *Solicitor General*
DANIEL W. BELL (FBN 1016188)
  *Chief Deputy Solicitor General*
DAVID M. COSTELLO (FBN 1004952)
  *Deputy Solicitor General*

**OFFICE OF THE ATTORNEY GENERAL**
The Capitol, PL-01
Tallahassee, FL 32399
(850) 414-3300
*john.guard@myfloridalegal.com*

*Counsel for Governor DeSantis and Secretary Ivey*

*\* pro hac vice motion forthcoming*
*\*\* admission to the Northern District of Florida forthcoming*

15

## CERTIFICATE OF CONFERRAL

Consistent with Local Rule 7.1(B), Defendants raised the issues identified in this motion with Disney. It opposes the requested relief.

*/s/ John Guard*
Chief Deputy Attorney General

## CERTIFICATE OF COMPLIANCE

This motion complies with the requirements of Local Rule 7.1(F) because it

contains 3,548 words.

*/s/ John Guard*_____
Chief Deputy Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2023, a true and correct copy of the foregoing

was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ John Guard*
Chief Deputy Attorney General