**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA**

---

WALT DISNEY PARKS AND RESORTS, U.S., INC.,

        Plaintiff,

    v.

RONALD D. DESANTIS, in his official capacity
as Governor of Florida; MEREDITH IVEY, in her
official capacity as Acting Secretary of the
Florida Department of Economic Opportunity;
MARTIN GARCIA, in his official capacity as
Board Chair of the Central Florida Tourism
Oversight District; MICHAEL SASSO, in his
official capacity as Board Member of the
Central Florida Tourism Oversight District;
BRIAN AUNGST, JR., in his official capacity as
Board Member of the Central Florida Tourism
Oversight District; RON PERI, in his official
capacity as Board Member of the Central
Florida Tourism Oversight District; BRIDGET
ZIEGLER, in her official capacity as Board
Member of the Central Florida Tourism
Oversight District; and JOHN CLASSE, in his
official capacity as Administrator of the Central
Florida Tourism Oversight District,

        Defendants.

Case No. 4:23-cv-00163-MW-MAF

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISQUALIFY CHIEF JUDGE MARK E. WALKER**

Defendants have moved to disqualify Chief Judge Mark E. Walker ("the Court") under 28 U.S.C. § 455(a).  Plaintiff Walt Disney Parks and Resorts U.S., Inc. ("Disney") opposes the motion and states as follows.

## INTRODUCTION

Defendants' motion to disqualify is premised on a misapprehension of the law and a misstatement of the facts.  Section 455(a) does not prescribe the hair-trigger disqualification standard defendants suggest.  Section 455(a) instead authorizes disqualification only when a court's comments about the issues or parties in a case would cause a reasonable, fully-informed observer to have significant doubts that the court can approach the case with an open mind.  As this Court, others in the District, and the Eleventh Circuit have emphasized, that standard establishes a high bar to disqualification—otherwise, parties could too easily use § 455(a) to effectively veto judges whose decisions they do not like and shop for a judge more to their liking.

Section 455(a)'s high threshold is well illustrated by the cases defendants cite as exemplars of when disqualification is required, which all prove by comparison why § 455(a) has no bearing here.  Their leading case is *Franklin v. McCaughtry*, 398 F.3d 955 (7th Cir. 2005), which involved cartoonishly improper judicial conduct—a court that essentially launched an out-of-court vendetta against a defendant in a criminal case pending before the court.  Other cases cited by defendants involve similar misconduct, i.e., a court making comments *to the press or public* about *a case pending before it*.  As those cases make clear, out-of-court comments about a pending case create two reasonable concerns about the court's impartiality.  First, judicial comments to the press on a pending case are so unusual and so unnecessary that they facially suggest some improper motivation on the judge's part.  Second, they invariably expose the court

to "extrajudicial sources" of information about the case.  Neither concern exists in this case, which does not involve any improper extrajudicial communications with the press or public about this case.

Defendants instead base their motion on two year-old hypothetical questions during prior judicial proceedings where the Court accurately referred to widely-publicized statements from Florida legislators about their intent to change the governing structure of the Reedy Creek Improvement District ("RCID") specifically because Disney expressed a political viewpoint disfavored by the legislators.  The Court did not make any findings about those statements, but simply invoked them during oral arguments as examples to test arguments being advanced by counsel addressing different issues under different factual records.

Judges are not prohibited from referring accurately to widely-reported news events during oral arguments, nor must they disqualify themselves if cases related to those events happen to come before them months later.  Disqualification is allowed only if the prior comments expose an incapacity on the judge's part to consider the new case on its own merits. The comments here come nowhere close to that standard.

Finally, as the Eleventh Circuit has emphasized, a disqualification motion should be viewed within the larger context of the court's rulings.  That context here conclusively refutes any suggestion that this Court harbors bias against the Governor or the State.  Not only has this Court repeatedly dismissed claims and cases asserted against the Governor and other State officers, but the Court recently ruled in favor of the relevant State defendants *in the very cases cited by defendants here as evidence of potential bias against them*.  Far from proving bias, the cases confirm the Court's impartiality.  The motion to disqualify should be denied.

