## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**WALT DISNEY PARKS AND
RESORTS U.S., INC.,**

       *Plaintiff,*

v.                              **Case No.: 4:23cv163-MW/MJF**

**RONALD D. DESANTIS, in his
official capacity as Governor of
Florida, et al.,**

       *Defendants.*

_____/

## <u>ORDER ON DISQUALIFICATION</u>

I have considered, without hearing, Defendants' motion to disqualify me, ECF No. 33, and Plaintiff's response, ECF No. 43. For the reasons that follow, Defendants' motion is **DENIED**. Nonetheless, I find disqualification required for a different reason.

I

Defendants seek to disqualify me from presiding over this case because, in their view, questions I have asked in previous, related cases raise substantial doubts about my impartiality. ECF No. 43 at 9. In response, Plaintiff argues, in short, that "Defendants' motion to disqualify is based on a misapprehension of the law and a misstatement of the facts." ECF No. 43 at 2.

Under 28 U.S.C. § 455(a), a judge must disqualify himself from "any proceeding in which his impartiality might reasonably be questioned." Section 455(a) mandates disqualification only when "an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which disqualification was sought would entertain a significant doubt about the judge's impartiality." *United States v. Amedeo*, 487 F.3d 823, 828 (11th Cir. 2007). For disqualification under section 455(a), "what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994). "[W]hen a judge harbors any doubts concerning whether his disqualification is required he should resolve the doubt in favor of disqualification." *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988).

Defendants' motion is without merit. My use of hypothetical questions referencing facts related to this case, *in an earlier case also dealing with the motivations of political actors* (including some of the same actors here), cannot raise a substantial doubt about my impartiality in the mind of a fully informed, disinterested lay person. As Plaintiff aptly notes, Defendants rely on cases involving "cartoonishly improper judicial conduct . . . ." ECF No. 43. Defendants cherry-pick language from these cases to support their position without acknowledging the wholly distinguishable context underlying each decision. For example, Defendants cite *United States v. South Florida Water Management District*, 290 F. Supp. 2d

2

1356, 1361 (S.D. Fla. 2003) for the assertion that an objective observer would have a significant doubt that I would treat Defendants impartially. What Defendants fail to acknowledge is that the court in that case found disqualification under § 455(a) required only where the judge in question gave several interviews to reporters and expressed his plain disfavor of legislation that ultimately came before him.[1] His comments to reporters and in orders included the following:

- "I think [Governor] Bush is a good man and he means well, . . . But I'm afraid he fell into the hands of those who don't like the Everglades" and that "[w]hen the governor signs this bill—and he will, I think, sign it—the South Florida Water Management District has got to be watched."

- "I think [Governor Bush is] doing what he thinks is right. He just doesn't agree with me."

- "I'll tell you one thing I'm sure of, we're going according to the old law, . . . and we're going to make sure of that."

- The "Court does not yet have cause to attempt to apply the legislation, and I sincerely hope I am never obliged to do so, for the bill is clearly defective in many respects. . . . While I am deeply troubled by the content of the bill, I am dismayed by the process that led to its passage. The bill was moved quickly through the legislative process, reportedly at the behest of more than forty lobbyists for the sugar industry."

---

[1] Defendants cite other dissimilar cases as well, including *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993) (finding disqualification necessary where a judge gave an interview to Barbara Walters on *Nightline* warning litigants in a case before him to obey his prior orders) and *In re Boston's Child. First*, 244 F.3d 164, 167 (1st Cir. 2001) (finding disqualification necessary where judge gave an interview to a reporter and compared the merits of a prior case to a case before her).

3

*Id.* at 1360–61. The statements at issue in this case fall far short of this conduct and do not merit disqualification under 28 U.S.C. § 455(a).

Defendants' motion cites cases for their convenient language without acknowledging the chasm between my statements in this case and the conduct at issue in those cases. Without exploring all the other defects in the motion, for the reasons noted above and as thoughtfully outlined in Plaintiff's response, Defendants' motion is wholly without merit. In fact, I find the motion is nothing more than rank judge-shopping. Sadly, this practice has become all too common in this district. *Cf. Common Cause Fla. v. Lee*, Case No. 4:22-cv-109-AW-MAF, 2022 WL 2343366, at *1 (N.D. Fla. Apr. 6, 2022) (dismissing meritless motion to disqualify in a redistricting case).

