## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

WALT DISNEY PARKS AND RESORTS U.S., INC.,

    *Plaintiff*,

    v.                                             No. 4:23-cv-163-AW-MJF

RON DESANTIS, in his official capacity
as Governor of Florida, et al.,

    *Defendants*.

_____/

## STATE DEFENDANTS' MOTION TO DISMISS
## AND INCORPORATED MEMORANDUM OF LAW

In 1967, a sweetheart deal with the State vested Walt Disney Parks and Resorts (Disney) with unprecedented power to govern itself. That year saw the creation of the Reedy Creek Improvement District (RCID), a local-government entity that governed Disney's territory in central Florida. The District's governing structure exploited Disney's status as the majority landowner by giving landowners—mainly of course Disney—one vote per acre of land for each seat on RCID's governing board. The result was that Disney had the pleasure of selecting every member of RCID's board from 1967 to present—"as clear a case" of corporate capture "as this Court is ever likely to see." DE25 ¶ 10.

Special districts in Florida typically operate for limited governmental purposes—water-management services, for example. RCID's powers, however,

gave Disney carte blanche to govern itself. Local taxes? Disney set them. Building and safety codes? Disney set those, too. Caps on land development? Disney made the final call. Disney could exercise eminent domain, permitting it to annex territory even outside the District's borders, all without legislative approval. It could build and operate an airport, or even a nuclear power plant.

In 2022, the Legislature passed, and the Governor signed, a tandem of bills reining in RCID's outsized authority and reconstituting it as a new entity—the Central Florida Tourism Oversight District (CFTOD), the governing board of which would be selected not by a California corporation, but by the People's elected chief executive—the Governor—and confirmed by the People's representatives in the Senate.

In the waning days of its corporate kingdom, Disney rushed through a series of collusive agreements between itself and its puppet RCID board. The agreements purported to bequeath to Disney much of the power that the State itself had given RCID. The newly appointed CFTOD Board announced that it would not comply with Disney's contracts because they were void under Florida law. For good measure, the State also enacted a law barring CFTOD from complying with the agreements in any event.

Its last-ditch power grab having been foiled under state law, Disney now turns to federal constitutional law to sue the Governor, the Secretary of the Florida

Department of Economic Opportunity, the CFTOD Board, and CFTOD's Administrator. Its claims are meritless for many reasons, not least of which is that a special district cannot bind the State to transfer a portion of its sovereign authority to a private entity.

But first things first. The Court lacks jurisdiction over at least two defendants—the Governor and the Secretary—who are also immune from suit. Although Disney has grabbed headlines by suing the Governor, Disney—like many litigants before it who have challenged Florida's laws[1]—has no basis for doing so. Neither the Governor nor the Secretary enforce any of the laws at issue, so Disney lacks standing to sue them, *see City of S. Miami v. Governor of Fla.*, 65 F.4th 631, 643 (11th Cir. 2023); *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201–02 (11th Cir. 2021); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020), and they are improper defendants under *Ex parte Young*, *see Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 534 (2021); *cf. Jacobson*, 974 F.3d at 1257. The Governor also is entitled to legislative immunity, which shields

---

[1] *See, e.g.*, *Falls v. DeSantis*, No. 4:22-cv-166, 2022 WL 19333278, at *1 (N.D. Fla. July 8, 2022) (dismissing Governor from challenge to law he did not enforce); *Dream Defs. v. DeSantis*, 553 F. Supp. 3d 1052, 1078–79 (N.D. Fla. 2021) (same); *Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1137 (N.D. Fla. 2020) (same); *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1209 (N.D. Fla. 2020) (same); *see also Equal. Fla. v. Fla. State Bd. of Educ.*, No. 4:22-cv-134, DE92 (N.D. Fla. July 27, 2022) (in which plaintiffs eventually dismissed their claims against the Governor).

"both governors' and legislators' actions in the proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015).

