**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

WALT DISNEY PARKS AND RESORTS
U.S., INC.,

     *Plaintiff*,

v.

RONALD D. DESANTIS, in his official
capacity as Governor of Florida, et al.,

     *Defendants*.

Case No. 4:23-cv-163-AW-MJF

## CFTOD DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO ABSTAIN OR DISMISS

Jason Gonzalez (No. 146854)
LAWSON HUCK GONZALEZ PLLC
215 S. Monroe Street, Suite 320
Tallahassee, FL 32301
Tel: (850) 825-4334

Charles J. Cooper (No. 248070DC)
David H. Thompson (No. 450503DC)
Peter A. Patterson (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
Joseph O. Masterman (No. 1004179)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601

June 26, 2023

*Counsel for Defendants Martin Garcia,
Charbel Barakat, Brian Aungst Jr., Ron
Peri, Bridget Ziegler, and Glenton
Gilzean, Jr.*

# TABLE OF CONTENTS

<u>**Page**</u>

TABLE OF AUTHORITIES ............................................................ iii

INTRODUCTION ....................................................................1

FACTUAL BACKGROUND ..........................................................5

    A.    The Florida Legislature Creates the Reedy Creek Improvement District. ..........................................................................5

    B.    The Florida Legislature Replaces the Reedy Creek Improvement District With A More Democratically Responsive Regulatory Entity. .....6

    C.    Days Before the New Entity Takes Over, the Reedy Creek Improvement District Purports To Give Long-Term Control To Disney.........................7

    D.    The Lame-Duck Entity's Agreements Are Deemed Void And Prompt Multiple Lawsuits. ......................................................9

STANDARD OF REVIEW ......................................................... 11

ARGUMENT ......................................................................12

  I.    The Court Should Abstain Under *Pullman*. ................................12

  II.    The Restrictive Covenant's Forum-Selection Clause Requires Dismissal Under the Doctrine of *Forum Non Conveniens*.............................15

  III.    Disney Has No Claim Under the Contracts Clause......................19

    A.    The Development Agreement and Restrictive Covenants are not valid contracts................................................................20

    B.    The Legislative Declaration is merely a declaration that the Development Agreement and Restrictive Covenants are void. ..........23

    C.    The Development Agreement and Restrictive Covenants are not protected by the Contracts Clause because they delegate sovereign power to a private entity....................................................25

i

D.    Any Impairment Was Not Substantial and Advanced Important Government Interests. ...........................................................27

IV.  Disney's Takings Clause Claim Must Be Dismissed. ...................30

    A.    The Development Agreement and Restrictive Covenants are not "property" under the Fifth Amendment. ..............................................31

    B.    Even if Disney had a property interest, it was subjected to subsequently enacted state law..........................................................32

    C.    The Legislative Declaration did not take Disney's alleged contract rights because the Declaration did not impair those rights. ...............35

    D.    Disney is not entitled to equitable relief as a matter of law...............37

V.  Disney's Due Process Clause Claim Must Be Dismissed. ...........................38

    A.    The Legislative Declaration does not impose any loss on Disney......38

    B.    The Legislative Declaration and SB 1604 are supported by a rational basis. ...............................................................................................38

VI.  Disney's First Amendment Retaliation Claims Fail.......................................40

    A.    Disney's First Amendment retaliation claims are foreclosed by *In re Hubbard*...............................................................................................40

    B.    The First Amendment does not constrain Florida's decision to reconstitute state entities that exercise sovereign power. ...................42

    C.    Because the Board's Legislative Declaration was government speech, Disney's retaliation claim fails...........................................................44

CONCLUSION ...........................................................................................46

# TABLE OF AUTHORITES

**Cases**          **Page**

*Abell v. Frank*, 625 F.2d 653 (5th Cir. 1980) ............................................................12

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) ................................25

*AllPlus Comput. Sys. Corp. v. Cisco Sys. Inc.*, No. 1:20-cv-24398, 2021 WL
    8743566 (S.D. Fla. Feb. 4, 2021) ....................................................................19

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
    571 U.S. 49 (2013)..............................................................................................15

*Batterman v. Leahy*, 544 F.3d 370 (1st Cir. 2008) ...................................................*14*

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) ................................................44

*Broer v. Fla. State Univ. Bd. of Tr.*, No. 4:21-cv-328-AW-MAF, 2021 WL
    7084094 (N.D. Fla. Oct. 21, 2021)............................................................35, 36

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) ..........................................34

*Dep't of Transp. of Fla. v. Nalven*, 455 So. 2d 301 (Fla. 1984)..............................21

*Dobco, Inc. v. Cnty. of Bergen*, No. 22-0090, 2022 WL 4366271
    (D.N.J. Sept. 21, 2022) ..............................................................................17, 18

*Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204 (11th Cir. 2011) ......................17

*Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400 (1983) ...........28

*Fields v. Rockdale Cnty.*, 785 F.2d 1558 (11th Cir. 1986)......................................14

*Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935 (11th Cir. 2013) .....39

*Gen. Motors Corp. v. Romein*, 503 U.S. 181 (1992) ................................................27

*Givens v. Ala. Dep't of Corrs.*, 381 F.3d 1064 (11th Cir. 2004) .......................30, 31

*Gold-Fogel v. Fogel*, 16 F.4th 790 (11th Cir. 2021) ...............................................12

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)...............................................1, 42, 43, 44

*Hartnett v. Austin*, 93 So. 2d 86 (Fla. 1956).........................................................21

*Hobbs v. Thompson*, 448 F.2d 456 (5th Cir. 1971) .................................................14

*Holland v. Carnival Corp.*, 50 F. 4th 1088 (11th Cir. 2022)............................11, 12

*Horwitz-Matthews, Inc. v. City of Chicago*,
    78 F.3d 1248 (7th Cir. 1996) ...........................................................23, 24, 36

*Hosp. Mortg. Grp. v. First Prudential Dev. Corp.*,
411 So. 2d 181 (Fla. 1982) ...............................................................24, 25

*Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253 (2022) .....................44, 45, 46

*Hubbard*, 803 F.3d 1298 (11th Cir. 2015)..............................................5, 40, 41, 42

*Isacks v. Walton Cnty.*, No. 3:20-cv-1472, 2021 WL 4992757
(N.D. Fla. June 29, 2021) ......................................................................22

*Keane v. Jacksonville Police Fire & Pension Fund Bd. of Tr.*,
775 Fed. App'x 496, 499 (11th Cir. 2019).....................................................35

*Kentner v. City of Sanibel*, 750 F.3d 1274 (11th Cir. 2014)...................................39

*Knick v. Twp. Of Scott*, 139 S. Ct. 2162 (2019)............................................37

*Knopick v. UBS AG*, 137 F. Supp. 3d 728 (M.D. Pa. 2015)...................................19

*Lam v. Univ. of Fla.,* No. 1:21-cv-137-AW-GRJ,
2021 WL 7081491 (N.D. Fla. Oct. 21, 2021) ........................................35, 36

*Liles v. Ginn-La West End, Ltd.*, 631 F.3d 1242 (11th Cir. 2011) ..........................18

*Mangus v. Present*, 135 So. 2d 417 (Fla. 1961).............................................20

*Morgran Co. Inc. v. Orange Cnty.*,
818 So. 2d 640 (Fla. Ct. App. 2002) ...............................................21, 32, 33

*NetChoice, LLC v. Moody*, 34 F.4th 1196 (11th Cir. 2022) ...................................40

*O'Hair v. White*, 675 F.2d 680 (5th Cir. 1982) .............................................14

*Pa. Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978) ...........................35

*Parella v. Ret. Bd. of R.I. Emps.' Ret. Sys.*,
173 F.3d 46 (1st Cir. 1999)....................................................................31

*Phillips v. Wash. Legal Found.*, 524 U.S. 156 (1998)........................................31

*Pittman v. Cole*, 267 F.3d 1269 (11th Cir. 2001) ...........................................*13*

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) ........................................46

*ProEco, Inc. v. Bd. of Comm'rs of Jay Cnty*, 57 F.3d 505 (7th Cir. 1995) .............31

*Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941)......................2

*Rubano v. Dep't of Transp.,* 656 So. 2d 1264 (Fla.1995) ...................................37

*Rucker v. Oasis Legal Finance, L.L.C.*, 632 F.3d 1231 (11th Cir. 2011)..........18, 19

*S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198 (11th Cir. 2019)....27, 28

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000) ...............................12, 13

*Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326 (11th Cir. 2011) ..........16, 17

*Support Working Animals, Inc. v. DeSantis*,
    457 F. Supp. 3d 1193 (N.D. Fla. 2020) ......................................................39

*Taylor v. City of Gadsden*, 767 F.3d 1124 (11th Cir. 2014).................23, 24, 25, 27

*Trump for President, Inc. v. Boockvar*, 481 F. Supp. 3d 476
    (W.D. Pa. 2020) ..............................................................................13

*U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1 (1977) ...............................25, 26, 27

