# EXHIBIT B

**Legislative Findings of the Central Florida Tourism Oversight District
Board of Supervisors Relating to the February 8, 2023, Development Agreement and
Declaration of Restrictive Covenants**

**Whereas,** on February 8, 2023, the former members of the Board of Supervisors of the Reedy Creek Improvement District, now known as the Central Florida Tourism Oversight District, (the "District"), executed two agreements with Walt Disney Parks & Resorts U.S., Inc. ("Disney"): (1) the Walt Disney World Chapter 163 Development Agreement (the "development agreement), and (2) the Declaration of Restrictive Covenants (the "restrictive covenants"); and

**Whereas,** after hearing presentations from its acting general counsel and litigation counsel team at public meetings regarding the development agreement and the restrictive covenants, the Board of Supervisors of the District makes the following legislative findings.

1. The development agreement states that it was entered into pursuant to and is subject to the provisions of the Florida Local Government Development Agreement Act, §§ 163.3220-163.3243, Fla. Stat.

2. The Florida Local Government Development Agreement Act contains an express, mandatory notice provision, which provides in relevant part:

> **Public hearings.**
> (1) Before entering into, amending, or revoking a development agreement, a local government shall conduct at least two public hearings. At the option of the governing body, one of the public hearings may be held by the local planning agency.
>
> (2)(a) Notice of intent to consider a development agreement shall be advertised approximately 7 days before each public hearing in a newspaper of general circulation and readership in the county where the local government is located. Notice of intent to consider a development agreement shall also be mailed to all affected property owners before the first public hearing. The day, time, and place at which the second public hearing will be held shall be announced at the first public hearing.

§ 163.3225, Fla. Stat.

3. Disney is not the sole property owner in the District. In addition to land owned by the District itself, other property owners within the District include private entities not affiliated with Disney and governmental entities.

4. The development agreement affects these other property owners. The following are some examples:

(a) under the terms of the development agreement, the District agrees, on a prospective basis, that development in the District must be allowed to the maximum levels authorized under the District's 2032 Comprehensive Plan, including the maximum densities and intensities. The development agreement then gives all the development rights in the District to Disney, which, pursuant to the development agreement, now owns and controls such development rights. Any property owner who proposes development within the District that would require the use of these development rights must first obtain prior written approval for the proposed development from Disney, and it is left to Disney's discretion whether or not to assign any development rights to other property owners in the District.

(b) under the terms of development agreement, the height of any building constructed by any property owner within the District is controlled by and must be approved by Disney;

(c) under the terms of the development agreement, the District must fund, design, and construct (or cause to be constructed) certain infrastructure projects, including a number of road projects. As set forth in the development agreement, these road projects must be funded by general obligation bonds financed with ad valorem taxes levied by the District, using a combination of funds on hand and new bond funds. In other words, the development agreement requires the District to levy and collect property tax revenue from all tax payers in the District in order to finance new bonds for these road project. The capital improvement section of the development agreement projects that the District must fund approximately $300,000,000 in new general obligation bond funds through 2027 and approximately $544,000,000 through 2030.

5. Prior to entering into this development agreement, the District's prior Board of Supervisors held two public hearings. The first hearing was held on January 25, 2023, during a Board of Supervisors meeting. Approximately six minutes of the Board's time was devoted to the first hearing on the development agreement. The second hearing was held on February 8, 2023, during a Board of Supervisors meeting. Approximately one minute of the Board's time was devoted to this second hearing on the development agreement, after which the Board approved the agreement.

6. Prior to the January 25 and February 8 Board meetings, the District published notices of intent to consider a development agreement in the *Orlando Sentinel*. The notices were

published on January 18 and 27, respectively. The *Orlando Sentinel* is a newspaper of general circulation and readership in both Orange and Osceola Counties. Such notices published in the newspaper did not fully inform the public or other property owners of the purposes or contents of the development agreement and how other property owners and the taxpayers of the District were affected by such proposed agreement.

