## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

WALT DISNEY PARKS AND RESORTS, U.S., INC.,

          Plaintiff,

v.

RONALD D. DESANTIS, in his official capacity as Governor of Florida; MEREDITH IVEY, in her official capacity as Acting Secretary of the Florida Department of Economic Opportunity; MARTIN GARCIA, in his official capacity as Board Chair of the Central Florida Tourism Oversight District; MICHAEL SASSO, in his official capacity as Board Member of the Central Florida Tourism Oversight District; BRIAN AUNGST, JR., in his official capacity as Board Member of the Central Florida Tourism Oversight District; RON PERI, in his official capacity as Board Member of the Central Florida Tourism Oversight District; BRIDGET ZIEGLER, in her official capacity as Board Member of the Central Florida Tourism Oversight District; and GLENTON GILZEAN, JR., in his official capacity as Administrator of the Central Florida Tourism Oversight District,

          Defendants.

Case No. 4:23-cv-00163-AW-MJF

## PLAINTIFF'S OPPOSITION TO CFTOD DEFENDANTS' MOTION TO ABSTAIN OR DISMISS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................1

BACKGROUND ............................................................................................3

    A.    For Decades, The Special District Created Enormous Public Benefits By Facilitating Disney's Development Of Its Private Property Into A World-Class Tourist Destination ............................3

    B.    Disney, RCID, And The State Develop The 2032 Comprehensive Plan.....................................................................5

    C.    Disney Comments On Pending Legislation, Prompting State Retaliation ...............................................................6

    D.    The Governor And Legislature Hastily Dissolve The RCID..............7

    E.    Obvious Problems With Dissolving RCID Ignored In The Haste To Punish Disney Force The Legislature To Reconstitute RCID As A "State Receivership" ...............................................10

    F.    Disney And RCID Execute Development Contracts Amid The State's Escalating Retaliation..........................................11

    G.    CFTOD And The Legislature Abrogate The Contracts ....................13

LEGAL STANDARD.....................................................................................15

ARGUMENT ...............................................................................................16

I.    *PULLMAN* ABSTENTION IS UNWARRANTED....................................16

    A.    Defendants Fail To Satisfy The *Pullman* Abstention Prerequisites ...........................................................16

    1.    This Case Requires A Straightforward Application Of Unambiguous State Law ...................................................17

    2.    Resolution Of The Underlying State Law Questions Would Not Avoid The Need For The Resolution Of Substantial Constitutional Questions ....................................................19

    B.    Discretionary Considerations Disfavor Abstention ..........................21

II.    THE RESTRICTIVE COVENANTS' FORUM-SELECTION CLAUSE PROVIDES NO BASIS FOR DISMISSAL...............................24

III.    THE COMPLAINT STATES A CONTRACTS CLAUSE CLAIM ..........27

    A.    The Contracts Are Valid ................................................27

i

# TABLE OF CONTENTS
(Continued)

**Page**

1.    The DAA Does Not Apply To The Contracts....................................27

2.    Section 163.3223 Is Permissive, Not Mandatory..............................29

3.    The Contracts Were Supported By Valid And Sufficient Consideration......................................................................................31

4.    The Contracts Did Not Unlawfully Delegate Government Authority Or Contravene Public Policy .............................................33

5.    Government Units Are Bound By Restrictive Covenants They Enter ...............................................................................................38

B.    The Legislature And CFTOD Impaired The Contracts Through Legislative Action ............................................................................39

C.    Defendants' Contractual Impairment Was Substantial And Unjustified .......................................................................................42

IV.   THE COMPLAINT STATES A TAKINGS CLAUSE CLAIM ................45

A.    Section 163.3241 Does Not Eliminate Disney's Private Property Rights................................................................................46

B.    Disney Is Entitled To Equitable Relief Under The Takings Clause .............................................................................................49

C.    The Legislative Declaration Triggers The Takings Clause ..............50

V.    THE COMPLAINT STATES A DUE PROCESS CLAIM .........................51

VI.   THE COMPLAINT STATES A CLAIM FOR FIRST AMENDMENT RETALIATION................................................................52

A.    Inquiry Into The Challenged Laws' Motives Is Not Prohibited ........55

B.    State Laws Relating To Government Structure Are Not Immune From Constitutional Scrutiny ...........................................................60

C.    The CFTOD Legislative Declaration Is Not Government Speech..............................................................................................62

CONCLUSION ...............................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*21st Century Oncology, Inc. v. Moody*,
402 F. Supp. 3d 1351 (N.D. Fla. 2019) ................................................................42

*303 Creative LLC v. Elenis*,
143 S. Ct. 2298 (2023) ........................................................................................52

*Allied Structural Steel Co. v. Spannaus*,
438 U.S. 234 (1978) ..................................................................................... 42, 44

*Baggett v. Bullitt*,
377 U.S. 360 (1964) ..................................................................................... 21, 23

*Bailey v. Wheeler*,
843 F.3d 473 (11th Cir. 2016) ............................................................................54

*Bakalich v. Vill. of Bellwood*,
2006 WL 1444893 (N.D. Ill. 2006) ....................................................................58

*Beckwith v. City of Daytona Beach Shores*,
58 F.3d 1554 (11th Cir. 1995) ............................................................................53

*Bethune-Hill v. Va. State Bd. of Elections*,
580 U.S. 178 (2017) ..................................................................................... 55, 61

*Board of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*,
512 U.S. 687 (1994) ............................................................................................61

*Bond v. Floyd*,
385 U.S. 116 (1966) ............................................................................................61

*BP Prods. N. Am., Inc. v. Coral Petroleum, Inc.*,
462 F. Supp. 2d 1221 (S.D. Fla. 2006) ........................................................ 24, 26

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*,
942 F.3d 1215 (11th Cir. 2019) ..........................................................................52

*Cate v. Oldham*,
707 F.2d 1176 (11th Cir. 1983) ..........................................................................22

*Central Florida Tourism Oversight District v. Walt Disney Parks & Resorts U.S., Inc.*,
No. 2023-CA-011818-O (Fla. Cir. Ct., 9th Cir. June 20, 2023) ..........................17

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
508 U.S. 520 (1993) ............................................................................................55

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) ..................................................... 47, 48

*Citizens State Bank v. Dixie County*,
2011 WL 1335805 (N.D. Fla. 2011) ................................................. 15

*Citizens United v. FEC*,
558 U.S. 310 (2010) ......................................................................... 52

*City of L.A. v. L.A. City Water Co.*,
177 U.S. 558 (1900) ......................................................................... 40

*City of Largo v. AHF-Bay Fund, LLC*,
215 So. 3d 10 (Fla. 2017) ................................................................. 37

*City Ry. Co. v. Citizens' St.-R.R. Co.*,
166 U.S. 557 (1897) ......................................................................... 40

*Club Madonna Inc. v. City of Miami Beach*,
42 F.4th 1231 (11th Cir. 2022) ........................................................ 48

*Colorado River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976) ............................................................... 16, 19, 23

*Contributors to Pa. Hosp. v. Phila.*,
245 U.S. 20 (1917) ........................................................................... 45

*Courthouse News Serv. v. Planet*,
750 F.3d 776 (9th Cir. 2014) ........................................................... 22

*Crawford-El v. Britton*,
523 U.S. 574 (1998) ......................................................................... 54

*Dade Cnty. v. Gen. Waterworks Corp.*,
267 So. 2d 633 (Fla. 1972) ............................................................... 32

*Dade County v. Brigham*,
47 So. 2d 602 (Fla. 1950) ................................................................. 33

*Dias v. Mediterranean Shipping Co.*,
2003 WL 23190184 (S.D. Fla. 2003) ............................................... 27

*DiMauro v. Martin*,
359 So. 3d 3 (Fla. Dist. Ct. App. 2023) ........................................... 31

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Div. of Admin., State Dep't of Transp. v. W. Palm Beach Garden Club*,
    352 So. 2d 1177 (Fla. Dist. Ct. App. 1977) ............................................................ 33

*Dobco, Inc. v. Cnty. of Bergen*,
    2022 WL 4366271 (D.N.J. 2022) .......................................................................... 26

*Dream Defs. v. DeSantis*,
    559 F. Supp. 3d 1238 (N.D. Fla. 2021) ................................................................. 21

*Duke v. James*,
    713 F.2d 1506 (11th Cir. 1983) ..................................................................... 16, 19

*E & E Hauling, Inc. v. Forest Pres. Dist. of DuPage Cnty., Ill.*,
    821 F.2d 433 (7th Cir. 1987) ................................................................................ 18

*E&E Hauling, Inc. v. Forest Preserve Dist. of Du Page Cnty.*,
    613 F.2d 675 (7th Cir. 1980) ................................................................................ 43

*Echols v. Lawton*,
    913 F.3d 1313 (11th Cir. 2019) ............................................................................ 53

*Fireman's Fund Ins. Co. v. City of Lodi*,
    302 F.3d 928 (9th Cir. 2002) ................................................................................ 18

*Fraternal Ord. of Police Hobart Lodge No. 121, Inc. v. City of Hobart*,
    864 F.2d 551 (7th Cir. 1988) ......................................................................... 57, 58

*Georgia Ass'n of Educators v. Gwinnett Cnty. Sch. Dist.*,
    856 F.2d 142 (11th Cir. 1988) ................................................................. 53, 57, 58

*Goldberg v. Whitman*,
    743 F. Supp. 943 (D. Conn. 1990) ................................................................. 58, 59

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ....................................................................................... 60, 61

*Hamilton v. Hall*,
    790 F. Supp. 2d 1368 (N.D. Fla. 2011) ................................................................ 15

*Hartman v. Moore*,
    547 U.S. 250 (2008) ............................................................................................. 53

*Hartnett v. Austin*,
    93 So. 2d 86 (Fla. 1956) ...................................................................................... 35

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Henley v. Herring,*
779 F.2d 1553 (11th Cir. 1986) ................................................................ 16, 17, 23

*Hill v. City of El Paso,*
437 F.2d 352 (5th Cir. 1971) ............................................................................. 23

*Hogan v. Norfleet,*
113 So.2d 437 (Fla. Dist. Ct. App. 1959) .......................................................... 49

*Holloman ex rel. Holloman v. Harland,*
370 F.3d 1252 (11th Cir. 2004) .................................................................... 52, 53

*Houston Community College System v. Wilson,*
142 S. Ct. 1253 (2022) ...................................................................................... 62

*Howard v. Murray,*
184 So. 3d 1155 (Fla. Dist. Ct. App. 2015) ....................................................... 35

*In re Hubbard,*
803 F.3d 1298 (11th Cir. 2015) .................................................................... 56, 57

*Indiana ex rel. Anderson v. Brand,*
303 U.S. 95 (1938) ............................................................................................ 20

*Irving Tr. Co. v. Day,*
314 U.S. 556 (1942) .......................................................................................... 20

*Jacksonville Expressway Auth. v. Henry G. Du Pree Co.,*
108 So. 2d 289 (Fla. 1959) ............................................................................... 32

*Keane v. Jacksonville Police Fire & Pension Fund Bd. of Tr.,*
775 Fed. App'x 496 (11th Cir. 2019) ................................................................ 50

*Kentner v. City of Sanibel,*
750 F.3d 1274 (11th Cir. 2014) ........................................................................ 51

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
480 U.S. 470 (1987) .......................................................................................... 42

*Knick v. Township of Scott,*
139 S. Ct. 2162 (2019) ...................................................................................... 49

*Lewis v. Brown,*
409 F.3d 1271 (11th Cir. 2005) ........................................................................ 51

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Liles v. Ginn-La West End, Ltd.*,
 631 F.3d 1242 (11th Cir. 2011) ........................................................... 25

*Lipscomb v. Columbus Mun. Separate Sch. Dist.*,
 145 F.3d 238 (5th Cir. 1998) ............................................................... 18

*Louisville Joint Stock Land Bank v. Radford*,
 295 U.S. 555 (1935) ............................................................................ 45

*Lynch v. United States*,
 292 U.S. 571 (1934) ............................................................................ 45

*Matthews v. Princess Cruise Lines, Ltd.*,
 728 F. Supp. 2d 1326 (S.D. Fla. 2010) ............................................... 38

*McKinney v. Pate*,
 20 F.3d 1550 (11th Cir. 1994) ............................................................. 51

*Mgmt. Comput. Controls, Inc. v. Charles Perry Const., Inc.*,
 743 So. 2d 627 (Fla. Dist. Ct. App. 1999) .......................................... 24

*Moore v. Harper*,
 143 S. Ct. 2065 (2023) ................................................................. 20, 47

