# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

WALT DISNEY PARKS AND RESORTS
U.S., INC.,

     *Plaintiff*,

v.

RONALD D. DESANTIS, in his official
capacity as Governor of Florida, et al.,

     *Defendants*.

Case No. 4:23-cv-163-AW-MJF

## <u>CFTOD DEFENDANTS' REPLY IN SUPPORT OF<br>MOTION TO DISMISS OR ABSTAIN</u>

Jason Gonzalez (No. 146854)
LAWSON HUCK GONZALEZ PLLC
215 S. Monroe Street
Suite 320
Tallahassee, FL 32301
Tel: (850) 825-4334
jason@lawsonhuckgonzalez.com

Charles J. Cooper (No. 248070DC)
David H. Thompson (No. 450503DC)
Peter A. Patterson (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
Joseph O. Masterman (No. 1004179)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

August 9, 2023

*Counsel for Defendants Martin Garcia,
Charbel Barakat, Brian Aungst Jr., Ron
Peri, Bridget Ziegler, and Glenton
Gilzean, Jr.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

ARGUMENT .................................................................................................. 2

I. *Pullman* Abstention Is Warranted ............................................................ 2

    A.    This case presents unsettled questions of state law. ............................ 2

    B.    Resolution of the state-law questions will decide or materially alter nearly all of Disney's claims. ................................................. 3

    C.    This case warrants exercise of the Court's discretion to abstain. ......... 5

II.    The Forum-Selection Clause Requires Dismissal. ........................................ 7

III.    Disney's Contracts Clause Claim Is Meritless. ........................................... 11

    A.    The Development Agreement and Restrictive Covenants were never valid. ........................................................................ 11

    B.    Even if the Agreements were valid, neither the Legislative Declaration nor SB 1604 impaired them in violation of the Contracts Clause ........................................................... 17

IV.    Disney Has Failed to State a Takings Claim. .............................................. 19

V.    Disney's Due Process Claim Should Be Dismissed. ..................................... 23

VI.    Disney's First Amendment Claims Are Meritless. ....................................... 24

    A.    *In re Hubbard* forecloses Disney's First Amendment challenges. ....... 24

    B.    A State's decision to reconstitute state entities that exercise sovereign power is not subject to the Speech Clause. ......................... 29

C.    Because the Legislative Declaration did not constitute "material adverse action" against Disney, Disney's First Amendment challenge to the Declaration fails. ........................................................................33

CONCLUSION ........................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Accident Fund v. Baerwaldt*,
    579 F. Supp. 729 (W.D. Mich. 1984)................................................................5

*Atl. Marine Constr. Co., v. U.S. Dist. Ct. for W. Dist. of Tex.*,
    571 U.S. 49 (2013).................................................................................7, 10

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) ................................................33

*Bethune-Hill v. Virginia State Board of Elections*, 580 U.S. 178 (2017)...........26, 32

*Bond v. Floyd*, 385 U.S. 116 (1966)..........................................................................32

*Branti v. Finkel*, 445 U.S. 507 (1980).......................................................................30

*Carey v. Piphus*, 435 U.S. 247 (1978) ......................................................................22

*Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983) .......................................................7

*Christiansen v. McRay*, 380 Fed. Appx. 862 (11th Cir. 2010).................................22

*DeMartini v. Town of Gulf Stream*, 942 F.3d 1277 (11th Cir. 2019)........................34

*Dobco, Inc. v. Cnty. of Bergen*, No. 22-0090,
    2022 WL 4366271 (D.N.J. Sept. 21, 2022) ..................................................9

*Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204 (11th Cir. 2011) .........................9

*Elrod v. Burns*, 427 U.S. 347 (1976).........................................................................30

*Fields v. Rockdale Cnty.*, 785 F.2d 1558 (11th Cir. 1986) .........................................5

*Foster v. City of Gainesville*,
    579 So.2d 774 (Fla. Dist. Ct. App. 1991) ....................................................22

*Georgia Association of Educators v. Gwinnett County School District*,
    856 F.2d 142 (11th Cir. 1988)......................................................................27

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ...........................................29, 30, 31, 32

*Hartnett v. Austin*, 93 So. 2d 86 (Fla. 1956) ............................................................17

*Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253 (2022) .............................32, 34

*In re Hubbard*, 803 F.3d 1298 (11th Cir. 2015) ...............................24, 25, 27, 28, 29

*Kurowski v. Krajewski*, 848 F.2d 767 (7th Cir. 1988)...............................................30

*Liles v. Ginn-Law West End, Ltd.*, 631 F.3d 1242 (11th Cir. 2011)  ..........................8

*Maui Vacation Rental Ass'n v. Maui Cnty. Plan. Dep't*,
    501 F. Supp. 3d 948 (D. Haw. 2020) .............................................................5

*Moheb, Inc. v. City of Miami*,
 756 F. Supp. 2d 1370 (S.D. Fla. 2010) ...........................................................2

*Morgran Co. v. Orange Cnty.*,
 818 So. 2d 640 (Fla. Dist. Ct. App. 2002)...................................11, 12, 15, 16

*Morrison v. Olson*, 487 U.S. 654 (1988)...............................................................1

*NetChoice LLC v. Moody*, 34 F.4th 1196 (11th Cir. 2022) ...............................25, 26

*Nissan Motor Corp. in U.S.A. v. Harding*,
 739 F.2d 1005 (5th Cir. 1984).......................................................................5

*Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4 (Fla. 1984).......................14

*Pittman v. Cole*, 267 F.3d 1269 (11th Cir. 2001) ....................................................6

*R.R. Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496 (1941) ...................................3

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019)..................................................32

*Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990)............................................30

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000) ...............................................2, 5

*Slater v. Energy Services Group International*
 634 F.3d 1326 (11th Cir. 2011) ....................................................................9

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011)..................................................26

*Trump for President, Inc. v. Boockvar*,
 481 F. Supp. 3d 476 (W.D. Pa. 2020) .............................................................4

*U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1 (1977) ..........................................17

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
 429 U.S. 252 (1977)......................................................................................29

*Ziegler v. Ziegler*, 632 F.2d 535 (5th Cir. Unit A 1980)..........................................6

**Statutes, Codes and Legislative Materials**

FLA. STAT.
 § 163.3223 ..................................................................................................11
 § 163.3241 .............................................................................................18, 19
 § 189.031(7).................................................................................................25

Fla. Laws ch. 2023-5
 § 1 ...............................................................................................................15

CITY OF POMPANO BEACH ZONING CODE §155.2428 .............................................13

HILLSBOROUGH COUNTY LAND DEVELOPMENT CODE Pt. 5.05.00 ...........................13

ORANGE COUNTY CODE § 30-1 ................................................................13

**<u>Other Authorities</u>**

Anticipatory Breach or Repudiation, Generally,
      11 Fla. Jur.2d Contracts § 277 .......................................................34