**ARGUMENT**

**A.     Under § 455(a), Disqualification Is Authorized Only When A Reasonable, Fully-Informed Observer Would Perceive A Significant Risk That The Court Has A Closed Mind On The Merits Of The Case**

Under 28 U.S.C. § 455(a), a judge must disqualify himself from "any proceeding in which his impartiality might reasonably be questioned."  Section 455(a) permits disqualification only when "an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *United States v. Amedeo*, 487 F.3d 823, 828 (11th Cir. 2007) (applying standard to reject disqualification); *see In re Moody*, 755 F.3d 891, 894 (11th Cir. 2014) (same); *United States v. Scrushy*, 721 F.3d 1288, 1303 (11th Cir. 2013) (same); *Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1329 (11th Cir. 2002) (same); *Christo v. Padgett*, 223 F.3d 1324, 1333 (11th Cir. 2000) (same).  Section 455(a) thus requires a court to determine whether the reasonable, fully informed observer would "perceive[] a significant risk that the judge will resolve the case on a basis other than the merits."  *In re Mason*, 916 F.2d 384, 385 (7th Cir. 1990).

To meet that standard, a court's statements or conduct must demonstrate "an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings."  *In re United States*, 158 F.3d 26, 34 (1st Cir. 1998) (quoting *Liteky v. United States*, 510 U.S. 540, 557-58 (1994) (Kennedy, J., concurring in judgment)).  "Thus, under § 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute."  *Id.*; *see Ark. Teacher Ret. Sys. v. State Street Bank & Trust Co.*, 404 F. Supp. 3d 486, 494 (D. Mass. 2018) (same).  In other words, a prior statement relating to the

parties or issues in a case will be "disqualifying only if it connotes a fixed opinion, a closed mind on the merits of the case." *United States v. Haldeman*, 559 F.2d 31, 136 (D.C. Cir. 1976) (quotation omitted); *see In re Wilborn*, 401 B.R. 848, 860 (Bankr. S.D. Tex. 2009) (same).

In determining whether the facts reasonably show that the court's mind is closed to the merits, the court "should adopt the perspective of a 'well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person.'" *Liberty Mut. Ins. Co. v. Com. Concrete Sys., LLC*, 2017 WL 1234140, at *3 (N.D. Fla. Apr. 1, 2017) (Walker, J.) (quoting *United States v. Jordan*, 49 F.3d 152, 156 (5th Cir. 1995)).

Finally, a court evaluating a motion to disqualify must "remain vigilant to the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." *Id.* at *8 (quotation omitted). Indeed, "[b]inding precedent holds that 'there is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is,'" *Common Cause Fla. v. Lee*, 2022 WL 2343366, at *5 (N.D. Fla. Apr. 6, 2022) (Winsor, J.) (quoting *Moody*, 755 F.3d at 895), as this Court has previously recognized, *see Liberty Mutual*, 2017 WL 1234140, at *6. Although "[o]ne might argue that a judge facing a public call to recuse could alleviate even a *hint* of impartiality by stepping aside, even when the law does not demand it," the "Eleventh Circuit has emphasized that this is not the answer: 'If this occurred the price of maintaining the purity of the appearance of justice would be the power of litigants or third parties to exercise a veto over the assignment of judges.'" *Common Cause*, 2022 WL 2343366, at *5 (quoting *United States v. Greenough*, 782 F.2d 1556, 1558); *see Smartt v. United States*, 267 F. Supp. 2d 1173, 1177 (M.D. Fla. 2003) (because § 455(a) "is not intended to bestow a veto power over judges, or to permit 'judge-shopping,'" court "has as strong a duty

to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require").  For these reasons, if "the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited."  *In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001).