However, Defendants did get one thing right. That is, if a judge has doubts over whether disqualification is required, he should resolve those doubts in favor of disqualification. I have consistently followed this principle. For example, I have disqualified myself where, after holding a hearing to investigate the issue, I learned that a former state-court colleague might be called as a witness in the case. *G.H. v. Tamayo*, Case No. 4:19cv431-MW-MJF (N.D. Fla. Mar. 11, 2021).[2] But this is not

---

[2] Defendants' reliance on *Kelly v. Davis*, No. 3:10CV392-MW/EMT, 2015 WL 5442789, at *9 (N.D. Fla. Aug. 24, 2015) is misleading. Defendants cite *Kelly* for the proposition that I have disqualified myself in close calls before. I did acknowledge that close calls favor disqualification, *see id.* at 5, but I also explained—in plain terms—that my decision on the merits of the motion to disqualify was "not a close call," *id.* at 6. In fact, I explicitly found that the motion to disqualify was "wholly without merit." *See id.* The "close question" that led me to disqualify myself, raised

4

a close case. And I have "as much obligation . . . not to [disqualify myself] when there is no occasion for [me] to do so as there is for [me] to do so when there is." *See In re Moody*, 755 F.3d 891, 895 (11th Cir. 2014) (quoting *United States v. Burger,* 964 F.2d 1065, 1070 (10th Cir.1992)).

But that doesn't end the inquiry. My ethical obligations are not limited to what the parties raise. Instead, I must evaluate all potential grounds for disqualification. Next, I explain why I must disqualify myself for reasons unrelated to Defendants' meritless motion.

## II

Although Defendant's motion to disqualify is without merit, I must consider a separate question of whether I should disqualify myself. On Friday, May 26, 2023, I learned, and later confirmed, that a relative within the third degree of relationship owns thirty shares of stock in Plaintiff's parent corporation, The Walt Disney Company. Upon learning this information, I became obligated to engage in a separate inquiry pursuant to the Code of Conduct for United States Judges to determine if the financial interest of my third-degree relative "could be substantially affected by the outcome of [this] proceeding." Canon 3C(1)(d)(iii).[3] I have engaged

---

*sua sponte*, stemmed from my doubt that I could set aside my resentment of the movant's scurrilous attacks on my family. *Id.* at 9. Of course, in explaining my reasons for disqualification in *Kelly*, I am certainly *not* inviting parties to judge-shop by making scurrilous attacks on my family in future cases.

[3] I pause to note that the Code of Conduct for Unites States Judges does not impose a duty on judges to inquire into the financial interests of third-degree relatives. *See* Canon 3C(1)(d)(iii)

in that inquiry and determined that disqualification from this proceeding is required under the circumstances.

Next, I discuss the relevant Canon of the Code of Conduct for United States Judges and Advisory Opinions construing it. After setting out the pertinent facts, I apply those rules to this case.

A

Canon 3C of the Code of Conduct for United States Judges describes several situations where a judge's impartiality may be reasonably questioned and when a judge should disqualify himself from a proceeding. Although some sections of Canon 3C impose bright-line rules for disqualification, others require judges to engage in fact-intensive inquiries to determine whether disqualification is proper under the circumstances. The section applicable here requires a fact-intensive inquiry.[4]

When a judge becomes aware that a third-degree relative has a financial interest that may be affected by the outcome of a proceeding, such as the case here,

---

(stating that a judge must disqualify himself when it is "*known* by the judge" that a person "within the third degree of relationship" has a financial interest that "could be substantially affected by the outcome of the proceeding") (emphasis added); *cf*. Committee on Codes of Conduct Advisory Opinion No. 90 (explaining duty to inquire when relatives may be members of a class action). Only when a judge becomes aware of the relevant financial interests of a third-degree relative must that judge determine whether the proceeding's outcome could substantially affect the third-degree relative's financial interests. *Id.*

[4] One example of a bright-line rule for disqualification is when a judge, a judge's spouse, or a judge's minor child residing in a judge's household "has a financial interest in the subject matter in controversy or in a party to the proceeding . . . ." Code of Conduct for United States

that judge must determine whether the third-degree relative's financial interest "could be *substantially affected* by the outcome of the proceeding." Code of Conduct for United States Judges, Canon 3C(1)(d)(iii) (emphasis added). An affirmative answer to that question requires disqualification from the proceeding.[5] The size or dollar amount of the third-degree relative's financial interest is irrelevant, as it is "not the size of the interest that is a concern under [Canon 3C], but rather whether the interest could be substantially affected." Committee on Codes of Conduct, Advisory Opinion No. 94. Thus, a judge's knowledge that a third-degree relative owns just one share of stock in a corporation, with the price of that stock being a single dollar per share, is enough to trigger the obligation to determine if the proceeding's outcome could substantially affect the value of that single share of stock.[6] *See id*. To any non-attorney, the standard imposed by Canon 3C(1)(d)(iii)

---

Judges, Canon 3C(1)(c). Under such circumstances, the judge must disqualify himself from the relevant proceeding. For that reason, if I, my spouse, or a minor child residing in my household owned shares of The Walt Disney Company, then I would have disqualified myself immediately.