## STATEMENT OF THE CASE

1.    In Florida, "[s]pecial districts" are local-government entities that generally administer one or more discrete governmental functions in a "limited geographic" region. Fla. Stat. § 189.012(6); *see, e.g.*, Fla. Stat. §§ 298.001, 298.005 (describing water-management districts). Like all "[l]ocal governments," special districts are "creatures of the State without any independent sovereignty." *Fried v. State*, 355 So. 3d 899, 908 (Fla. 2023). Accordingly, the State may create, modify, or dissolve them—powers it exercises often.[2]

In 1967, the State determined that an undeveloped, 43-mile tract of land in central Florida would benefit from a special district. To that end, it modified a judicially created special district already operating in the area (the Reedy Creek Drainage District) and rebranded it under a new name: the Reedy Creek Improvement District. Ch. 67-764, § 1, Laws of Fla. (1967). From the start, Disney

---

[2] *See, e.g.*, *Gulf Coast Transp., Inc. v. Hillsborough Cnty.*, 352 So. 3d 368, 372–73 (Fla. 2d DCA 2022) (in which the State dissolved a special transportation district in Hillsborough County).

has been RCID's supermajority landowner, owning roughly 69% of the District's territory.[3]

The revamped District was unusual. Unlike most districts—which typically provide a particular government service—RCID had a lofty mandate to "experiment[]" with "new and advanced concepts" to "create favorable conditions" for a "recreation-oriented community" that would both cement Florida's "leadership as a tourist state" and encourage "newcomers [to] mak[e] Florida their permanent home." Ch. 67-764 at 5. To achieve those ends, RCID was given "broad powers typically reserved for municipal and county governments." OPPAGA Report at 3. For just a few examples, RCID had virtually "exclusive authority [over] the construction of public roads within the District," Ch. 67-764 at 2, "superced[ing]" that "of the State Road Department of Florida and of any other agency or authority of the State," *id.* § 10(2).[4] It could exercise eminent domain even outside the District's "territorial limits"—including "without limitation [upon] property owned by any other political body"—and was shielded from the eminent-domain power of other state entities. *Id.* § 9(5). It was exempt from the State's building and safety codes and could instead adopt codes of its choosing (called the "EPCOT Codes").

---

[3] Office of Program Policy Analysis & Government Accountability, *Central Florida's Reedy Creek Improvement District Has Wide-Ranging Authority* 2 (Dec. 2004), https://oppaga.fl.gov/Documents/Reports/04-81.pdf (OPPAGA Report); *see also* DE25 ¶¶ 35–36.

[4] The State Road Department is now part of the Florida Department of Transportation. *See Fla. Dep't of Transp. v. Clipper Bay Invs., LLC*, 160 So. 3d 858, 864 (Fla. 2015).

*Id.* § 23(2)–(3); OPPAGA Report at 4. It could use public funds to advertise "attractions within the District," Ch. 67-764, § 9(15), and could stretch its boundaries without any authorization from the Legislature, *id.* § 64(1). It could build and own airports and develop "novel and experimental [transportation] facilities, such as moving platforms and sidewalks." *Id.* § 9(16). It could even generate and transmit "power through nuclear fission," and develop "other new and experimental sources" of energy. *Id.* § 9(17).

RCID's sweeping authority was not its only oddity. Its five-member board of supervisors was elected not by RCID's citizens, but by "landowners" in the District, *id.* § 4(5), and each landowner could cast one vote for roughly "every acre of land" it owned in RCID in every board-member election, *id.* As a result, Disney—RCID's vast-majority landowner—had an electoral monopoly for every board seat, empowering the corporation to hand-select its local regulator. And indeed, since RCID's creation, Disney's chosen candidate has won every board election. *See* OPPAGA Report at 2.

2.    In 2022, the State determined that RCID was an anomalous entity long overdue for reform. It thus passed SB 4C in April 2022, which set RCID and several other antiquated districts for dissolution effective June 2023. *See* Ch. 2022-266, § 1(2), Laws of Fla. Later, however, the State concluded that the best course was not

to dissolve RCID, but to reform it—just as the State had reformed the Reedy Creek Drainage District to pave way for RCID years before. *See* Ch. 67-764, § 1.