*United States v. O'Brien*, 391 U.S. 367, 383 (1968) .................................41

*United States v. Willow River Power Co.*, 324 U.S. 499 (1945) ...........................31

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) ...........................................25

*Ziegler v. Ziegler*, 632 F.2d 535 (5th Cir. 1980) .....................................14

## Constitutional Provisions, Statutes, and Legislative Materials

U.S. CONST.
    art. I, § 10, cl. 1 ...........................................................................19
    amend. V ....................................................................................37

42 U.S.C.
    § 1404(a) ....................................................................................15
    § 1983 .......................................................................................37

FLA. STAT.
    § 163.3223 ..................................................................................20
    § 163.3225 ..................................................................................22
    § 163.3231 ..................................................................................23
    § 163.3241 ..................................................................4, 27, 28, 32
    §§ 163.3220–163.3243 ......................................................................27
    § 167.3227(1)(g) ...........................................................................25, 26
    § 189.031(7)...........................................................................11, 33, 34

S.B. 4 C, Fla. Laws ch. 2022-266 ..................................................*Passim*
    § 1(2).........................................................................................7
S.B. 1604, Fla. Laws ch. 2023-31..................................................*Passim*

H.B. 9 B, Fla. Laws ch. 2023-5
    § 2(1).........................................................................................7
    § 4(1).........................................................................................7

§ 4(2)................................................................................................7
§ 8(5)..............................................................................................21
§ 9(5)................................................................................................6
H.B. 486, Fla. Laws ch. 67-764 ..............................................................5
§ 4(5)................................................................................................6
§ 9(5)................................................................................................6
§ 9(17)..............................................................................................6
§§ 24–26 .....................................................................................6, 43

## **Other Authorities**

FLA. OFF. OF PROGRAM POL'Y ANALYSIS & GOV'T ACCOUNTABILITY, REP. NO. 04-81, CENTRAL FLORIDA'S REEDY CREEK IMPROVEMENT DISTRICT HAS WIDE-RANGING AUTHORITY 2 (Dec. 2004), https://bit.ly/42X5Vt2 ..........................7

*Land and Use and Development Regulations: Hearing on S.B. 1604 Before the S. Comm. On Rules*, 2023 Leg., Reg. Sess. (Fla. Apr. 19, 2023), https://bit.ly/3XqsAgk ..........................................................29, 30

*QuickFacts for Miami, Florida*, U.S. CENSUS BUREAU (July 1, 2022), https://bit.ly/3r0JmXn ..........................................................................5

3 JULIAN C. JUERGENSMEYER, FLORIDA LAND USE LAW 2 (2d ed. 1998) .........33, 34

**INTRODUCTION**

"Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). This case is a frontal assault on this bedrock principle of our constitutional order. Walt Disney Parks and Resorts, U.S., Inc. ("Disney"), prefers the old structure and governing composition of the Central Florida Tourism Oversight District (formerly the Reedy Creek Improvement District ("RCID"), hereafter, the "District"), which gave Disney de facto authority to govern itself through hand-picked board members, to the current structure that has been established by the people of Florida acting through their elected representatives, which places appointment authority with the Governor. Indeed, Disney has gone to great lengths in its attempt to thwart the will of the people of Florida, including by colluding with the outgoing RCID leadership to try to enter into eleventh-hour contracts (the Development Agreement and Restrictive Covenants) that purport to hamstring the new Board of Supervisors' ability to govern the District for decades to come. And Disney has now filed this lawsuit, raising a host of baseless constitutional claims against the legislation reforming the District, the new Board's Legislative Declaration finding that the eleventh-hour Development Agreement and Restrictive Covenants are null and void under existing Florida law, and the Legislature's exercise of its express authority to preclude a special district from

1

complying with the terms of a development agreement. Disney's claims should either be held in abeyance and this case stayed pending resolution of state court litigation over the validity of the Development Agreement and Restrictive Covenants or dismissed.

*First*, this Court should enter a stay and abstain from deciding this case under *Railroad Commission of Texas v. Pullman Company*, 312 U.S. 496 (1941). Consistent with the doctrine of constitutional avoidance, *Pullman* counsels in favor of abstaining from deciding federal constitutional issues when those issues could be substantially affected by a determination of state law. Here, nearly all of Disney's claims are predicated on a hotly contested issue of State law: that the Development Agreement and Restrictive Covenants are valid contracts under Florida law. The District has filed an action in state court seeking a declaration that those contracts are null and void. If the state court agrees, all but one of Disney's claims would be defeated on that basis alone, making this a quintessential case for application of *Pullman* abstention.

*Second*, Disney itself agreed to an extremely expansive venue provision in the Restrictive Covenants, directing that any suit in any way "arising out of or pertaining to this declaration" be brought in the circuit court for Orange County, Florida. The subject matter of this litigation falls within those broad terms, and therefore Disney must assert its claims in state court.

*Third*, all of Disney's claims against the Legislative Declaration and SB 1604 fail because the Development Agreement and Restrictive Covenants are void as a matter of Florida law and therefore have never had any legal force or existence. Disney cannot possibly be entitled to declaratory and injunctive relief requiring compliance with contracts that are null and void under state law.

*Fourth*, all of Disney's claims against the Legislative Declaration fail for the additional reason that the Legislative Declaration simply declared the District's view that Disney's contracts did not comply with preexisting Florida law. The District did not purport to (and lacks the authority to) change Florida's law of government contracts. Therefore, to the extent the Development Agreement and Restrictive covenants are void, they are void by operation of preexisting Florida law; to the extent they are valid, the District's Legislative Declaration did not change that. The Legislative Declaration therefore could not possibly have impaired any of Disney's constitutional rights.

*Fifth*, Disney's property-based claims with respect to the Legislative Declaration fail because the Declaration did not abrogate or take any property rights Disney possesses in the Development Agreement and Restrictive Covenants. Instead, the Legislative Declaration is at most a breach (and an anticipatory one at that). If Disney has any remedy for that action, it is for breach of contract, not for violation of the federal Constitution.

3

*Sixth*, all of Disney's property-based claims also fail because the bargain struck by the legislature to authorize localities to enter development agreements expressly states that such agreements are subject to state laws "enacted after the execution of a development agreement which are applicable to and preclude the parties' compliance with the terms of a development agreement." FLA. STAT. § 163.3241. SB 1604 is precisely such a law, and therefore its enactment cannot have impaired Disney's contractual rights in a constitutionally material way (or even have breached the contracts, for that matter).

*Seventh*, even if there were a taking here (and there has not been), Disney's remedy would be for just compensation in an inverse condemnation action in state court or in a Section 1983 claim in federal court. In no event would the Takings Clause entitle Disney to the equitable relief it seeks here.

*Eighth*, Disney's substantive due process claim fails even assuming that Disney has property rights in the Development Agreement and Restrictive Covenants (and it does not) because the challenged actions were taken in furtherance of the eminently rational end of ensuring that the lameduck leaders of soon-to-be-restructured government entities cannot tie the regulatory hands of their successors against the will of the people of the State.

*Ninth*, Disney's First Amendment claims are squarely foreclosed by well-established, binding precedent holding that otherwise constitutional enactments

cannot be attacked on the basis of the alleged motives of those who enacted them. *See In re Hubbard*, 803 F.3d 1298 (11th Cir. 2015). And even if that were not the case, Disney does not have a First Amendment right to its preferred governance structure for the district in which it is located. To the contrary, that is a fundamental matter of state sovereignty that the First Amendment does not restrict.

For these reasons and the reasons explained below, this Court should grant this motion and deny Disney's attempt to improperly interfere with the internal governance of the State of Florida and its subdivisions.

## FACTUAL BACKGROUND

### A.    The Florida Legislature Creates the Reedy Creek Improvement District.

In 1967, the Florida Legislature created the Reedy Creek Improvement District pursuant to H.B. 486, Chapter 67-764. The Walt Disney Company owned the vast majority of land within the boundaries of the RCID. *See* First Am. Compl., Doc. 25, ¶ 36 (May 8, 2023) ("FAC"). The RCID exercised tremendous government authority over the 25,000 acres under its control—an area larger than the City of Miami. *Id*. ¶ 41.[1] For example, the RCID was authorized to exercise many of the traditional powers of local government, such as regulation of zoning and development matters, capital improvements, building code enforcement, and fire and

---

[1] *See QuickFacts for Miami, Florida*, U.S. CENSUS BUREAU (July 1, 2022), https://bit.ly/3r0JmXn (land area of Miami is 36 square miles as of 2020).

safety matters. *See Id.* ¶ 40. It had "exclusive authority [over] the construction of public roads," Fla. Laws ch. 67-764, could exercise eminent domain beyond the District's "territorial limits," *id.* § 9(5), and was even authorized by Florida law to generate and transmit "power through nuclear fission," and develop "other new and experimental sources" of energy, *id.* § 9(17). The Legislature also gave the RCID the power to levy ad valorem taxes. *See id.* §§ 24–26.