7. Prior to the January 25 and February 8 Board meetings, the District did not post a copy of its agenda packages for such meetings on its website. The District did not upload agenda packages for the January 25 and February 8, 2023 meetings onto its website until early March 2023 after the new Board of Supervisors appointed by the Governor took office. Copies of the proposed development agreement and declaration of restrictive covenants were not posted on the District's website in advance of the January 25 and February 8 Board meetings.

8. Prior to the January 25 meeting, the District did not mail notice of intent to consider a development agreement to all property owners affected by the development agreement.

9. Because the District failed to comply with 163.3225(2)(a), the development agreement is void and unenforceable.

10. The Florida Local Government Development Agreement Act provides that "[a]ny local government may, by ordinance, establish procedures and requirements ... to consider and enter into a development agreement." Fla. Stat. § 163.3223.

11. Absent the enactment of such an ordinance, a local government like the District is not authorized to enter a development agreement.

12. The District failed to satisfy this condition precedent before entering the development agreement. Because the District did not pass enabling rules as § 163.3223 requires, the District lacked authority to enter the development agreement, and the development agreement is void and unenforceable.

13. Under the terms of the development agreement, any local government laws and policies governing development that were effect on February 8, 2023, i.e., the date of execution, shall govern development under the development agreement for the duration of the agreement.

14. There are two municipalities within the boundaries of the District: the City of Bay Lake ("Bay Lake") and the City of Lake Buena Vista ("Lake Buena Vista"). Prior to February 27, 2023, and thus at the time the development agreement was approved by the District

and executed, Bay Lake and Lake Buena Vista had exclusive authority over comprehensive planning, land development regulations, development orders, and building permitting within their municipal boundaries, while the District had exclusive authority over those matters for lands in the District outside the municipal boundaries. Thus, at the time that the development agreement was executed, the District had no authority or jurisdiction to approve or regulate development-related activities on property located within the municipalities' boundaries, including, but not limited to, issuing development orders, building permits, or enforcing the District's comprehensive plan and land development regulations.

15. The development agreement applies to property that is located inside the boundaries of Bay Lake and Lake Buena Vista and to property that is located outside those municipalities' boundaries.

16. The only signatories to the development agreement are the District and Disney. Bay Lake and Lake Buena Vista did not sign development agreement, and the District did not purport to sign the agreement on behalf of either municipality. Bay Lake and Lake Buena Vista did not conduct public hearings on or approve the development agreement.

17. Under the development agreement, the District assigns to Disney all of the development rights within the District, regardless of whether such rights are held or regulated by Bay Lake or Lake Buena Vista. In addition, under the development agreement, all proposed development, whether within or outside the municipalities' boundaries, will be subject to the District's land development regulations, including reviewing and approving development applications, issuing development orders and building permits, and enforcing other aspects of its land development regulations.

18. Because the District had no authority or jurisdiction on February 8, 2023, to approve or regulate this activity and because Bay Lake and Lake Buena Vista did not conduct public hearings on, approve, or join as parties to the development agreement, the development agreement is void and unenforceable.

19. The development agreement requires the District to levy and collect ad valorem taxes from the District's tax payers in order to finance new general obligation bonds used to fund certain road and utility capital improvement projects.

20. Article VII, section 12 of the Florida Constitution provides that the District can issue general obligation bonds to finance capital projects that are payable from its ad valorem

taxation and that mature more than twelve (12) months after their issuance only when approved by "vote of the electors who are owners of freeholds therein not wholly exempt from taxation."

21. The development agreement constitutes a general obligation debt of the District for capital improvement projects exceeding a twelve (12) month period in violation of the Florida constitution. Because the development agreement is unconstitutional, it is void and unenforceable.

22. As already found above, prior to February 27, 2023, Bay Lake and Lake Buena Vista had exclusive authority over comprehensive planning, land development regulations, and development order and building permit authority within their municipal boundaries, while the District had exclusive authority over those matters for lands within the District outside the municipal boundaries. Thus, prior to February 27, 2023, establishing uniform guidelines and regulations for development within the entirety of the District's boundaries required all three local governments – the District, Bay Lake, and Lake Buena Vista – to adopt a joint comprehensive plan and identical land development regulations.