*Morgran Co. v. Orange Cnty.*,
 818 So. 2d 640 (Fla. Dist. Ct. App. 2002) ..................................... 34, 35

*MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.*,
 950 F.3d 764 (11th Cir. 2020) ............................................................. 30

*Mulkey v. Division of Admin., State Dep't of Transp.*,
 448 So. 2d 1062 (Fla. Dist. Ct. App. 1984) ........................................ 33

*N. Ohio Traction & Light Co. v. Ohio ex rel. Pontius*,
 245 U.S. 574 (1918) ............................................................................ 40

*Nasser v. City of Homewood*,
 671 F.2d 432 (11th Cir. 1982) ................................................. 17, 19, 21

*NCAA v. Corbett*,
 25 F. Supp. 3d 557 (M.D. Pa. 2014) ................................................... 18

*NCAA v. Miller*,
 795 F. Supp. 1476 (D. Nev. 1992) ...................................................... 21

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*NetChoice LLC v. Att'y Gen., Fla.*,
34 F.4th 1196 (11th Cir. 2022) ................................................................. 52

*New Orleans Waterworks Co. v. La. Sugar-Refin. Co.*,
125 U.S. 18 (1888) ................................................................................ 40

*O'Boyle v. Sweetapple*,
187 F. Supp. 3d 1365 (S.D. Fla. 2016) .................................................... 56

*Pa. Coal Co. v. Mahon*,
260 U.S. 393 (1922) ............................................................................... 45

*Perry v. Sindermann*,
408 U.S. 593 (1972) ............................................................................... 53

*Phillips v. Wash. Legal Found.*,
524 U.S. 156 (1998) ............................................................................... 47

*Pleasant Grove City, Utah v. Summum*,
555 U.S. 460 (2009) ............................................................................... 63

*Quackenbush v. Allstate Ins. Co.*,
517 U.S. 706 (1996) ............................................................................... 21

*Railroad Commission of Texas v. Pullman Co.*,
312 U.S. 496 (1941) ............................................................................... 16

*Ramphal v. TD Bank Nat'l Ass'n*,
206 So. 3d 172 (Fla. Dist. Ct. App. 2016) ............................................... 33

*Rankin v. McPherson*,
483 U.S. 378 (1987) ............................................................................... 53

*Ripplinger v. Collins*,
868 F.2d 1043 (9th Cir. 1989) ................................................................ 22

*Romika-USA, Inc. v. HSBC Bank USA, N.A.*,
2006 WL 8431829 (S.D. Fla. 2006) ....................................................... 24

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995) ............................................................................... 52

*Ryan v. Town of Manalapan*,
414 So. 2d 193 (Fla. 1982) .............................................................. 38, 39

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*S&M Brands, Inc. v. Georgia ex rel. Carr*,
  925 F.3d 1198 (11th Cir. 2019) ............................................................43

*Slater v. Energy Servs. Grp. Int'l, Inc.*,
  634 F.3d 1326 (11th Cir. 2011) ............................................................26

*Sorrell v. IMS Health Inc*.,
  564 U.S. 552 (2011) ............................................................................55

*Spicer v. Tenet Fla Physician Servs., LLC*,
  149 So. 3d 163 (Fla. Dist. Ct. App. 2014) ................................... 24, 25

*State v. Reedy Creek Improvement Dist*.,
  216 So. 2d 202 (Fla. 1968) ...............................................................5, 28

*Stevens Fam. Ltd. P'ship v. Paradise Island Ventures, LLP*,
  2009 WL 3177568 (N.D. Fla. 2009) ....................................................50

*Sys. Components Corp. v. Dep't of Transp.*,
  985 So. 2d 687 (Fla. Dist. Ct. App. 2008) ..........................................32

*Taylor v. City of Gadsden*,
  767 F.3d 1124 (11th Cir. 2014) ....................................... 21, 40, 42, 43

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) ............................................................................55

*U.S. Tr. Co. of New York v. New Jersey*,
  431 U.S. 1 (1977) ......................................................... 35, 37, 44, 45

*United States v. O'Brien*,
  391 U.S. 367 (1968) ...................................................................... 56, 59

*United States v. Winstar Corp*.,
  518 U.S. 839 (1996) ............................................................................36

*Univ. of S. Fla. Coll. of Nursing v. State, Dep't of Health*,
  812 So. 2d 572 (Fla. Dist. Ct. App. 2002) ..........................................29

*Vázquez-Velázquez v. Puerto Rico Highway & Transp. Auth*.,
  2016 WL 183653 (D.P.R. 2016) .........................................................18

*Vicksburg Waterworks Co. v. City of Vicksburg*,
  185 U.S. 65 (1902) ..............................................................................40

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Warren v. DeSantis*,
  631 F. Supp. 3d 1188 (N.D. Fla. 2022) ................................................20

*Webb's Fabulous Pharms. v. Beckwith*,
  449 U.S. 155 (1980) ...............................................................................47

*Woods v. Christensen Shipyards, Ltd.*,
  2005 WL 5654643 (S.D. Fla. 2005) ......................................................26

*Zwickler v. Koota*,
  389 U.S. 241 (1967) ......................................................................... 21, 22

**Statutes**

1967 Fla. Laws 256, Ch. 67-764 ("RCID Act") ........................................ 27, 28, 29

1985 Fla. Law 207, Ch. 85-55 § 3 ..............................................................28

Fla. Stat. § 163.3161(10) ............................................................................46

Fla. Stat. § 163.3220(2)(a) ................................................................ 12, 31, 32

Fla. Stat. § 163.3220(2)(b) ......................................................................... 12, 43

Fla. Stat. § 163.3227(1)(c) ..........................................................................36

Fla. Stat. § 163.3229 ...................................................................................43

Fla. Stat. § 163.3241 ............................................................................. 43, 46

Fla. Stat. § 189.072(2)(a) ..............................................................................9

Fla. Stat. § 73.071 .......................................................................................33

Fla. Stat. § 73.092 .......................................................................................33

Fla. Stat. § 849.46 .......................................................................................36

**Other Authorities**

1977 Fla. Op. Atty. Gen. 91 (May 16, 1977) ..............................................28

2023 Fla. Sess. Law Serv. Ch. 2023-5 (C.S.H.B. 9B) (West) ..................38

5 Eugene McQuillin, *The Law of Municipal Corporations* § 15:2 (3d ed. 2010)...41

Development Agreement between Forestar (USA) Real Estate Group, Inc. and the
  City of Lakeland (recorded in the Public Records of Polk County, Florida at
  Official Records Book 12152, Page 1408) (Feb. 22, 2022) ...............................30

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

Development Agreement between Hometown Communities, Inc. and Flagler County (recorded in the Public Records of Flagler County, Florida at Official Records Book 1234, Page 1757 (Apr. 20, 2005) .................................................30

HB 9B, CFTOD Charter § 7 ....................................................................................41

HB 9B, CFTOD Charter § 7(2).................................................................................41

HB 9B, CFTOD Charter § 7(5).................................................................................41

McQuillin, *The Law of Municipal Corporations* § 15:2...........................................42

Robert M. Rhodes, *The Florida Local Government Development Agreement Act*, 62 Fla. Bar J. 81, 81 (Oct. 1988) .........................................................................30

Senate Bill 1604 Rules Committee Bill Analysis and Fiscal Impact Statement at 9, Fla. Leg. (Apr. 20, 2023)......................................................................................44

Tri-Party Development Agreement between City of Orlando; Community Redevelopment Agency of the City of Orlando, Florida; and Universal City Development Partners (recorded in the Public Records of Orange County, Florida at Official Records Book 5044, Page 3973) (Apr. 17, 1996) .................30

### Constitutional Provisions

U.S. Const. amend V.................................................................................................45

# INTRODUCTION

The right to free speech and the right to contract are essential pillars of a free society.  The State of Florida has recently lost sight of those foundational principles.

The State—which Walt Disney Parks and Resorts, U.S., Inc. ("Disney") has proudly called home for more than 50 years—has chosen Disney as its most recent target for attacks on free speech and contractual liberty.  But if the State's strategy succeeds, Disney assuredly will not be the last person or entity the State punishes for espousing political viewpoints that do not conform with State-approved doctrine.

As the Florida Governor has declared, the State's attacks on Disney "started, of course, with our parents' rights bill," which Disney publicly opposed.  First Am. Compl. ("FAC") ¶ 173, ECF No. 25.  According to the Governor, Disney's comments "crossed a line" by expressing viewpoints the State would not tolerate. In response, the State launched a campaign to weaponize State power to punish and silence Disney and others who might express unsanctioned political views.

One of the State's first moves in this campaign was to eliminate the landowner-elected special district that had overseen Disney's development of its privately-owned swampland into a world-class tourist destination, creating

incalculable benefits for the people of Florida.  To teach Disney and others a lesson, the State replaced the elected special district board with a Governor-controlled "state receivership" successor district specifically charged with disrupting Disney's development plans.

Disney was paying attention.  Taking the Governor at his word that the State would make Disney pay for expressing unacceptable political views, Disney sought to secure its long-term development rights by entering contractual agreements with the special district before its reorganization.  The contracts—which were openly discussed and approved at public meetings—are not unique: they are exactly the kind of long-term development agreements Florida law expressly recognizes as essential to promoting the efficient development of private property for the public's benefit.  But they created a problem for the State:  they thwarted its scheme to seize control of Disney's property, frustrate the company's development plans, and enforce the State's unwritten speech code.  The State's solution?  Just make the contracts go away.  At the Governor's direction, the new State-controlled special district board, then the Legislature itself, declared the contracts void and unenforceable.  Disney had no choice but to bring this action to protect its speech and contract rights.

The State's motion now puts into stark relief the fundamental question whether government entities in America may control their citizens' speech and override their contracts without fear of oversight from federal courts. The answer is no. Contrary to the State's principal theme, state laws are not categorically immune from review merely because they involve manipulation of a local governance structure. A state certainly may establish governing entities in many different forms. But a state cannot abrogate lawful contracts and eliminate locally-accountable property governance to punish political speech, just as it cannot condition government benefits or employment on adherence to a government-prescribed speech code. When a government entity fails to respect the Constitution's constraints on its conduct, federal courts have a duty to intervene.

## BACKGROUND

### A.   For Decades, The Special District Created Enormous Public Benefits By Facilitating Disney's Development Of Its Private Property Into A World-Class Tourist Destination

Before 1963, much of central Florida comprised undeveloped swampland. FAC ¶¶ 7, 35-36. That year Walt Disney purchased tens of thousands of acres of land in the area, with a vision to develop his property into a major theme park and world-class tourist destination. *Id.* Recognizing that massive public benefits would flow from Disney's successful development of his property, in 1966 the State created the Reedy Creek Drainage District to facilitate Disney's efforts to

3

drain the property so construction would be feasible. *Id.* ¶ 36. In 1967 the Legislature established the Reedy Creek Improvement District ("RCID"), with expanded authority over Disney's property, in the Reedy Creek Enabling Act ("RCID Act"), 1967 Fla. Laws 256, Ch. 67-764. Because "the economic progress and well-being of the people of Florida depend in large measure upon the many visitors and new residents who come to Florida," the RCID Act tasked the District with fostering a new "recreation-oriented" community anchored by Disney's planned development of its property to spur additional growth in the area. FAC ¶ 37 (quoting RCID Act at 4-5). Like many other Florida special districts, RCID was governed by a board elected by the landowners whose property the district oversees, based on one-acre, one-vote principles. *Id.* ¶¶ 43, 91.

The Legislature specifically found that the Act's vitally important public purpose of promoting effective development of private property could *only* be achieved "through a special taxing district" that centralized certain government powers over land-use regulation and infrastructure development. *Id.* ¶ 37. These powers included providing for "the reclamation, drainage and irrigation of land," "water and sewer systems and waste collection and disposal facilities," "public transportation and public utilities," and "streets, roads, [and] bridges." *Id.*

RCID was immediately challenged as an improper special deal for Disney that lacked adequate public benefits. *Id.* ¶ 38. The Florida Supreme Court rejected that challenge, holding that RCID's "multi-purpose powers" were "essential to the realization of a valid public purpose," which was "essentially and primarily directed toward encouraging and developing tourism and recreation for the benefit of citizens of the state and visitors to the state generally." *State v. Reedy Creek Improvement Dist.*, 216 So. 2d 202, 205-06 (Fla. 1968).

RCID served the region for decades thereafter, leveraging Disney's development of its private swampland property into broader regional economic growth, ultimately transforming Central Florida into a thriving tourism hub. *Id.* ¶¶ 40-41.