David L. Callies & Glenn H. Sonoda, *Providing Infrastructure for Smart Growth:*
      *Land Development Conditions*, 43 IDAHO L. REV. 351 (2007) ....................13

David L. Callies & Julie A. Tappendorf, *Unconstitutional Land Development*
      *Conditions and the Development Agreement Solution: Bargaining for Public*
      *Facilities After* Nollan *and* Dolan,
      51 CASE W. RSRV. L. REV. 663 (2001) ...........................................13

Michael B. Kent, Jr., *Forming a Tie that Binds: Development Agreements in*
      *Georgia and the Need for Legislative Clarity*,
      30 ENVIRONS ENV'L. L. & POL'Y J. (2006)....................................13

Patricia Grace Hammes, *Development Agreements: The Intersection of Real Estate*
      *Finance and Land Use Controls*, 23 U. BALT. L. REV. 119 (1993)..............13

Robert M. Rhodes, *The Florida Local Government Development Agreement Act*,
      62 FLA. BAR J. 81 (Oct. 1988) .......................................................12

3 JULIAN C. JUERGENSMEYER, FLORIDA LAND USE LAW
      § 29.02 (2d ed. 1998).............................................................12, 13

In another case involving the allocation of government authority, Justice Scalia famously wrote that "this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). The same is true here. Disney confirms that the Agreements at the heart of this dispute were entered to frustrate the will of the People of Florida, expressed through their elected representatives, about how to organize the governance of the State: the Agreements, Disney states, were meant to "secure" for Disney "long-term certainty ... [b]efore RCID's dissolution and governance changes took effect." Opp. Mot. to Dismiss, Doc. 60-1 12 ("Opp."). The Constitution, however, does not entitle Disney to a local government that functions essentially as the Company's wholly owned subsidiary, nor does it grant Disney a right to undermine the State's attempt to end that corrupting arrangement. The Court need not reach the merits, however, because this dispute doubly belongs in state court—Disney agreed that disputes would be heard in that forum, and *Pullman* counsels abstention for disputes involving unsettled issues of state law "implicat[ing] matters of the State's sovereignty and … of great interest to its economy and citizenry." Order, Case No. 2023-CA-011818-O at 8 (Fla. Cir. Ct. July 28, 2023) ("State Opn.") (attached as Exhibit A). This Court should grant the District's motion and either abstain or dismiss the case.

1

## ARGUMENT

### I.  *Pullman* Abstention Is Warranted.

The Court should abstain because this case "present[s] an unsettled question of state law"—in fact, several such questions—that will "be dispositive of" or "materially alter the constitutional question[s] presented. *Siegel v. LePore*, 234 F.3d 1163, 1174 (11th Cir. 2000) (en banc).

#### A.  This case presents unsettled questions of state law.

The validity of the Development Agreement and Restrictive Covenants is "unsettled." The validity of these Agreements raises questions regarding the interpretation of FLA. STAT. § 163.3223, the scope of a municipality's ability to contract away discretionary legislative power under Florida law, and the enforceability of restrictive covenants against Florida governmental units (among other state law issues). *See* Mot. to Dismiss Mem., Doc. 51-1 20-22 ("MTD"); *see also Moheb, Inc. v. City of Miami*, 756 F. Supp. 2d 1370, 1373 (S.D. Fla. 2010) (deeming "the first prong of the *Pullman* test satisfied" in part because "neither Party … presented any case law interpreting" the relevant provision). Disney additionally raises a wholly novel argument that Section 163 *does not even apply* to the District. *See* Opp. 27-29.

Disney quips that Defendants' briefs in state court have insisted the state-law issues are "straightforward." Opp. 17. It is unclear what rhetorical advantage Disney

2

hopes to gain from this point. True, Defendants believe the state-law questions are straightforward—*in Defendants' favor*. Meanwhile, Disney believes they are "straightforward"—*in Disney's favor*. *See* Opp. 17. The parties' opposing litigating positions only underscore that the state-law questions at issue here are "unsettled." This is not to say, as Disney asserts, that Defendants believe *Pullman* abstention applies whenever a state-law question is merely "disputed." Opp. 19. To the contrary, *Pullman* turns on whether the state-law questions are *settled* under state law, and here they are not—evidenced by the state-court litigation over these precise issues.

Lastly, Disney attempts to distinguish "the *meaning* of" state law from "the *application* of clear state-law rules." Opp. 19 (emphasis in original). *Pullman* forecloses any such distinction. There, the Supreme Court abstained because it "would have little confidence in [its] independent judgment regarding *the application of [state] law to the present situation*." *R.R. Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 499 (1941) (emphasis added).

### B.   Resolution of the state-law questions will decide or materially alter nearly all of Disney's claims.

A state-court ruling that the Agreements were void *ab initio* would decide or—at the very least—"materially alter" four of Disney's five claims. If the Agreements are void, Disney's Contracts Clause claim in Count I would fail because there was no contract. Its Takings claim in Count II would fail because there was no property to be taken. Its Due Process claim in Count III would fail because Disney was not

deprived of anything. And its First Amendment retaliation claim in Count IV would fail because Disney suffered no adversity from actions directed at a contract without legal existence.

Even though Disney's First Amendment retaliation claim in Count V may not be "materially altered" by a ruling that the Agreements are void, the Court should exercise its discretion to stay the entire action. *Trump for President, Inc. v. Boockvar*, 481 F. Supp. 3d 476, 502-03 (W.D. Pa. 2020). When the Western District of Pennsylvania was faced with a situation where four counts were subject to *Pullman* abstention, two counts were not, and three other counts had "aspect[s]" that were subject to *Pullman*, the court deemed it "consistent with, and fully within, the Court's discretion" to "stay[] the entire case ... based on the existence of some *Pullman*-implicated claims." *Id.* at 501-02 (emphasis deleted). This Court should do the same and exercise its discretion to abstain under *Pullman* for Counts I-IV and stay its adjudication of Count V until the state court resolves the underlying state-law questions.