**B.     The Two Cited Remarks Do Not Reasonably Suggest That The Court Has A Closed Mind On The Merits Of This Case**

Applying the principles recited above, "courts have only granted recusal motions in cases involving particularly egregious conduct."  *Belue v. Leventhal*, 640 F.3d 567, 573 (4th Cir. 2011).  The conduct here was nothing of the kind.  The two comments defendants cite provide no basis on which a reasonable, fully-informed person could perceive any risk—much less a significant risk—that the Court's mind is closed and that it is incapable of fair and dispassionate inquiry into the legal and factual issues in this case.  Both comments were merely brief, illustrative examples used to frame hypothetical questions about different issues.  Neither remark reflects a conclusive finding about the distinct circumstances here or demonstrates that the Court has a fixed opinion and closed mind "resistant to fair and dispassionate inquiry" (*United States*, 158 F.3d at 34 (quotation omitted)) into the distinct claims and defenses that will be asserted in this case, based on a complete record of evidence and briefing on legal standards and requirements.

Defendants first cite a statement from a hearing in *Link v. Corcoran*, No. 4:21-cv-271-MW-MAF (N.D. Fla.), made as the Court was querying counsel for plaintiffs about the evidence she was relying on to support plaintiffs' standing theory.  Plaintiffs there challenged the distribution of a survey to state universities about political views on campus.  To claim injury from the mere distribution of a survey, plaintiffs alleged that that their speech was chilled because the State intended to cut university funding if the survey reported "liberal" political

5

orientations.  In its colloquy with plaintiffs' counsel excerpted by defendants here, the Court

probed the plaintiffs' assertion that the State would act imminently to harm them:

> THE COURT: . . . I don't understand how—it seems to me how you can say that
> threat, the chill, is reasonable when you've got to assume so many things.  I mean,
> it requires you to assume the survey will show that liberal views are widespread
> on campus.  You've got to assume the legislature will react by reducing their
> school funding and that the funding will directly harm those plaintiffs . . . aren't
> there too many inferential steps for me to make at this juncture to find the chill is
> reasonable?
>
> MS. VELEZ:  Your Honor, there's a lot to parse here. And the first that I want to
> draw the Court's attention back to is that we think that the inquiry and the asking
> is a harm in and of itself.  That's under the *Baird* decision.  But, of course, we're
> primarily attacking—
>
> THE COURT:  But in that case, though—again, I just can't let it go.  In that case,
> though, isn't the reason why that chill would be reasonable is you knew who I am
> and you know what my responses are, so you can target me directly?
> I mean, I've already ruled, and the Eleventh Circuit will do what it does, but, you
> know, in the UF professor case, the chill—they knew who they were targeting,
> and they could target individuals, and so there was—and had announced their
> intent to do so, per the head of the board of trustees.  So, I mean, there was facts
> before the Court that would—didn't require you to make a—stack inferences, but
> there were facts before the Court from which such a reasonable fear could be
> adduced from the record, other than the assumption—well, let me ask you this.
> *What's in the record, for example—is there anything in the record that says we
> are now going to take away Disney's special status because they're woke? Is
> there anything in the record that says—that you put in the record that says we are
> going to slash the funding?*  We did, in fact, take away millions of dollars from
> school boards because they had the audacity to require their students to wear
> masks during a pandemic.
>
> What sort of—and *I'm not suggesting that would be determinative in this case,
> but is that even in the record to say, Well, Judge, here's what we've got in the
> record that shows these fears are well founded?*  Because, you know, Judge, if
> somebody says, I'm going to hit you with a baseball bat, take them at their word;
> they're going to hit you with a  baseball bat.  They announced it, and . . . they've,
> in fact, done it in the past because here are the three people that just got hit with
> the baseball bat.
>
> *So what do we have in the record that would support such a finding?*

MS. VELEZ: Well, Your Honor, I mean, of course, we think that we should take defendants at their word and everyone at their word. But, again, the larger point—

THE COURT: . . . *What's in the record . . . that shows these very people have taken putative measures against those they've described as woke in other contexts?*

Daily Transcript of Preliminary Injunction Proceedings ("*Link* Tr.") at 21:25-24:11, *Link v. Corcoran*, 4:21-cv-271-MW-MAF (N.D. Fla. Apr. 1, 2022) (emphasis added).