   [5] Under most circumstances, divestiture of a financial interest causing a judge's impartiality to be reasonably questioned is enough to alleviate the concerns surrounding that judge's impartiality. Here, however, divesture would not have the same curative effect. *See* Code of Conduct for United States Judges, Canon 3C(4) ("Notwithstanding the preceding provisions of this Canon, if a judge would be disqualified because of a financial interest in a party (*other than an interest that could be substantially affected by the outcome*), disqualification is not required if the judge (or the judge's spouse or minor child) divests the interest that provides the grounds for disqualification.") (emphasis added).

   [6] It is not relevant to the analysis that my third-degree relative owns stock in the Plaintiff's parent corporation and not in Plaintiff itself. Under the Code of Conduct for United States Judges, the owner of stock in a parent corporation is considered to have a financial interest in that parent

may seem counterintuitive. It is hard to imagine that a third-degree relative's investment of one dollar could sway a judge. Even so, Canon 3C is clear that the impact on the third-degree relative's investment—not the amount of the investment—governs disqualification.

Canon 3C does not define the term "substantially affected," and the Advisory Opinions issued by the Committee on Codes of Conduct provide only limited guidance on the matter.[7] In the context of determining when a judge's financial royalty interests in oil or gas could be substantially affected by the outcome of a proceeding, the Committee on Codes of Conduct has stated that "a $.60 per month increase would not have a substantial impact on a judge's utility bill" but that "the doubling of a utility bill from $10 to $20 per month would be substantial." Committee on Codes of Conduct, Advisory Opinion No. 94. Extending this guidance to the present case, where the financial interest in question is thirty shares of stock in The Walt Disney Company, a six-percent change in the value of The Walt Disney Company's stock as a result of these proceedings would not be substantial under Canon 3C(1)(d)(iii), but a fifty-percent change in the stock's value would be. Still,

---

corporation's controlled subsidiaries. *See* Committee on Codes of Conduct, Advisory Opinion No. 57 ("The Committee concludes that under the Code the owner of stock in a parent corporation has a financial interest in a controlled subsidiary.").

[7] The dearth of guidance on what "substantially affected" means within Canon 3C(1)(d)(iii) is not surprising, given that the share prices of most publicly traded companies are unlikely to be substantially affected by the outcome of litigation in which the companies are involved.

the exact threshold for when a proceeding rises to the level of substantially affecting a financial interest remains unclear. Another open question is the relevant time horizon (i.e., the length of time during which the value increases or decreases) for determining whether a proceeding substantially affects a financial interest.[8]

B

Now to this case. In its own complaint, Plaintiff, the owner and operator of Walt Disney World Resort in Central Florida, alleges that it has been the victim of a "targeted campaign of government retaliation" that now "threatens [Plaintiff's] business operations, jeopardizes its economic future in the region, and violates its constitutional rights." ECF No. 25 at ¶¶ 2, 4. Plaintiff alleges that Florida's oversight board, at the request of Defendant Governor Ron DeSantis ("Governor DeSantis"), has stated that it will "void" Plaintiff's "publicly noticed and duly agreed development contracts," which Plaintiff alleges has "laid the foundation for billions of Disney's investment dollars . . . ." *Id*. Plaintiff claims that it "seeks to invest up to $17 billion in capital . . . in the region over the next decade" and that "development and investment of this magnitude cannot effectively take place when it can be nullified or undermined at the whim of new political leadership." *Id*. at ¶¶ 105–106. Plaintiff also alleges that Governor DeSantis publicly stated that he plans "to look at

---

[8] This inquiry is made even more difficult by attempting to parse the precise reasons a stock's value may increase or decrease over time.

things like taxes on the hotels," "tolls on the roads," "developing some of the property that the district owns" with "more amusement parks," and even putting a "state prison" next to the Walt Disney World Resort. *Id*. at ¶ 3.

The Walt Disney Company has also acknowledged the potential impact of Defendants' alleged retaliation in its public filings with the Securities and Exchange Commission. I take judicial notice of these public filings, including The Walt Disney Company's disclosure in its most recent quarterly report that "[i]n Florida, steps directed at the Company (including the passage of legislation) have been taken and future actions have been threatened, which collectively could negatively impact (and may have already impacted) our ability to execute on our business strategy, our costs and the profitability of our operations in Florida." The Walt Disney Company, Quarterly Report (Form 10-Q) (May 10, 2023).