The Legislature thus passed HB 9B. *See* Ch. 2023-5, Laws of Fla. (2023).[5] That bill renamed RCID the "Central Florida Tourism Oversight District" and eliminated the District's land-based electoral scheme in favor of a governing board appointed by the Governor. *Id.* §§ 1, 4. The bill also eliminated RCID's exemption from Florida's building and safety codes, *id.* § 10; its near-exclusive control over in-district roadways, *id.* § 9; its abnormal eminent-domain powers, *id.* § 8(5); its capacity to build airports and "novel" transportation facilities, *id.* § 8(14); its right to transform its boundaries without State approval, *compare* Ch. 2023-5, *with* Ch. 67-764 § 64(1); its power to use public funds to advertise "attractions" within the District, *compare* Ch. 2023-5, *with* Ch. 67-764, § 9(15); and its permission to generate and transmit nuclear power or other "experimental" energy sources, Ch. 2023-5 § 8(15).

On February 27, 2023, the Governor signed HB 9B into law and appointed the CFTOD Board members. DE25 ¶ 128. The bill took effect immediately.

---

[5] All references to HB 9B in this motion refer to sections of the amended CFTOD charter, not to the section numeration in HB 9B itself.

**3.**      While the Legislature was deliberating over HB 9B, but before the law took effect, RCID's outgoing board undertook to surrender to Disney much of RCID's governmental power through a series of development contracts.

By way of background, development in a special district is governed by a "comprehensive plan." Fla. Stat. §§ 163.3161, 163.3177. Special districts must re-evaluate their plans and consider possible amendments every seven years. Fla. Stat. § 163.3191(1). RCID began its most recent evaluation in 2018, proposing modest amendments to the existing plan that focused on de-annexing certain land and updating the plan to comply with Florida's Administrative Code. *See* CFTOD Decl. ¶ 24.[6] After their initial introduction, though, RCID left the amendments dormant for nearly four years. *See id.* ¶ 25; DE25 ¶¶ 45–46.

Then, just a month after the State scheduled RCID for dissolution, DE25 ¶ 46, RCID's board approved radically altered versions of the amendments that aggrandized Disney's power to develop property within the District. *See* CFTOD Decl. ¶ 27. Among other things, the new amendments skyrocketed the permitted densities and intensities of private development within RCID and called for construction of sizeable public-works projects funded by local taxes. *Id.*[7] RCID

---

[6] Meeting Package, *Central Florida Tourism Oversight District Board of Supervisors* 9–24 (April 26, 2023), https://www.rcid.org/wp-content/uploads/2023/04/CFTOD-4-26-23-BOS-Packet-FINAL-revised-4-24-23.pdf (containing CFTOD Declaration).

[7] *See also, e.g.*, RCID Comprehensive Plan 2032 9B1–45 (July 15, 2022), https://www.rcid.org/wp-content/uploads/2023/02/2032-RCID-Comprehensive-Plan.pdf.

introduced and adopted the new amendments in the same meeting, DE25 ¶ 46, even though it never attached the amendments' text to the adoptive resolution, CFTOD Decl. ¶ 25; *see* Fla. Stat § 166.041 (requiring that the text be provided), and even though adopting the altered amendments flouted a detailed procedural process that localities must follow when passing ordinances, *see, e.g.*, Fla. Stat. § 166.041.

Alongside all that, on the same day the Legislature passed HB 9B, RCID executed two contracts with Disney—a set of restrictive covenants and a development agreement. DE25-1, 25-2. Both contracts purport to assign Disney substantial governmental authority. The development agreement, for example, assigns to Disney exclusively *all* development rights in the District. DE25-1 at 6. In other words, the agreement precludes any other entity—even the District—from developing property without Disney's say-so. The agreement also empowers Disney to set the maximum height of any building constructed in the District, *id.* at 3; mandates that the District issue new general-obligation bonds financed by local property taxes to fund future development, *id.*; and obligates RCID to let Disney pursue the greatest development density and intensity available under the comprehensive plan, *id.* at 4–6.

The restrictive covenants, in turn, hinder the District's ability to use its own property contrary to Disney's commands. The covenants, for instance, restrict the District to using its property solely for those uses existing on February 8, 2023 (or

as contemplated in the comprehensive plan), DE25-2 at 3; bar the District from altering its property without Disney's consent, *id.* at 3–4; and even hamper the District from speaking out against Disney or promoting any entity besides the District on the District's own property, *id.* at 3.