The RCID was governed by a five-member Board of Supervisors, whose only qualification for office was that they own at least one acre of land within the RCID. *See* FAC ¶ 43. Election to the Board of Supervisors required a majority vote of the RCID's electors, who had to own at least one acre of land within the RCID and who cast one vote for every acre owned. Fla. Laws ch. 67-764 § 4(5). Because Disney owned the vast majority of the land within RCID, and because of the one-acre-one-vote system governing RCID, Disney had complete control over the selection of RCID Board Members.

**B.    The Florida Legislature Replaces the Reedy Creek Improvement District With A More Democratically Responsive Regulatory Entity.**

Florida's elected representatives eventually decided that the existing structure of RCID did not adequately serve the interests of the State of Florida, its voters, or the other individuals and entities who owned land within the District but lacked

adequate representation[2]—a decision that led to the enactment of Senate Bill 4C. *See* Senate Bill 4-C, Fla. Laws ch. 2022-266 (amending FLA. STAT. § 189.0311) ("SB 4C"). That law required the dissolution of RCID on June 1, 2023. *Id.* § 1(2). Senate Bill 4C took effect on July 1, 2022.

Ultimately, the Florida Legislature decided to reform rather than abolish RCID. On February 6, 2023, HB 9B was filed in the Florida Legislature. *See* House Bill 9-B, Fla. Laws ch. 2023-5 ("HB 9B"). Among other things, HB 9B reformed RCID's governance structure. *Id.* § 4(1). Membership on the Board of Supervisors would no longer be based on land ownership within the District. *See id.* § 4(2). Instead, the members of the Board of Supervisors would be nominated by the Governor and confirmed by the Florida Senate. *See id.* § 4(1). Signaling a further break from the past, HB 9B also changed the District's name from the "Reedy Creek Improvement District" to the "Central Florida Tourism Oversight District." *See id.* § 2(1). The bill became law on February 27, 2023.

C. **Days Before the New Entity Takes Over, the Reedy Creek Improvement District Purports To Give Long-Term Control To Disney.**

On February 8, 2023—two days after the filing of HB 9B signaled that

---

[2] *See* FLA. OFF. OF PROGRAM POL'Y ANALYSIS & GOV'T ACCOUNTABILITY, REP. NO. 04-81, CENTRAL FLORIDA'S REEDY CREEK IMPROVEMENT DISTRICT HAS WIDE-RANGING AUTHORITY 2 (Dec. 2004), https://bit.ly/42X5Vt2 ("OPPAGA Report") (noting that 31% of the land within the District was owned by others).

Florida's lawmakers were interested in installing a more democratically responsive regulatory entity—RCID and Disney purported to enter into two agreements that would have had the opposite effect. Specifically, RCID approved and adopted a 30-year development agreement, *see* Exhibit A to First Am. Compl., Disney Chapter 163 Development Agreement, Doc. 25-1 (May 8, 2023) (the "Development Agreement"), and a declaration of restrictive covenants, *see* Exhibit B to First Am. Compl., Decl. of Restrictive Covenants, Doc. 25-2 (May 8, 2023) (the "Restrictive Covenants"), between itself and Disney.

Both the Development Agreement and the Restrictive Covenants purport to assign to Disney much of the District's governmental authority. For example, the Development Agreement mandates, on a prospective basis, permission to develop within the District's boundaries at the maximum levels, including the maximum densities and intensities, that are described in the amendments to the joint comprehensive plan purportedly adopted in 2022. Development Agreement at 3, § II(A). Moreover, the Development Agreement gives all the development rights within the District's boundaries to Disney, which, pursuant to the Development Agreement, now owns and controls such development rights. *Id*. at 6, §§ II(D)(1)–(2). Under the terms of the Development Agreement, the height of any building constructed by any property owner within the district is controlled by and must be approved by Disney. *Id*. at 3, § II(B). And under the Development Agreement, the

8

District is now required to issue new general obligation bonds financed by ad valorem taxes collected from all of the District's taxpayers in order to fund infrastructure projects. *Id*. at § II(C).

Similarly, under the Restrictive Covenants, Disney restricts the District to using its own property solely for those uses existing on February 8, 2023, or as contemplated by the amendments to the joint comprehensive plan purportedly adopted in May 2022. Restrictive Covenants at 3, § 2.1. The Restrictive Covenants allow Disney to censor the District's speech on its own property. *Id*. at § 2.2. And the Restrictive Covenants prohibit the District from altering its own property without Disney's review and consent. *Id*. at 3–4, § 3.

### D. The Lame-Duck Entity's Agreements Are Deemed Void And Prompt Multiple Lawsuits.

After the new Board of Supervisors took control of the District, it held its first official meeting on March 8. FAC ¶ 131. During this meeting, the Board officially hired legal counsel to help navigate the legal issues left behind by RCID. *See id*. ¶ 132. At the Board's April 19 meeting, its outside counsel explained why the Development Agreement and the Restrictive Covenants were void *ab initio*. *Id*. ¶ 151–52. During that presentation, the District's outside counsel recommended that a resolution be prepared setting forth the District's view that the agreements were void *ab initio*. *Id*. ¶ 153. A motion to that effect passed with the Board's unanimous support. *Id*.

9

At its next meeting on April 24, the Board published its Legislative Declaration. FAC ¶ 155. The Legislative Declaration described the multiple legal infirmities with the Development Agreement and Restrictive Covenants. *Id*. Two days later, the Board unanimously approved the Legislative Declaration recognizing that the Development Agreement and Restrictive Covenants were void *ab initio*. *Id*. ¶ 158.

That same day, Disney filed this lawsuit. *See* Compl., Doc. 1 (Apr. 26, 2023). Disney alleged that the Legislative Declaration abrogated the Development Agreement and Restrictive Covenants and therefore violated the U.S. Constitution's Contracts Clause, Takings Clause, and Fourteenth Amendment Due Process Clause. *Id*. at ¶¶ 161–83. Disney further alleged that the Legislative Declaration and both Senate Bill 4C and House Bill 9B violated the First Amendment because they were adopted in retaliation for Disney's protected speech. *Id*. at ¶¶ 184–200.

On May 1, the District filed its own suit in the Circuit Court for Orange County, Florida, which is the forum identified in the Restrictive Covenants. *See* Development Agreement at § 8.10; Ex. A, *Cent. Fla. Tourism Oversight Dist. v. Walt Disney Parks & Resorts U.S., Inc.*, No. 2023-CA-011818-O (Fla. Cir. Ct. 2023). In that complaint, the District explains that the Development Agreement and Restrictive Covenants are void as a matter of state law for a host of reasons, including that they were not properly noticed, the District lacked authority to enter

them, and the agreements improperly delegate governmental authority in violation of the Florida Constitution. *Id*. ¶¶ 35–120. Additionally, the District's suit alleges that the Development Agreement and Restrictive Covenants are void as against public policy, because they are unconscionable, and because the agreements lacked consideration. *Id*. ¶¶ 121–75.

The Florida Legislature also responded to RCID's last-minute abdication of the State's sovereignty. On May 5, Governor DeSantis signed SB 1604 into the law. *See* Senate Bill 1604, Fla. Laws ch. 2023-31 ("SB 1604"); FAC ¶ 173. Among other things, SB 1604 ensures that new governing bodies for independent special districts would have the power to review agreements that the outgoing body entered into during its final three months in existence. *See* FLA. STAT. § 189.031(7) (as amended by SB 1604).

Three days later, Disney amended its complaint to add challenges to SB 1604. *See* FAC ¶¶ 188, 194, 201, 209. Defendants now file this motion to dismiss.

## STANDARD OF REVIEW

Rule 12(b)(6) allows a claim to be dismissed for "failure to state a claim upon which relief can be granted." A court must "accept[ ] the complaint's allegations as true and constru[e] them in the light most favorable to the plaintiff," but "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Holland v. Carnival Corp.*, 50 F. 4th 1088, 1093

11

(11th Cir. 2022).

## ARGUMENT

### I.   The Court Should Abstain Under *Pullman*.

Abstention under *Pullman* is appropriate "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law." *Gold-Fogel v. Fogel*, 16 F.4th 790, 799 n.11 (11th Cir. 2021) (internal quotation marks omitted). "Two elements must be met for *Pullman* abstention to apply: (1) the case must present an unsettled question of state law, and (2) the question of state law must be dispositive of the case or would materially alter the constitutional question presented." *Siegel v. LePore*, 234 F.3d 1163, 1174 (11th Cir. 2000) (en banc).

Here, both elements are met. First, the validity and enforceability of the Development Agreement and Restrictive Covenants are indisputably "unsettled question[s] of state law." *Id.* Those determinations rise or fall under Florida law. And they are already being litigated in the Orange County Circuit Court. *Abell v. Frank*, 625 F.2d 653, 657–58 (5th Cir. 1980) (deeming *Pullman* abstention "particularly appropriate" because a state court challenge was "currently pending in the state court").