23. In or around 1991, the District, Bay Lake, and Lake Buena Vista adopted a joint comprehensive plan, which was amended from time to time.

24. On November 14, 2018, Bay Lake, Lake Buena Vista, and the District each conducted a first reading and public hearing on their respective resolutions/ordinances to adopt amendments to the joint comprehensive plan. The hearings were held at 8:30, 9:00, and 9:30 a.m. respectively. Attached to each proposed resolution/ordinance was an Exhibit A that set out the text of the proposed amendments. The proposed amendments primarily addressed the deannexation of approximately 100 acres of land within the District's boundaries, as well as certain amendments that were required because of changes in the Florida Administrative Code. The proposed amendments that were the subject of the first public hearings did not revise the densities or intensities of the existing joint comprehensive plan nor did they include a capital improvements program.

25. On May 22, 2022, at 9:30 a.m., after a three-and-a-half year gap, the District conducted its second reading and public hearing on its proposed resolution/ordinance to adopt amendments to the joint comprehensive plan. Unlike the first reading and hearing, the proposed resolution/ordinance did not attach an Exhibit A nor otherwise set out the text of the proposed

amendment. The Board of Supervisors adopted the resolution/ordinance, and thereby the purported proposed amendments to the joint comprehensive plan, at that hearing.

26. On May 24, 2022, at 8:30 and 9:00 a.m. respectively, Bay Lake and Lake Buena Vista conducted their second readings and public hearings on their proposed ordinances to adopt amendments to the joint comprehensive plan. Like the District, the municipalities' proposed ordinances did not attach an Exhibit A nor otherwise set out the text of the proposed amendments. Each municipality adopted its respective ordinance, and thereby the purported proposed amendments to the joint comprehensive plan, at those hearings.

27. The amendments to the joint comprehensive plan jointly transmitted by the District, Bay Lake, and Lake Buena Vista to the State of Florida Department of Economic Opportunity ("DEO") after the May 2022 second reading and public hearings substantially and materially differ from and serve a new purpose than the proposed amendments that had been set out in full in the exhibits attached to the resolutions/ordinances considered at the first reading and public hearings in November 2018. For example, the amendments that were purportedly approved at the second public hearings substantially increased the allowed densities and intensities and changed the uses within the District and the municipalities. Additionally, the amendments that were purportedly approved at the second public hearings include a significant capital improvement program. None of these provisions were included in the text of the amendments noticed at the first public hearings and transmitted to DEO in November 2018. Nor had the text of these provisions been set out in the resolutions/ordinances considered at the second readings and public hearings.

28. After adoption of the ordinances/resolutions relating to amendments to the joint comprehensive plan, the District, Bay Lake, and Lake Buena Vista adopted, via resolution/ordinance, amendments to their land development regulations. The District held its public hearings on December 14, 2022, and January 25, 2023, at 9:30 a.m. Bay Lake held its public hearings on January 11, 2023, and February 8, 2023, at 8:30 a.m. Lake Buena Vista held its public hearings on January 11, 2023, and February 8, 2023, at 9:00 a.m. Additionally, neither Bay Lake nor Lake Buena Vista set out, whether by way of exhibit to or in the body of the ordinance, the language of the proposed amendments to their land development regulations. Bay Lake and Lake Buena Vista had not adopted their ordinances concerning the amendments to land

development regulations prior to the District's first public hearing on the development agreement.

29. The land development regulations purportedly adopted by the District, Bay Lake and Lake Buena Vista in January and February of 2023, changed the list of uses permitted and increased densities and intensities of uses.

30. When enacting ordinances or resolutions, municipalities like Bay Lake and Lake Buena Vista must comply with the provisions of § 166.041, Fla. Stat. That statute provides in relevant part: "No ordinance shall be revised or amended by reference to its title only. Ordinances to revise or amend shall set out in full the revised or amended act or section or subsection or paragraph of a section or subsection." § 166.041(2), Fla. Stat.

31. Section 166.041(3)(c), Florida Statutes, requires a particular type of newspaper advertisement to be published for proposed ordinances that change the actual list of permitted, conditional, or prohibited uses or change a zoning map. All other proposed ordinances of municipalities must be advertised for a public hearing pursuant to the minimum requirements of Section 166.041(3)(a), Florida Statutes.