## B.    Disney, RCID, And The State Develop The 2032 Comprehensive Plan

Florida's Community Planning Act required RCID to adopt and maintain a "comprehensive plan" to guide future growth and development. *Id.* ¶ 44. The current version, RCID Comprehensive Plan 2032 ("Comprehensive Plan"), is the product of years of collaboration between RCID and Disney—the District's primary landowner and taxpayer. *Id.* ¶¶ 42-43, 45.

RCID adopted the Comprehensive Plan on May 25, 2022, after a public hearing, and after the City Councils of Bay Lake and Lake Buena Vista had also

adopted the Plan.  *Id.* ¶ 46.  The State's Department of Economic Opportunity

reviewed the Plan and found it complied with all legal requirements.  *Id.* ¶ 47.

Because no party challenged the Department's finding within the statutory

deadline, the Plan became conclusively effective on July 15, 2022.  *Id.* ¶¶ 47-48.

### C.  Disney Comments On Pending Legislation, Prompting State Retaliation

Florida's Parental Rights in Education Act ("HB 1557") sparked vigorous

public debate.  *Id.* ¶¶ 49-50.  As a Florida corporation with many thousands of

affected employees and patrons, Disney chose to participate in the public discourse

in opposition to the bill.  *Id.* ¶ 51.  On March 9, 2022, the then-CEO of Disney's

parent company called Governor DeSantis personally to express concerns about

the bill.  *Id.*  In his memoir, the Governor recalls thinking it was a "mistake" for

Disney to speak out and warning Disney's CEO that Disney "shouldn't get

involved" because "it's not going to work out well for you."  *Id.* ¶ 52.

Disney was undeterred.  Its first public comments stated:  "To ALL who

come to this happy place, welcome.  Disney Parks, Experiences and Products is

committed to creating experiences that support family values for every family, and

will not stand for discrimination in any form.  We oppose any legislation that

infringes on basic human rights, and stand in solidarity and support our

LGBTQIA+ Cast, Crew, and Imagineers and fans who make their voices heard

today and every day." *Id.* ¶ 54.  After the Governor signed the bill, Disney stated it

"never should have been signed into law," and that its "goal as a company is for

this law to be repealed by the [L]egislature or struck down in the courts." *Id.* ¶ 55.

In the Governor's view, this statement "crossed the line" and he pledged "to make

sure we're fighting back" in response. *Id.* ¶ 56.  As a result, he said, "[t]hings got

worse for Disney." *Id.* ¶ 57.

The Governor cited Disney's opposition to HB 1557 as a "textbook example

of when a corporation should stay out of politics." *Id.* ¶ 100.  He asserted that

businesses have a duty to remain "merely economic[] actors," and that states must

"stand up and fight back" when businesses seek "to advance a political agenda,"

"as Disney did." *Id.* ¶ 99.  The Governor reserved particular ire for businesses that

do not conform their speech to his own preferred ideology, emphasizing that he

would wield official State power against them to make Florida "the state where

woke goes to die." *Id.*

### D.    The Governor And Legislature Hastily Dissolve The RCID

The Governor's first retaliatory strike was to dissolve the special district that

had long overseen Disney's use of its own property. *Id.* ¶ 59.  His memoir

recounts secret plotting with legislative leaders, whom he solicited to join his plan

on the condition that they "work on this in a very tight circle," with "no leaks." *Id.*

¶ 59.  "We need the element of surprise," he warned, "nobody can see this

coming." *Id.*  As one legislative ally stated, the plan was to dissolve the District as a "fitting" punishment of Disney for its choice to "embrace" a disfavored "ideology." *Id*.  The Governor was unambiguous:  dissolving the District would make clear that the State was "not going to bend a knee to woke executives in California" any longer. *Id.* ¶ 60.

The bill dissolving RCID—SB 4C—went from proposal to passage almost literally overnight.  The Governor called a special extended session on April 19 to consider the bill, which the Senate approved on April 20 and the House approved on April 21. *Id.* ¶¶ 61, 73.  There was no meaningful legislative research or findings.  Whereas past bills dissolving other special districts included various provisions accounting for disposition of district property, assets, and debts, the RCID dissolution bill included nothing of the kind. *Id.* ¶¶ 70-71.  The legislative analysis accompanying SB 4C included no discussion of its economic impact; the House enacted its version in less than five minutes with no debate. *Id.* ¶¶ 72-73.  Neither Orange nor Osceola County was afforded an opportunity to study or analyze the effect eliminating RCID would have on its residents and businesses. *Id.* ¶ 73.

To avoid triggering certain procedural impediments, SB 4C was nominally written to encompass five other special districts—out of almost 2,000 statewide—

that also were created before promulgation of the 1968 Florida Constitution.  *Id*. ¶¶ 61-63.  The enacted bill provided that "any independent special district established by a special act prior to the date of ratification of the Florida Constitution on November 5, 1968, and which was not reestablished, re-ratified, or otherwise reconstituted by a special act or general law after November 5, 1968, is dissolved effective June 1, 2023."  *Id*. ¶ 66.[1] Nothing in the sparse legislative record reflects any concerns about the few other pre-1968 districts.  In fact, the Governor admitted that he only "found" the "handful of other districts" *after* his "staff worked with the legislative staff in the House" to target Disney and RCID.  *Id*. ¶ 63.  As a result, the legislative findings make no references to problems with other districts.

To the contrary, the Governor and the Legislature were perfectly candid that SB 4C was enacted to punish Disney for its speech.  The day after expanding the special session to dissolve RCID, the Governor declared that "Disney and other woke corporations won't get away with peddling their unchecked pressure campaigns any longer."  *Id*. ¶ 65.  He said nothing about other long-standing districts.  He later added that while dissolving RCID would have been "unthinkable just a few months before," it became possible only because "Disney had clearly

---

[1] The bill contravened Florida law explicitly prohibiting the dissolution of an independent special district absent approval by a majority of the district's electors or landowners.  Fla. Stat. § 189.072(2)(a).

crossed a line" by opposing HB 1557.  *Id.* ¶ 69.  In signing SB 4C, the Governor

emphasized that Disney's public statements had been "a provocation," and that

dissolving RCID was part of the State's effort "to fight back against" Disney's

opposition to his political agenda.  *Id.* ¶ 75.  The bill's House sponsor agreed:

"You kick the hornet's nest, things come up.  And I will say this: You got me on

one thing, this bill does target one company.  It targets The Walt Disney

Company."  *Id.* ¶ 68.  A Senate supporter declared that "Disney is learning lessons

and paying the political price of jumping out there on an issue."  *Id.* ¶ 74.

> **E.     Obvious Problems With Dissolving RCID Ignored In The Haste
>          To Punish Disney Force The Legislature To Reconstitute RCID
>          As A "State Receivership"**

Given the haste to dissolve RCID to punish Disney without considering the

consequences, it is unsurprising that problems immediately arose.  In particular,

dissolution would have required shifting liability for approximately $1 billion in

outstanding District bond obligations from District taxpayers (mainly Disney) to

taxpayers in Orange and Osceola Counties or even the State more broadly.  *Id.*

¶¶ 77-78.  For months, the Governor and Legislature sat idle, with no plan for

resolving the predictable bond problems created in their rush to make Disney pay a

price for speaking out.  *Id.* ¶¶ 83-85.

The Governor finally proposed a solution in October 2022, and the

Legislature eventually enacted HB 9B, which reversed the District's dissolution

and created a "successor agency" called the "Central Florida Tourism Oversight District" ("CFTOD") to "function essentially unchanged" from RCID, leaving intact all preexisting contracts, debts, bonds, and other liabilities.  *Id.* ¶¶ 86, 93-94. But there was one major difference:  the District's governing Board would no longer be elected by and accountable to District property owners, but instead would be appointed by the Governor and accountable only to him.  *Id.* ¶¶ 43, 86, 91-92.  The new Board would be "state-controlled" and function as a "state receivership."  *Id.* ¶¶ 88, 98.

The Legislature was explicit that punishing Disney for its speech was the reason it eliminated local landowner voting rights in favor of unilateral Tallahassee control.  The Legislature "joined with the Governor in saying it was Disney's decision to go from an apolitical, safe 25,000 acres, and try to be involved in public policy" that motivated the new Board structure.  *Id.* ¶ 97.  In other words, by enacting HB 9B, the Legislature was "saying" to Disney that by engaging in political debate, Disney had "changed the terms of our agreement, therefore we will put some authority around what you do."  *Id.*

## F.   Disney And RCID Execute Development Contracts Amid The State's Escalating Retaliation

All developers seek certainty about land-use restrictions on their property. Nobody will build a twelve-story office tower if local authorities can prohibit the

11

construction on a whim halfway through.  Florida's Local Government

Development Agreement Act ("DAA") reflects that premise.  Its formal findings

state that the "lack of certainty in the approval of development can result in a waste

of economic and land resources, discourage sound capital improvement planning

and financing, escalate the cost of housing and development, and discourage

commitment to comprehensive planning."  Fla. Stat. § 163.3220(2)(a).  Further,

giving a developer certainty "that upon receipt" of its development permit it "may

proceed in accordance with existing laws and policies, subject to the conditions of

a development agreement, strengthens the public planning process, encourages

sound capital improvement planning and financing, assists in assuring there are

adequate capital facilities for the development, encourages private participation in

comprehensive planning, and reduces the economic costs of development."  *Id.*

§ 163.3220(2)(b).

Given the State's persistent threats to make government regulation of

Disney's property conditional on its adherence to an unwritten State speech code,

Disney sought to secure the kind of long-term certainty expressly contemplated in

the DAA.  FAC ¶¶ 102-103.  Before RCID's dissolution and governance changes

took effect, Disney executed two agreements with the District:  a Development

Agreement (the "Development Agreement") and a Declaration of Restrictive

Covenants (the "Restrictive Covenants") (together, the "Contracts"). *Id.* ¶ 103. The Contracts followed public notices in the Orlando Sentinel and discussion at public hearings attended by representatives of several news outlets. *Id.* ¶¶ 110-116. The Contracts were approved by the District, executed on February 8, and recorded in official county records. *Id.* ¶¶ 115-17. The Contracts confirm the substance of the Comprehensive Plan, including its allocation of development rights and restrictions. *Id.* ¶¶ 120-126. The Contracts do not implicate the District's core powers over infrastructure development and management. *Id.* ¶ 119.

### G.    CFTOD And The Legislature Abrogate The Contracts

The Governor-appointed members of the newly-named CFTOD sat for their first public meeting on March 8. *Id.* ¶¶ 131-132. At CFTOD's March 29 meeting, the Board claimed to have just discovered the Contracts, despite the public notices, public hearings, and broad publicity. *Id.* ¶ 135. One member denounced the Contracts as "a last minute sweetheart development agreement," warning that "Disney has once again overplayed their hand in Florida. We won't stand for this and we won't back down." *Id.* ¶ 136.

The Governor also denounced the Contracts and announced plans for the Board and State to abrogate them and take other punitive measures. The Board and State were "not just going to void the development agreement," he declared,

but also "look at things like taxes on the hotels, . . . tolls on the roads" and "developing some of the property that the district owns." *Id.* ¶ 142.  Days later, he suggested other plans for property surrounding Disney, such as "more amusement parks" or "another state prison." *Id.* ¶ 147.  The Governor also announced that the Contracts "will be nullified by new legislation that I intend to execute," along with "additional actions that the state control board will implement in the upcoming days." *Id.* ¶ 150.

CFTOD took such actions in its next two meetings, endorsing a proposal to adopt "legislative findings" that would "declare" the Contracts void *ab initio*. *Id.* ¶¶ 152-154.  On April 26, the Board adopted an agenda item entitled:  "Approval of legislative findings regarding and declare the Development Agreement and Declaration of Restrictive Covenants entered into by Reedy Creek Improvement District and Walt Disney Parks and Resorts U.S. void *ab initio* and direction to litigation counsel regarding same." *Id.* ¶ 154.  The Board then formally declared the Contracts "void and unenforceable." *Id.* ¶ 158.

Meanwhile, the Governor worked on a parallel path with "'leaders of the House and Senate' on a 'bill that will be put out in the Florida legislature that will make sure' that the Contracts 'are revoked.'" *Id.* ¶ 159.  The enacted law provides:

> An independent special district is precluded from complying with the terms of any development agreement, or any other agreement for

which the development agreement serves in whole or part as consideration, which is executed within 3 months preceding the effective date of a law modifying the manner of selecting members of the governing body of the independent special district from election to appointment or from appointment to election.