Disney contends that *Pullman* abstention is inappropriate for Disney's "Contracts-related claims." Opp. 20. (It is unclear which "claims" Disney deems "Contracts-related," but the relevant passage in Disney's brief appears to address only its Contracts Clause claim.) Disney argues that under the Contracts Clause the existence of a contract is a federal question. *Id.* But as Disney concedes, federal

courts must give "respectful consideration and *great weight* to the views of the State's highest court when making this determination." *Id.* at 20-21 (quoting *Taylor v. City of Gadsden*, 767 F.3d 1124, 1133 (11th Cir. 2014) (emphasis added)). Therefore, the Florida courts' resolution of the validity of the Agreements would at the very least "materially alter" Disney's Contracts Clause claim. Although federal courts need not abstain simply because a state contract is part of the case, *see* Opp. 18, they need not steadfastly forge ahead to decide a case involving unsettled and significant issues of state law simply because a Plaintiff brings a Contracts Clause claim, *see, e.g.*, *Nissan Motor Corp. in U.S.A. v. Harding*, 739 F.2d 1005, 1007-08 (5th Cir. 1984); *Maui Vacation Rental Ass'n v. Maui Cnty. Plan. Dep't*, 501 F. Supp. 3d 948, 952, 956-57 (D. Haw. 2020); *Accident Fund v. Baerwaldt*, 579 F. Supp. 729, 730-32 (W.D. Mich. 1984).

## C.    This case warrants exercise of the Court's discretion to abstain.

"The purpose of *Pullman* abstention is to avoid unnecessary friction in federal-state functions, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication." *Siegel*, 234 F.3d at 1174 (quotation marks omitted). Abstention is particularly well-suited to cases relating to land use. *Fields v. Rockdale Cnty.*, 785 F.2d 1558, 1561 (11th Cir. 1986). Disney seems to suggest that this principle applies only to "routine application of zoning regulations," Opp. 23 n.2, but fails to explain why. The

regulation and use of land that spans 25,000 acres implicates the concern regarding "important state functions" that animates *Pullman* abstention *even more than* "routine" local zoning laws. Indeed, as the state court hearing the parallel action has stated:

> The validity of these Agreements is clearly a question of great public importance. They contradict the Legislature's policies toward the District and, if valid, would permit Disney to control all development rights and land use regulations in one of the most heavily visited areas in Central Florida. These issues implicate matters of the State's sovereignty and are of great interest to its economy and citizenry.

State MTS Opn. 8.

The pending state court proceeding further underscores the appropriateness of abstention. Among the factors that "favor abstention" are "the availability of easy and ample means for determining the state law question" and "the existence of a pending state court action that may resolve the issue." *Pittman v. Cole*, 267 F.3d 1269, 1286 (11th Cir. 2001) (internal quotations omitted); *see also Ziegler v. Ziegler*, 632 F.2d 535, 539 (5th Cir. Unit A 1980).

Disney primarily responds that the Court should not abstain because of Disney's First Amendment claims. Opp. 21-23. But the principle that abstention is disfavored in First Amendment cases largely arises from the concern that *others*, not before the Court, would have to wait while a state court resolves the relevant question. *See* MTD 13-14. But a First Amendment retaliation claim, like the one

6

Disney brings here, involves only one entity. Disney has failed to muster *a single case* where a court held that abstention was inappropriate because the case involved a First Amendment *retaliation* claim. Disney's reliance on *Cate v. Oldham*, which involved a malicious-prosecution claim, undermines Disney's argument that this Court should not wait for the state court to rule because there the Eleventh Circuit *certified* the relevant question to the Florida Supreme Court. 707 F.2d 1176, 1185 (11th Cir. 1983).

## II.   The Forum-Selection Clause Requires Dismissal.

A forum-selection clause should ordinarily "be given controlling weight." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013). The Restrictive Covenants' forum-selection clause applies to "any legal proceeding of any nature" that "aris[es] out of or in connection with any matter pertaining to" the Restrictive Covenants. Doc. 25-2 8, § 8.10. This language encompasses Disney's claims, which center on the Restrictive Covenants and associated Development Agreement and are—at the very least—"in connection with" a "matter pertaining to" the Restrictive Covenants.

Disney suggests that the forum-selection clause is cabined solely to the Restrictive Covenants. But the clause applies to "any legal proceeding of any nature" that is "in connection with any matter pertaining to" the Restrictive Covenants. A legal claim related to the Development Agreements is "in connection with [a] matter

pertaining to" the Restrictive Covenants—which reference the Development Agreement five times and were signed on the exact same day as the Development Agreement. And Disney confirms that the claim relating to the Board's structure pertains to the Agreements, because the Agreements were entered with the express aim to "secure . . . long-term certainty" before the "governance changes took effect." Opp. 12.

Disney's argument regarding "incorporation by reference" under Florida law is irrelevant. The relevant question for the application of a forum-selection clause primarily turns on the "central basis" of "Plaintiffs' claims." *Liles v. Ginn-Law West End, Ltd.*, 631 F.3d 1242, 1255-56 (11th Cir. 2011). When the Eleventh Circuit was faced with applying a contract's forum-selection clause to claims regarding separate documents, it did not analyze contract law regarding "incorporation by reference" before concluding that the forum-selection clause applied. *Id.* at 1255-56. Instead, because the separate documents (that did not contain a forum-selection clause) "form[ed] the central basis for most of Plaintiffs' claims" and "reference[d], and [we]re explicitly referenced in, the contracts themselves," the forum-selection clause applied. *Id.* So too here. The *text* of the forum-selection clause applies to the *claims* brought by Disney, regardless of whether the forum-selection clause is formally "incorporated by reference" in the Development Agreement.

8

Disney next asserts that its claims do not fall within the forum-selection clause because Disney's claims address "not just contractual obligations *inter se*" and are "exogenous to the contract." Opp. 25-26 & n.4. But the forum-selection clause covers any claim "in connection with a matter pertaining to" the Agreements ("exogenous" and "non-exogenous" alike). And cases support the application of a contract's forum-selection clause to both statutory and constitutional retaliation claims. In *Slater v. Energy Services Group International*, the Eleventh Circuit applied a forum-selection clause governing claims "relating to or arising from" an employee contract to a Title VII claim and state-retaliation claim. *See* 634 F.3d 1326, 1331 (11th Cir. 2011). In *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1219-21 (11th Cir. 2011), the Eleventh Circuit applied an arbitration clause to "claims" that merely "involve[d] factual allegations" "based on" the contractual "relationship between the parties."[1] And in *Dobco, Inc. v. Cnty. of Bergen*, the District of New Jersey applied a forum-selection clause governing claims "arising out of or relating to the contract" to a First Amendment retaliation claim where a local government allegedly retaliated against an individual by bringing a lawsuit over two procurement agreements. *See* No. 22-0090, 2022 WL 4366271, at *3-4 (D.N.J. Sept. 21, 2022).

---

[1] In their opening memorandum, Defendants inadvertently misidentified the claims that were deemed subject to the arbitration provision in *Doe*—which were three federal statutory claims and claims relating to "seaworthiness" and "maintenance and cure" under general maritime law. *See* 657 F.3d at 1220-21.