Viewed in context—as a reasonable, fully-informed observer would view it—the Court's reference to legislators' explicitly, well-publicized comments about Disney is entirely unobjectionable. The issue the Court was probing in *Link* was whether the plaintiffs had *any* support for their theory that the State planned to harm them specifically because of their political viewpoints. To frame the issue, the Court first observed that in a prior case involving a University of Florida professor, the plaintiff successfully asserted that the Board of Trustees had explicitly stated its intention to target the plaintiff. The Court was asking whether the *Link* plaintiffs could identify comparable express statements. The Court then referred to widely-reported, undisputed statements by legislators about Disney to ask the same question—were the *Link* plaintiffs relying on similarly express statements to support their theory of injury?

It is unsurprising and entirely appropriate that the Court would refer to state legislators' Disney-related statements in probing the *Link* plaintiffs' evidence about the State's future plans. As defendants here admit, the argument in *Link* occurred just days after numerous state legislators began making repeated, widely-reported, undisputed comments that they intended to dissolve RCID specifically because Disney had expressed a political viewpoint the legislators found objectionable. Defs.' Mot. to Disqualify Chief

Judge Mark E. Walker at 5, ECF No. 33 ("Those state-official remarks about RCID were widely reported in the news cycles surrounding the *Link* preliminary-injunction hearing, as were many similar statements.").  The statements thus provided a public, ready-made comparison to help the Court test the nature of the *Link* plaintiffs' own support for their claims about the State's intentions.  *Link* Tr. at 24.  Whether or not the legislators' statements about Disney would actually *prove* a substantive case of retaliation—if one were ever brought—was not before the Court in *Link* and not addressed in its questioning.  Nothing about the *Link* colloquy reasonably suggests that when the actual facts, claims, and defenses are fully developed in this case, the Court will be unable to assess that complete record with an open mind.

The same is true for the analogous comment made during a hearing in *Falls v. DeSantis*, No. 4:22-cv-166-MW-MJF (N.D. Fla.), which also occurred near in time to the legislators' many public statements about Disney.  As in *Link*, the comment was purely for illustration—a hypothetical offered in the course of querying counsel about the evidence required to satisfy standing requirements.  In *Falls*, the reference came during a colloquy with counsel for the defense, who was arguing that plaintiffs' claims about potential retaliation were too "conjectural."  To test that argument, the Court asked whether it would be less conjectural if the plaintiff could identify other incidents where the State took actions against individuals because they expressed disfavored political viewpoints.  As an illustration, the Court again invoked the timely, widely-reported example of the Florida Legislature planning to dissolve RCID "arguably" because of Disney's political speech:

> MR. COOPER:  Thank you, Your Honor.  Charles Cooper again for the
> defendants.

Your Honor, with respect to Dr. Cassanello in particular, we think the basic theory of the hipbone-connected-to-the-thigh-bone injury that Dr. Cassanello is alleging here is simply not a sufficient injury-in-fact to create an invasion of a legally protected interest which is concrete and particularized and actual or imminent, not conjectural or hypothetical. And, Your Honor, the potential downstream consequences that the plaintiffs are saying provides the professor with his standing are simply quite conjectural. We've—

THE COURT: Does it make any difference that in—just in recent history when schools or entities or organizations have not complied with what is demanded by Tallahassee that funding has been cut, for example, the face mask? Does that make it any less speculative and less conjectural?

MR. COOPER: Your Honor, I don't think so because we certainly concede that there is the possibility of that form of enforcement against the institutions, and that is, as you say, a recent example of that authority being exercised by the—I guess here, the Board of Governors.