The income that Plaintiff generates from the Walt Disney World Resort in Central Florida, as well as Plaintiff's other business activities in Florida, is likely significant. While The Walt Disney Company does not disclose the income it generates specifically from the Walt Disney World Resort, The Walt Disney Company has disclosed in its most recent annual report that its "Disney Parks, Experiences and Products" segment generated $7.905 billion in operating income in

2022.[9] The Walt Disney Company, Annual Report (Form 10-K) (November 29, 2022). For context, the operating income from The Walt Disney Company's only other segment, its "Disney Media and Entertainment Distribution" segment, was $4.216 billion in 2022. *Id*. Theme park admissions, as well as park and experience merchandise, are significant sources of income for the Disney Parks, Experiences and Products segment.[10] *Id*.

It's also true that an adverse outcome for Plaintiff in these proceedings could result in Defendants continuing to engage in the alleged retaliatory conduct that, according to Plaintiff, "threatens [Plaintiff's] business operations [and] jeopardizes its economic future in the region." ECF No. 25 at ¶ 2. An adverse outcome for Plaintiff could also result in Defendants engaging in similar conduct, which could additionally impact Plaintiff. I am no speculator. But Plaintiff's own allegations make clear that this case involves significant economic interests for its parent corporation, in which my third-degree relative owns stock.

---

[9] The Walt Disney Company's "Disney Parks, Entertainment, and Products" segment includes more than just the Walt Disney Work Resort. The Walt Disney Company, Annual Report (Form 10-K) (November 29, 2022). This segment also includes, for example, The Walt Disney Company's other theme parks, its cruise line, and its vacation club, as well as the licensing of the Walt Disney Company's intellectual property and the sale of its branded merchandise. *Id*. I also note that operating income is just one metric used to measure the performance of a corporation and its divisions, but I find it helpful for my analysis here.

[10] The income The Walt Disney Company receives from theme park admissions, as well as park and experience merchandise, also includes income associated with other theme parks. *See* The Walt Disney Company, Annual Report (Form 10-K) (November 29, 2022).

C

Based on the language of Canon 3C(1)(d)(iii), the guidance provided by the Committee on Codes of Conduct, and the facts pertaining to this case, disqualification is required under the circumstances.

To be clear, I *do not* think it likely that the outcome of this litigation would substantially affect The Walt Disney Company's share price. Indeed, almost all of litigation involving Plaintiff is unlikely to have a substantial effect on The Walt Disney Company's share price. Plaintiff is just one slice of the vast pie that makes up The Walt Disney Company. That said, Canon 3C(1)(d)(iii) requires me to apply an ambiguous standard—with the threshold of substantially affecting the share price being somewhere between a six- and fifty-percent change—to the present case. And here, Plaintiff has alleged that Defendant's alleged retaliation has threatened its business operations, jeopardized its economic future in the region, and impacted its plan to invest billions of dollars in the region over the next decade. It is uncertain how much income The Walt Disney Company generates from Plaintiff's operation of the Walt Disney World Resort, but The Walt Disney Company's public filings reveal that its Disney Parks, Experiences and Products segment generates

considerable income for the company. Ultimately, no clear picture exists of how this case's outcome will impact—whether positively or negatively—The Walt Disney Company's share price.

Given the ambiguous standard I must apply under Canon 3C(1)(d)(iii), as well the number of unknown variables present in this case, I cannot say for sure that the outcome of these proceedings could not substantially affect the value of my family member's financial interest in The Walt Disney Company, Plaintiff's parent corporation. Even though I believe it is highly unlikely that these proceedings will have a substantial effect on The Walt Disney Company, I choose to err on the side of caution—which, here, is also the side of judicial integrity—and disqualify myself. Maintaining public trust in the judiciary is paramount, perhaps now more than ever in the history of our Republic.

### III

As set out above, Defendant's motion to disqualify me is without merit. Nevertheless, based on Canon 3C(1)(d)(iii), and the guidance provided by the Committee on Codes of Conduct, and the facts of this case, I must disqualify myself, because a relative within the third degree owns stock in Plaintiff's parent corporation, which could be substantially affected by the outcome of this case. I am confident that my colleagues on this Court can preside over the remainder of this case and judge it fairly and wisely.

Accordingly,

**IT IS ORDERED**:

1. Defendants' motion to disqualify, ECF No. 33, is **DENIED**.

2. However, for other reasons articulated here, I disqualify myself from further participation in this case.

**SO ORDERED on June 1, 2023.**

<u>**s/Mark E. Walker**</u>
**Chief United States District Judge**

14