4.     After HB 9B took effect and the CFTOD Board assumed office, the Board determined and declared that both the contracts and the comprehensive plan were riddled with legal deficiencies and were thus void under Florida law. DE25 ¶ 155–56, 158 (the CFTOD Declaration); *see also supra* n.6.

The Legislature also enacted SB 1604, which "preclude[s]" an independent special district "from complying with the terms of any development agreement, or any other agreement for which the development agreement serves" as "consideration," when the agreement "is executed" three months before "the effective date of a law" changing the electoral structure of a district from election to appointment or vice versa. Ch. 2023-31, § 5, Laws of Fla. (2023). The bill requires the newly installed governing board to review the agreement "within 4 months of taking office" and decide "whether to [readopt the] agreement." *Id.*

5.     Disney subsequently filed this lawsuit against the Governor and the Secretary of the Department of Economic Opportunity (the State Defendants), along with the new CFTOD Board and CFTOD's Administrator (the CFTOD Defendants). Disney claims that all Defendants are liable for violating the Contract Clause (Count

I), the Takings Clause (Count II), substantive due process (Count III), and for First Amendment retaliation based on purportedly rendering the contracts void (Count IV) and reorganizing RCID (Count V). CFTOD has also sued Disney in Florida state court, seeking a declaration that the contracts are void and unenforceable on numerous state-law grounds, including failure to comply with various contractual and procedural requirements. *See* No. 2023-CA-11818, *Cent. Fla. Tourism Oversight Dist. v. Walt Disney Parks and Resorts U.S., Inc.* (Fla. Cir. Ct.).

## LEGAL STANDARD

In deciding a motion to dismiss a complaint, the Court must "assume the veracity of well-pleaded factual allegations" but must not credit mere "labels and conclusions." *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022) (cleaned up). The well-pleaded allegations, "accepted as true," must be sufficient "to state a claim to relief that is plausible on its face." *Id.* (cleaned up). The alleged facts must be "more than merely *possible*, and a plaintiff's factual allegations that are merely consistent with a defendant's liability will not be considered facially plausible." *Id.* (cleaned up; emphasis in original). A claim is plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

For the reasons set forth in the CFTOD Defendants' contemporaneously filed motion to dismiss, the amended complaint fails to state a claim on which relief can be granted. This motion raises several other independent bases for dismissal: Disney lacks standing to sue the Governor and Secretary, who are also immune from suit.

## I.   DISNEY LACKS STANDING TO SUE THE STATE DEFENDANTS.

The amended complaint fails to plead that Disney has standing to sue the State Defendants. *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). To show standing, Disney must establish "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citation omitted). Because "standing is not dispensed in gross," Disney must demonstrate standing "for each claim that [it] press[es] and for each form of relief that [it] seek[s]." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).

Disney challenges two general types of state action: (1) the rejection of its contracts (Counts I–IV), and (2) the reorganization of RCID (Count V). Any alleged

injuries that might flow from those acts, however, are not traceable to the State Defendants, and enjoining the State Defendants would not provide Disney relief.

## A.    The contract claims (Counts I–IV)

For its contract claims, Disney asks this Court to "enjoin[] Defendants from enforcing" the CFTOD Declaration and SB 1604 because each has supposedly caused Disney to lose the purported benefit of its contracts. DE25 ¶¶ 205–06, 209. But to establish traceability and redressability, Disney must show that the State Defendants have "the authority to enforce the particular provision[s] that [Disney] has challenged, such that an injunction prohibiting enforcement would be effectual." *Support Working Animals*, 8 F.4th at 1201 (citation omitted). Because neither the Secretary nor the Governor enforces SB 1604 or the CFTOD Declaration, Disney cannot meet its burden. *See id.*[8]

The Secretary makes for short work, as she has no connection at all to SB 1604, the CFTOD Declaration, or the putative contracts. Disney complains only of her duty to "maintain the Official List of Special Districts," including the formerly titled RCID. DE25 ¶ 22. But that duty has nothing to do with the alleged contracts or the acts related to them, which explains why Disney never mentions the Secretary