Second, the state law question will "be dispositive" or, at the very least, "materially alter" the analysis for Disney's claims. *Siegel*, 234 F.3d at 1174. If the

state court concludes that the Development Agreement and Restrictive Covenants are void and unenforceable, then Disney's Contracts Clause claim fails (because there was no contract); its Takings claim fails (because there was no property to be taken); and its Due Process Claim fails (because there was no property Disney was deprived of). In addition, as explained in more detail below, if the Development Agreement and Restrictive Covenants are void and unenforceable, then Defendants would have a complete defense to Disney's First Amendment retaliation claims because Disney will have not suffered any adverse action sufficient to support such a claim. And the relief Disney requests would raise serious questions about this Court's remedial authority to force the District to adhere to a contract that is *unlawful and void under state law*. Alternatively, even if one of the five claims were not subject to *Pullman*, the Court should exercise its discretion to stay the entire action. *See Trump for President, Inc. v. Boockvar*, 481 F. Supp. 3d 476, 502–03 (W.D. Pa. 2020).

To be sure, the Court must consider the significance of the right allegedly impaired. *Siegel*, 234 F.3d at 1174. And the Eleventh Circuit has said abstention is often inappropriate in actions involving First Amendment challenges. *Pittman v. Cole*, 267 F.3d 1269, 1287 (11th Cir. 2001). But that principle typically applies in a different context: a challenge to a statute *on its face* as either unconstitutionally vague or violating the First Amendment by regulating protected speech—because

abstention would "require piecemeal adjudication in many courts" while "the vagueness of a state statute may inhibit the exercise of First Amendment freedoms" of others not party to the litigation. *See Hobbs v. Thompson*, 448 F.2d 456, 462-63 (5th Cir. 1971). That reasoning does not apply where, as here, the statutes and Legislative Declaration are constitutional on their face, and Disney instead alleges *retaliatory motive*. There will be no need for "extensive adjudications" regarding "a variety of factual situations" to resolve the constitutionality of the statute at issue. Moreover, Plaintiff's First Amendment theory is counterbalanced by the fact this case concerns "[m]atters of land use planning," which "are primarily of local concern" and is thus "a 'classic' case for abstention under *Pullman*." *Fields v. Rockdale Cnty.*, 785 F.2d 1558, 1561 (11th Cir. 1986). And "where, as here, there is already pending a state action that is likely to resolve the state question without the commencement of new proceedings in state court, the argument in favor of abstention is even more compelling." *Ziegler v. Ziegler*, 632 F.2d 535, 539 (5th Cir. Unit A 1980).

Finally, even if the Court concludes that it will not abstain on one of the First Amendment claims, abstention requires a claim-by-claim analysis, and the Court should abstain on all other counts. *See, e.g.*, *O'Hair v. White*, 675 F.2d 680, 693 (5th Cir. 1982); *Batterman v. Leahy*, 544 F.3d 370, 375 (1st Cir. 2008).

14

**II.    The Restrictive Covenant's Forum-Selection Clause Requires Dismissal Under the Doctrine of *Forum Non Conveniens.***

The Court should dismiss the complaint under the doctrine of *forum non conveniens* because the Restrictive Covenant's forum-selection clause permits suit only in Orange County state court. The "appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 60 (2013). Although the same "balancing-of-interests standard" that governs a motion to transfer under 42 U.S.C. § 1404(a) also governs the application "of a forum-selection clause pointing to a nonfederal forum," *id.* at 61, the "presence of a valid forum-selection clause requires district courts to adjust their usual § 1404(a) analysis" in two ways that are relevant here, *id.* at 63. "First, the plaintiff's choice of forum merits no weight." *Id.* Second, a court "should not consider arguments about the parties' private interests." *Id.* at 64. Thus, "a district court may consider arguments about public-interest factors only" under the standard § 1404(a) analysis. *Id.* And "[b]ecause those factors will rarely defeat" a *forum non conveniens* motion, *id.*, a forum-selection clause "should be given controlling weight in all but the most exceptional cases," *id.* at 63 (cleaned up). Ultimately, "a successful motion under *forum non conveniens* requires dismissal of the case." *Id.* at 66 n.8.

Here, the forum-selection clause in the Restrictive Covenants requires dismissal. That clause provides in all caps:

15

ANY LEGAL PROCEEDING OF ANY NATURE BROUGHT TO ENFORCE ANY RIGHT OR OBLIGATION UNDER THIS DECLARATION, OR TO INTERPRET, CONSTRUE OR SEEK ANY DECLARATION WITH RESPECT TO ANY RIGHTS, REMEDIES OR RESPONSIBILITIES HEREUNDER, OR OTHERWISE ARISING OUT OF OR IN CONNECTION WITH ANY MATTER PERTAINING TO THIS DECLARATION, SHALL BE SUBMITTED EXCLUSIVELY FOR TRIAL, WITHOUT A JURY, BEFORE THE CIRCUIT COURT FOR ORANGE COUNTY, FLORIDA; OR IF SUCH COURT SHALL NOT HAVE JURISDICTION, THEN EXCLUSIVELY BEFORE ANY OTHER COURT SITTING IN ORANGE COUNTY, FLORIDA HAVING SUBJECT MATTER JURISDICTION.

*See* Restrictive Covenants at 8, § 8.1.

"Under general contract principles, the plain meaning of a contract's language governs its interpretation." *Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011). Here, the sweeping scope of the plain language in the forum-selection clause encompasses all of Disney's claims. This case is a "legal proceeding" that—at a minimum—is "arising out of or in connection with any matter pertaining to th[e] declaration." The forum-selection clause thus requires dismissal under the doctrine of *forum non conveniens*, and Disney must bring its claims in the Circuit Court for Orange County.

The Eleventh Circuit has construed equally broad language in a forum-selection clause to encompass claims similar to Disney's claims here. For example, in *Slater*, an employee's employment contract contained a forum-selection clause

16

that covered "all claims or causes of actions *relating to or arising from* the employment agreement." *Id*. at 1331 (emphasis added) (cleaned up). The Court held that the employee's Title VII retaliation claim was subject to this clause because the text encompassed "all claims arising directly or indirectly from the relationship evidenced by the contract." *Id.* (internal quotation marks omitted).

In a later case, the Eleventh Circuit construed an arbitration provision that covered "any and all disputes, claims, or controversies . . . relating to or in any way arising out of or connected with" an employment contract to encompass claims as diverse and far-reaching as false imprisonment, intentional infliction of emotional distress, spoliation of evidence, invasion of privacy, and fraudulent misrepresentation. *See Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011) (internal quotation marks omitted). Because "those claims involve[d] factual allegations" that were "based on the [contractual] relationship between the parties," the arbitration clause applied. *Id.* at 1219–21.

Moreover, at least one court has held that a forum-selection clause applies to a First Amendment retaliation claim where a local government allegedly retaliated against an individual by bringing a lawsuit over two procurement agreements. *See Dobco, Inc. v. Cnty. of Bergen*, No. 22-0090, 2022 WL 4366271 (D.N.J. Sept. 21, 2022). There, the forum-selection clause covered "any and all disputes arising out of or relating to the contract or breach thereof." *Id.* at *3 (cleaned up). Given the

17

breadth of the phrase "relating to," the court held that the "retaliation claim [wa]s a dispute relating to the Contract or its breach" because the claim had "its factual basis in the contractual business relationship between the parties." *Id.* at *4 (cleaned up). So too here.

In addition, although the forum-selection clause appears in the Restrictive Covenants, it applies to the Development Agreement. For example, in *Liles v. Ginn-La West End, Ltd.*, the Eleventh Circuit held that a contract's forum-selection clause applied to claims regarding separate documents (that did not contain a forum-selection clause) because those documents "form[ed] the central basis for most of Plaintiffs' claims" and "reference[d], and are explicitly referenced in, the contracts themselves." 631 F.3d 1242, 1255–56 (11th Cir. 2011). Here, the Restrictive Covenants and the Development Agreement both "form the central basis" for all of Disney's claims, and the Restrictive Covenants repeatedly reference "the Development Agreement" as part and parcel of the parties' agreement. *See* Restrictive Covenants at 2 (referencing "the Development Agreement" five times across four different whereas clauses).

Finally, although Defendants maintain that the underlying contracts are unlawful and unenforceable, Defendants may nevertheless seek enforcement of the forum-selection clause. "A forum selection clause is viewed as a separate contract that is severable from the agreement in which it is contained." *Rucker v. Oasis Legal*

*Fin., L.L.C.*, 632 F.3d 1231, 1237–38 (11th Cir. 2011). Therefore, a forum-selection clause can "be given effect" even if "it is included within a contract that is void as a matter of law." *Id.* at 1237; *see also id.* at 1238. "Accordingly, the forum selection clause can be severed such that the validity and enforceability of certain contract provisions—or even the Agreement as a whole—can determined in the transferred venue" or, as here, the appropriate venue after dismissal. *AllPlus Comput. Sys. Corp. v. Cisco Sys. Inc.*, No. 1:20-cv-24398, 2021 WL 8743566, at *2 (S.D. Fla. Feb. 4, 2021); *see also Knopick v. UBS AG*, 137 F. Supp. 3d 728, 733 (M.D. Pa. 2015) ("The validity of the underlying contracts, together with any breach of those contracts, are questions more properly addressed to the court or courts that the parties themselves selected to settle their disputes.").