32. At the time that the District adopted its resolutions/ordinances regarding the amendments to the joint comprehensive plan and land development regulations, the District was also subject to these statutory requirements for municipalities.

33. Because the adopted amendments to the joint comprehensive plan and land development regulations changed intensities, densities, and uses of land within the District and municipalities and modified the future land use map, they qualified as changes in the "list of permitted, conditional, or prohibited uses within a zoning category" or changes in the "zoning map designation of a parcel or parcels of land involving 10 contiguous acres or more." The District and the municipalities thus were required to hold at least one of the public hearings after 5 p.m. § 166.041(3)(c)1.a., Fla. Stat., which did not happen.

34. With respect to the comprehensive plan amendments purportedly adopted in May 2022, the District, Bay Lake, and Lake Buena Vista adopted these resolutions/ordinances illegally and in violation of § 166.041, Fla. Stat., and Florida law, and they are void and unenforceable because:

(a) the District, Bay Lake, and Lake Buena Vista failed to set out in full the amendments to the joint comprehensive plan that were adopted at the second public hearings;

(b) the District, Bay Lake, and Lake Buena Vista failed to hold at least one public hearing on the amendments to the joint comprehensive plan after 5 p.m.;

(c) the District, Bay Lake, and Lake Buena Vista failed to start anew and have two advertised readings and public hearings on the materially and substantially modified comprehensive plan amendment that had a different purpose than the original purpose of the EAR-based comprehensive plan amendment transmitted to DEO in November 2018.

35. With respect to the land development regulation amendments purportedly adopted in February 2023 by Bay Lake and Lake Buena Vista, Bay Lake Ordinance No. 139 and Lake Buena Vista Ordinance No. 132 are void and unenforceable because:

(a) Bay Lake and Lake Buena Vista failed to set out in full the amendments to their land development regulations that were adopted at their February 8, 2023, Council meetings;

(b) Bay Lake and Lake Buena Vista failed to hold at least one public hearing on the amendments to their land development regulations after 5 p.m.;

(c) These land development regulation amendments are not consistent with the Comprehensive Plan -- as set forth herein, the May 2022 amendments to the joint comprehensive plan were not effective and did not amend the Comprehensive Plan.

36. With respect to the land development regulation amendments purportedly adopted in January 2023 by the District via Ordinance/Resolution No. 637, such Ordinance/Resolution is void and unenforceable because:

(a) The official executed Ordinance/Resolution No. 637 failed to set out in full the amendments to the District's land development regulations that were adopted;

(b) The District failed to hold at least one public hearing on the amendments to its land development regulations after 5 p.m.;

(c) The District had no authority to adopt land development regulations inconsistent with the Comprehensive Plan -- as set forth herein, the May 2022 amendments to the joint comprehensive plan were not effective and did not amend the Comprehensive Plan; and

(d) The District had no authority to adopt land development regulations within the jurisdictional limits of the Cities of Lake Buena Vista and Bay Lake, and such cities failed to properly adopt land development regulation amendments in tandem with the District's proposed land development regulations.

37.     Each of these is a separate violation of § 166.041, Fla. Stat., that renders the resolutions/ordinances void a*b initio*. Because the amendments to the joint comprehensive plan and the land development regulations are void, the prior version of the joint comprehensive plan remains in effect pursuant to § 163.3197, Fla. Stat. Further, the prior version of the District, Lake Buena Vista and Bay Lake land development regulations remain in effect, not the versions purportedly adopted in January and February 2023.

38.     Section 163.3231, Fla. Stat., provides that a development agreement "shall be consistent with the local government's comprehensive plan and land development regulations."

39.     The maximum development program identified in Table 1, the densities and intensities identified in Table 2, and the capital improvement element identified in Exhibit 3 of the February 8, 2023, development agreement are inconsistent with the joint comprehensive plan and land development regulations currently in effect.

40.     Because the development agreement violates the consistency mandate of § 163.3231, Fla. Stat., it is void and unenforceable.