*Id.* ¶ 162.  The law allows a district board to readopt such agreements within four months, but CFTOD has declared that it will not do so.  *Id.* ¶ 163.

## LEGAL STANDARD

On a motion to dismiss, "the court accepts all factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff." *Hamilton v. Hall*, 790 F. Supp. 2d 1368, 1370 (N.D. Fla. 2011).  "The motion is properly denied if the complaint contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id.* (quotation omitted). Courts consider "the complaint, any exhibits attached to the complaint, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Citizens State Bank v. Dixie County*, 2011 WL 1335805, at *3 (N.D. Fla. 2011) (quotation omitted).

## ARGUMENT

The CFTOD Defendants, joined by the State Defendants, assert eight grounds for dismissing all or some of Disney's claims. Defendants' contentions are meritless.

## I.   *PULLMAN* ABSTENTION IS UNWARRANTED

Defendants first urge the Court to abstain under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), in favor of CFTOD's subsequently filed state-court action challenging the validity of the Contracts. Federal courts, however, "have a virtually unflagging obligation . . . to exercise the jurisdiction given to them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Abstention is "an extraordinary and narrow exception" to that obligation, *id*. at 813, warranted only in "exceptional circumstances," *Henley v. Herring*, 779 F.2d 1553, 1555-56 (11th Cir. 1986). It is especially disfavored in First Amendment cases. *See infra* at 21-22. Abstention is not justified here.

### A.   Defendants Fail To Satisfy The *Pullman* Abstention Prerequisites

*Pullman* abstention applies only when there is (1) an "unsettled question of state law," that is (2) "dispositive of the case and would avoid, or substantially modify, the constitutional question" at issue in the federal case. *Duke v. James*, 713 F.2d 1506, 1510 (11th Cir. 1983). Neither element is satisfied here.

16

1.  *This Case Requires A Straightforward Application Of Unambiguous State Law*

Abstention under *Pullman* is permissible only when the state law underlying the case is "substantially uncertain or ambiguous, necessitating a construction by the state supreme court."  *Nasser v. City of Homewood*, 671 F.2d 432, 439 (11th Cir. 1982); *see Henley*, 779 F.2d at 1556 (law must be "unclear" or "difficult to apply").  Defendants have identified no such uncertainty or ambiguity.

The only question of state law Defendants cite is "the validity and enforceability" of the Contracts.  CFTOD Defs' Mem. of Law in Supp. of Mot. to Abstain or Dismiss at 12, ECF No. 51-1 ("Mem.").  That inquiry rests on a straightforward application of unambiguous Florida law.  CFTOD's own state-court complaint asserts that the Contracts-related issues are all governed by "plain and unambiguous statutory mandates" and "well settled principles of Florida constitutional and common law."  Ex. A to Mem., ECF No. 51-2 at ¶ 25. CFTOD's state-court briefing likewise affirms that the "state-law issues in this suit are straightforward."  Ex. 1 (Plaintiff's Amended Response in Opposition to Motion to Dismiss, *Central Florida Tourism Oversight District v. Walt Disney Parks & Resorts U.S., Inc.*, No. 2023-CA-011818-O (Fla. Cir. Ct., 9th Cir. June 20, 2023)) at 15.

17

Federal courts routinely refuse to defer under *Pullman* in Contracts Clause cases involving similarly clear underlying legal rules.  *See*, *e.g.*, *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 940-41 (9th Cir. 2002) (*Pullman* abstention was "inappropriate" in Contracts Clause case where state-law issue was "fairly clear," even though "a state court ha[d] not ruled on the precise issue"); *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 145 F.3d 238, 245-47 (5th Cir. 1998) (*Pullman* abstention inappropriate in Contracts Clause case because "the statutory scheme involved here is not so ambiguous to require *Pullman* abstention"); *E & E Hauling, Inc. v. Forest Pres. Dist. of DuPage Cnty.*, *Ill.*, 821 F.2d 433, 436 (7th Cir. 1987) (*Pullman* abstention inappropriate in Contracts Clause case because "the state law question presented is not an unsettled issue"); *Vázquez-Velázquez v. Puerto Rico Highway & Transp. Auth.*, 2016 WL 183653, at *3 (D.P.R. 2016) (in Contracts Clause case, absent "a showing of actual uncertainty or the effect that local interpretation of [the relevant state law] could have on this case, the court will not abstain merely to give the Commonwealth courts the first opportunity to vindicate the plaintiffs' federal rights"); *NCAA v. Corbett*, 25 F. Supp. 3d 557, 567-71 (M.D. Pa. 2014) (*Pullman* abstention not warranted in Contracts Clause case where language of challenged state statute was clear and lacked obvious limiting construction).  Because, as Defendants acknowledge, this case lacks any

18

complex question of state law "necessitating a construction by the state supreme court," *Nasser*, 671 F.2d at 439, *Pullman*'s narrow carveout from the obligation to exercise jurisdiction is inapplicable.

Defendants' abstention argument wrongly assumes that *Pullman* applies whenever the application of state law is "disputed."  Mem. 12.  On that view, the "extraordinary and narrow exception" to jurisdiction, *Colorado River*, 424 U.S. at 813, would become a default rule authorizing abstention in virtually any dispute over the application of state law.  Abstention instead is allowed only when the *underlying state-law rules* are unsettled or complex.  Here, they are not—the parties do not dispute the *meaning* of any state land-use regulations, only the *application* of clear state-law rules and precedents to the factual record surrounding adoption of the Contracts.  *Pullman* abstention does not authorize federal courts to foist onto state courts factbound disputes over the application of clear state law.

2.   <u>Resolution Of The Underlying State Law Questions Would Not Avoid The Need For The Resolution Of Substantial Constitutional Questions</u>

Defendants also cannot show that any underlying state-law question would be "dispositive of the case and . . . avoid, or substantially modify, the constitutional question."  *Duke*, 713 F.2d at 1510.

Defendants assert that Disney's First Amendment claims depend entirely on the Contracts' validity.  Mem. 13.  They do not.  Count V challenges RCID's dissolution, the elimination of Disney's landowner-voting rights, and the reorganization of the District into a state-controlled receivership.  That claim does not require adjudication of state-law contract issues.  Because "the substantive First Amendment issue that is the subject of this federal lawsuit" cannot "be rendered moot" by a state court ruling, *Pullman* abstention is inappropriate. *Warren v. DeSantis*, 631 F. Supp. 3d 1188, 1202 (N.D. Fla. 2022).

There is also no basis for abstaining from adjudication of Disney's Contracts-related claims.  In a Contracts Clause challenge, "the existence of the contract and the nature and extent of its obligation become federal questions for the purposes of determining whether they are within the scope and meaning of the Federal Constitution, and for such purposes finality cannot be accorded to the views of a state court." *Irving Tr. Co. v. Day*, 314 U.S. 556, 561 (1942).  Federal courts "are bound to decide for [themselves] whether a contract was made" and "what are its terms and conditions," to ensure that the Contracts Clause does "not become a dead letter." *Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 100 (1938); *see Moore v. Harper*, 143 S. Ct. 2065, 2088 (2023).  While courts "must accord respectful consideration and great weight to the views of the State's highest

20

court when making this determination," *Taylor v. City of Gadsden*, 767 F.3d 1124, 1133 (11th Cir. 2014) (quotation omitted), that principle has no application where there are no complex questions of state law "necessitating a construction by the state supreme court," *Nasser*, 671 F.2d at 439; *see NCAA v. Miller*, 795 F. Supp. 1476, 1481 (D. Nev. 1992) (refusing to abstain under *Pullman* in Contracts Clause case because "[r]esolution of state law issues would not terminate the federal constitutional controversy").

## B.   Discretionary Considerations Disfavor Abstention

Even when *Pullman*'s threshold prerequisites are satisfied, a court still must engage in "a discretionary exercise . . . on a case-by-case basis" to determine whether to abstain.  *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964).  In conducting that exercise, "a federal court must consider whether 'certain classes of cases, and certain federal rights' are more appropriately 'adjudicated in federal court.'" *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1266 (N.D. Fla. 2021) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996)).

At the top of the list of cases and rights long deemed inappropriate for abstention are those involving free speech.  *See Zwickler v. Koota*, 389 U.S. 241, 252 (1967); *Baggett*, 377 U.S. at 379; *Dream Defs.*, 559 F. Supp. 3d at 1266 (collecting cases).  "Abstention is to be invoked particularly sparingly in actions involving alleged deprivations of First Amendment rights," *Cate v. Oldham*, 707

F.2d 1176, 1184-85 (11th Cir. 1983), both "because the guarantee of free

expression is always an area of particular federal concern," *Ripplinger v. Collins*,

868 F.2d 1043, 1048 (9th Cir. 1989), and because forcing the federal plaintiff "to

suffer the delay of state court proceedings might itself effect the impermissible

chilling of the very constitutional right he seeks to protect," *Zwickler*, 389 U.S. at

252.

 Contrary to Defendants' submission (Mem. 13), these concerns are not

limited to facial challenges to speech regulations.  In *Cate*, for example, the

Eleventh Circuit applied *Zwickler*, *Baggett*, and other precedents to reject *Pullman*

abstention in a § 1983 suit seeking to enjoin a specific civil prosecution as a

violation of the First Amendment's Petition Clause.  707 F.2d at 1184-85.  Other

courts have rejected abstention challenges in First Amendment cases outside the

facial challenge context.  *See Courthouse News Serv. v. Planet*, 750 F.3d 776, 784

(9th Cir. 2014) (citing cases in variety of postures).

 In any event, Disney's First Amendment retaliation claim implicates the

same "chilling" concerns that arise in facial challenges to speech regulations.  The

Governor himself has crowed that the State's retaliation has already chilled

Disney's speech:  "Since our skirmish last year, Disney has not been involved in

any of those issues.  They have not made a peep."  FAC ¶ 174.  And the chilling

22

extends beyond Disney:  State officials tout their attacks as efforts to force "Disney and other woke corporations" to adhere to the State-prescribed orthodoxy, *id.* ¶ 65, putting *all* businesses on notice that Florida is a place where unapproved viewpoints "go[] to die," *id.* ¶ 99.

Finally, Defendants suggest that even if the Court adjudicates the First Amendment claims, it should abstain from the Contracts-related claims.  Mem. 13-14.  The Supreme Court, however, has emphasized the problematic effects of "piecemeal adjudication in many courts."  *Baggett*, 377 U.S. at 378; *cf. Colorado River*, 424 U.S. at 818 ("desirability of avoiding piecemeal litigation" is factor disfavoring abstention).  Accordingly, the fact that abstention is so plainly improper for the First Amendment claims is reason enough to reject abstention altogether and adjudicate the case as a whole in this single proceeding.[2]

---

[2] Although the Contracts involve land-use issues, such issues "do not in and of themselves present such extraordinary circumstances that abstention becomes automatic."  *Henley*, 779 F.2d at 1555-56.  This case is *not* fundamentally about a "routine application of zoning regulations," which is the "classic" scenario in which discretionary considerations may favor abstention.  *Hill v. City of El Paso*, 437 F.2d 352, 357 (5th Cir. 1971).

## II.   THE RESTRICTIVE COVENANTS' FORUM-SELECTION CLAUSE PROVIDES NO BASIS FOR DISMISSAL

Defendants contend that a forum-selection clause in the Restrictive Covenants prevents Disney from vindicating its federal constitutional claims in federal court.  That contention is wrong for multiple reasons.

*First*, the Restrictive Covenants' forum-selection clause does not apply to the Development Agreement, which has no comparable clause.  Defendants emphasize that the Restrictive Covenants refer to the Development Agreement "five times," Mem. 18, but under Florida law, "[i]ncorporation by reference . . . requires *more* than simply making reference to another document in a contract." *Romika-USA, Inc. v. HSBC Bank USA, N.A.*, 2006 WL 8431829, at *4 (S.D. Fla. 2006) (emphasis added).  Rather, one contract incorporates another document by reference only where the contract *both* specifically describes the separate document to be incorporated *and* includes an express statement that the parties intend to be bound by its relevant terms.  *See Spicer v. Tenet Fla Physician Servs., LLC*, 149 So. 3d 163, 168 (Fla. Dist. Ct. App. 2014); *Mgmt. Comput. Controls, Inc. v. Charles Perry Const., Inc.*, 743 So. 2d 627, 631 (Fla. Dist. Ct. App. 1999); *BP Prods. N. Am., Inc. v. Coral Petroleum, Inc.*, 462 F. Supp. 2d 1221, 1222 (S.D. Fla. 2006).