9

Disney attempts (at 26 n.4) to dismiss these cases as "involv[ing] contract-related disputes," but fails to explain why, for example, the First Amendment retaliation claim in *Dobco* was "contract-related" but Disney's First Amendment retaliation claims are not. No distinction is apparent.

Lastly, if the Court agrees that one of Disney's claims is not subject to the forum-selection clause, Disney asks the Court to bootstrap the remaining claims to the surviving one and keep the entire case in federal court. *See* Opp. 26-27. In support, Disney cites district court cases that predate *Atlantic Marine*. There, the Court explained that, when a party agrees to a forum-selection clause, the party "waive[s] the right to challenge the preselected forum as inconvenient," and "the practical result is that forum-selection clauses should control" as a general matter. 571 U.S. 64-65. *Atlantic Marine* does not leave it to the Court's discretion to retain jurisdiction over claims that are subject to the forum-selection clause. Only in the most "unusual" cases would the "public-interest factors" for transfer potentially overcome a forum-selection clause, *id.* at 64, but Disney makes no argument under those factors. This point is ultimately academic, however, because all of Disney's claims are covered by the forum-selection clause and should thus be dismissed under the doctrine of *forum non conveniens*.

## III.    Disney's Contracts Clause Claim Is Meritless.

### A.    The Development Agreement and Restrictive Covenants were never valid.

1.    Disney does not dispute that, when the Development Agreement was entered, RCID lacked an "ordinance" establishing "procedures and requirements … to consider and enter into a development agreement." FLA. STAT. § 163.3223. Rather, Disney argues that the Development Agreement Act, including § 163.3223, does not apply. If that were so, then RCID lacked any authority whatsoever to enter the Development Agreement (and the Restrictive Covenants that depend on it). The agreement was explicitly "entered into pursuant to the authority of the Florida Local Government Development Agreement Act." Doc. 25-1 3. And though the agreement goes on to describe this authority as "supplemental" to RCID's other authorities, *id*., the Development Agreement Act was the *only* source of RCID's authority to enter development agreements.

Florida law has long prohibited "contract zoning," *i.e.*, "an agreement by a governmental body with a private landowner to rezone property for consideration." *Morgran Co. v. Orange Cnty.*, 818 So. 2d 640, 642 (Fla. Dist. Ct. App. 2002). The Agreements go well beyond a mere zoning contract; they effectively cede governmental authority to Disney over land use throughout the District. Accordingly, they surpass even the authority conferred by the Development Agreement Act. Yet Florida allows development agreements—*i.e.*, contracts "freezing the existing

11

zoning regulations applicable to a property"—only because they "are expressly permitted by" the Development Agreement Act. *Id.* at 643 (quotation marks omitted). Thus, "[t]he *Act*" is what "authorizes local governments to enter into" such agreements. 3 JULIAN C. JUERGENSMEYER, FLORIDA LAND USE LAW § 29.02 (2d ed. 1998) (emphasis added). RCID's organic statute could not have conferred that authority in 1967; the authority did not exist until the Development Agreement Act was passed in 1986.

Disney also argues that the Act allowed, but did not require, RCID to enact an enabling ordinance. To be sure, nothing in the Act requires localities to enter development agreements; thus, § 163.3223 provides that they "may" enact a development-agreement enabling ordinance. But § 163.3223 is the specific well of authority—the "actual authorization"—for entering development agreements. JUERGENSMEYER § 29.02 n.11. If a local government wishes to be able to enter such agreements, therefore, it *must* enact an enabling ordinance.

Disney cites a single Bar Journal article stating that an ordinance is required only to "adopt procedures to further refine development agreement policies and procedures." Robert M. Rhodes, *The Florida Local Government Development Agreement Act*, 62 FLA. BAR J. 81, 81 (Oct. 1988). But the article contradicts the statutory text and the weight of other commentary. *See* JUERGENSMEYER § 29.02 n.14 ("In the absence of this type of ordinance, it appears that local governments are

unable to enter into development agreements."); *accord* Patricia Grace Hammes, *Development Agreements: The Intersection of Real Estate Finance and Land Use Controls*, 23 U. BALT. L. REV. 119, 155 n.192 (1993); David L. Callies & Julie A. Tappendorf, *Unconstitutional Land Development Conditions and the Development Agreement Solution: Bargaining for Public Facilities After* Nollan *and* Dolan, 51 CASE W. RSRV. L. REV. 663, 682-83 & n.83 (2001); David L. Callies & Glenn H. Sonoda, *Providing Infrastructure for Smart Growth: Land Development Conditions*, 43 IDAHO L. REV. 351, 392–93 & n.240 (2007); Michael B. Kent, Jr., *Forming a Tie that Binds: Development Agreements in Georgia and the Need for Legislative Clarity*, 30 ENVIRONS ENV'L. L. & POL'Y J. 1, 27 & n.138 (2006).

Further, that some localities might not have complied with § 163.3223's plain text, while others have done so, *see, e.g.*, ORANGE COUNTY CODE § 30-1; HILLSBOROUGH COUNTY LAND DEVELOPMENT CODE Pt. 5.05.00; CITY OF POMPANO BEACH ZONING CODE §155.2428, does not change the text. Because RCID lacked an enabling ordinance, the Agreements were *ultra vires*.

2.   Disney identifies no valid consideration for the Agreements. It first suggests that the Development Agreement somehow "restrict[s]" Disney's use of its own property. Opp. 31. But it fails to explain how an agreement vesting in Disney the maximum development rights for the District to promote Disney's "plans to continue to develop Walt Disney World" can be seen as a *restriction* on Disney. Doc.

13

25-1 2. Meanwhile, Disney posits only amorphous return value, *e.g.*, that the agreement makes the District "better able" to "commit to comprehensive planning." Opp. 31-32 (quotation marks omitted). But the District can abide by its own commitments without an Odysseus-like contract tying the District to Disney's wishes.

Disney further suggests that its agreement not to ask more than fair market value for Disney property that the District might need to provide public facilities in support of Disney's development projects is consideration for the Development Agreement. Disney does not deny that the District could take that property by eminent domain and that fair market value would be the default compensation. Rather, Disney notes that some landowners receive compensation on top of fair market value in eminent-domain proceedings. But any supposed promise to forego such additional compensation is "illusory." *Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4, 5 (Fla. 1984). Any entitlement to such compensation is speculative, and the agreement does not foreclose any payments on top of "payment for the land." Doc. 25-1 3; *see* Opp. 32-33. Even this part of the Development Agreement vests rights only in Disney: the right to demand that the District acquire Disney land, pay Disney for it, and finance public-works projects to the benefit of Disney's other property. Disney gives nothing and loses nothing. This provision thus cannot be consideration for any of RCID's many promises in the Development Agreement.