THE COURT: *And then Disney is going to lose its status because—arguably, because they made a statement that run afoul—ran afoul of state policy of the controlling party.  At what point do you stack so many examples where punitive actions are taken if you don't do what you are told that suddenly it no longer becomes conjectural and you pass that threshold so you can establish standing?* It's no longer fanciful or conjectural.

Transcript of Preliminary Injunction Proceedings at 77:23-79:2, *Falls v. DeSantis*, 4:22-cv-166-MW-MJF (N.D. Fla. June 21, 2022) (emphasis added).

The Court again did not purport to make any findings or rulings about the actual facts concerning the State's motivation for dissolving RCID or replacing its Board (which happened almost a year later).  Nor did the Court announce any committed view to what a fully developed record would show about that motivation.  Rather, the Court asked an expressly hypothetical question:  *if* it were shown that the State acted in retaliation against Disney—if the Court's "arguably" qualifier were proven as fact, that is—would that showing support plaintiff's claims about likely injury?  Posing a hypothetical question using an accurate statement of reported facts does not reflect any unshakeable prejudgment about the premise of the question or the issues it probes.  Whether retaliation against Disney had actually occurred was not at issue in *Falls* and

was not addressed by the Court.  As with the *Link* colloquy, nothing about the single question asked in *Falls* would give a reasonable observer any basis for concluding that the Court will be incapable of considering all the facts, claims, and defenses in this case fairly and with an open mind.

Not only do the *Falls* and *Link* remarks fail to justify disqualification on their own terms, but viewing them both in their broader context further undermines the case for disqualification. In *Thomas*, the Eleventh Circuit rejected disqualification in part because "other actions of the district judge" demonstrated "his objectivity and neutrality."  293 F.3d at 1330.  The same is true here in spades.  In particular, this Court (like any other district court) has heard many cases involving claims against the Governor and other State officers and agencies.  And as the Court is well aware, it has often ruled in their favor—indeed, too often to cite the decisions exhaustively.[1] But two particularly telling examples are the very cases defendants cite, *Link* and *Falls*, both of which the Court dismissed for lack of standing—in *Falls*, on the very same day defendants filed this motion.  *See Falls v. DeSantis*, 2023 WL 3568526 (N.D. Fla. May 19, 2023); *Link v. Diaz*, 2023 WL 2984726 (N.D. Fla. Apr. 17, 2023).  Those rulings provide especially salient proof of the Court's fairness and neutrality.

In addition to dismissing cases like *Link* and *Falls* based strictly on the merits, the Court itself last year observed that it "has not been shy about dismissing Governor DeSantis from cases where he did 'not have more than "some connection" with the underlying claim.'"  *Falls v.*

---

[1] Illustrative decisions dismissing claims or cases against the Governor himself include *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1226 (N.D. Fla. 2020); *Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1137 (N.D. Fla. 2020); *Dream Defs. v. DeSantis*, 553 F. Supp. 3d 1052, 1098 (N.D. Fla. 2021); *Bowles v. DeSantis*, 2019 WL 10631192, at *4 (N.D. Fla. July 19, 2019); *Israel v. DeSantis*, 2020 WL 2129450, at *27 (N.D. Fla. May 5, 2020); *Nevels v. DeSantis*, 2021 WL 121211, at *1 (N.D. Fla. Jan. 13, 2021).

*DeSantis*, 2022 WL 19333278, at *1 (N.D. Fla. July 8, 2022) (citing *Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1137 (N.D. Fla. 2020); *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1209 (N.D. Fla. 2020)).   The Court's proven even-handedness applies fully to cases involving political claims and issues such as voting rights and electoral districting.   In *League of Women Voters, Inc. v. Lee*, 595 F. Supp. 3d 1042 (N.D. Fla. Mar. 31, 2022), the Court's Final Order reported its record of decisions on voting-related cases:

> All told, I have heard 17 cases related to voting in Florida. I ruled against Florida in six of those 17 cases.  Of those six, Florida appealed two.  For one, a motions panel denied a motion to stay this Court's order, and a superseding change in the law then rendered the case moot.  On the other, the Eleventh Circuit reversed.  As for the other four, Florida did not appeal and changed the law to conform with this Court's orders . . . .  Of the remaining 11 cases in which this Court ruled for the state, only one was appealed, and eventually affirmed.