---

[8] Disney also seeks a "[d]eclar[ation] that the Contracts remain in effect and [are] enforceable," DE25 at 79, but that does not change the analysis. The "Declaratory Judgment Act does not enlarge the jurisdiction of the federal courts," so Disney must still establish standing to sue the State Defendants. *Wendy's Int'l, Inc. v. City of Birmingham*, 868 F.2d 433, 435 (11th Cir. 1989). For the reasons stated in the text, Disney cannot do so.

or her duties in any of its contract-related counts. *Id.* ¶¶ 176–209. No causal chain links the Secretary to Disney's loss of its contractual benefits, *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1272 (11th Cir. 2019), nor would an order enjoining the Secretary from enforcing SB 1604 and the CFTOD Declaration "be effectual," *Support Working Animals*, 8 F.4th at 1201 (citation omitted).

Disney similarly identifies no authority for the Governor to enforce Disney's contracts, the CFTOD Declaration, or SB 1604. Nothing in either the contracts or the CFTOD Declaration[9] purports to endow the Governor with any power. And SB 1604 "preclude[s]" CFTOD "from complying with the terms of" the contracts, but mentions nothing of the Governor. Ch. 2023-31, § 5. Rather, the Board is "independent[ly] oblig[ed] to follow" the Legislature's command. *City of S. Miami v. Governor of Fla.*, 65 F.4th 631, 643 (11th Cir. 2023). That statutory structure makes this case much like the many others in which plaintiffs lacked standing to sue a state official for laws enforced by local officials or private parties. In *City of South Miami*, for instance, plaintiffs lacked standing to sue the Governor for a law that, independent of the Governor's action, required local officials to cooperate with

---

[9] In fact, *no one* enforces the CFTOD Declaration. The Declaration does not have freestanding legal force. It merely recognizes that the contracts are void under background principles of Florida law. *See, e.g.*, CFTOD Decl. ¶ 9 ("Because the District failed to comply with 163.3225(2)(a), the development agreement is void and unenforceable."). The Declaration, in other words, does not purport to render the contracts void by its own operation—it is simply a statement reflecting CFTOD's belief that independent sources of state law render the contracts void. It is not an independently enforceable state action.

federal immigration authorities. 65 F.4th at 640–44. Similarly in *Jacobson*, plaintiffs lacked standing to sue the Florida Secretary of State for an election law administered by local election supervisors. 974 F.3d at 1253. And in *Lewis v. Governor of Alabama*, plaintiffs lacked standing to sue Alabama's Attorney General for a law preempting local minimum wage laws that had no state enforcement scheme. 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc); *see also Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021) (no standing to sue state actors that did not enforce state abortion law, which was instead enforced by private actors). In all relevant respects, this case is no different. The only entities that arguably enforce SB 1604 are the special districts that must comply with it, and they must do so regardless of the Governor's actions.

Nor does it matter that Florida's Constitution empowers the Governor to suspend board members for failing to follow state law. *See* Fla. Const. art. IV, § 7. In both *Lewis* and *Jacobson*, the Eleventh Circuit rejected the argument that a state official "enforced" a challenged law because it had general authority to sue local officials for disregarding that law. *Lewis*, 944 F.3d at 1301 (Alabama Attorney General); *Jacobson*, 974 F.3d at 1253 (Florida Secretary of State). And in *City of South Miami*, the Eleventh Circuit held that the Governor's power to suspend local officials for refusing to follow the law did not allow him to "enforce"—for standing purposes—a law requiring local cooperation with federal immigration officials. 65

F.4th at 642–43. Any other view would "prove[] entirely too much," because it would make the Governor, through his suspension power, "a proper party defendant under innumerable provisions of the [Florida] Code." *See id.* at 643 (quoting *Lewis*, 944 F.3d at 1300).

Disney also cannot claim that the Governor enforces SB 1604 just because he signed it. When the Governor signs a bill, he acts in a legislative, not executive, capacity, *see Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998), and the Eleventh Circuit has explained that a plaintiff may not "challenge a law by suing the legislators who enacted it instead of the officials who execute it," *Jacobson*, 974 F.3d at 1257. The Eleventh Circuit reinforced that idea in *Support Working Animals* when it recognized that the Florida Attorney General's role "in crafting [the challenged] legislation" did not "satisfy the traceability requirement." 8 F.4th at 1204. The Governor's legislative role in signing SB 1604 therefore cannot establish that Disney's alleged contractual losses are traceable to or redressable by him.