## III.  Disney Has No Claim Under the Contracts Clause.

Even if Disney's claims were not subject to abstention under *Pullman* or to dismissal under the forum-selection clause, they would be subject to dismissal on the merits under Rule 12(b)(6). Disney's first claim is brought under the Contracts Clause, which provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. CONST. art. I, § 10, cl. 1. But this Clause does not apply to every action that a government might take with respect to a contract. And Disney's Contracts Clause claim suffers four fatal flaws.

## A.     The Development Agreement and Restrictive Covenants are not valid contracts.

First, for the many reasons that the Board surveyed in its legislative findings and has asserted in its concurrent state-court action, Disney had no valid contract with the District. *See* Legis. Findings of the Cent. Fla. Tourism Oversight Dist., Ex. B, ¶¶ 1–90 (Apr. 26, 2023); Ex. A, ¶¶ 35–175. Among other probems, the Development Agreement and Restrictive Covenants are *ultra vires*, void for lack of consideration, void as an unconstitutional delegation of government authority, and void as against public policy.

These purported agreements are *ultra vires* because the prior Board failed to comply with FLA. STAT. § 163.3223, which provides that "[a]ny local government may, *by ordinance*, establish procedures and requirements . . . to consider and enter into a development agreement" (emphasis added). Without such an ordinance, the District was not authorized to enter a development agreement. Yet the Board never passed the enabling rules required by § 163.3223. The Board thus lacked the authority to enter either the Development Agreement or the Restrictive Covenants, which depend on the existence of the Development Agreement.

These purported agreements also lacked valid consideration, which must consist of something more than what the party—here, Disney—was already legally obliged to do. *See Mangus v. Present*, 135 So. 2d 417, 418 (Fla. 1961). In return for the extensive powers that Disney gained through the Development Agreement, all

that Disney promised was to demand no more than fair market value for any Disney-owned lands that the District might need in order to construct the public facilities that Disney may obligate the District to construct pursuant to the Development Agreement. But the District already had the power to take private lands for public projects and to pay only fair market value for them. *See* HB 9B § 8(5); *Dep't of Transp. of Fla. v. Nalven*, 455 So. 2d 301, 307 (Fla. 1984). Thus, Disney's purported consideration for the Development Agreement was merely a promise to provide no more than what it was obliged to provide. And Disney's consideration for the Restrictive Covenants consisted of "the commitments made by [Disney] . . . under the Development Agreement." Restrictive Covenants at 2. The covenants are thus void for lack of either valid or independent consideration.

These purported agreements unlawfully delegated government authority to a private entity. A municipality may not "contrac[t] away its discretionary legislative power as the final decisionmaking authority" through a development agreement. *Morgran Co. v. Orange Cnty.*, 818 So. 2d 640, 643 (Fla. Dist. Ct. App. 2002); *accord Hartnett v. Austin*, 93 So. 2d 86, 89 (Fla. 1956) (en banc). Yet the Development Agreement and Restrictive Covenants purport to give *Disney* final decision-making authority over District land use. Among other things, Disney receives "all of the development rights and entitlements . . . applicable to all additional approved development" in the District—meaning that any other District landowner must

21

obtain Disney's "prior written approval" before undertaking any such development—and these powers trump the District's own Land Development Regulations. Development Agreement at 6–7, §§ II(D)(2) & II(E)(1). For the same reasons, these purported agreements are void as against public policy, namely the public policy embodied in HB 9B, which reconstituted the current Board so that it would provide meaningful public oversight of the District and all regulated entities in it—authority that these purported agreements cede back to Disney.

Finally, Florida courts have long held that "restrictive covenants are not enforceable against governmental units." *Isacks v. Walton Cnty.*, No. 3:20-cv-1472, 2021 WL 4992757, at *3 (N.D. Fla. June 29, 2021) (cleaned up). Although these cases specifically hold that covenants entered between private parties cannot bind the government, the same logic applies here: the prior Board could not contract away the current Board's authority through restrictive covenants.

These legal problems render the Development Agreement and Restrictive Covenants void *ab initio* and warrant dismissal. If this litigation were to proceed to discovery and summary judgment, however, the Board Defendants could and would point to even more. In brief, the prior Board never mailed notices of intent, as required by FLA. STAT. § 163.3225, to all affected District property owners before the first hearing on the Development Agreement. The Board also lacked authority or jurisdiction to enter a development agreement on behalf of the municipalities of Bay

Lake and Lake Buena Vista, both of which have property subject to the Development Agreement and neither of which signed the agreement. The Development Agreement imposes a general debt obligation on the District without the vote of District property holders required by Article VII, Section 12 of the Florida Constitution. The Development Agreement is inconsistent with the District's comprehensive plan adopted in 1991 (and occasionally amended), which was the legally operative comprehensive plan at the time, violating the consistency mandate of FLA. STAT. § 163.3231. And the Development Agreement is unconscionable: procedurally, it was adopted by a Board whose members were elected and controlled by Disney, without independent counsel for both sides; substantively, it grants one-sided, long-term benefits to one party (Disney). The Restrictive Covenants depend on the existence of the Development Agreement and are therefore void as well; they also suffer many of these same flaws in their own right.

Because Disney and the District never formed a valid contractual relationship, Disney lacks any predicate contract for its Contracts Clause claim.

### B.    The Legislative Declaration is merely a declaration that the Development Agreement and Restrictive Covenants are void.

Second, by its plain terms, the Contracts Clause only prohibits the government "from passing any *'law'* that impairs the obligation of contracts." *Taylor v. City of Gadsden*, 767 F.3d 1124, 1132 (11th Cir. 2014) (emphasis added). "Without passing any 'law,'" the government does "nothing different from what a private party does."

23

*Id*. at 1133 (quoting *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250 (7th Cir. 1996)). After all, "the obligation created by a contract" is not an obligation to perform; it "is an obligation to perform or pay damages for nonperformance." *Horwitz-Matthews, Inc.*, 78 F.3d at 1251 (citing Oliver Wendell Holmes, *The Path of the Law*, 10 HARV. L. REV. 457, 462 (1897)). When a government merely breaches a contract, therefore, it does not use government power in the way that the Contracts Clause seeks to restrain.

This rule requires dismissal of Disney's Contracts Clause claim with respect to the Legislative Declaration even if Disney had any basis for that claim (*i.e.*, a contract). The Board's findings are not a "Law impairing the Obligation of Contracts." Indeed, the findings did not purport to *change* the law in any way; rather, they announced the Board's conclusion that the Development Agreement and Restrictive Covenants are void under *existing* law. They are thus more akin to a resolution, which, "[u]nlike an ordinance, . . . denotes something less solemn or formal and is usually a mere declaration with respect to future purpose or proceedings." *Id*. at 1132 n.33 (internal quotation marks omitted). Even if one assumes (wrongly) that the Development Agreement and Restrictive Covenants were valid contracts, the findings would constitute at most only a breach, and an anticipatory one at that, *i.e.*, a "repudiat[ion]" of "a duty" to perform before "a breach by non-performance." *Hosp. Mortg. Grp. v. First Prudential Dev. Corp.*, 411 So. 2d

24

181, 182 (Fla. 1982) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 253 (1979)). That is, the findings are "a mere declaration with respect to future purpose or proceedings," *Taylor*, 767 F.3d at 1132 n.33 (internal quotation marks omitted), not a law impairing obligations under these purported contracts.

### C. The Development Agreement and Restrictive Covenants are not protected by the Contracts Clause because they delegate sovereign power to a private entity.

The government cannot "bargain away" its sovereign power to a private entity. *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977). As a result, the Contracts Clause does not protect a government contract "that surrenders an essential attribute of [the government's] sovereignty." *Id*.; *see also United States v. Winstar Corp.*, 518 U.S. 839, 888 (1996); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978).

As detailed in the Board's Legislative Declaration, the Development Agreement and Restrictive Covenants "bargain away" the Board's sovereign authority to Disney in multiple ways. The Development Agreement provides that if, at the time of agreement, "there is any conflict between the Agreement and the Comprehensive Plan or [the District's Land Development Regulations,] this Agreement shall prevail." Development Agreement at 7. This elevates a contractual agreement above the District's binding legislative acts, turning on its head the State-law requirement that any development agreement be "*consistent* with the local

government's comprehensive plan and land development regulations." FLA. STAT. § 163.3227(1)(g) (emphasis added). This agreement that trumps local law also gives Disney authority to set maximum building heights throughout the District and control over all development rights and entitlements in the District—functions that the Florida Legislature first gave to the Board when establishing the District in 1967 and reaffirmed in the Board with House Bill 9B—and enables Disney to obligate the District to finance and construct facilities in aid of Disney's growth without the possibility of the periodic reassessment encouraged and required by State law. Meanwhile, the Restrictive Covenants cede land-use authority over the District's own property, generally limiting the District to those uses of its property existing on the date of the agreement, effectively enabling Disney to censor the District by banning the District from speaking on its own property about anything other than the District, and prohibiting the District from altering its property absent Disney's review. *See* Restrictive Covenants at 3–4.