41.     Florida law has long prohibited any local government from contracting away its discretionary legislative power.

42.     The development agreement contracts away the District's discretionary legislative power in multiple ways. It provides that "if there is any conflict between the [Development] Agreement and the Comprehensive Plan or RCID LDRs [Land Development Regulations] this [Development] Agreement shall prevail." That provision elevates a private contractual agreement above the binding legislative acts of the District and is therefore invalid and unenforceable. Moreover, it violates the statutory requirement that any development agreement be "consistent with the local government's comprehensive plan and land development regulations." Fla. Stat. § 163.3227(1)(g).

43.     The development agreement also gives Disney authority to set maximum building heights throughout the District and assigns "all of the development rights and entitlements" in the District to Disney. The Florida Legislature explicitly empowered the District to perform these functions, both under the legislative act establishing the District in 1967 and the more recent legislation that took effect this year. These are governmental functions that the District could not lawfully delegate to a private entity.

44. Additionally, the development agreement obligates the District to "fund[], design[] and construct[]" public facilities to accommodate Disney's future growth, but without allowing for periodic reassessment of currently planned projects, including as encouraged or required by law. This improperly delegates the District's governmental authority to a private entity in violation of § 163.3191, Fla. Stat., which requires the District to "evaluate its comprehensive plan to determine if plan amendments are necessary to reflect changes in state requirements" "[a]t least once every 7 years," and "encourag[es]" local governments like the District "to comprehensively evaluate and, as necessary, update comprehensive plans to reflect changes in local conditions.

45. The development agreement contains multiple invalid delegations of the District's governmental authority to Disney, a private entity, it is void and unenforceable.

46. Contract principles apply to development agreements.

47. Agreements that contravene the Legislature's intent are void as against public policy.

48. The Florida Legislature established the policies that govern the District through House Bill ("H.B.") 9-B, codified at ch. 2023-5, Laws of Fla.

49. Among other things, this law replaces the District's prior landowner-elected board with a Board appointed by the Governor, subject to Senate confirmation, and subject to limitations that ensure members' independence from any "theme park or entertainment complex." H.B. 9-B § 4(2)(c). The law also maintains the District's authority to adopt planning, zoning, and other regulations while explicitly providing that any regulations "relating to safety, health, sanitation, or building safety shall prescribe standards at least equivalent to the minimum standards in applicable statewide regulations" such as the Florida Building Code and Florida Fire Prevention Code. *Id.* §§ 23(4)(b), (10). In short, H.B. 9-B provides public oversight for the District and ensures that the same laws apply in the District as apply throughout the State of Florida.

50. Although H.B. 9-B was still under legislative consideration on February 8, 2023, when the development agreement was signed, the public policies that the law advances—public oversight and accountability—preexist this particular law. Indeed, H.B. 9-B came in the wake of Senate Bill ("S.B.") 4-C, codified at ch. 2022-266, Laws of Fla., which had abolished any special district established by special act before the ratification of the Florida Constitution in 1968 and

not reestablished afterwards. Moreover, H.B. 9-B has now been enacted and thus constitutes the public policy against which any attempted enforcement of the development agreement would be judged.

51. The Development Agreement contravenes H.B. 9-B in multiple ways.

52. In contravention of the District's authority to "[r]egulate, restrict, and determine the ... height ... of buildings," H.B. 9-B § 23(9)(a), and of the District's explicit obligation to do so according to the standards of the Florida Building Code, *see id*. §§ 23(4)(b), (10), the development agreement gives Disney exclusive control over building heights in the covered property, which are otherwise controlled only by "the Federal Aviation Administration (FAA) height standards."

53. In contravention of the District's authority to "[r]egulate, restrict, and determine ... the density of population" and "the percentage and portion of lots and land that may be occupied or built on," H.B. 9-B § 23(9)(a); *see also id*. § 23(7)(a), the development agreement grants to Disney—and to the exclusion of other District landowners—the right to all additional development in the District.