24

The latter element is not satisfied here:  neither Contract includes any provision explicitly stating the parties' mutual intent to make the Development Agreement subject to the Restrictive Covenants' forum-selection clause.  *See Spicer*, 149 So. 3d at 168 (no incorporation by reference when only one element satisfied).[3]

*Second*, even on its own terms, the Restrictive Covenants' forum-selection clause does not justify dismissal.  Disney's claims address fundamental constitutional limitations on State power, not just contractual obligations *inter se*, and they arise from an official State retaliation campaign that began nearly a year before the Contracts were executed.  Only *one* of the remedies that Disney seeks— a declaration that the Contracts are valid and enforceable—even arguably implicates the forum-selection clause.  Contrary to Defendants' assertion that the clause "encompasses *all* of Disney's claims," Mem. 16 (emphasis added), Disney's

---

[3] The only case Defendants cite in support of their position, *Liles v. Ginn-La West End, Ltd.*, 631 F.3d 1242 (11th Cir. 2011), is irrelevant.  *Liles* involved multiple land-purchase contracts, which all included identical forum-selection clauses designating a venue for related litigation, as well as provisions stating that if the seller did not submit certain property reports to the purchasers, the purchasers could rescind the contracts.  The court held that claims concerning the sufficiency of the property reports fell within the scope of the forum-selection clause.  *Id.* at 1255-56.  It did *not* hold that the contracts' forum-selection clause was incorporated by reference into a separate contract that lacked its own comparable clause.

fifth cause of action alleges that the State enacted SB 4C and HB 9B to reorganize the District into an unelected "state receivership" to retaliate against Disney for violating the State's speech code.  FAC ¶¶ 49-58, 98, 210-220.  The forum-selection clause has no application to that claim.  Nor does it apply even to the Contracts-related claims, which address not merely CFTOD's failure to comply with particular contractual obligations, but the exercise of *State legislative power* to prohibit compliance with the Contracts.[4]

*Finally*, even if the Court found that the Restrictive Covenant's forum-selection clause governs some of Disney's claims, the Court should retain jurisdiction over the entire case to avoid inconsistent judgments and to prevent duplication of judicial effort.  *See BP Prods. N. Am., Inc.*, 462 F. Supp. 2d at 1222 (retaining jurisdiction in case involving three claims under two contracts, one lacking forum-selection clause, where partial remand "would waste judicial resources and raise the possibility of competing judgments"); *Woods v. Christensen Shipyards, Ltd.*, 2005 WL 5654643, at *11-12 (S.D. Fla. 2005) (declining to dismiss case where "result of enforcement of the forum selection

---

[4] Defendants cite *Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326 (11th Cir. 2011), and *Dobco, Inc. v. Cnty. of Bergen*, 2022 WL 4366271 (D.N.J. 2022), but the claims in those cases involved contract-related disputes between the contracting parties—there was no constitutional challenge to a state law exogenous to the contract and prohibiting its enforcement.

26

clause would be parallel proceedings in different forums"); *Dias v. Mediterranean Shipping Co.*, 2003 WL 23190184, at *2 (S.D. Fla. 2003) (declining to enforce forum selection clause where litigating "in more than one forum could lead to inconsistent results at worst and an unnecessary duplication of judicial effort at best").

## III.   THE COMPLAINT STATES A CONTRACTS CLAUSE CLAIM

The Legislative Declaration and SB 1604 expressly make the Contracts unenforceable, violating Disney's rights under the U.S. Constitution's Contracts Clause, which forbids any State from enacting any "Law impairing the obligation of Contracts."  Defendants' arguments for dismissal of Disney's Contracts-based claims lack merit.

### A.   The Contracts Are Valid

Defendants' principal contention is that the Contracts Clause does not apply because "Disney had no valid contract with the District."  Mem. 20.  That contention is incorrect.

### 1.   *The DAA Does Not Apply To The Contracts*

Defendants first argue that the process for adopting the Contracts did not comply with the DAA, §§ 163.3220-163.3243.  The DAA, however, does not apply to the Contracts.

27

When the Legislature established RCID in 1968 through HB 486, 1967 Fla. Laws 256, Ch. 67-764 ("RCID Act"), the DAA did not exist.  In establishing RCID, the Legislature found that "the general welfare and continued prosperity of Florida depends in a large measure upon tourism, recreation and the conservation of natural resources" and that RCID would further "public purposes" by "fostering such programs."  *Reedy Creek Improvement Dist.*, 216 So. 2d at 205.  To serve those public purposes, the Legislature granted broad and exclusive authority to RCID:

> The jurisdiction and powers of the Board of Supervisors provided for herein shall also be *exclusive of any law now or hereafter enacted* providing for land use regulation, zoning or building codes, by the State of Florida or any agency or authority of the State and *the provisions of any such law shall not be applicable within the territorial limits of the District*.

RCID Act § 23(2) (emphases added); *see id.* § 8(5) (giving RCID power to "[e]xecute all contracts and other documents").  The RCID Act thus expressly preempts subsequently enacted land-use laws like the DAA.

Florida has long recognized the RCID Act's broad and preemptive authority. In 1977, the Florida Attorney General cited § 23(2) in opining that the District was exempt from a later-enacted growth management regulatory program.  1977 Fla. Op. Atty. Gen. 91 (May 16, 1977).  And where the Florida Legislature has intended for RCID to be subject to new land-use regulation, it has been explicit.

28

Florida's 1985 Growth Management Act, for example, specifically applied only to RCID and none of the hundreds of other special districts in Florida that existed at the time.  *See* 1985 Fla. Law 207, Ch. 85-55 § 3.  The DAA includes no mention of RCID, and thus has no effect on RCID's "exclusive" power to undertake "land use regulation" or "[e]xecute all contracts and other documents."  RCID Act §§ 8(5), 23(2).[5]

2.   *Section 163.3223 Is Permissive, Not Mandatory*

Leaving aside the exemption of the Contracts from the DAA, Defendants' DAA-based objection fails on its own terms.  Defendants assert that RCID never adopted a development agreement ordinance under Fla. Stat. § 163.3223, but that provision states only that a "local government *may*, by ordinance, establish procedures and requirements . . . to consider and enter into a development agreement" (emphasis added).  Given that the word "'may' cannot, by any

---

[5] It is irrelevant that the Development Agreement mentions "Chapter 163" in its title and refers to compliance with the DAA.  Section I(C) of the Development Agreement specifically observes that authority under the DAA "is supplemental and additional to the powers conferred upon local governments by other laws." Any voluntary reference to or compliance with the DAA does not nullify the antecedent statutory grant of exclusive authority to RCID.  *See Univ. of S. Fla. Coll. of Nursing v. State, Dep't of Health*, 812 So. 2d 572, 574 (Fla. Dist. Ct. App. 2002) (one who is "exempted from" statutory "mandates is not subjected to those mandates simply because" one has elected to comply voluntarily with certain of mandates' components).

rendering, mean 'must,'" *MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co*., 950

F.3d 764, 773-74 (11th Cir. 2020), it has been understood for decades that

"enactment of such an ordinance is not a condition precedent to local use of the

act," Robert M. Rhodes, *The Florida Local Government Development Agreement

Act*, 62 Fla. Bar J. 81, 81 (Oct. 1988). Accordingly, many other local governments

in Florida have entered into development agreements without first passing an

optional § 163.3223 "ordinance," including the City of Orlando, Flagler County,

and the City of Lakeland, among others.[6] Defendants' atextual reading would

jeopardize all of those agreements.

In RCID's case, interpreting § 163.3223 to make local contracting

conditional on adoption of an enabling ordinance also would conflict with

§ 163.3220(5), which states that § 163.3220 is only "*supplemental* and *additional*

to the powers conferred upon local governments by other laws and shall not be

regarded as in derogation of any powers now existing" (emphasis added). In other

---

[6] *See*, *e.g.*, Tri-Party Development Agreement between City of Orlando; Community Redevelopment Agency of the City of Orlando, Florida; and Universal City Development Partners (recorded in the Public Records of Orange County, Florida at Official Records Book 5044, Page 3973) (Apr. 17, 1996); Development Agreement between Hometown Communities, Inc. and Flagler County (recorded in the Public Records of Flagler County, Florida at Official Records Book 1234, Page 1757 (Apr. 20, 2005); Development Agreement between Forestar (USA) Real Estate Group, Inc. and the City of Lakeland (recorded in the Public Records of Polk County, Florida at Official Records Book 12152, Page 1408) (Feb. 22, 2022).

words, when a government entity already has contracting power, § 163.3223

cannot diminish that power.  And the RCID Act already granted RCID unqualified

authority to undertake land-use regulation and contract.  Section 163.3220 cannot

derogate that authority.

      3.    <u>*The Contracts Were Supported By Valid And Sufficient Consideration*</u>

Defendants argue the Contracts "lacked valid consideration" because Disney

promised only to do what it "was already legally obligated to do."  Mem. 20.  Not

so.

Under Florida law, a "promise, no matter how slight, can constitute

sufficient consideration so long as a party agrees to do something that they are not

bound to do."  *DiMauro v. Martin*, 359 So. 3d 3, 8 (Fla. Dist. Ct. App. 2023).  The

Contracts obligated Disney to assume multiple distinct commitments it otherwise

would not have incurred.

*First*, Disney bound itself to the land-use restrictions specified in the

Development Agreement's "Maximum Development Program."  As a private

landowner, Disney had no prior obligation to restrict itself this way; by

contractually forgoing countless other ways to use its property, Disney gave the

District the valuable "certainty" development agreements exist to provide.  Fla.

Stat. § 163.3220(2)(a).  Armed with enforceable promises from Disney about how

it would use its own property, the District was better able to conserve "economic

and land resources," engage in "sound capital improvement planning and financing," protect "the cost of housing and development," and commit to "comprehensive planning." *Id.*

*Second*, Disney agreed in § II(c) of the Development Agreement not to seek more than "fair market value" for any property Disney sold to the District to construct public facilities.  According to Defendants, Disney gave nothing by that promise because eminent domain law already limited Disney to recovering "only fair market value."  Mem. 21.  In Florida, however, eminent domain recovery is *not* invariably limited to fair market value.  To the contrary, that "compensation standard has been rejected by Florida Courts on those occasions where it has not led to an accurate determination of full compensation." *Dade Cnty. v. Gen. Waterworks Corp.*, 267 So. 2d 633, 641 (Fla. 1972); *see Jacksonville Expressway Auth. v. Henry G. Du Pree Co.*, 108 So. 2d 289, 291 (Fla. 1959) ("fair market value . . . is not an exclusive standard in this jurisdiction," but is "merely a tool to assist us in determining what is full or just compensation").  Full compensation in an eminent domain proceeding can *also* include business damages, *see Sys. Components Corp. v. Dep't of Transp.*, 985 So. 2d 687 (Fla. Dist. Ct. App. 2008); cost of moving, *Jacksonville Expressway*, 108 So. 2d at 291; severance damages, *Mulkey v. Division of Admin., State Dep't of Transp.*, 448 So. 2d 1062 (Fla. Dist.

32

Ct. App. 1984); expert witness fees, *Dade County v. Brigham*, 47 So. 2d 602, 604-05 (Fla. 1950); and attorneys' fees, Fla. Stat. § 73.092.  In restricting itself to fair market value, Disney abandoned such bases for potentially much greater payment.  *See Div. of Admin., State Dep't of Transp. v. W. Palm Beach Garden Club*, 352 So. 2d 1177, 1180 (Fla. Dist. Ct. App. 1977) (affirming compensation almost double fair market value).

*Third*, the Development Agreement requires Disney to sacrifice important due process protections normally applicable when government confiscates private property, including a jury trial to calculate full compensation, Fla. Stat. § 73.071, and expert testimony on valuation.  Section II(C) requires that fair market value be determined "by a Member of the Appraisal Institute (MAI) real estate appraiser, jointly selected by the Parties."  Absent this provision, Disney could present its own evidence about fair market value.  *Cf. Ramphal v. TD Bank Nat'l Ass'n*, 206 So. 3d 172, 173 (Fla. Dist. Ct. App. 2016) (one expert opined that fair market valuation was $890,000 while opposing expert claimed $1.63 million).

4.     <u>*The Contracts Did Not Unlawfully Delegate Government Authority Or Contravene Public Policy*</u>

Defendants next assert that the Contracts "unlawfully delegate[] government authority to a private entity."  Mem. 21.  They do not.  Under Florida law, a development agreement exists to "provide[] the developer with vested rights by

freezing the existing zoning regulations applicable to a property in exchange for public benefits.'"  *Morgran Co. v. Orange Cnty.*, 818 So. 2d 640, 643 (Fla. Dist. Ct. App. 2002).  That is, a development agreement by definition constitutes a promise by the government not to exercise certain government authority over the use of private property in exchange for the owner's promise to develop its property in specified ways.