14

Disney likewise sacrificed no tangible eminent-domain "protections." Opp. 33. As Disney acknowledges, fair market value would be calculated under the agreement by a third-party appraiser, who would need Disney's approval, and Disney nowhere suggests that its property would be evaluated differently than in an eminent-domain proceeding. Finally, Disney makes no effort to argue that the Restrictive Covenants had adequate, independent consideration.

3.      The Agreements delegate government authority to a private entity and thereby violate public policy. Disney admits that it "sought to secure its long-term development rights by entering contractual agreements with the [RCID] *before its reorganization*"; in other words, Disney sought to usurp the incoming Board's authority in direct contravention of the public policy embodied in the statute (HB 9B) placing that authority in the Board. Opp. 2 (emphasis added). Disney notes that HB 9B's provisions did not themselves "affect existing contracts." Fla. Laws ch. 2023-5 § 1. But the Agreements are contrary to the policy embodied by HB 9B as a whole. The statute cannot be interpreted to preserve contracts that undermine the Legislature's intent in passing it.

Disney argues that development agreements "by definition" delegate government authority and thus that all the delegations here are "unexceptional." Opp. 34. But there is a difference between "freezing the existing zoning regulations applicable to a property," as development agreements are meant to do, *Morgran*, 818

15

So. 2d at 643, and promising "not to exercise certain government authority over the use of private property," as Disney correctly says this Development Agreement does. Opp. 34. The former preserves the government's nondelegable authority to *enforce* its zoning regulations. The latter abdicates that responsibility. It therefore unlawfully places a private entity in the position of a zoning authority—and not only for the entity itself, but also for other landowners in the District. Indeed, that is Disney's admitted position under this Development Agreement. *See* Opp. 35 (admitting the agreement requires other landowners to obtain Disney's "prior written approval" for development on their land); *id*. at 34-35 (admitting the agreement's purported primacy over the District's Land Development Regulations, Disney's authority over building heights throughout the District, and Disney's authority to obligate the District to finance public works). None of these provisions can be severed without undoing the entire agreement. In Disney's own words, securing this effective zoning authority was the point of the agreement.

The Restrictive Covenants—which limit the District's use of its own property—are invalid for the same reason. And Disney does not dispute the settled principle that restrictive covenants *cannot* bind the government. Disney argues that this principle applies only to "prior covenants contained in deeds for land that the government later acquires," not to covenants that governments voluntarily enter. Opp. 38 (emphases omitted). But a government likewise voluntarily enters a

16

covenant by acquiring property subject to it. And Disney offers no case holding a government to a covenant in either circumstance.

> **B.    Even if the Agreements were valid, neither the Legislative Declaration nor SB 1604 impaired them in violation of the Contracts Clause.**

Disney acknowledges all the ways that the Agreements purported to delegate RCID's zoning authority, *see supra*, and it also concedes that the Contracts Clause does not protect contracts that surrender "sovereignty." *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977). Disney's only answer is that governments cannot delegate their "*police power*." Opp. 35 (emphasis in original; quotation marks omitted). That is an admission, not an answer: "the zoning power … is an aspect of the police power." *Hartnett v. Austin*, 93 So. 2d 86, 88 (Fla. 1956).

Regardless, Disney also does not dispute that the Legislative Declaration is what it purports to be: a *declaration* of the District's *opinion* that these purported agreements were already nonbinding when the current Board took control because they were void. The Board's expression of that view had no independent effect on the Agreements' validity.

Disney is thus left to argue that the declaration had the "imprimatur" of legislative authority by listing the Board's general powers. Opp. 40. Absent from this list is any authority to alter State contract law—the authority needed for the declaration to render these purported contracts legally void if they were not void

already. Disney recognizes as much, explaining that the "government impairs a contract ... when it denies the possibility of a damages remedy by establishing a state legislative mandate as a defense." *Id.* at 42 (quotation marks omitted). But the Legislative Declaration did not, and could not, do that. The Declaration thus could not have impaired the agreements even if they were valid.

As for SB 1604, it was not "astonishing," much less unconstitutional, for the Legislature to exercise its statutory authority to preclude compliance with a development agreement that undermined another State law (namely, HB 9B). Opp. 43; FLA. STAT. § 163.3241. Development agreements are creatures of a specific statute. Thus, while freezing in place local regulations, they remain subject to the provisions of the Development Agreement Act that gives them their existence— including the provision allowing the Legislature to modify or revoke them as deemed appropriate. Notwithstanding the tentative views of some legislative staffers, SB 1604 did not impair any alleged contractual rights. It was the exercise of a limitation on those rights that existed within the contracts themselves.

The Legislative Declaration and SB 1604 also could not have impaired any reasonable expectation that the agreements would survive the District's reorganization under HB 9B, for Disney could not have had any such expectation. Disney pays no heed to the strong public interest in redressing collusion between lame-duck bodies and the entities they supposedly regulate. Disney claims to feel

18

targeted by these measures. But of course, the Legislative Declaration could pertain only to Disney, the only beneficiary of the Agreements. And by its terms, SB 1604 exists to prevent all similar eleventh-hour maneuvers, now or in the future while the law remains in effect. There would be no other way to serve that purpose here than to preclude compliance with the Agreements intended to make the Board powerless over the District's predominant landowner. Even if those Agreements were not void, therefore, any impairment was insubstantial, narrowly tailored, fully justified, and consistent with the Contracts Clause.

## IV.    Disney Has Failed to State a Takings Claim.

Disney's supposed property rights in the Agreements have not been taken because those contracts were stillborn, for the reasons already given. MTD 20-23; *supra* § III.A. Disney's remaining counterarguments are unavailing.

*First*, SB 1604's preclusion of compliance with the Development Agreement (and the dependent Restrictive Covenants) could not have taken Disney's property because, as explained, laws like SB 1604 are expressly authorized by preexisting state law. To the extent the District had authority to enter into a development agreement at all, that authority came from the Development Agreement Act. That Act makes clear that development agreements are subject to subsequently enacted state and federal laws "which are applicable to and preclude the parties' compliance with" their terms. FLA. STAT. § 163.3241.

19

Disney argues that SB 1604 constituted a taking of its contract rights despite being fully consistent with preexisting state law. Disney hyperbolically claims that "[a]ccording to Defendants, § 163.3241 makes *all* government contracts permanently conditional on government's continuing agreement to recognize them." But that is not what we have argued, nor what the text of the statute provides. Rather, § 163.3241 pertains only to *development agreements*, and it is a part of the balance the legislature struck when authorizing these traditionally disfavored types of contracts. *See* MTD 32-35.