*Id.* at 1062 n.7 (citations omitted).

Especially given the Court's lengthy record of consistent fairness and objectivity, no reasonable, fully-informed observer could possibly conclude from its brief questions in the *Link* and *Falls* arguments that the Court "harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute."  *United States*, 158 F.3d at 34 (quotation omitted).[2]

---

[2] In a footnote, defendants refer to the Court's observation in its final written order in *Link* that there was "abundant testimony" in that case showing that "lawmakers who sponsored or supported" the statute at issue there had "embraced rhetoric directed at the 'woke' boogeyman of the day" and thereby "signaled a suspicion of, and outright hostility toward, certain viewpoints."  *Link*, 2023 WL 2984726, at *2.  Defendants omit to mention that the Court's order goes on to find that such statements did *not* suffice to prove that plaintiffs' speech had been chilled.  *See generally id.*  Nor do defendants acknowledge the long-settled rule that knowledge and opinions may be "properly and necessarily acquired in the course of [judicial] proceedings," and that "opinions held by judges as a result of what they learned in earlier proceedings" do not qualify as "bias" or "prejudice."  *Liteky v. United States*, 510 U.S. 540, 551 (1994).

**C.     The Few Cases Defendants Cite To Show When Disqualification Is Required Merely Illustrate Why Disqualification Is Not Authorized Here**

Defendants cite several cases reciting the controlling legal standard, but almost none that actually mandate disqualification under that standard.  And the few that actually required disqualification involved "particularly egregious conduct," *Belue*, 640 F.3d at 573, which only shows why disqualification is *not* warranted on the facts of this case.

 The case defendants emphasize most heavily is *Franklin v. McCaughtry*, 398 F.3d 955 (7th Cir. 2005).  In that case, a state judge overseeing the pending trial of the defendant Franklin took the bizarre step of submitting a memorandum to an appellate court in *another* case that argued against releasing that second defendant pending appeal.  To support his argument, the judge recited lengthy details about Franklin's criminal history and cited him as a cautionary "example of the terrible things that happen when indigent prisoners are released on bail pending their appeals: they simply commit more crimes while free." *Id.* at 961.  The judge then made matters even worse:  after a newspaper published an article about the two cases, the judge initially refused to admit any connection to the article, then eventually grudgingly confessed to having filed the appellate memorandum.  In fact, the memorandum was a key basis for the article, and the judge had never previously disclosed it to Franklin.  To top it all off, the judge then read his memorandum into the record of Franklin's case, even though it included many facts from extrajudicial sources that had not previously been introduced. *Id.* at 958.

On that remarkable record, the Seventh Circuit concluded that "despite the judge's use of the magic word 'alleged' in the memorandum, the inference is irresistible that the judge was pointing to Franklin as the latest such incorrigible criminal, even though Franklin's trial had not yet taken place." *Id.* at 961.  The court also emphasized that the memorandum and the judge's "contacts with the newspaper were extrajudicial activities vis-à-vis Franklin's own case" under

the "extrajudicial source" rule addressed in *Liteky v. United States*, 510 U.S. 540 (1994).
*Franklin*, 398 F.3d at 961; *see infra* at 14-15 (discussing extrajudicial source doctrine).

This case bears no comparison to *Franklin*—there is no long litany of unethical acts, no
obfuscation by the judge of blatantly unethical conduct,  and no persistent targeting of the party
in a pending case through extrajudicial acts.