## B.     The reorganization claim (Count V)

Disney also asks this Court to "enjoin[] Defendants from enforcing" Senate Bill 4C and House Bill 9B—the laws reorganizing RCID and reinstituting it as CFTOD—and to declare those laws unenforceable because Disney purportedly "faces concrete, imminent, and ongoing injury as a result of CFTOD's new powers and composition." DE25 ¶¶ 214, 220. As with its contract claims, Disney cannot

show that those alleged harms are traceable to, or redressable by, the State Defendants.

Neither SB 4C nor HB 9B give the Secretary any authority over CFTOD's new powers or CFTOD's new board. The only connection Disney identifies is the Secretary's ministerial duty "to maintain the Official List of Special Districts." DE25 ¶ 22 (citing Fla. Stat. §§ 189.061, 189.012). But that mine-run bookkeeping act does not animate CFTOD or affect its powers. Rather, CFTOD's existence and powers are governed by SB 4C and HB 9B—neither of which meaningfully implicate the Secretary's job duties. *Cf. Whole Woman's Health*, 142 S. Ct. at 533 (ministerial actors cannot be sued under *Ex parte Young*).

The same is true of the Governor. His sole connection to CFTOD is his authority to appoint CFTOD's Board. *See* Ch. 2023-5, § 4. But an official's appointment power is not even enough to satisfy *Ex parte Young*'s more-relaxed "some connection" standard,[10] let alone Article III's more-stringent traceability requirement. *See Falls*, 2022 WL 19333278, at *1 ("[T]he *Ex parte Young* analysis is, if anything, more lenient than Article III's traceability requirement . . . .").

---

[10] *See, e.g.*, *Peter B. v. Sanford*, No. 6:10-cv-767, 2010 WL 5684397, at *3 (D.S.C. Dec. 6, 2010) (collecting cases holding that appointment power does not satisfy *Ex parte Young*), *report and recommendation adopted*, No. 6:10-cv-767, 2011 WL 347019 (D.S.C. Feb. 1, 2011); *see also Equal. Fla.*, 2022 WL 19263602, at *8 & n.8; *Denton v. Bd. of Governors*, No. 4:22-cv-341, DE65 at 3–4.

## II.  DISNEY'S CLAIMS AGAINST THE STATE DEFENDANTS ARE BARRED BY SOVEREIGN IMMUNITY.

The Eleventh Amendment bars federal-court litigation against the State unless the immunity is waived or validly abrogated by Congress. *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). Under *Ex parte Young*, 209 U.S. 123 (1908), there is an exception for suits seeking prospective injunctive relief against individual state officials who "enforce the law . . . at issue in the suit." *Grizzle*, 634 F.3d at 1319. But as described above (at 12–17), neither the Governor nor the Secretary enforces SB 1604, the CFTOD Declaration, SB 4C, or HB 9B. Those acts are enforced, at most, by the Board, either as a party to alleged contracts or as the entity animated by the tandem of SB 4C and HB 9B.

Disney's attempts to link the State Defendants to those laws are unpersuasive. Disney mainly focuses on the Governor's role in signing SB 1604, SB 4C, and HB 9B, *see* DE25 ¶ 21, but again, signing a law is not "enforcing" a law, *cf. Jacobson*, 974 F.3d at 1257; *Support Working Animals*, 8 F.4th at 1204, and the Governor is entitled to absolute legislative immunity for that act in any event, *infra* 19–23. Nor does the Governor's power to appoint CFTOD Board members establish an adequate connection to the challenged acts, *supra* n.10 (collecting cases holding that the power to appoint enforcing officials does not make the appointing official an *Ex parte Young* defendant); *see also Equal. Fla. v. Fla. State Bd. of Educ.*, No. 4:22-cv-134, 2022 WL 19263602, at *8 & n.8 (N.D. Fla. Sept. 29, 2022) (observing that an