Disney does not dispute any of these features of the Development Agreement or Restrictive Covenants. In fact, Disney alleges that "amid great uncertainty"—that is, uncertainty over whether the District would remain under Disney's absolute control—"Disney and [the District] sought to secure future development plans." FAC ¶ 103. In other words, the *point* of these purported contracts was to surrender these "essential attribute[s] of [the District's] sovereignty" to Disney going forward.

*U.S. Tr. Co. of N.Y.*, 431 U.S. at 23. The Contracts Clause does not protect such agreements.

### D.   Any Impairment Was Not Substantial and Advanced Important Government Interests.

Even if Disney could show that a valid contractual interest had been impaired (and it cannot), its Contracts Clause claim would still fail. The Contracts Clause protects "reasonable contractual expectations against unreasonable abrogation by the states." *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1202–03 (11th Cir. 2019). Disney must therefore show that any "impairment is substantial," *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992), which it cannot do. And even if it could, the challenged actions nevertheless "pass constitutional muster" because they are "'reasonable and necessary to serve an important public purpose.'" *Taylor*, 767 F.3d at 1133 (quoting *U.S. Tr. Co. of N.Y.*, 431 U.S. at 25).

Neither the Board's Legislative Declaration nor SB 1604 could have impaired any "reasonable contractual expectations." *S&M Brands, Inc.*, 925 F.3d at 1202–03. Land development, including by development agreement, is heavily regulated. *See* FLA. STAT. §§ 163.3220–163.3243 (requirements for development agreements). When these purported contracts were entered, the Florida laws cited as authority for the Development Agreement (which was itself the basis for the Restrictive Covenants) expressly provided that "such agreement shall be modified or revoked as is necessary to comply with the relevant state or federal laws." FLA. STAT.

27

§ 163.3241; *see* Development Agreement at 3, § I(C) (citing FLA. STAT. §§ 163.3220–163.3243). Against this backdrop, Disney could not reasonably have expected that the Development Agreement and Restrictive Covenants would be exempt from the effect of State law throughout the 30-year term of the Development Agreement or, for the Restrictive Covenants, "until twenty one (21) years after the death of the last survivor of the descendants of King Charles III." Restrictive Covenants at 5, § 7.1. Where "parties are operating in a heavily regulated" field, and where "the contracts expressly recognize the existence of extensive regulation" by citing it, the operation of that regulation cannot constitute a substantial impairment. *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 413, 416 (1983); *accord S&M Brands, Inc.*, 925 F.3d at 1203. Nor as a practical matter could Disney reasonably have expected the current Board to adhere to agreements that cede to Disney vast swaths of the Board's regulatory authority over the District and that were entered while the Florida Legislature was considering the legislation that created the current Board in order for the Board to exercise that authority.

Even if Disney could show substantial impairment, the Contracts Clause claim would fail because of the important public purpose supporting the challenged actions. The Florida Legislature passed a law (HB 9B) intended to ensure public control over the District. Disney's purported agreements with the District attempt to subvert that intent by sapping authority from the Board in which the Legislature

28

vested it. Ensuring that the State's policies are not subverted by such last-minute maneuvers, and that government authority remains with the government, is an intrinsically important public purpose. And that is the effect of both the Legislative Declaration and SB 1604.

This is precisely the rationale that SB 1604's sponsor articulated in proceedings in the Florida Senate Rules Committee:

> [W]hen we come together as a legislature and pass a law that modifies the composition, makeup, or manner in which an independent special district is to operate, outgoing members cannot take that as an opportunity to enforce agreements that bind future boards adhering to our legislative intent. That will be precluded by law [by SB 1604], as it should be.

*Land and Use and Development Regulations: Hearing on S.B. 1604 Before the S. Comm. On Rules*, 2023 Leg., Reg. Sess., at 3:11:04–3:11:20 (Fla. Apr. 19, 2023) (statement of Fla. Sen. Blaise Ingoglia), https://bit.ly/3XqsAgk. In other words, as even the Amended Complaint describes, SB 1604 was intended to prevent "[a] lame duck board [from] saddling a new board with obligations." FAC ¶ 166. And SB 1604 does not address only Disney's purported agreements. It is a law of general applicability that will prevent other special districts from attempting such maneuvers in the future.

Nor is such a circumstance unheard of. SB 1604's sponsor analogized the bill's purpose to that of another bill under consideration in the Florida legislature that would have restricted the authority of an outgoing county commission board,

city commissioners, or school boards to renew or extend contracts within eight months of an election for substantially the same reason. He also analogized the bill's purpose to federal bankruptcy law, which allows a bankruptcy judge to look back *two years* to recover assets that were transferred out of the bankruptcy estate. *Sen. Comm. Hearing on S.B. 1604*, at 3:21:21–3:21:55 (statement of Fla. Sen. Blaise Ingoglia). The important purpose served by SB 1604 and the Legislative Declaration necessarily defeats Disney's Contracts Clause claim.

## IV.   Disney's Takings Clause Claim Must Be Dismissed.

To prevail on a takings claim, the claimant must both identify a cognizable Fifth Amendment property interest that is the subject of the taking, and, if such an interest exists, show that the government's "deprivation or reduction of that interest constitutes a 'taking.'" *Givens v. Ala. Dep't of Corrs.*, 381 F.3d 1064, 1066 (11th Cir. 2004). Disney can do neither. First, Disney has no cognizable Fifth Amendment property interest in the Development Agreement and Restrictive Covenants, which were void—nullities—under Florida law from the outset. Second, even if Disney had a property interest in the Development Agreement, that property interest was subject to and limited by the possibility of a subsequent state law requiring its revocation. And the Restrictive Covenants depend upon the Development Agreement for their existence. Third, even if the Development Agreement and Restrictive Covenants were valid contracts, they have not been "taken" by the

30

Legislative Declaration, for that action did not abrogate Disney's right to pursue damages in a breach-of-contract action in state court. Finally, Disney seeks only equitable relief here, but such relief is unavailable here under the Takings Clause.

### A.   The Development Agreement and Restrictive Covenants are not "property" under the Fifth Amendment.

Disney claims that the Development Agreement and Restrictive Covenants are contracts and therefore "property" under the Fifth Amendment, but because both agreements were void *ab initio* as a matter of state law, neither qualifies.

"[T]he Takings Clause protects private property; it does not create it." *Givens*, 381 F.3d at 1066. Accordingly, to determine whether something is "property" within the meaning of the Takings Clause, a court must look to "an independent source [of law], such as state law." *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (internal quotation marks omitted). While *valid* contracts can sometimes qualify as property for purposes of the Takings Clause, the Development Agreement and Restrictive Covenants are not, and never were, valid contracts under Florida law, as already described above. And Disney cannot have a property interest in a void contract. *See, e.g.*, *United States v. Willow River Power Co.*, 324 U.S. 499, 502 (1945); *Parella v. Ret. Bd. of R.I. Emps.' Ret. Sys.*, 173 F.3d 46, 58 (1st Cir. 1999); *ProEco, Inc. v. Bd. of Comm'rs of Jay Cnty.,* 57 F.3d 505, 510–11 (7th Cir. 1995).

**B.      Even if Disney had a property interest, it was subjected to subsequently enacted state law.**

Even if the Development Agreement were a valid contract such that Disney could have a property interest in it, that property interest was necessarily limited by subsequent enactments of state law. And because the Restrictive Covenants wholly depend on the Development Agreement, any limitations on property in the Development Agreement necessarily extend to the Restrictive Covenants as well.

The Florida Local Government Development Agreement Act (the "Development Agreement Act") specifically provides that "[i]f state … laws are enacted after the execution of a development agreement which are applicable to and preclude the parties' compliance with the terms of a development agreement, such agreement shall be modified or revoked as is necessary to comply with the relevant state … laws." FLA. STAT. § 163.3241. This is a key feature of the Development Agreement Act. Before its enactment in the 1980s, municipalities in Florida were not permitted to provide special treatment under local law to particular entities through so-called "contract zoning." *See Morgran*, 818 So. 2d at 642–43 ("Contract

zoning" … "has long been disapproved in Florida.").[3] The Development Agreement Act changed that background rule of law, subject to the terms and conditions of the Act. One of those conditions is that all development agreements are subject to changes in law by the legislature of the State as it gains experience in this relatively new authorization of power to localities. Disney entered the Development Agreement against the backdrop of that law, which it acknowledged. Development Agreement at 1 (invoking "Sections 163.3220–163.3243, … the 'Florida Local Government Development Agreement Act'" as authorizing development agreements) (emphasis omitted). SB 1604 is precisely the type of law contemplated by Section 163.3241, which responds to a newly appreciated risk posed by development agreements: the risk that a locality and private entity will use a development agreement to attempt to thwart the legislature's determination to change the governing structure of the locality. SB 1604 therefore provides that localities are "precluded from complying with the terms of any development agreement, or any other agreement for which the development agreement serves in whole or in part as consideration," in circumstances where this risk is elevated. FLA.