54. Under the development agreement, Disney may also obligate the District to construct public facilities (*e.g.*, roads), and even to purchase from Disney any lands that Disney owns and that are needed for such facilities. The development agreement restricts the District from reassessing the relative costs and benefits of any such facilities, in contravention not only of the District's authority over the construction of roads and other public facilities, *see* H.B. 9-B § 8, but also of statutes encouraging or requiring such reassessment, *see* Fla. Stat. §§ 163.3191, .3177(3)(b).

55. The Legislature enacted H.B. 9-B to create a Board that would exercise meaningful public authority over the District, including over land development. But the development agreement removes that authority by exempting a large swath of land from District regulation and transferring zoning authority over that land to a single private developer. The Development Agreement thereby contravenes H.B. 9-B., and It is therefore void as against public policy and unenforceable.

56. A contract contrary to a strong public policy against a particular practice is unconscionable and unenforceable.

57. Because the development agreement violates the public policies embodied in H.B. 9-B, it is also unconscionable and therefore unenforceable.

58. Independent of H.B. 9-B, however, the development agreement is both procedurally and substantively unconscionable.

59. Procedural unconscionability focuses on factors surrounding entering into the contract that add up to an absence of meaningful choice on the part of one of the parties to the terms of the contract. Indicators of procedural unconscionability include evidence of self-dealing and a lack of independent counsel for both parties.

60. The Board has been presented with substantial evidence of self-dealing and other indicia of procedural unconscionability. Due to the prior manner of electing Board members, where each District landowner was allowed one vote per acre of land owned in the District, Disney had effective control over Board membership. Records also suggest that, in at least some cases, Disney gave parcels of land to Board members on a temporary basis and for minimal consideration in order to satisfy the prior requirement that all Board members be District landowners. This self-dealing resulted in the substantively one-sided provisions of the development agreement discussed herein.

61. The District lacked independent counsel when entering the development agreement. The District's general counsel at that time also represented Disney in real estate and other matters at the time of his engagement in 2019, and his communications with Disney's counsel relating to the Development Agreement indicate a desire to maintain business with Disney.

62. Communications between the District's counsel and Disney's counsel also indicate that Disney drafted the development agreement but attempted to obscure this fact by naming the District's counsel as the drafter.

63. These communications further show that Disney's counsel edited the text of the agenda item for the District's January 25, 2023, meeting during which the District held its first hearing on the development agreement.

64. This evidence reflects a procedurally unconscionable attempt by Disney to arrogate authority to itself on the eve of H.B. 9-B's enactment.

65. In contrast to procedural unconscionability, substantive unconscionability focuses on whether the terms of the contract itself are unreasonably favorable to the other party.

Indicators of substantive unconscionability include the length of the benefit conferred on a party, and the gross disparity in the values exchanged. That last factor may be sufficient by itself for a finding of unconscionability.

66. The benefits of the development agreement are entirely one-sided. The development agreement entitles Disney to the exclusive use of future development rights in the District, delegates District zoning powers to Disney, and allows Disney to obligate the District to construct private facilities in aid of Disney's development projects.

67. The District receives nothing in return. The only theoretical benefit to the District in the text of the development agreement is that, when Disney obligates the District to construct public facilities that require land that Disney owns, Disney will not "request payment for the land in excess of fair market value." This benefit is illusory because the District has the power of eminent domain, meaning that it may take private property for public use and for just compensation. Because payment by the District of fair market value meets the full compensation requirement when it exercises its power of eminent domain, the development agreement does not provide the District any rights beyond what the District would have in the normal course.

68. These one-sided benefits are long-term. The development agreement lasts for 30 years. Although the statute allowing for development agreements allows such terms, this development agreement extends for twenty years beyond the joint comprehensive plan purportedly adopted in May 2022 and was entered just before the Florida Legislature passed H.B. 9-B to increase public oversight for the District through a newly appointed Board. In this context, the development agreement's duration exacerbates the substantive unconscionability of its one-sided terms.

69. Because the development agreement is both procedurally and substantively unconscionable, it is void and unenforceable on this ground as well.

70. All contracts require "consideration," meaning that the District (the promisor) must have received something in return from Disney (the promisee).