Defendants say that the Contracts give Disney too much "final decision-making authority" over the use of property in the District, Mem. 21, but that property is owned almost entirely by Disney, and Defendants do not show how Disney now possesses impermissible authority over its own property.  Defendants observe only that the Development Agreement vests Disney with "'development rights and entitlements . . . applicable to all additional approved development,'" and that any proposed development of property within the District seeking to utilize those rights and entitlements "must obtain Disney's 'prior written approval' before undertaking any such development."  Mem. 21-22 (quoting Development Agreement § II(D)(2)).

Those provisions are unexceptional.  The entire purpose of any development agreement is to vest development rights.  *See Morgran*, 818 So. 2d at 643.  To the extent another entity (presumably a purchaser or lessee of Disney) seeks to exploit

Disney's vested rights as master developer, it is appropriate and reasonable that "prior written approval" from the master developer is required. Mem. 21-22 (quoting Development Agreement § II(D)(2)). Unless a development order provides otherwise, it is up to the "contracting parties" to "determine which development rights, if any, are transferred" with property. *Howard v. Murray*, 184 So. 3d 1155, 1164-65 (Fla. Dist. Ct. App. 2015). Here, because Disney owns the development rights as a matter of contract, it also controls the ability to assign those rights within the District. This is distinct from, and does not in any way "trump," the District's authority to exercise its police powers. Mem. 22.

The two Florida cases cited by Defendants—Mem. 21 (citing *Hartnett v. Austin*, 93 So. 2d 86, 89 (Fla. 1956); *Morgran*, 818 So. 2d at 643)—do not support their position. Each involved contracts that granted the developer authority to order the municipality to rezone certain areas. The Development Agreement includes no comparable provision mandating zoning amendments.

It is true that "the Contracts Clause does not protect a government contract 'that surrenders an essential attribute of . . . sovereignty,'" Mem. 25 (quoting *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 23 (1977)), but the Contracts do no such thing. The "classic example" of impermissible police-power delegation traces back to 1880 when "a corporation bargained for and received a state legislative

charter to conduct lotteries, only to have them outlawed by statute a year later."
*United States v. Winstar Corp.*, 518 U.S. 839, 888 (1996).  The Court "rejected the
argument that the charter immunized the corporation from the operation of the
statute."  *Id.*  Florida law expressly describes prohibitions on "lotteries and
gambling" as "exercise of the *police power* of the state for the protection of the
public welfare, health, safety and morals of the people of the state."  Fla. Stat.
§ 849.46 (emphasis added).  Defendants invoke no similar control over police
powers delegated by the Contracts.

The delegations they do cite are unexceptional.  Defendants complain about
a conflict-of-laws provision but identify no actual conflict.  Mem. 25-26.  They
lament Disney's "authority to set maximum building heights," *id.* at 26, but they
ignore that Florida law expressly makes "building intensities and height" subject to
development agreements.  Fla. Stat. § 163.3227(1)(c).  Defendants complain that
the Development Agreement "enables Disney to obligate the District to finance
and construct facilities . . . without the possibility of the periodic reassessment
encouraged and required by State law."  Mem. 26.  As discussed above, however,
Florida law expressly recognizes that development agreements provide the long-
term certainty necessary to promote investment in large-scale developments, which

would be thwarted if local governments could periodically revisit and revoke their commitments.  *See supra* at 11-12.

Bizarrely, Defendants take Disney's desire to "secure future development plans" against the "great uncertainty" it faced to mean that "the *point* of these purported contracts was to surrender . . . 'essential attribute[s] of [the District's] sovereignty.'"  Mem. 26 (quoting *U.S. Trust*, 431 U.S. at 23).  Just the opposite is true.  The "debates in the Constitutional Convention" made "clear" that a core purpose of the Contracts Clause was to promote "confidence in the stability of contractual obligations."  *U.S. Trust*, 431 U.S. at 15.  Disney's interest in securing its development rights is the same bedrock interest the Constitution protects in the Contracts Clause and Florida law protects in the DAA.

Finally, Defendants halfheartedly assert that "[f]or the same reasons," the Contracts violate the "public policy embodied in HB 9B."  Mem. 22.  They do not. As a general matter, only "extreme circumstances" will justify voiding a contract on public policy grounds.  *City of Largo v. AHF-Bay Fund, LLC*, 215 So. 3d 10, 15 (Fla. 2017).  The agreement must be "clearly injurious to the public good" or must "contravene[] some established interest of society."  *Id.*  The Contracts here do the opposite:  they serve important economic development interests expressly recognized by Florida law.  *See supra* at 11-12.  Moreover, voiding the Contracts

37

would directly contravene HB 9B itself, which states that the "provisions of this act shall not affect existing contracts that the district entered into prior to the effective date of this act."  2023 Fla. Sess. Law Serv. Ch. 2023-5 (C.S.H.B. 9B) (West).  That is, HB 9B's clear public policy is to *protect* RCID's prior contracts.[7]

5.        *Government Units Are Bound By Restrictive Covenants They Enter*

Defendants argue that Florida government entities cannot freely enter into enforceable restrictive covenants.  Of course they can.  The only restrictive covenants considered unenforceable are *prior* covenants contained in deeds for land that the government *later* acquires.  *See Ryan v. Town of Manalapan*, 414 So. 2d 193, 196 (Fla. 1982).  The unexceptional point in *Ryan* and similar cases is that a government entity cannot be forced to *inherit* a restrictive covenant that the entity itself did not freely agree to.  Defendants cite no case holding that a government entity can enter into its own restrictive covenant and then refuse to respect it when government leadership turns over.

---

[7] The Development Agreement includes a severability clause (§ XI) providing that "the remainder of this Agreement shall be valid and enforceable to the fullest extent permitted by law" if any provision of the Contract is found invalid or unenforceable.  If the Court finds any specific provision of the contract void as an excessive delegation, it must sever that provision and uphold the remainder of the contract.  *See* Ex. A to FAC, ECF No. 25-1 § XI; *Matthews v. Princess Cruise Lines, Ltd*., 728 F. Supp. 2d 1326, 1332 (S.D. Fla. 2010).

38

Defendants insist that the "same logic" that justifies disclaiming an inherited covenant also justifies disclaiming one freely entered.  Mem. 22.  It plainly does not.  The principle underpinning the *Ryan* line of cases is that "restrictive covenants are not interests in real property" but are "contractual rights, not compensable when destroyed by exercise of the power of eminent domain."  *Ryan*, 414 So. 2d at 196.  The conception of restrictive covenants as "contractual rights" militates in favor of *enforcing* them here, where the government itself was a contracting party.  No precedent or principle allows the District to escape its own lawful agreement.[8]

## B. The Legislature And CFTOD Impaired The Contracts Through Legislative Action

By enacting SB 1604 and the Legislative Declaration, Defendants engaged in legislative action impairing Disney's Contracts.  Defendants do not dispute that SB 1604 is subject to the Contracts Clause.  They focus only on the Legislative Declaration, Mem. 22-23, but it too triggers the Clause.

---

[8] Defendants preview factual arguments they would make "[i]f this litigation were to proceed to discovery and summary judgment."  Mem. 22-23.  Because those arguments are concededly not before the Court, Disney does not address them here.  As Disney will demonstrate at the appropriate juncture, however, Defendants' arguments lack merit.

A government entity contravenes the Contracts Clause when it impairs contracts through "an exercise of legislative power delegated by the legislature." *New Orleans Waterworks Co. v. La. Sugar-Refin. Co.*, 125 U.S. 18, 31 (1888); *see N. Ohio Traction & Light Co. v. Ohio ex rel. Pontius*, 245 U.S. 574, 584 (1918) (county board resolution terminating rail company contract "[m]anifestly . . . amounted to action by the State"); *Vicksburg Waterworks Co. v. City of Vicksburg*, 185 U.S. 65, 79-82 (1902) (Contract Clause question raised by city council resolution instructing city officials to notify corporation that city would "deny any liability upon any contract" with corporation); *City of L.A. v. L.A. City Water Co.*, 177 U.S. 558, 569-70 (1900) (city ordinance impairing municipal contract implicated Contracts Clause because city acted in relation to contract "as governmental agent of the State"); *City Ry. Co. v. Citizens' St.-R.R. Co.*, 166 U.S. 557, 563 (1897) ("All that is necessary to establish the jurisdiction of the court is to show that the complainant had, or claimed in good faith to have, a contract with the city, which the latter had attempted to impair.").

Defendants seek to remove the Legislative Declaration from the Clause's ambit by describing it as merely a nonbinding expression of CFTOD's opinions about the Contracts. The Declaration, however, bears "the imprimatur of the State's legislative authority." *Taylor*, 767 F.3d at 1132. The Legislative

40

Declaration's findings nullifying the Contracts are an essential element of a State-led effort to punish Disney for its protected speech.  Governor DeSantis said so on April 17, 2023, announcing that, while he rushed legislation through the State Legislature in effort to void the Contracts, CFTOD would "implement" "additional actions . . . in the upcoming days" to accomplish the same result.  FAC ¶¶ 146-147, 150.  CFTOD then drew on the powers delegated to it by the Florida Legislature to void the Contracts.  The CFTOD Charter provides that "all of the powers and duties of the district shall be exercised by and through the board of supervisors." HB 9B, CFTOD Charter § 7.  This includes the authority to "[a]dopt bylaws, rules, resolutions, and orders prescribing . . . the conduct of the business of the district," *id.* § 7(2), as well as to "[e]xecute all contracts and other documents, adopt all proceedings, and perform all acts as determined by the board to be necessary or that are otherwise authorized by general law or this act," *id*. § 7(5).  The Legislative Declaration was an exercise of this power.

The Legislative Declaration moreover constituted a "legislative act" because it was "passed with all the formalities of an ordinance."  5 Eugene McQuillin, *The Law of Municipal Corporations* § 15:2 (3d ed. 2010).  CFTOD points to no other method by which it could have voided the Contracts other than through the procedures it followed.  The Legislative Declaration set forth CFTOD's

"legislative findings" that the Contracts were "void and unenforceable."  FAC

¶¶ 153-155.  CFTOD duly adopted these findings after providing notice and

holding a public hearing.  *Id.* ¶¶ 154-155, 158; *see* CFTOD Defs' Mot. to Abstain

or Dismiss, Ex. B at 17, ECF No. 51-3.  These findings were the means by which

CFTOD repudiated Disney's right to demand performance by CFTOD or payment

of damages.  The Legislative Declaration was thus far more "solemn and formal"

than the kind of "mere declaration with respect to future purpose or proceedings"

held to be insufficient in *Taylor*.  767 F.3d at 1132 n.33 (quoting McQuillin, *The*

*Law of Municipal Corporations* § 15:2).

### C.  Defendants' Contractual Impairment Was Substantial And Unjustified

SB 1604 and the Legislative Declaration completely nullified the Contracts,

which obviously constitutes a "substantial impairment of a contractual

relationship."  *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978);

*see Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504 (1987)

(law that "removes" party's "contractual obligations" substantially impairs

contract); *21st Century Oncology, Inc. v. Moody*, 402 F. Supp. 3d 1351, 1359

(N.D. Fla. 2019).  The government impairs a contract—rather than merely

breaches it—when it denies "the possibility of a damages remedy" by establishing

a "state legislative mandate as a defense" to nonperformance.  *Taylor*, 767 F.3d at

1136; *see E&E Hauling, Inc. v. Forest Preserve Dist. of Du Page Cnty.*, 613 F.2d

675, 679 (7th Cir. 1980).

Defendants argue that the Contracts were not impaired because, they say,

Florida law grants the State the prerogative to nullify any development agreement,

and thus no development agreement can *ever* be impaired.  Mem. 27-28.  In

support of that astonishing contention, they cite a handful of cases declining to find

contractual impairment in certain "heavily regulated" industries where the

contracts at issue contained terms hinging on state laws that were subject to

foreseeable change.  Mem. 27-28.  Development agreements under Florida law are

entirely different—they are specifically intended to *freeze* applicable regulations in

place, for decades at a time, thereby providing "[a]ssurance to a developer that . . .

he or she may proceed in accordance with existing laws and policies."  Fla. Stat.