Disney argues that § 163.3241 is "better read as contemplating subsequently-enacted laws that regulate the subject matter addressed by a development contract," but the plain text of § 163.3241 belies any such reading. It applies without qualification to "state or federal laws … enacted after the execution of a development agreement which are applicable to and preclude the parties' compliance with the terms of a development agreement." There is no plausible reading of the statute that would support the distinction Disney proposes, and Disney provides no authority for such a reading.

*Second*, Disney provides no credible argument for equitable relief under the Takings Clause. Disney says that "*Knick* holds only that equitable relief is unavailable in a takings claim when the property owner has an 'adequate' damages remedy," Opp. 60 (citing *Knick v. Township of Scott*, 139 S. Ct. 2162, 2176 (2019)),

20

but "adequate" in *Knick* does not mean what Disney takes it to mean. *Knick* says that equitable relief is not available "[a]s long as an adequate provision for obtaining just compensation exists." *Id*. State and federal law provide for obtaining just compensation through reverse condemnation and § 1983 actions, respectively. *See* MTD 37. Under *Knick*, Disney cannot obtain equitable relief.

Disney argues that the procedures available to it for obtaining compensation are inadequate because any compensation it may receive may be funded, in part, from Disney's tax dollars. *See* Opp. 49. This argument proves too much. Given the fungibility of money, every time a state or local government takes property from one of its taxpayers, an award of just compensation likely will be funded in part by the taxpayer's tax dollars. Presumably, Disney is not saying that equitable relief should be available in all such cases. Rather, Disney argues for special treatment on the theory that here, "payment would come almost entirely from Disney itself," as the District's largest landholder. *Id.* But there is no constitutional basis to give the biggest property owner in a jurisdiction veto power over the jurisdiction's condemnation proceedings, nor is there any principled basis to determine when a resident's portion of the jurisdiction's tax revenue is large enough to provide it with this special status. If accepted in Disney's case, Disney's argument would mean that the District could *never* take Disney's property without Disney's consent because the just compensation paid would come predominantly from Disney's tax dollars,

and Disney would always be entitled to an injunction instead. That is untenable and completely without support in the Constitution or caselaw.

Disney also argues that calculating its monetary loss "would be difficult." *Id.* But any such difficulty does not entitle Disney to equitable relief. In an inverse condemnation proceeding, Disney would bear the burden of "presenting competent evidence tending to establish" the value of its taken property. *Foster v. City of Gainesville*, 579 So. 2d 774, 777 (Fla. Dist. Ct. App. 1991); *see also id.* at n.4. Disney would have to do the same in a § 1983 action for damages, as the measure of damages would be the compensation Disney claims it was due but not paid. *See Carey v. Piphus*, 435 U.S. 247, 254 (1978); *Christiansen v. McRay*, 380 Fed. Appx. 862 (11th Cir. 2010). If Disney cannot make that showing, that would mean that Disney's claim to be entitled to compensation would fail, not that it would be entitled to equitable relief.

*Third*, Disney does not substantively address how the Legislative Declaration effects a taking. *See* Opp. 50. The Legislative Declaration could have effected a taking only if it *changed* Florida law in some way to invalidate the Agreements and to preclude Disney from obtaining a remedy for any breach of those contracts. But as Defendants have explained, the Legislative Declaration is, at most, an anticipatory breach for which Disney could seek breach-of-contract remedies. And Disney elsewhere cites two cases in which Florida courts consider granting specific

22

performance as a contractual remedy in the context of a real estate contract. *See e.g.,* Opp. 49-50 (citing *Hogan v. Norfleet*, 113 So.2d 437, 439 (Fla. Dist. Ct. App. 1959); *Stevens Fam. Ltd. P'ship v. Paradise Island Ventures, LLP*, 2009 WL 3177568, at *3 (N.D. Fla. Sept. 29, 2009)). Disney thus could argue in a breach action that specific performance is required. If a court were to hold that it was required, Disney would get the performance it desires. If a court were to hold that it was not required, then any alleged breach could not have *taken* Disney's non-existent right to specific performance.

## V.   Disney's Due Process Claim Should Be Dismissed.

Disney recognizes that it can state a Due Process Claim only if Defendants have acted pursuant to an "arbitrary and irrational" law that deprives Disney of its property rights. Opp. 51. As we have explained, Disney has not been deprived of property. But regardless, Disney has not plausibly alleged that either the Legislative Declaration or SB 1604 are arbitrary and irrational.

First, before issuing the Legislative Declaration, the Board obtained the advice of independent outside counsel that the Agreements were void under Florida law. Doc. 51-3 2. It was hardly irrational for the Board to act on that advice by issuing the Legislative Declaration and initiating litigation to obtain a definitive answer to the question of the contracts' validity. Indeed, if anything it would have been

23

irrational for the Board not to act after being advised that contracts that purport to substantially restrict the Board's authority are void.

Second, it was rational for the Florida Legislature to require an incoming special district board to review and affirm any eleventh-hour contracts entered by an outgoing, lame-duck board. MTD 38-40. Disney complains that SB 1604 is irrational because "the whole point of a contract is to create binding obligations" (emphasis omitted), Opp. 51, but SB 1604 addresses the *procedures* required to make a contract binding, and it rationally creates special procedures to protect against a lame-duck board seeking through contract to frustrate the Legislature's intent in reorganizing a district. Legislatures consider and enact similar procedures in analogous settings, and they act rationally when they do so. *See* MTD 29–30.

## VI.    Disney's First Amendment Claims Are Meritless.

### A.    *In re Hubbard* forecloses Disney's First Amendment challenges.

*In re Hubbard* forecloses Disney's First Amendment claims. 803 F.3d 1298 (11th Cir. 2015). In *Hubbard*, the Court rejected the Alabama Education Association's (AEA) claim that the relevant statute was enacted "to retaliate against AEA for its political speech on education policy." *Id.* at 1301. "[T]he First Amendment does not support the kind of claim AEA" made: "a challenge to an otherwise constitutional statute based on the subjective motivations of the lawmakers who passed it." *Id.* at 1312.

24

Disney brings the precise claim the Eleventh Circuit rejected in *Hubbard*. Disney's First Amendment retaliation claims turn exclusively on the purported retaliatory motive behind SB 1604, SB 4C, and HB 9B. (Even if *Hubbard* did not apply to SB 1604, Disney's First Amendment retaliation challenge to that statute would fail if we are correct that the Agreements were void from the beginning, as SB 1604 by its terms applies only to agreements "in effect on, or executed after," its effective date. FLA. STAT. § 189.031(7).) Disney makes no argument that anything on the face of those statutes infringes protected speech. Therefore, *Hubbard* squarely controls, and Disney "cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose." *Hubbard,* 803 F.3d at 1312.