Among the most important of the many foregoing distinctions is that the *Franklin* judge
made his ill-considered comments to the newspaper and in his appellate memorandum *while the
case against Franklin was pending*.  The same is true in other cases defendants proffer as
exemplars of when disqualification is required.  Defendants cite only four other cases where the
disqualification standard was met, and in three of them, the judge was disqualified for making
out-of-court statements to the press or the public about a pending case, just as in *Franklin*.  *See
United States v. S. Fla. Water Mgmt. Dist.*, 290 F. Supp. 2d 1356, 1358, 1360 (S.D. Fla. 2003)
(judge "quoted and cited as a source in five newspaper articles" discussing issues in case, making
it "evident that extrajudicial sources may have influenced [the judge] or, at least, there is a
reasonable appearance of such influence," because "meetings between [the judge] and reporters
are themselves evidence of extrajudicial sources, as these interviews are not merely one-way
conversations"); *In re Boston's Children First*, 244 F.3d 164, 166, 170 (1st Cir. 2001) (judge
wrote letter to *Boston Herald* about pending case and was interviewed about it, giving comments
that could be construed "as a preview of a ruling on the merits of petitioner's motion for class
certification, despite the fact that defendants had not yet filed a response to that motion"); *United
States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993) (judge appeared on *Nightline* to express strong
public message to public about compliance with court's injunction that "conveyed an uncommon

interest and degree of personal involvement in the subject matter" and created "justified doubt as to his impartiality in the case involving these defendants").[3]

The Court here did no such thing—the Court's passing references to the legislators' widely-reported statements about their intent to take actions against Disney were made almost a full year *before* this case was filed, and they were made during judicial proceedings.  There is no basis for expecting the Court would engage in the kind of inappropriate public communications that occurred in the cases defendants cite.  Accordingly, contrary to defendants' misleading assertion (ECF No. 33 at 10), this case does not implicate the observation in *Boston's Children* that "the very rarity of such public statements, and the ease with which they may be avoided, make it more likely that a reasonable person will interpret such statements as evidence of bias." 244 F.3d at 170.  That observation has force when a court goes out of its way to address the public about the issues or parties in a case pending before it—such a decisive break from accepted protocol reasonably suggests the judge is being driven by passion or bias rather than by reason.  To hammer the square peg of that laudable principle into the round hole of this case, the defendants literally rewrite the passage from *Boston's Children* so it refers to "the rarity of [these kinds of] public statements," ECF No. 33 at 10 (alteration added by defendants), as if the passage specifically condemns the kinds of statements at issue here.  It does no such thing.  It instead addresses an extrajudicial letter to the editor and a newspaper interview expressing specific

---

[3] In the only other case cited by defendants to show when disqualification is required, the judge's law clerk, who drafted an opinion granting summary judgment to defendants and even held a hearing in the judge's absence, was the son of a partner in the firm representing defendants.  *See Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524-25 (11th Cir. 1988).  *Parker* is thus another case with especially egregious facts that serves only to show why the anodyne facts here fall well short of the disqualification standard.

views on the merits of issues in a case pending before the court—serious judicial misconduct that has nothing to do with this case.

For similar reasons, defendants err in relying on the "extrajudicial source" doctrine, contending that "disqualification is especially appropriate here because the Court's comments 'stem from extrajudicial sources' and were 'focused against a party [in] the proceeding.'" ECF No. 33 at 13 (quoting *Hamm v. Members of Bd. of Regents*, 708 F.2d 647, 651 (11th Cir. 1983)). The extrajudicial source doctrine applies when a court expresses opinions about issues or parties *in a pending case* that are based on extrajudicial sources. *See*, *e.g.*, *Liteky*, 510 U.S. at 555 (addressing "judicial remarks *during the course of a trial* that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases," which "ordinarily do not support a bias or partiality challenge," but "*may* do so if they reveal an opinion that derives from an extrajudicial source" (first emphasis added); *Thomas*, 293 F.3d at 1330 (applying extrajudicial source doctrine, but declining to disqualify, based on comments about issues and parties made during pending case); *Christo*, 223 F.3d at 1333-34 (same); *Hamm*, 708 F.2d at 651 (same). Even when a court expresses an opinion about issues or parties during a pending case, an "extrajudicial source" for that opinion is by itself "neither necessary nor sufficient to require recusal." *Bell v. Johnson*, 404 F.3d 997, 1004 (6th Cir. 2005). But the more decisive point for present purposes is that the Court here has not made any comments or rulings *in this case* based on extrajudicial sources or communications of any kind, so the doctrine is categorically inapplicable.