official's appointment power did not suffice to make him an *Ex parte Young* defendant, and that the plaintiffs had specifically "withdr[awn] their claims against the Governor because of Eleventh Amendment immunity, even though the Governor" had appointment power); *Denton v. Bd. of Governors*, No. 4:22-cv-341, DE65 at 3–4. The Governor's general power to suspend local officials, too, does not establish a sufficient enforcement connection under *Ex parte Young*. *See Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003) ("A governor's 'general executive power' is not a basis for jurisdiction in most circumstances."). Nor is the Secretary's clerical role of jotting CFTOD's name in the state record the type of enforcement responsibility that waives sovereign immunity. *Cf. Whole Woman's Health*, 142 S. Ct. at 533 (ministerial actors do not enforce laws).

The Court should dismiss the claims against the State Defendants on sovereign-immunity grounds.

### III. DISNEY'S CLAIMS AGAINST THE GOVERNOR ARE BARRED BY LEGISLATIVE IMMUNITY.

Disney's claims against the Governor turn on his "call[ing] on the Legislature to pass bills to punish Disney for its speech" and "sign[ing]" those bills into law. *See, e.g.*, DE25 ¶ 21. Because those acts are "legislative" in character, Disney's claims against the Governor run square into his legislative immunity. *Bogan*, 523 U.S. at 54–55.

In Section 1983 cases, state officials are absolutely immune from suit for actions taken "in the sphere of legitimate legislative activity." *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951). The doctrine "shields from suit not only legislators, but also public officials outside of the legislative branch when they perform legislative functions." *Baraka v. McGreevey*, 481 F.3d 187, 195–96 (3d Cir. 2007) (citing *Bogan*, 523 U.S. at 54). The question is whether the challenged governmental act "is legislative" in character, and that "turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54–55.

"[S]tripped of all considerations of intent and motive," *id.* at 55, the acts that Disney rests its claims on were the proposal of, advocacy for, and execution of legislation—core *legislative* roles expressly assigned to the Governor by the Florida Constitution, *see* Fla. Const. art. III, § 8 ("veto" or "approval" of legislation); *id.* art. IV, § 1(e) ("propos[al]" and "recommend[ation]" of legislation). Disney cannot argue, as others have tried, that "legislative immunity does not apply because . . . these are political, not legislative, activities." *Baraka*, 481 F.3d at 196. Courts—from the Eleventh Circuit to the Supreme Court—have rejected that argument because "[t]he privilege protects the legislative process itself" and therefore "covers both governors' and legislators' actions in the proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015); *see also Women's Emergency Network*, 323 F.3d at 950 ("Under the doctrine of absolute legislative

immunity, a governor cannot be sued for signing a bill into law." (citing *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 731–34 (1980))).

In *Bogan*, for example, a unanimous Supreme Court held that legislative immunity protected a city mayor in his proposing, and signing into law, the city's budget. 523 U.S. at 55. The same is true for the Governor of the Nation's third-largest state in his proposing, advocating, and signing into law SB 4C, HB 9B, and SB 1604. "[W]hen a governor and a governor's appointee advocate bills to the legislature, they act in a legislative capacity," even if their advocacy rises to the level of "orchestrat[ing] and direct[ing]" the passage of legislation, as Disney alleges here. *Baraka*, 481 F.3d at 196–97 (citing *Tenney*, 341 U.S. at 376).

Disney's allegations of retaliatory intent do not change the analysis. The claim in *Bogan* was that the enactment of the city's budget was motivated by racial animus, as well as by an illicit desire to eliminate the plaintiff's position in retaliation for her First Amendment protected activity. 523 U.S. at 46–48. The Supreme Court still held the claim barred by legislative immunity, explaining that "[t]he privilege of absolute immunity 'would be of little value if [officials] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.'" *Id.* at 54–55 (quoting *Tenney*, 341 U.S. at 377). Thus, "the nature of the

act" is dispositive, and "the motive or intent of the official performing it" is irrelevant. *Id.* at 54.