---

[3] 3 JULIAN C. JUERGENSMEYER, FLORIDA LAND USE LAW 2 (2d ed. 1998):

> Although bilateral agreements in land use regulation between a local government and a private party frequently have been invalidated as contract zoning and/or an improper delegation of a local government's police power, the development agreement, when sanctioned by the state enabling legislation, is generally enforceable and binding on both parties.

STAT. § 189.031(7).

Therefore, whatever property interest Disney could possibly have in the Development Agreement contains the inherent limitation that a subsequently enacted state law could preclude compliance with the Development Agreement and result in its revocation. SB 1604 thus cannot have effected a taking of any property interest Disney could have in the Development Agreement, even if it were a valid contract. *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2079 (2021) (no taking occurs when the State acts "consistent with longstanding background restrictions on property rights"). And it follows from that fact that SB 1604 also could not have taken any property interest in the Restrictive Covenants. While SB 1604 precludes the District from complying with the terms of the Restrictive Covenants, the Restrictive Covenants are dependent upon the Development Agreement—indeed, they were entered expressly "in consideration of the commitments made by [Disney] and its Affiliates under the Development Agreement." Restrictive Covenants at 2. Without any valid property interest in the Development Agreement, any claim to a property interest in the Restrictive Covenants evaporates.

Even if Section 163.3241 does not rid Disney of a property interest in the Development Agreement and Restrictive Covenants altogether, it at a minimum negates any reasonable investment-backed expectations Disney could claim to have in the continued validity of the contracts for the life of their stated terms. And that

alone defeats any regulatory takings claim Disney asserts with respect to the agreements, because "the extent to which the regulation has interfered with distinct investment-backed expectations" is of "particular significance" in regulatory taking analysis. *See Pa. Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

### C. The Legislative Declaration did not take Disney's alleged contract rights because the Declaration did not impair those rights.

Even if the Development Agreement and Restrictive Covenants were valid contracts, nothing that the District has done has "taken" those contracts.

The Legislative Declaration could not have taken the Development Agreement and Restrictive Covenants because the Declaration did nothing to change Florida law—the contracts are either void or they are not under Florida law, wholly apart from the Legislative Declaration. The Declaration at most constitutes a simple breach (and an anticipatory one at that), and an alleged breach cannot constitute a taking.

Where, as here, the alleged property rights are "voluntarily created by contract with a government," any "interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Keane v. Jacksonville Police Fire & Pension Fund Bd. of Tr.*, 775 Fed. App'x 496, 499 (11th Cir. 2019) (internal citation omitted). That is because, even if the Development Agreement and Restrictive Covenants were valid contracts and the District had breached them, "the government did not take [Disney's] property because [Disney] retained the range of remedies

associated with vindication of a contract, such as a breach-of-contract claim." *Id.* (internal quotation marks omitted). *See also Broer v. Fla. State Univ. Bd. of Tr.*, No. 4:21-cv-328-AW-MAF, 2021 WL 7084094, at *3 (N.D. Fla. Oct. 21, 2021); *Lam v. Univ. of Fla.,* No. 1:21-cv-137-AW-GRJ, 2021 WL 7081491, at *3 (N.D. Fla. Oct. 21, 2021). In other words, "the obligation created by a contract is an obligation to perform or pay damages for nonperformance," *Horwitz-Matthews*, 78 F.3d at 1251; so long as the opportunity for the latter has not been abrogated, a contract cannot be said to have been taken.

Here, Disney focuses its complaint on the Legislative Declaration's finding that the Development Agreement and Restrictive Covenants are void as a matter of Florida law. But the Legislative Declaration did not *change* Florida law—either the Development Agreement and Restrictive Covenants are void as a matter of Florida law or they are not; that is why the Board has filed an action in State court seeking a judicial declaration vindicating the findings it made in the Legislative Declaration. If the state courts hold, contrary to the Legislative Declaration, that the Development Agreement and Restrictive Covenants are valid, those agreements will continue in effect (putting to the side for the sake of this argument SB 1604). That is not because such a ruling would cause them to spring back to life, but rather because the Legislative Declaration did not itself independently void the agreements. And because the Legislative Declaration did not independently void the agreements, it

36

follows that *at most* the Declaration amounted to an anticipatory breach of the Development Agreement and Restrictive Covenants on the part of the District. And as explained above, a breach does not constitute a taking.

### D.   Disney is not entitled to equitable relief as a matter of law.

Even if Disney had pleaded a valid claim that the Development Agreement and Restrictive Covenants have been taken (and it has not), Disney's claim would still have to be dismissed because Disney has sought the wrong remedy—declaratory and injunctive relief. FAC ¶ 194. The Takings Clause prohibits the government from taking private property "*without just compensation*." U.S. CONST. amend. V (emphasis added). Accordingly, "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2176 (2019). Here, Disney has two avenues for seeking compensation for any injury it has suffered from the government's alleged taking.

First, in Florida, an inverse condemnation proceeding is available to obtain just compensation for a government action that effects a taking. *Rubano v. Dep't of Transp.*, 656 So. 2d 1264, 1266 (Fla. 1995).

Second, Disney could seek recompense in federal court under 42 U.S.C. § 1983. Yet Disney has chosen to request only equitable relief, which is not an available remedy. FAC ¶¶ 189–94.

V.    **Disney's Due Process Clause Claim Must Be Dismissed.**

Disney's Third Cause of Action alleging a substantive due process claim must be dismissed because Disney has not been deprived of any entitlement it possessed under state law and because both the Legislative Declaration and SB 1604 are supported by a rational basis.

A.    **The Legislative Declaration does not impose any loss on Disney.**

As already described, the Development Agreement and Restrictive Covenants are void and therefore were not valid contracts from the day they were signed. Because there cannot be a property interest in void contracts, Disney's due process claim necessarily fails.

As also explained above, even if the Development Agreement and Restrictive Covenants *are* valid contracts, Disney can, at most, claim that the Legislative Declaration effectuated a breach (and an anticipatory one at that). But the remedy for that claim would not sound in due process; it would sound in breach of contract. The Legislative Declaration has not deprived Disney of any entitlement that could support a substantive due process claim.

B.    **The Legislative Declaration and SB 1604 are supported by a rational basis.**

Even if the Development Agreement and Restrictive Covenants created substantive rights possessed by Disney, neither the Legislative Declaration nor SB 1604 deprive Disney of those rights without a rational basis.

A substantive due process claim premised on a state-created right (here, the Development Agreement and Restrictive Covenants) is subject only to rational basis review. *Kentner v. City of Sanibel*, 750 F.3d 1274, 1279–80 (11th Cir. 2014); FAC ¶ 197. Under this "highly deferential" standard, "governments are not required to convince the courts of the correctness of their legislative judgments." *Kentner*, 750 F.3d at 1281 (internal quotation marks omitted). Rather, the government action "will be upheld so long as there is any reasonably conceivable state of facts that could provide a rational basis" for it. *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 945 (11th Cir. 2013) (internal quotation marks omitted); *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1225–26 (N.D. Fla. 2020).

The Legislative Declaration states a rational basis on its face. It describes the procedural and substantive problems with the Development Agreement and Restrictive Covenants and concludes based on reasoned support that those agreements are unenforceable as a matter of state law. The Board sought and received the advice of outside counsel in evaluating the legality of the Development Agreement and Restrictive Covenants and in drafting the legislative declaration in accordance with applicable state law. *See* Legis. Decl. at 1. While Disney may disagree with that analysis, it cannot claim that it is *irrational*.

SB 1604 and the Legislative Declaration are supported by an additional rational basis. As described above in connection with the Contracts Clause claim,

there is an important government interest in protecting against the actions of an outgoing, lame duck board that might improperly bind an incoming, new board of a special district.

## VI.   Disney's First Amendment Retaliation Claims Fail.

### A.   Disney's First Amendment retaliation claims are foreclosed by *In re Hubbard*.

Disney's First Amendment claims turn exclusively on the purported illicit motive behind Senate Bill 1604, Senate Bill 4C, House Bill 9B, and the Legislative Declaration rather than anything on the face of those measures themselves. Under the Eleventh Circuit's decision in *In re Hubbard*, this fact dooms Disney's First Amendment retaliation claims.