71. Consideration must be something more than what a party was already legally obliged to do.

72. The only purported consideration that Disney provided through the development agreement was its agreement to demand no more than fair market value for Disney-owned lands that the District might need for any public-facilities projects that Disney may obligate the District

to undertake pursuant to the development agreement. But the District already has the power to take private lands for public projects and to pay only fair market value for those lands.

73. Because the development agreement lacks valid consideration, it is void and unenforceable.

74. Turning to the restrictive covenants, they depend upon the District choosing to enter the development agreement. For example, the restrictive covenants state "that, in furtherance of the Comprehensive Plan and the Development Agreement, ... and in consideration of the commitments made by [Disney] and its Affiliates under the Development Agreement, it is in the mutual interest of [the District] and [Disney]" to subject "the [District] Properties to this Declaration". Because the restrictive covenants are dependent upon the development agreement, if the development agreement is invalid for any of the reasons explained above the restrictive covenants necessarily are invalid as well.

75. Additionally, contract principles apply to restrictive covenants.

76. Florida courts have long held that restrictive covenants are not enforceable against governmental units. Although these holdings have referred specifically to covenants between private parties, the same rationale applies here: the District could not contract away the authority of the current Board through restrictive covenants. Indeed, though Florida law allows local governments to enter development agreements in specified circumstances, these statutes do not provide for restrictive covenants.

77. Like the development agreement, the restrictive covenants contravene the authorities granted to the District by H.B. 9-B, and the public policy embodied by that law, in several ways.

78. Section 2.1 of the restrictive covenants restrict the District to using its property solely for those uses existing on February 8, 2023, or as contemplated by the amendments to the joint comprehensive plan purportedly adopted in May 2022.

79. Section 2.2 effectively enables Disney to censor the District, banning the District from speech on its own property about anything other than the District.

80. Section 3 prohibits the District from altering its own property without Disney's review and consent.

81. There is no public purpose for the restrictive covenants.

82. Moreover, the restrictive covenants are the product of the same self-dealing and absence of independent counsel, and thus bear the same indicia of procedural unconscionability, as the development agreement.

83. Drafting records also show that, as with the development agreement, Disney's counsel initially drafted the restrictive covenants but attempted to obscure that fact by listing the District's counsel as the drafter.

84. As with the development agreement, the benefits of the restrictive covenants are entirely one-sided. Disney receives the authority to limit the District's use of and speech on the District's own property, while the District receives no consideration in return. Just as these provisions violate public policy, they are substantively unconscionable.

85. Although the restrictive covenants constitute a distinct agreement, they do not even purport to have their own consideration. Rather, they simply refer to "the commitments made by [Disney] and its Affiliates under the Development Agreement."

86. The development agreement does not reference the restrictive covenants or contain any requirement that the District enter into them.

87. The development agreement had not been executed or approved at the time that the former Board voted to approve the restrictive covenants. A then-non-existent agreement cannot constitute consideration for the restrictive covenants.

88. There is no statute, code or regulation that contemplates local governments entering into restrictive covenants at the request of and for the benefit of a developer or private property owner. As already found above, those commitments did not constitute valid consideration for the development agreement. The restrictive covenants likewise lack valid consideration and are void and unenforceable.

89. Even if there were valid consideration for the development agreement, the restrictive covenants do not even purport to provide any additional, independent consideration to the District. They are therefore void and unenforceable.

90. The foregoing legislative findings are not intended to be exhaustive of the infirmities in the development agreement and restrictive covenants, nor are they intended to limit the District's counsel from pursuing any factual or legal theory relating to the development agreement and restrictive covenants.

91. Neither the development agreement nor the restrictive covenants are in the best interest of the District or the taxpayers or public, and the Board has no desire to readopt or ratify such instruments.

**PASSED AND DULY ADOPTED**, with a quorum present and voting, by the Board of Supervisors of the Central Florida Tourism Oversight District, this 26th day of April 2023.

CENTRAL FLORIDA TOURISM OVERSIGHT DISTRICT

By: _____
Martin Garcia
Chair of the Board of Supervisors

Attested:

By: _____
John H. Classe, Jr.
District Administrator and
Secretary of the Board of Supervisors