§ 163.3220(2)(b)); *see* FAC ¶¶ 104, 106; *see also* Fla. Stat. § 163.3229

(development agreements can last up to 30 years).  While development agreements

"shall be modified or revoked as is necessary to comply" with subsequently

enacted state law precluding compliance, *see id.* § 163.3241, that narrow statutory

limitation does not destroy a private developer's expectations that the government

will perform under a duly enacted development agreement, *see S&M Brands, Inc.*

*v. Georgia ex rel. Carr*, 925 F.3d 1198, 1203 n.3 (11th Cir. 2019) (recognizing the

State can "bind itself by contract to limit some of its own powers"); *see also infra* at 46-49 (discussing § 163.3241 in context of Takings Clause claim).  Legislative staff therefore warned, while SB 1604 was under consideration, that the legislation "may unconstitutionally impair contracts," as the "specific interaction between [§ 163.3241] and the contracts clause has not been reviewed by any court."  Senate Bill 1604 Rules Committee Bill Analysis and Fiscal Impact Statement at 9, Fla. Leg. (Apr. 20, 2023).

Nor can Defendants defeat Disney's plausible allegations, *see* FAC ¶¶ 182-183, 185-187, that the Contracts were impaired for no "legitimate public purpose." *U.S. Trust*, 431 U.S. at 22.  Where a state has imposed a "[s]evere impairment" of contracts, the Court must make "a careful examination of the nature and purpose of the state legislation" at issue.  *Spannaus*, 438 U.S. at 245.  The retaliatory voiding of the Contracts cannot withstand this "careful examination."  Neither the Legislative Declaration nor SB 1604 was "even purportedly enacted to deal with a broad, generalized economic or social problem."  *Id.* at 250.  SB 1604 was instead precision-engineered to target Disney alone.  FAC ¶¶ 159-170; *see infra* at 58-59. No other developer or special district falls within the law's finely-calibrated compass, which is unsurprising given the State's explicit targeting of Disney in retaliation for its protected political speech.  *Id.* ¶¶ 173-174.

Finally, "a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." *U.S. Trust*, 431 U.S. at 31.  That narrow-tailoring rule applies here.  If CFTOD or the Legislature genuinely believed that specific provision(s) of the Contracts delegated excessive authority or otherwise contravened Florida law, they could have sought to modify only the problematic provision(s).  But because reasonable modifications would not inflict the desired punishment, they abrogated the Contracts outright, which the Constitution forbids.

## IV.   THE COMPLAINT STATES A TAKINGS CLAUSE CLAIM

The Legislative Declaration and SB 1604 strip Disney of valuable rights in the use of its own private property without any compensation—a paradigmatic violation of the Takings Clause, which dictates that "private property" shall not "be taken for public use, without just compensation."  U.S. Const. amend V.

"Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid." *U.S. Trust*, 431 U.S. at 19 n.16; *see Lynch v. United States*, 292 U.S. 571, 579 (1934); *Contributors to Pa. Hosp. v. Phila.*, 245 U.S. 20 (1917).  When a law overrides "substantive" contract rights in "specific" real property, the Takings Clause's protections apply.  *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 590 (1935); *see Pa. Coal Co. v. Mahon*, 260 U.S. 393 (1922) (regulation overriding contractual right to mine land

invalid under Takings Clause).  Defendants agree that valid contracts in property

may "qualify as property for purposes of the Takings Clause."  Mem. 31.  They

principally argue, however, that Disney's contracts are *not* valid, incorporating

their Contracts Clause arguments.  Those arguments are incorrect for the reasons

already explained.  *See supra* Section III.

Defendants proffer three other Takings Clause arguments.  None has merit.

### A.    Section 163.3241 Does Not Eliminate Disney's Private Property Rights

Defendants' first argument is startling:  the Takings Clause does not apply

because a preexisting statute—Fla. Stat. § 163.3241—grants the State general

authority to "modif[y] or revoke[]" any development contract by later statute for

any reason, which effectively vitiates the property interest that would otherwise be

protected by the Takings Clause.  Mem. 34-36.  According to Defendants,

§ 163.3241 makes *all* government contracts permanently conditional on the

government's continuing agreement to recognize them, meaning that that

contracting parties cannot have "any reasonable investment-backed expectations

. . . in the continued validity of the contracts for the life of their stated terms."

Mem. 34.

That argument is a shocking submission from the officers of State agencies

that are statutorily *required* to "recognize and respect judicially acknowledged or

constitutionally protected private property rights." Fla. Stat. § 163.3161(10).  It is also demonstrably wrong.  A state cannot circumvent the Takings Clause by defining traditional property rights out of existence by statute, and § 163.3241 does not do so in any event.

*First*, "a State 'may not sidestep the Takings Clause by disavowing traditional property interests'" long recognized under state law.  *Moore*, 143 S. Ct. at 2088 (quoting *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 167 (1998)); *see Webb's Fabulous Pharms. v. Beckwith*, 449 U.S. 155, 164 (1980) (state may not "by *ipse dixit* . . . transform private property into public property without compensation").  The whole "purpose of contracts"—the reason they create property rights—is "to fix obligations and entitlements so that they will not be affected by subsequent background changes." *Cienega Gardens v. United States*, 331 F.3d 1319, 1334 (Fed. Cir. 2003).  Accordingly, a statute that grants a state unfettered discretion to revoke its contracts functionally eliminates property itself, which "is the very kind of thing that the Taking[s] Clause of the Fifth Amendment was meant to prevent." *Webb's*, 449 U.S. at 164.

To be sure, a state or local government entity *can* "explicitly" reserve the right to modify or revoke a given contract *within the terms of the contract itself*.

47

*See Cienega Gardens*, 331 F.3d at 1332-34.  But there is no such express reservation here, so the Takings Clause applies.

*Second*, § 163.3241 in any event is not reasonably construed as eliminating property rights *ex ante* by authorizing contract revocation *ex post*, especially given that it should be construed to "avoid[] placing its constitutionality in doubt."  *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1252 (11th Cir. 2022) (quotation omitted)).  Contrary to Defendants' submission, SB 1604 is *not* "precisely the type of law contemplated by Section 163.3241."  Mem. 33.  If it were, Defendants would cite numerous comparable laws invalidating prior government contracts outright pursuant to § 163.3241.  They cite none.

Section 163.3241 is better read as contemplating subsequently-enacted laws that regulate the subject matter addressed by a development contract and render full compliance with it unlawful.  For example, when a subsequently-enacted environmental law obstructs or precludes compliance with a contract provision concerning construction of a road over a wetland area, § 163.3241 would protect the performing party from a breach claim and require the parties to revise the contract to account for the new regulation.  It is not reasonable to read § 163.3241

to go beyond that important function and authorize the Legislature to invalidate any and all development contracts after the fact, as SB 1604 did here.

**B.    Disney Is Entitled To Equitable Relief Under The Takings Clause**

Defendants also argue that even if SB 1604 violates the Takings Clause, Disney is not entitled to equitable relief because it could obtain legal damages through an inverse condemnation proceeding or a § 1983 damages claim. Defendants rely on *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), but *Knick* holds only that equitable relief is unavailable in a takings claim when the property owner has an "adequate" damages remedy. *Id.* at 2176. Damages would not provide adequate relief here because payment would come almost entirely from Disney itself, given that the CFTOD budget is funded principally by property taxes paid by Disney. FAC ¶ 42. Further, because the property at issue involves 30 years of development rights, plus an even longer term of beneficial restrictions on the detrimental uses of adjacent District-owned property, calculating Disney's monetary loss would be difficult, if not impossible. Under Florida law, the equitable remedy of specific performance is permissible when "the value of the property involved is uncertain or not readily ascertainable in the open market" or because "the damages resulting from the breach of the contract are too uncertain or indefinite." *Hogan v. Norfleet*, 113 So.2d 437, 439 (Fla. Dist. Ct. App. 1959); *see Stevens Fam. Ltd. P'ship v. Paradise Island Ventures, LLP*, 2009 WL 3177568, at

*3 (N.D. Fla. 2009) ("when damages are inadequate or uncertain, specific performance may be an appropriate remedy").

For these reasons, only an order enjoining the taking and restoring Disney's long-term property development rights would provide adequate relief.

### C.     The Legislative Declaration Triggers The Takings Clause

Defendants assert that even if SB 1604 works an unconstitutional taking, the Legislative Declaration does not, because it at most is an "anticipatory" breach of the Contracts that does not give rise to a takings claim.  Mem. 35.  Defendants rely on authorities holding that when property rights arise from a "contract with a government," that government's interference with contract rights "generally gives rise to a breach claim not a takings claim."  Mem. 35 (quoting *Keane v. Jacksonville Police Fire & Pension Fund Bd. of Tr.*, 775 Fed. App'x 496, 499 (11th Cir. 2019)).  As Defendants concede, however, that principle applies only when a damages claim remains a viable remedy for breach.  Mem. 35-36.  And as just explained, a damages claim for breach would not be a viable remedy both because any damages would be funded almost entirely by Disney itself and because the full measure of damages could not be properly determined.  The only adequate remedy for Disney is the restoration of its property interests, *i.e.*, the Contracts settling Disney's development rights in its own land.

50

## V.   THE COMPLAINT STATES A DUE PROCESS CLAIM

The Due Process Clause forbids a state from enacting any "arbitrary and irrational" statute depriving a person of state-created rights, including property rights. *Kentner v. City of Sanibel*, 750 F.3d 1274, 1279-80 (11th Cir. 2014); *see Lewis v. Brown*, 409 F.3d 1271, 1273 (11th Cir. 2005). The Clause requires states to "demonstrate that they are violating private interests only as necessary to promote state interests." *McKinney v. Pate*, 20 F.3d 1550, 1557 n.9 (11th Cir. 1994). The Legislative Declaration and SB 1604 fail that test because, as alleged in the FAC, they were not enacted to promote *any* legitimate state purpose, but to punish Disney for its protected speech.

Defendants first contend that Disney has no valid interest in its Contracts, and that it was "rational" to abrogate them, because they are void. Mem. 39-40. That argument is wrong for the reasons already explained. *See supra* at 27-39.

Defendants also contend that it was rational to abrogate the Contracts to ensure that they did not have binding effect on the new District governing entity. But the whole point of a "contract" is to create *binding* obligations. It is the essence of irrational state conduct to abrogate a binding obligation precisely *because* it is binding.

## VI.   THE COMPLAINT STATES A CLAIM FOR FIRST AMENDMENT RETALIATION

"Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).  The right to criticize government policy "extends to corporations," *id.* at 342-43, because speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech," *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2316 (2023).  "Put simply, with minor exceptions, the government can't tell a private person or entity what to say or how to say it." *NetChoice LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1203 (11th Cir. 2022).

"One of the most egregious types of First Amendment violations is viewpoint-based discrimination," *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1279-80 (11th Cir. 2004), which "occurs 'when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the regulation,'" *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1240-41 (11th Cir. 2019) (quoting *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828-29 (1995)).  "Government actors may not discriminate against speakers based on viewpoint, even in places or under

circumstances where people do not have a constitutional right to speak in the first place." *Holloman*, 370 F.3d at 1280.

The same principle underlies "the right to be free from retaliation" for expressing a viewpoint a state wants to suppress. *Echols v. Lawton*, 913 F.3d 1313, 1320 (11th Cir. 2019). It is long-settled that "even though a person has no 'right' to a valuable government benefit, and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely," including the recipient's failure to conform to viewpoints approved by the ruling party. *Georgia Ass'n of Educators v. Gwinnett Cnty. Sch. Dist.*, 856 F.2d 142, 144 (11th Cir. 1988) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)); *see Rankin v. McPherson*, 483 U.S. 378, 383 (1987) (even where probationary employee "could have been discharged for any reason or for no reason at all," she could not be discharged "on a basis that infringes [her] constitutionally protected interest in freedom of speech"). "Official reprisal for protected speech offends the Constitution" not because the benefit itself is protected, but because revoking it as punishment "threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2008) (quotation omitted); *see Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1563 (11th Cir. 1995) ("although a retaliatory discharge claim by a state employee involves

the denial of the state-created benefit of employment, the right upon which a retaliatory government employment decision infringes is the right to free speech, not the right to a job"). Retaliation for protected speech "is thus akin to an 'unconstitutional condition' demanded for the receipt of a government-provided benefit." *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998).

To state a First Amendment retaliation claim, the plaintiff must allege that "(1) he engaged in protected speech; (2) the defendant's conduct adversely affected the protected speech; and (3) a causal connection exists between the speech and the defendant's retaliatory actions." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016).