Application of *Hubbard* and *O'Brien* to this case is arguably even more compelling than in *Hubbard*, *O'Brien,* and *NetChoice* themselves. In *Hubbard*, the text of the statute referenced expressive activity given its regulation of payroll deductions for organizations that engage in "political activity." *Id.* at 1301 (quotation marks omitted). So too with "the statute in *O'Brien*," which "regulated expressive conduct." *NetChoice LLC v. Moody*, 34 F.4th 1196, 1224 (11th Cir. 2022). And in *NetChoice,* the Eleventh Circuit held that the statute regulated expressive activity when it, among other things, prohibited social-media companies from "removing or deprioritizing content or users" and required those companies "to disseminate

messages that they find objectionable." *Id.* at 1222. The statutes at issue here do not even arguably reference expressive activity. Thus, Disney's challenge rests *wholly and exclusively* on the subjective motivations of the lawmakers who enacted the statutes. *Hubbard* forecloses that challenge.

Disney responds by citing cases in other contexts that suggest courts may consider lawmakers' motivations when reviewing the constitutionality of a legislative enactment. Opp. 55 (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994); *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011)). The Eleventh Circuit recently canvassed these very cases and nevertheless concluded that they do not "overcome the clear statements in *Hubbard* and *O'Brien*" with respect to the Speech Clause. *NetChoice,* 34 F.4th at 1224-25. Disney also cites *Bethune-Hill v. Virginia State Board of Elections*, 580 U.S. 178 (2017), but that case involved a claim of racial gerrymandering, where subjective motivations may be considered, rather than the type of First Amendment retaliation claim that Disney brings here and that is governed directly by *Hubbard*. Thus, the Eleventh Circuit has held "many times" that a party may not bring a free-speech challenge based exclusively on the motivations of those who enacted the statute. *NetChoice*, 34 F.4th at 1224.

Disney cites a footnote in *Hubbard* for the proposition that "there are limitations to [its] rule." Opp. 56. But Disney omits the remainder of the footnote,

which clarifies that those limitations are only "where a law is challenged as a bill of attainder, as an ex post facto law, or on another ground that requires the court to determine whether the challenged statute is penal in nature." *Hubbard*, 803 F.3d at 1312 n.14 (quotation marks omitted). And in the next sentence (again omitted by Disney), the *Hubbard* Court made clear that its "discussion of the *O'Brien* rule" applies "to the context before us: a free-speech retaliation challenge to an otherwise constitutional statute." *Id.*

Disney next tries to find shelter in *Hubbard*'s narrow exception for statutes that, on their face, "single out" specific individuals. In *Hubbard*, the AEA attempted to rely on the Eleventh Circuit's earlier decision in *Georgia Association of Educators v. Gwinnett County School District*, 856 F.2d 142 (11th Cir. 1988). In *Gwinnett County*, the Court denied a motion to dismiss a First Amendment retaliation claim based on the local school board's termination of employees' ability to set up an automatic dues deduction for the teachers' union. *See Hubbard*, 803 F.3d at 1314.

But *Hubbard* held that "[t]he facts" of *Gwinnett County* "limit the holding of the decision to acts of governmental retaliation that explicitly single out a specific group." *Id.* at 1314. "The crucial fact in *Gwinnett County*," the Court continued, "is that the school board did not adopt a generally applicable policy—it specifically singled out 'GAE-GCAE members'" by name. *Id.* (quoting relevant policy). The statute at issue in *Hubbard*, in contrast, did not single out a specific group. Instead,

27

it prohibited public employees from setting up a payroll deduction for "an organization that uses any portion of those contributions for political activity." *Id.* at 1301 (quotation marks omitted). Therefore, "the *O'Brien* rule applie[d]." *Id.* at 1314-15.

Disney's attempt to invoke *Gwinnett County* fails for the same reasons. None of the statutes at issue here "explicitly single out" Disney. *Hubbard*, 803 F.3d at 1314. Disney concedes as much with respect to SB 4C and HB 9B. *See* Opp. 58. Disney acknowledges that SB 4C applies to "five other special districts." *Id.* And Disney similarly acknowledges that HB 9B applies to *all* landowners in the District, not just Disney. *Id.* Therefore, these statutes are governed by *Hubbard*, for they do not "specifically" and "explicitly single out" Disney.

The same is true for SB 1604. That statute says nothing about Disney (or the District). And although Disney suggests that, currently, only Disney's Agreements fall within the statute's text, the statute does not *limit* its application to *only* Disney's Agreements. Instead, it is written in generally applicable terms, and any contract that falls within its text (whether now or in the future) would be covered. Because SB 1604 does not "specifically" and "explicitly single out" Disney, *Hubbard* controls.

Finally, Disney asks this Court to do precisely what *Hubbard* prohibits. *See* Opp. 59-60. Disney says the Court should consider the "objective public record"— by which Disney apparently means the statements of lawmakers—to hold that

28

Disney's First Amendment retaliation claims survive a motion to dismiss. Disney appears to be drawing on the analysis for *race-discrimination* claims under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). But Disney is bringing a First Amendment retaliation claim, which is directly controlled by *Hubbard*'s holding that a plaintiff may not use lawmakers' "alleged illicit legislative motive" to bring a Free Speech claim when the statute does not, on its face, infringe protected speech. *Hubbard*, 803 F.3d at 1312. *Hubbard* did not create a mere evidentiary rule regarding the degree of "ambiguity" in legislators' public statements. *See* Opp. 59. Instead, it flatly foreclosed First Amendment claims like Disney's premised on "the alleged retaliatory motive that [Florida's] lawmakers had when passing" these challenged statutes. *Hubbard*, 803 F.3d at 1313.

### B.    A State's decision to reconstitute state entities that exercise sovereign power is not subject to the Speech Clause.

The State of Florida holds the power to determine who will exercise "important elective and nonelective positions whose operations go to the heart of representative government." *Gregory v. Ashcroft*, 501 U.S. 452, 463 (1991) (quotation marks omitted). Indeed, "[t]hrough the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." *Id.* at 460. "This rule is no more than a recognition of a State's constitutional responsibility for the establishment and operation of its own

29

government." *Id.* at 462 (cleaned up). The Speech Clause of the First Amendment does not constrain this exercise of State sovereignty.

This same principle explains why elected State officials do not violate the Speech Clause when they remove unelected policymaking officials from high office. *See Elrod v. Burns*, 427 U.S. 347 (1976) (plurality op.); *Branti v. Finkel*, 445 U.S. 507, 517 (1980); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64-65 (1990). Therefore, officials who exercise "discretion concerning issues of public importance," *Gregory*, 501 U.S. at 467, or "wield[] the final authority of government," *Kurowski v. Krajewski*, 848 F.2d 767, 770 (7th Cir. 1988), may be managed by a State's elected officials free from the constraints of the Speech Clause. "That is to say, the first amendment does not remove political beliefs from politics; it would undermine the democratic process to hold that the winners at the polls may not employ those committed to implementing their political agenda." *Id*. And just as the Speech Clause does not constrain elected State officeholders from determining which *individual officials* exercise immense government power, nor does it constrain elected State officeholders from determining the structure and composition of state *entities* that exercise immense government power.