While the extrajudicial source doctrine rightly cautions against courts expressing opinions in pending cases based on sources outside the record, there is no comparable restriction on courts referring to widely-reported matters of public record (long before any case is filed about them) to frame questions during oral arguments. Our judicial system does not "expect

15

judges to live as moles, roving about the limited underground landscape of the official record but never perceiving the illuminated world at the surface." *United States v. Carey*, 929 F.3d 1092, 1105 (9th Cir. 2019).  To the contrary, in "our modern, interconnected, endlessly broadcast world, complete blinders are impracticable, as a reasonable person would surely conclude." *Id.* Put more simply:  "An open mind is required; an empty mind is not." *Dean v. Colvin*, 585 Fed. Appx. 904, 905 (7th Cir. 2014).

For these reasons, courts have rejected motions to disqualify based on prior comments about issues or parties in a case that later ends up before them, so long as the prior comments were not so conclusive as to demonstrate the lack of an open mind in the later-filed case.  *See*, *e.g.*, *In re City of Milwaukee*, 788 F.3d 717, 723 (7th Cir. 2015) (rejecting disqualification where judge previously made comments in opinions and conferences in related stop-and-frisk cases); *In re Sherwin-Williams Co.*, 607 F.3d 474, 476-79 (7th Cir. 2010) (rejecting disqualification where judge previously authored law review article addressing key issue in case); *Starbuck v. RJ. Reynolds Tobacco Co.*, 59 F. Supp. 3d 1377, 1382 (M.D. Fla. 2014) (rejecting disqualification where judge previously made comments critical of defendants in published article).  The passing remarks at issue here are *much* less declarative than the prior statements made in *Milwaukee*, *Sherwin-Williams*, and *Starbuck*, where disqualification was denied; it follows a fortiori that disqualification is improper here as well.  Indeed, as already noted, defendants have not cited a single case mandating disqualification on facts remotely similar to the facts here.  This case should not be the first.

## CONCLUSION

For the foregoing reasons, the motion to disqualify should be denied.

16

Dated:  May 25, 2023

ALAN SCHOENFELD
(*pro hac vice*)
New York Bar No. 4500898
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel. (212) 937-7294
alan.schoenfeld@wilmerhale.com

ADAM COLBY LOSEY
LOSEY PLLC
Florida Bar No. 69658
1420 Edgewater Drive
Orlando, FL 32804
Tel. (407) 906-1605
alosey@losey.law

Respectfully submitted,

DANIEL M. PETROCELLI
(*pro hac vice*)
California Bar No. 97802
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Tel. (310) 246-6850
dpetrocelli@omm.com

JONATHAN D. HACKER
(*pro hac vice*)
District of Columbia Bar
No. 456553
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Tel. (202) 383-5285
jhacker@omm.com

STEPHEN D. BRODY
(*pro hac vice*)
District of Columbia Bar
No. 459263
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Tel. (202) 383-5285
sbrody@omm.com

*Attorneys for Plaintiff Walt Disney Parks and Resorts U.S., Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 25, 2023, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which will provide electronic service to all parties.

ADAM COLBY LOSEY
LOSEY PLLC
Florida Bar No. 69658
1420 Edgewater Drive
Orlando, FL 32804
Tel. (407) 906-1605
alosey@losey.law
Counsel for Plaintiff Walt Disney Parks
and Resorts U.S., Inc.

18