It may well be that the "formally legislative character" of the bills "is alone sufficient to entitle [the Governor] to legislative immunity." *Id.* at 55. The Supreme Court reserved that question in *Bogan* because there the challenged acts were legislative "in *substance*" as well. *Id.* (emphasis in original). The Court explained that the challenged bills "reflected a discretionary, policymaking decision implicating . . . budgetary priorities" and "services the [government] provides to its constituents." *Id.* at 55–56. The same is true here: The bills Disney complains of "have prospective implications that reach well beyond the particular" agreements at issue "in a field where legislators traditionally have power to act." *Id.* at 56 (citing *Tenney*, 341 U.S. at 379). SB 4C and HB 9B, after all, reflect the State's sovereign prerogative to reorganize a local government that provides services and levies taxes in a major metropolitan region. And SB 1604 reflects the State's sovereign prerogative to ensure that such reorganization is given effect and not undermined by poison-pill agreements. These acts, in short, are exactly the kind of legislative decisions that legislative immunity protects.

That is no less true even if the bills targeted RCID and "the Contracts specifically." DE25 ¶ 162. Legislative immunity shields even "very narrow actions." *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 973–74 (9th Cir. 2010) (Kozinski,

C.J., concurring). In *Community House*, for example, the city "establish[ed]" a community shelter, leased it to the plaintiff organization, and "eventually took over," "closed the shelter and evicted everyone," "then leased the building for a dollar a year to a [different organization] with an option to purchase at a below-market price." *Id.* at 973. The city council "monitor[ed] [and] administer[ed]" the lease by adopting ordinances targeted at the lease, and those actions were shielded by legislative immunity because they reflected a decision about the disbursement of public resources. *Id.* at 960–62 (majority op.); *see also Young v. Mercer Cnty. Comm'n*, 849 F.3d 728, 734 (8th Cir. 2017) ("[T]he district court correctly ruled the Commissioners are entitled to legislative immunity for their termination of the Agreement and cessation of rent payments."). In short, it is the act's character, not its scope, that makes it legislative.

The Eleventh Circuit has likewise held that "[u]nlike the termination of an individual employee," which "generally [is] administrative," eliminating the individual's public employment position "through traditional legislative functions such as policymaking and budgetary restructuring" falls squarely within the scope of the privilege. *Bryant v. Jones*, 575 F.3d 1281, 1306 (11th Cir. 2009). "[T]he decision to abolish the position . . . is properly construed as embodying a policy decision with prospective implications." *Id.* at 1306–07. That is so even if the "facts obviously suggest an improper motive" or the decision was "an artifice for what was

in fact a retaliatory personnel decision." *Id.* at 1307, 1303. As the Supreme Court has made clear, "[t]he claim of an unworthy purpose does not destroy the privilege." *Id.* at 1307 (quoting *Tenney*, 341 U.S. at 377). The Governor's legislative immunity therefore bars Disney's claims here.

## IV.   DISNEY FAILS TO STATE A CLAIM.

Finally, the State Defendants adopt and incorporate the additional arguments raised in the CFTOD Defendants' motion to dismiss.

## CONCLUSION

For these reasons, the Court should dismiss the amended complaint, or at minimum, dismiss all claims against the State Defendants.

Dated: June 26, 2023

Respectfully submitted,

ASHLEY MOODY
  *Attorney General of Florida*

JOHN GUARD (FBN 374600)
  *Chief Deputy Attorney General*

JAMES H. PERCIVAL (FBN 1016188)
  *Chief of Staff*

*/s/ Henry C. Whitaker*
HENRY C. WHITAKER (FBN 1031175)
  *Solicitor General*

DANIEL W. BELL (FBN 1016188)
  *Chief Deputy Solicitor General*

DAVID M. COSTELLO (FBN 1004952)
  *Deputy Solicitor General*

**OFFICE OF THE ATTORNEY GENERAL**
The Capitol, PL-01
Tallahassee, FL 32399
(850) 414-3300
*henry.whitaker@myfloridalegal.com*

*Counsel for Governor DeSantis and
Secretary Ivey*

## CERTIFICATE OF COMPLIANCE

This motion complies with the requirements of Local Rule 7.1(F) because it contains 5,598 words.

*/s/ Henry C. Whitaker*
Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2023, a true and correct copy of the foregoing

was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Henry C. Whitaker*
Solicitor General