*Hubbard* involved a retaliation claim closely analogous to this case. There, a public-sector union, the Alabama Education Association (AEA), argued that an Alabama statute "violate[d] the First Amendment rights of AEA and its members because the subjective motivations of the lawmakers in passing the Act were to retaliate against AEA for its political speech on education policy." *Hubbard*, 803 F.3d at 1301. Specifically, the union said the legislation "was an act of political retribution against AEA for its past opposition to education policy proposals by [then-]Governor Riley and other Alabama Republicans." *Id.* at 1304. The case arrived at the court when state legislators appealed the denial of their motion to quash third-party subpoenas that sought evidence of the legislators' subjective motivations

40

in enacting the law. *See id.* at 1304–05. In concluding that the subpoenas should have been quashed, the Court held that AEA's First Amendment claim failed as a matter of law.

Specifically, the Court held that "the First Amendment does not support the kind of claim AEA makes here: a challenge to an otherwise constitutional statute based on the subjective motivations of the lawmakers who passed it." *Id.* at 1312. The Court grounded its analysis in the Supreme Court's decision in *United States v. O'Brien*, which "held that, as a 'principle of constitutional law,' courts cannot 'strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'" *Id.* (quoting *O'Brien*, 391 U.S. 367, 383 (1968)). The Eleventh Circuit's "precedent applying *O'Brien*," the Court explained, "recognizes that, when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose." *Id.* The Eleventh Circuit has recently reaffirmed the principle of *Hubbard*. *See NetChoice, LLC v. Moody*, 34 F.4th 1196, 1224 (11th Cir. 2022).

*Hubbard* controls here. Senate Bill 1604, Senate Bill 4C, House Bill 9B, and the Legislative Declaration do not even regulate private speech at all—let alone protected speech. And Disney does not attempt to suggest otherwise. Therefore, the "only basis for [Disney's] retaliation claim is the alleged retaliatory motive that [Florida's] lawmakers had when passing" these provisions, which "is precisely the

challenge that *O'Brien*," and the Eleventh Circuit's "decisions following it, foreclose." *Hubbard*, 803 F.3d at 1313.

In sum, Disney's First Amendment challenge to Senate Bill 1604, Senate Bill 4C, House Bill 9B, and the Legislative Declaration runs headlong into *Hubbard*. Because Disney's First Amendment challenge to these provisions rests *exclusively* on the alleged illicit motives of the lawmakers who enacted them, Disney's First Amendment retaliation claims fail. On this basis alone, the Court should dismiss Counts IV and V.

**B.   The First Amendment does not constrain Florida's decision to reconstitute state entities that exercise sovereign power.**

"Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." *Gregory*, 501 U.S. at 460. Nevertheless, Disney asks this Court to enjoin the "reconstitution" of RCID's "structure" by Florida's elected lawmakers, FAC ¶ 213, and to enjoin the State's efforts to ensure that a newly elected or appointed governing body for an independent special district may *effectively* govern by having the opportunity to review last-minute agreements by the outgoing members. But States have long had the power to determine who will exercise "important elective and nonelective positions whose operations go to the heart of representative government." *Gregory*, 501 U.S. at 463 (internal quotation marks omitted). "This rule is no more than a recognition of a State's constitutional responsibility for the establishment and

42

operation of its own government." *Id.* at 462 (cleaned up). The Speech Clause imposes no constraint on the State's exercise of that responsibility—no matter the State's motivation for doing so.

Here, RCID exercised immense government authority over 25,000 acres in Central Florida. FAC ¶ 41. As Disney's amended complaint outlines, "RCID's powers over land use and economic development were broad." *Id*. RCID "enforce[d] building codes, provide[d] emergency services, and offer[ed] utilities." *See id*. It even had the power to levy ad valorem taxes. *See* Chapter 67-764, §§ 24–26. Given the immense power exercised by RCID, the State of Florida's elected officials had the power—free from any First Amendment scrutiny, no matter the reason why—to revoke RCID's authority and to replace that body with a more democratically responsive one through SB 4C and HB 9B. To hold otherwise would undermine the very nature of representative government. Thus, Count V should be dismissed.

Likewise, the State possesses the sovereign power to permit its chosen high-level officers to govern *effectively*. Through SB 1604, Florida's elected lawmakers ensured that the officers they chose could not be hamstrung by a soon-to-be defunct governing body that enters into unlawful agreements that bind the newly elected or appointed governing body. The *First Amendment* does not require a State to let a group of lame-duck bureaucrats frustrate the democratic will of its voters and nullify the State's sovereign prerogative to select its own high-level officers. For this reason,

Disney's challenge to SB 1604 in Count IV should also be dismissed.

RCID undoubtedly exercised "discretion concerning issues of public importance," *Gregory*, 501 U.S. at 466–67, in Reedy Creek. The Speech Clause does not prevent the State of Florida's elected officials from determining who may exercise that immense and significant government authority. Thus, Disney may not use the First Amendment to block the revocation of that extraordinary authority by Florida's elected lawmakers, and Disney's challenge to these statutes should be dismissed.

### C.   Because the Board's Legislative Declaration was government speech, Disney's retaliation claim fails.

Even if Disney's First Amendment retaliation claim attacking the Legislative Declaration survives *Hubbard*, it still fails because the Legislative Declaration was merely government speech and thus had no adverse effect on Disney. To state a Section 1983 First Amendment retaliation claim, a plaintiff must show that (1) "his speech or act was constitutionally protected," (2) "the defendant's retaliatory conduct adversely affected the protected speech," and (3) "there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

To demonstrate that retaliatory conduct adversely affected protected speech, a plaintiff "must establish that the retaliatory acts would deter a person of ordinary firmness from exercising his or her First Amendment rights." *Id.* "Some adverse

actions may be easy to identify—an arrest, a prosecution, or a dismissal from governmental employment." *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1260 (2022). But only a "material" adverse action gives rise to a First Amendment violation.

The Supreme Court recently addressed this issue in *Wilson*. There, a member of community college's board of trustees brought a First Amendment retaliation claim in response to the censure he received from the majority of the board. *See id.* at 1257. The Court held that this censure did not "qualify as a materially adverse action" in part because the censure "was a form of speech by elected representatives." *Id.* at 1261.[4] The Court reasoned that, although the First Amendment surely promised Mr. Wilson the right to speak freely, "just as surely, it cannot be used as a weapon to silence" elected officials "seeking to do the same." *Id.*

Here, the Legislative Declaration is government speech. The Declaration itself did not *do* anything other than state the Board's opinion that, under principles of

---

[4] The other basis for the Court's holding was that Mr. Wilson was an elected official, who is expected "to shoulder a degree of criticism." *Wilson*, 142 S. Ct. at 1261. Disney's hegemony over the District likewise conferred the *de facto* status that Mr. Wilson held. Moreover, if a lone trustee for the "Houston Community College System" is deemed, as a matter of law, hardy enough to withstand censure by his colleagues without self-censoring, then surely Disney—a multibillion-dollar global corporation—may not plausibly say it is self-censoring in response to an administrative board issuing an opinion that two contracts are void.

Florida law, the contracts were void *ab initio*. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009) ("A government entity has the right to speak for itself" and to "select the views that it wants to express" (cleaned up)). Just as in *Wilson*, the Legislative Declaration was a form of speech by elected officials. Therefore, it does not "qualify as a materially adverse action," *Wilson*, 142 S. Ct. at 1261, and Disney's retaliation challenge fails.

## CONCLUSION

For these reasons, the Court should either abstain and stay this case pending the outcome of state court litigation or, alternatively, dismiss Disney's complaint.

Dated: June 26, 2023                         Respectfully submitted,

  Jason Gonzalez (No. 146854)              /s/ Charles J. Cooper
  LAWSON HUCK GONZALEZ PLLC              Charles J. Cooper (No. 248070DC)
  215 S. Monroe Street                   David H. Thompson (No. 450503DC)
  Suite 320                              Peter A. Patterson (*Pro Hac Vice*)
  Tallahassee, FL 32301                  Megan M. Wold (*Pro Hac Vice*)
  Tel: (850) 825-4334                    Joseph O. Masterman (No. 1004179)
  jason@lawsonhuckgonzalez.com           John D. Ramer (*Pro Hac Vice*)
                                         COOPER & KIRK, PLLC
                                         1523 New Hampshire Avenue, N.W.
                                         Washington, D.C. 20036
                                         Tel: (202) 220-9600
                                         Fax: (202) 220-9601
                                         ccooper@cooperkirk.com
                                         dthompson@cooperkirk.com
                                         ppatterson@cooperkirk.com
                                         mwold@cooperkirk.com
                                         jmasterman@cooperkirk.com
                                         jramer@cooperkirk.com


                                         *Counsel for Defendants Martin Garcia,*
                                         *Charbel Barakat, Brian Aungst Jr., Ron*
                                         *Peri, Bridget Ziegler, and Glenton*
                                         *Gilzean, Jr.*

47

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to Northern District of Florida Rule 7.1(F), the undersigned counsel hereby certifies that the foregoing Defendants' Memorandum of Law in Support of Motion to Dismiss, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 10,737 words as measured by Microsoft Office for Word 365.

Respectfully submitted,

<u>/s/ Charles J. Cooper</u>
Charles J. Cooper