Defendants do not deny that Disney's comments on HB 1557 were political speech entitled to the highest level of constitutional protection. Nor do they deny that the First Amendment forbids a state from enacting laws with the "illicit motive" of retaliating against disfavored political speech. Mem. 40. They do not even dispute that the laws here were enacted to punish Disney for refusing to adhere to State-approved viewpoints.

Defendants nevertheless seek dismissal of Disney's First Amendment claims for three reasons. None has merit.

## A.   Inquiry Into The Challenged Laws' Motives Is Not Prohibited

Defendants first argue that courts are categorically barred from considering the motives of a legislature in evaluating a challenge to a law that is facially non-discriminatory.  Mem. 40-42.

As a threshold matter, Defendants vastly overstate the principle they attempt to invoke.  Courts frequently inquire into legislative motive to determine whether a facially constitutional statute was enacted for an impermissible purpose.  *See*, *e.g.*, *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 179, 189-90 (2017) (in redistricting case, considering evidence of "actual considerations" underlying district lines because facially-neutral lines are unlawful "if race is the overriding reason for choosing one map over others"); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("Even if the hypothetical measure on its face appeared neutral as to content and speaker, its purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional."); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 540-41 (1993) (invalidating facially-neutral statute based on legislative record showing intent to discriminate against religious exercise); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 645 (1994) ("even a regulation neutral on its face" can have "manifest purpose" to "regulate speech because of the message it conveys").

55

Defendants' objection to considering legislative motive is based on the
Eleventh Circuit's decision in *In re Hubbard*, 803 F.3d 1298 (11th Cir. 2015),
which applied the statement in *United States v. O'Brien*, 391 U.S. 367 (1968), that
courts will not "strike down an otherwise constitutional statute on the basis of an
alleged illicit legislative motive." 803 F.3d at 1312 (quoting *O'Brien*, 391 U.S. at
383). But as *Hubbard* itself acknowledged, "there are limitations to this rule." *Id.*
at 1312 n.14; *accord O'Boyle v. Sweetapple*, 187 F. Supp. 3d 1365, 1374 (S.D. Fla.
2016).

In particular, *O'Brien* held that courts *can* "inquir[e] into legislative purpose
or motive" when needed "to determine whether the statutes under review were
punitive in nature," similar to cases "involving . . . bill[s] of attainder." 391 U.S. at
383 n.30. Applying the same principle, *Hubbard* expressly recognized that when a
statute "specifically single[s] out" one entity for regulation, a court may examine
the legislature's motives to determine whether the regulation was imposed as
retaliation for the entity's opposition to a state-approved political viewpoint. 803
F.3d at 1314; *see O'Boyle*, 187 F. Supp. 3d at 1374 (the "*O'Brien* rule is limited"
and *Hubbard*'s "outcome may have been different had the statute explicitly singled
out a specific group"). When a statute operates "wholesale"—as most do—it is
unlikely to have been enacted to punish one single entity, and a broad category of

affected parties is "somewhat more likely to have political remedies" to respond to the law. *Fraternal Ord. of Police Hobart Lodge No. 121, Inc. v. City of Hobart*, 864 F.2d 551, 555-56 (7th Cir. 1988). But when a statute is "easily pinpointed against particular" actors, it is easier for a court to identify an improper motive, and especially important to do so because an individual actor may not have an effective political response. *Id.* For these reasons, statutes that "single out particular individuals or groups for benefits or burdens" are "subject to a more exacting scrutiny" under the First Amendment, requiring the "more beady-eyed examination of motive" appropriate for statutes that operate like bills of attainder. *Id.* at 554-56.

Many courts addressing *O'Brien*'s limits on legislative-motive inquiry have recognized the distinction between broadly-applicable laws and those singling out specific entities. Most importantly, in *Hubbard* itself, the Eleventh Circuit cited its own precedent in *Gwinnett*, which held that a union could rely on improper legislative motive in asserting a First Amendment retaliation claim against a law that applied only to that union. *Hubbard*, 803 F.3d at 1314 (citing *Gwinnett*, 856 F.2d at 144-45). According to *Hubbard*, inquiry into legislative motive was permissible in *Gwinnett* because the law was not "a generally applicable policy," but instead "specifically singled out" the union and eliminated only its benefit,

making the *O'Brien* rule "inapplicable."  *Id.*  Other decisions similarly recognize

that courts may consider legislative motive to determine whether attainder-like

statutes were enacted to punish specific entities for disfavored speech.  *See Hobart*,

864 F.2d at 556 (if statute were "directed just at the police," then "[l]egislators'

motives would be admissible" on First Amendment challenge); *Goldberg v.*

*Whitman*, 743 F. Supp. 943, 963-64 (D. Conn. 1990) (triable issue of retaliatory

legislative motive where plaintiff was only regular beneficiary affected by part of

defendants' adverse action); *Bakalich v. Vill. of Bellwood*, 2006 WL 1444893, at

*9-*10 (N.D. Ill. 2006) (*O'Brien* "default rule" did not apply to First Amendment

retaliation claim challenging ordinance that "regulated Police Department structure

and nothing else").

    That principle controls here.  Disney's retaliatory reorganization claims

challenge two statutes specific to Disney:  SB 4C, which initially dissolved RCID

(and just five other special districts out of almost 2,000 statewide), and HB 9B,

which reconstituted *only* RCID, and restructured *only* RCID's governance to

eliminate the voting rights of *only* RCID's landowners—principally Disney, which

owns almost all the property in the District.  FAC ¶¶ 42-43, 61-63, 91-92.

    Disney's Contracts-related claims likewise challenge legislative acts directly

targeted at Disney.  The Legislative Declaration nullifies only the Contracts with

Disney.  *Id.* ¶¶ 156, 158.  The Legislature thereafter invalidated the same Contracts in SB 1604, which was written precisely to capture Disney's Contracts, and only those Contracts.  *Id.* ¶¶ 161-162.  No other districts and no other contracts fit the statute's narrow description.  And the law sunsets in 2028, for no evident reason other than to avoid potential future effects on other special districts and developers.

Because Disney's retaliation claims challenge attainder-like laws that single out Disney's voting rights and Disney's contracts, *O'Brien*'s default limits on inquiry into legislative motive are inapplicable.

It bears emphasis, however, that even if the Court applied *O'Brien* to prohibit inquiry into the *subjective* motives of legislators here, the Court must still consider whether the "objective evidence" permits an inference of unlawful intent to retaliate against Disney.  *Goldberg*, 743 F. Supp. at 953.  The objective public record here differs markedly from *O'Brien*, where the plaintiff challenged a generally applicable law based "principally" on statements of just "three Congressmen," which in turn were affirmatively contradicted by "more authoritative reports of the Senate and House" committees explaining the law's purpose.  391 U.S. at 385-86.  The record here reflects no such ambiguity.  The Legislature employed a rushed and exceedingly irregular process to enact statutes in direct response to the Governor's statements about Disney's speech, with no

attempt to develop any basis for dissolving other districts or eliminating local, politically-accountable control in favor of a Governor-controlled state receivership. The Legislature instead enacted laws objectively gerrymandered to draw a tight circle around Disney alone.  According to the FAC's allegations, which must be accepted as true, the objective evidence supports an inference that the State unlawfully retaliated against Disney for deviating from the official State-sanctioned political narrative.

### B. State Laws Relating To Government Structure Are Not Immune From Constitutional Scrutiny

Defendants next assert that the challenged laws are immune from scrutiny because they relate to the "structure of . . . government," which is how "a State defines itself as a sovereign."  Mem. 42.  Defendants rely entirely on a reference in *Gregory v. Ashcroft*, 501 U.S. 452 (1991), to "important elective and nonelective positions whose operations go to the heart of representative government."  Mem. 42 (quoting *Gregory*, 501 U.S. at 463).

But *Gregory* held only that a state's mandatory retirement age for judges did not violate a federal *statute* (the ADEA) or the Equal Protection Clause (which does not protect against age discrimination).  *Gregory* did not suggest that the Constitution is categorically inapplicable to laws addressing state and local government structures.  To the contrary, *Gregory* expressly recognized that the

"authority of the people of the States to determine the qualifications of their government officials is, of course, not without limit," and that "[o]ther constitutional provisions, most notably the Fourteenth Amendment, proscribe certain qualifications."  501 U.S. at 463.

Courts frequently entertain challenges to state laws establishing government structures that allegedly violate federal constitutional protections.  *See*, *e.g.*, *Board of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 709-10 (1994) (invalidating special school district that violated Religion Clauses of First Amendment); *Bethune-Hill*, 580 U.S. at 181-83 (applying Equal Protection Clause to state legislative electoral districts); *Bond v. Floyd*, 385 U.S. 116, 137 (1966) (First Amendment limits state power to disqualify state legislator due to legislator's public statements).

As these examples show, laws addressing state and local government structures are not immune from constitutional review.  And while RCID did not, in fact, "exercise[] immense government authority," Mem. 43, the case for constitutional immunity would not improve if it did.  Just the opposite:  when a government entity wields significant power, it is all the *more* important for courts to ensure the entity is established in accordance with our Nation's foundational principles of democratic self-government.

61

**C.     The CFTOD Legislative Declaration Is Not Government Speech**

Defendants assert that the Legislative Declaration pronouncing Disney's Contracts void was merely a form of "government speech," which under *Houston Community College System v. Wilson*, 142 S. Ct. 1253 (2022), does not qualify as adverse action for purposes of First Amendment retaliation.  Mem. 44-45.  That argument has nothing to do with Disney's reorganization claims or with SB 1604, which voided the Contracts as a matter of State law.  It affects only the Legislative Declaration, and even within that limited scope, the argument lacks merit.

*Wilson* involved a First Amendment retaliation claim brought by a board of trustees member against fellow board members who issued a "purely verbal censure" of the plaintiff's behavior.  142 S. Ct. at 1263.  The plaintiff was an elected official expected to "shoulder a degree of criticism about [his] public service," and the only "action" plaintiff challenged was "a form of speech from [his] colleagues that concern[ed] the conduct of public office."  *Id.* at 1261.

The Legislative Declaration shares nothing with *Wilson*'s "purely verbal censure."  Disney is not "one member of an elected body" being reprimanded "by other members of the same body," *id.* at 1259, and the Declaration did not merely subject Disney to "a degree of criticism," *id.* at 1261.  The Legislative Declaration made official findings with the immediate effect of repudiating the District's contractual obligations.  FAC ¶¶ 153-156.  The Declaration was surely binding on

CFTOD employees and barred them from complying with the Contracts and allowing Disney to exercise its rights under them.  The Declaration thus had legal and practical effects with concrete adverse consequences for Disney.

The decision in *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009), is also inapposite.  In *Summum*, the Supreme Court rejected a Free Speech challenge to a city's decision to exclude a proposed private monument from a public park, explaining that the government's choice about which private monuments to place was "linked to the City's identity" and "best viewed as a form of government speech"—*i.e.*, a form of expression that was "meant to convey and ha[d] the effect of conveying a government message." *Id.* at 473-74.  The Legislative Declaration, by contrast, was not an identity-affirming act of expression—it was a concrete repudiation of contractual obligations with significant commercial value to Disney.  Neither *Summum* nor *Wilson* insulates that retaliatory act from challenge under the First Amendment.

## CONCLUSION

The motion to abstain or dismiss should be denied.

Dated:  July 26, 2023

ALAN SCHOENFELD
(*pro hac vice*)
New York Bar No. 4500898
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel. (212) 937-7294
alan.schoenfeld@wilmerhale.com

ADAM COLBY LOSEY
LOSEY PLLC
Florida Bar No. 69658
1420 Edgewater Drive
Orlando, FL 32804
Tel. (407) 906-1605
alosey@losey.law

Respectfully submitted,

*/s/ Daniel M. Petrocelli*

DANIEL M. PETROCELLI
(*pro hac vice*)
California Bar No. 97802
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Tel. (310) 246-6850
dpetrocelli@omm.com

JONATHAN D. HACKER
(*pro hac vice*)
District of Columbia Bar
No. 456553
STEPHEN D. BRODY
(*pro hac vice*)
District of Columbia Bar
No. 459263
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Tel. (202) 383-5285
jhacker@omm.com

*Attorneys for Plaintiff Walt Disney Parks and Resorts U.S., Inc.*

64

## CERTIFICATE OF WORD COUNT

Pursuant to Northern District of Florida Rule 7.1(F), the undersigned counsel hereby certifies that the foregoing Plaintiff's Opposition to CFTOD Defendants' Motion to Abstain or Dismiss, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 13,846 words as measured by Microsoft Office for Word 365.

Respectfully submitted,

*/s/ Daniel M. Petrocelli*
DANIEL M. PETROCELLI