Consider the alternative. Every time a State eliminates or restructures a state agency for policy reasons, some arguably interested private party could attempt to bring a Speech claim. For example, if the Governor and State Legislature decided to

eliminate a particular state agency because the agency had become irrevocably politically hostile, on Disney's theory, individuals who share the political views of the former agency could arguably bring a Speech claim based on an alleged "chill" of their political speech. No precedent supports such federal judicial oversight of State elected officials making policy decisions about how to structure their own government.

Here, RCID undoubtedly exercised immense "government authority." *Gregory*, 501 U.S. at 460. It held the power to tax, the power to regulate building codes and utilities, and the power to regulate land use and economic development for 25,000 acres in Central Florida. *See* MTD 43. And RCID was merely the *de jure* government entity wielding these powers. The *de facto* governing body over the District was Disney itself, which had exclusive control over the selection of RCID's Board members. *See* MTD 6. The State of Florida's elected officials were therefore not constrained by the Speech Clause when deciding to revoke RCID's authority and to replace that body with a genuinely democratically responsive one through SB 4C and HB 9B. Nor were they constrained in ensuring that the new body may govern *effectively* through SB 1604. *See* MTD 43-44.

Disney's only response is to caricature Defendants' argument. Defendants do *not* suggest "the Constitution is categorically inapplicable to laws addressing state and local government structures." Opp. 60. Defendants are not arguing that the state

may restructure an agency to *establish a State religion*. *See id.* (citing *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687 (1994)). Nor are Defendants arguing that the State may restructure an agency for the purpose of *invidiously discriminating on the basis of race*. *See id.* (citing *Bethune-Hill*, 580 U.S. at 181-83). Instead, as Defendants explained in their opening memorandum, "[t]he *Speech Clause* does not prevent the State of Florida's elected officials from determining who may exercise … immense and significant government authority." MTD 44 (emphasis added). Indeed, Disney's invocation of gerrymandering cases only undercuts its argument because, while a claim for racial gerrymandering is cognizable under the Equal Protection Clause, *Bethune Hill*, 580 U.S. at 187, a claim for *partisan* gerrymandering under the *Speech Clause* is *not*, *Rucho v. Common Cause*, 139 S. Ct. 2484, 2502, 2504-05 (2019). Disney also cites *Bond v. Floyd*, 385 U.S. 116 (1966). But that case involved a State legislature's refusal to seat a single representative. *See Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1263 (2022). Ultimately, Disney fails to cite a single case involving a challenge to a "government structure" based on the Speech Clause. This Court should not be the first. To hold otherwise would nullify the "State's constitutional responsibility for the establishment and operation of its own government." *Gregory*, 501 U.S. at 462 (cleaned up). Disney's Free Speech challenge to SB 4C, HB 9B, and SB 1604 therefore fails.

**C.    Because the Legislative Declaration did not constitute "material adverse action" against Disney, Disney's First Amendment challenge to the Declaration fails.**

Because SB 1604 is constitutional under *Hubbard*, the District "is precluded from complying with" Disney's Agreements irrespective of whether the Legislative Declaration falls within *Gwinnett County*. Regardless, the Legislative Declaration was not a material adverse action, as required to state a First Amendment retaliation claim, *see Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005), because it imposed no adverse consequence at all. In *Wilson*, the Supreme Court recently held that a college board's censure of a board member did not "qualify as a materially adverse action" in part because the censure "was a form of speech by elected representatives." 142 S. Ct. at 1261. Similarly, the Legislative Declaration was merely "a form of speech"—a "declaration." It had no effect other than to state the Board's opinion that, under principles of Florida law, the contracts were void.

The Declaration merely took a position on an existing legal reality. This position is either correct or incorrect; the Legislative Declaration's statement about the Agreements' invalidity did not *change* anything about the Agreements' validity. If the Declaration is correct, the Agreements are, and always have been, void. If the Declaration is incorrect, that would just mean that the District was incorrect in its legal analysis. Issuing a legal opinion that turns out to be incorrect cannot be a materially adverse action.

33

Disney responds that the Legislative Declaration had "the immediate effect of repudiating the District's contractual obligations." Opp. 62. But while we have suggested (*see* MTD 24) that the Declaration could, *at most*, be seen as an anticipatory breach (another name for repudiation, *see* Anticipatory Breach or Repudiation, Generally, 11 Fla. Jur.2d Contracts § 277), Disney has not pleaded any facts to support an argument that the Legislative Declaration *did* constitute an anticipatory breach. Disney posits that the Legislative Declaration "was surely binding on [District] employees and barred them from complying with the Contracts and allowing Disney to exercise its rights under them." Opp. 62-63. But the Legislative Declaration itself contains no such directive, and Disney's complaint says nothing about any employees refusing to comply with the Agreements. True, the District implemented its opinion in the Legislative Declaration by filing suit for declaratory and injunctive relief in Florida state court—but that action does not form the basis for Disney's First Amendment retaliation claim. Nor could Disney challenge CFTOD's lawsuit as First Amendment retaliation. *See DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1303-05 (11th Cir. 2019). The Declaration therefore does not "qualify as a materially adverse action," *Wilson*, 142 S. Ct. at 1261, and Disney's First Amendment retaliation challenge to the Legislative Declaration fails.

## CONCLUSION

For these reasons, the Court should abstain or dismiss the case.

34

Dated: August 9, 2023

Jason Gonzalez (No. 146854)
LAWSON HUCK GONZALEZ PLLC
215 S. Monroe Street
Suite 320
Tallahassee, FL 32301
Tel: (850) 825-4334
jason@lawsonhuckgonzalez.com

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper (No. 248070DC)
David H. Thompson (No. 450503DC)
Peter A. Patterson (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
Joseph O. Masterman (No. 1004179)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
mwold@cooperkirk.com
jmasterman@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Defendants Martin Garcia,
Charbel Barakat, Brian Aungst Jr., Ron
Peri, Bridget Ziegler, and Glenton
Gilzean, Jr.*

35

## **CERTIFICATE OF WORD COUNT**

Pursuant to Northern District of Florida Rule 7.1(F), the undersigned counsel hereby certifies that the foregoing Defendant's Reply in Support of Motion to Dismiss, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 7,999 words as measured by Microsoft Office for Word 365.

Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper