# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

WALT DISNEY PARKS AND RESORTS U.S., INC.,

    *Plaintiff*,

v.

RONALD D. DESANTIS, in his official capacity as Governor of Florida, et al.,

    *Defendants*.

Case No. 4:23-cv-163-AW-MJF

## CFTOD DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

| | |
|---|---|
| Jason Gonzalez (No. 146854) | Charles J. Cooper (No. 248070DC) |
| LAWSON HUCK GONZALEZ PLLC | David H. Thompson (No. 450503DC) |
| 215 S. Monroe Street, Suite 320 | Peter A. Patterson (*Pro Hac Vice*) |
| Tallahassee, FL 32301 | Megan M. Wold (*Pro Hac Vice*) |
| Tel: (850) 825-4334 | John D. Ramer (*Pro Hac Vice*) |
| | COOPER & KIRK, PLLC |
| | 1523 New Hampshire Avenue, N.W. |
| | Washington, D.C. 20036 |
| | Tel: (202) 220-9600 |
| | Fax: (202) 220-9601 |

September 28, 2023

*Counsel for Defendants Martin Garcia, Charbel Barakat, Brian Aungst Jr., Ron Peri, Bridget Ziegler, and Glenton Gilzean, Jr.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION .....................................................................................................1

FACTUAL BACKGROUND ....................................................................................2

    A.    The Florida Legislature Creates the Reedy Creek Improvement District. ....................................................................................................2

    B.    The Florida Legislature Replaces the Reedy Creek Improvement District With A More Democratically Responsive Regulatory Entity ....................3

    C.    Disney Sues To Seize Government Power Over The 25,000 Acre District. ....................................................................................................4

STANDARD OF REVIEW .......................................................................................6

ARGUMENT .............................................................................................................7

  I.    Disney's First Amendment Retaliation Is Meritless. ......................................7

    A.    Disney's First Amendment retaliation claim is foreclosed by *In re Hubbard*. ........................................................................................................7

    B.    The First Amendment does not constrain Florida's decision to reconstitute state entities that exercise sovereign power. ....................11

CONCLUSION ........................................................................................................13

# TABLE OF AUTHORITIES

**Cases**          **Page**

*Branti v. Finkel*,
    445 U.S. 507 (1980)..................................................................................11, 12

*Elrod v. Burns*,
    427 U.S. 347 (1976).........................................................................................11

*Georgia Association of Educators v. Gwinnett County School District*,
    856 F.2d 142 (11th Cir. 1988).........................................................................9

*Gregory v. Ashcroft*,
    501 U.S. 452, 460 (1991) ........................................................1, 10, 11, 12, 13

*Holland v. Carnival Corp.*,
    50 F. 4th 1088 (11th Cir. 2022).......................................................................6

*In re Hubbard*,
    803 F.3d 1298 (11th Cir. 2015)....................................................1, 7, 8, 9, 10

*Kurowski v. Krajewski*,
    848 F.2d 767 (7th Cir. 1988)..........................................................................12

*NetChoice, LLC v. Moody*,
    34 F.4th 1196 (11th Cir. 2022)....................................................................8, 9

*Rutan v. Republican Party of Ill.*,
    497 U.S. 62 (1990)..........................................................................................12

*United States v. O'Brien,*
    391 U.S. 367 (1968).........................................................................................8

**Statutes and Legislative Materials**

Fla. Laws ch. 67-764.................................................................................................2
        § 4(5)...........................................................................................................3
        § 9(5)...........................................................................................................2
        § 9(17).....................................................................................................2, 3
        §§ 24–26 ...................................................................................................3

H.B. 9-B, Fla. Laws ch. 2023-5 ...............................................................................4
        § 2(1)...........................................................................................................4
        § 4(1)...........................................................................................................4
        § 4(2)...........................................................................................................4

S.B. 4-C, Fla. Laws ch. 2022-266........................................................................3, 4

§ 1(2)......................................................................................................................4

FED. R. OF CIV. PROC. 12(b)(6) ................................................................................6

U.S. CONST. art. IV, § 4 .........................................................................................11

**Other Authorities**

FLA. OFF. OF PROGRAM POL'Y ANALYSIS & GOV'T ACCOUNTABILITY, REP. NO. 04-81, CENTRAL FLORIDA'S REEDY CREEK IMPROVEMENT DISTRICT HAS WIDE-RANGING AUTHORITY 2 (Dec. 2004), https://bit.ly/42X5Vt2 ..........................3

*QuickFacts for Miami, Florida*, U.S. CENSUS BUREAU (July 1, 2022), https://bit.ly/3r0JmXn .......................................................................................2

## INTRODUCTION

"Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). This case is a frontal assault on this bedrock principle of our constitutional order. Walt Disney Parks and Resorts, U.S., Inc. ("Disney"), prefers the old structure and governing composition of the Central Florida Tourism Oversight District (formerly the Reedy Creek Improvement District ("RCID"), hereafter, the "District"), which gave Disney de facto authority to govern itself through hand-picked board members, to the current democratically responsive governing entity established by the people of Florida acting through their elected representatives, which places appointment authority with the Governor. Disney claims that the First Amendment gives it, rather than Florida lawmakers, the right to decide the structure and composition of the governing entity in the District. Disney may own most of the land in the District, but it does not own the government. That still belongs to the People, acting through their elected representatives.

But Disney's First Amendment claims are squarely foreclosed by well-established, binding precedent holding that otherwise constitutional enactments cannot be attacked on the basis of the alleged motives of those who enacted them. *See In re Hubbard*, 803 F.3d 1298 (11th Cir. 2015). And even if that were not the case, Disney does not have a First Amendment right to its preferred governance

1

structure for the district in which it is located. To the contrary, that is a fundamental matter of state sovereignty that the First Amendment does not restrict.

For these reasons and the reasons explained below, this Court should reject Disney's attempt to coax this Court into intervening in the internal governance of the State of Florida and its subdivisions.

## FACTUAL BACKGROUND

**A. The Florida Legislature Creates the Reedy Creek Improvement District.**

In 1967, the Florida Legislature created the Reedy Creek Improvement District pursuant to H.B. 486, Chapter 67-764. The Walt Disney Company owned the vast majority of land within the boundaries of the RCID. *See* Second Am. Compl., Doc. 87, ¶ 32 (September 7, 2023) ("SAC"). The RCID exercised tremendous government authority over the 25,000 acres under its control—an area larger than the City of Miami. *Id*. ¶ 37.[1] For example, the RCID was authorized to exercise many of the traditional powers of local government, such as regulation of zoning and development matters, capital improvements, building code enforcement, and fire and safety matters. *See Id*. ¶ 36. It had "exclusive authority [over] the construction of public roads," Fla. Laws ch. 67-764, could exercise eminent domain beyond the District's "territorial limits," *id*. § 9(5), and was even authorized by

---

[1] *See QuickFacts for Miami, Florida*, U.S. CENSUS BUREAU (July 1, 2022), https://bit.ly/3r0JmXn (land area of Miami is 36 square miles as of 2020).

2

Florida law to generate and transmit "power through nuclear fission" and develop "other new and experimental sources" of energy, *id.* § 9(17). The Legislature also gave the RCID the power to levy ad valorem taxes. *See id.* §§ 24–26.

The RCID was governed by a five-member Board of Supervisors, whose only qualification for office was that they own at least one acre of land within the RCID. *See* SAC ¶ 39. Election to the Board of Supervisors required a majority vote of the RCID's electors, who had to own at least one acre of land within the RCID and who cast one vote for every acre owned. Fla. Laws ch. 67-764 § 4(5). Because Disney owned the vast majority of the land within RCID, and because of the one-acre-one-vote system governing RCID, Disney had complete control over the selection of RCID Board Members.

**B.    The Florida Legislature Replaces the Reedy Creek Improvement District With A More Democratically Responsive Regulatory Entity.**

Florida's elected representatives eventually decided that the existing structure of RCID did not adequately serve the interests of the State of Florida, its voters, or the other individuals and entities who owned land within the District but lacked adequate representation[2]—a decision that led to the enactment of Senate Bill 4C. *See* Senate Bill 4-C, Fla. Laws ch. 2022-266 (amending FLA. STAT. § 189.0311) ("SB

---

[2] *See* FLA. OFF. OF PROGRAM POL'Y ANALYSIS & GOV'T ACCOUNTABILITY, REP. NO. 04-81, CENTRAL FLORIDA'S REEDY CREEK IMPROVEMENT DISTRICT HAS WIDE-RANGING AUTHORITY 2 (Dec. 2004), https://bit.ly/42X5Vt2 ("OPPAGA Report") (noting that 31% of the land within the District was owned by others).

4C"). That law required the dissolution of RCID on June 1, 2023. *Id.* § 1(2). Senate Bill 4C took effect on July 1, 2022.

Ultimately, the Florida Legislature decided to reform rather than abolish RCID. On February 6, 2023, HB 9B was filed in the Florida Legislature. *See* House Bill 9-B, Fla. Laws ch. 2023-5 ("HB 9B"). Among other things, HB 9B reformed RCID's governance structure. *Id.* § 4(1). Membership on the Board of Supervisors would no longer be based on land ownership within the District. *See id.* § 4(2). Instead, the members of the Board of Supervisors would be nominated by the Governor and confirmed by the Florida Senate. *See id.* § 4(1). Signaling a further break from the past, HB 9B also changed the District's name from the "Reedy Creek Improvement District" to the "Central Florida Tourism Oversight District." *See id.* § 2(1). The bill became law on February 27, 2023.

### C. Disney Sues To Seize Government Power Over The 25,000 Acre District.

Once it became clear that Florida's elected officials sought to install a more democratically responsive regulatory entity, Disney took audacious steps to frustrate the will of Florida's lawmakers. First, Disney and RCID purported to enter into two agreements that assigned Disney much of the District's governmental authority for at least the next three decades. *See* Exhibit A to First Am. Compl., Disney Chapter 163 Development Agreement, Doc. 25-1 (May 8, 2023); Exhibit B to First Am. Compl., Decl. of Restrictive Covenants, Doc. 25-2 (May 8, 2023). As CFTOD later

4

recognized in a legislative declaration, however, the stunt was unsuccessful because the agreements were void *ab initio* under Florida law. *See* Exhibit B to CFTOD Defs.' Mot. to Dismiss, Legislative Declaration, Doc. 51-3 (June 26, 2023). Second, Disney filed this lawsuit challenging both the District's legislative declaration and the statutes restructuring the District. *See* Compl., Doc. 1 (Apr. 26, 2023). Specifically, Disney argued that the statutes and legislative declaration violated the Takings Clause, the Contracts Clause, the Due Process Clause, and the First Amendment. *Id.* at ¶¶ 184-200.

The District filed its own suit in the Circuit Court for Orange County, Florida, which is the forum identified in the agreements Disney and RCID purported to enter. *See* Ex. A to CFTOD Defs.' Mot. to Dismiss, Doc. 51-2, *Cent. Fla. Tourism Oversight Dist. v. Walt Disney Parks & Resorts U.S., Inc.*, No. 2023-CA-011818-O (Fla. Cir. Ct. 2023). In that complaint, the District explains that the Development Agreement and Restrictive Covenants are void and unenforceable as a matter of state law for a host of reasons. *Id.* ¶¶ 35–175.

Defendants filed a motion to dismiss the original complaint in this action. In addition to refuting Disney's arguments on the merits, Defendants also urged the Court to abstain from deciding four of the five counts under *Pullman*. For the fifth count—which challenged HB 9B and SB 4C under the First Amendment—Defendants argued that the Court should stay the case while the State law issues

5

most directly relevant to Counts I-IV were decided by the State court.

Rather than wait for this Court to rule on Defendants' motion to abstain or dismiss, Disney fled this venue, shifting the bulk of its case to State court. Specifically, Disney filed its Answer in the State proceeding to assert counterclaims under the Florida Constitution that mimic the federal constitutional claims it had previously raised here—a Contracts Clause claim, a Takings claim, a Due Process claim, and a First Amendment claim. Disney chose not to assert a state-law version of Count V's challenge to HB 9B and SB 4C, however, and instead amended its complaint here to bring only that claim. Defendants now move to dismiss that sole remaining claim.

## STANDARD OF REVIEW

Rule 12(b)(6) allows a claim to be dismissed for "failure to state a claim upon which relief can be granted." A court must "accept[ ] the complaint's allegations as true and constru[e] them in the light most favorable to the plaintiff," but "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Holland v. Carnival Corp.*, 50 F. 4th 1088, 1093 (11th Cir. 2022).

# ARGUMENT

## I. Disney's First Amendment Retaliation Claim Is Meritless.

### A. Disney's First Amendment retaliation claim is foreclosed by *In re Hubbard*.

Disney's First Amendment claims turn exclusively on the purported illicit motive behind Senate Bill 4C and House Bill 9B rather than anything on the face of those statutes themselves. Under the Eleventh Circuit's decision in *In re Hubbard*, this fact alone dooms Disney's First Amendment retaliation claims.

*Hubbard* involved a retaliation claim materially indistinguishable from Disney's. There, a public-sector union, the Alabama Education Association (AEA), argued that an Alabama statute "violate[d] the First Amendment rights of AEA and its members because the subjective motivations of the lawmakers in passing the Act were to retaliate against AEA for its political speech on education policy." *Hubbard*, 803 F.3d at 1301. Specifically, the union said the legislation "was an act of political retribution against AEA for its past opposition to education policy proposals by [then-]Governor Riley and other Alabama Republicans." *Id.* at 1304. The case arrived at the court when state legislators appealed the denial of their motion to quash third-party subpoenas that sought evidence of the legislators' subjective motivations in enacting the law. *See id.* at 1304–05. In concluding that the subpoenas should have been quashed, the Court held that AEA's First Amendment claim failed as a matter of law.

7

Specifically, the Court held that "the First Amendment does not support the kind of claim AEA makes here: a challenge to an otherwise constitutional statute based on the subjective motivations of the lawmakers who passed it." *Id.* at 1312. The Court grounded its analysis in the Supreme Court's decision in *United States v. O'Brien*, which "held that, as a 'principle of constitutional law,' courts cannot 'strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'" *Id.* (quoting *O'Brien*, 391 U.S. 367, 383 (1968)). The Eleventh Circuit's "precedent applying *O'Brien*," the Court explained, "recognizes that, when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose." *Id.* The Eleventh Circuit has recently reaffirmed the principle of *Hubbard*. *See NetChoice, LLC v. Moody*, 34 F.4th 1196, 1224 (11th Cir. 2022).

Disney's First Amendment retaliation claim turns exclusively on the purported retaliatory motive behind SB 4C and HB 9B. Disney makes no allegation that anything on the face of those statutes infringes protected speech. Therefore, *Hubbard* squarely controls, and Disney "cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose." *Hubbard,* 803 F.3d at 1312.

Application of the rule from *Hubbard*, *O'Brien*, and *NetChoice* to this case is even more compelling than its application to *Hubbard*, *O'Brien*, and *NetChoice*

themselves. In *Hubbard*, the text of the statute referenced expressive activity; it regulated payroll deductions for organizations that engage in "political activity." *Id.* at 1302 (quotation marks omitted). So too with "the statute in *O'Brien*," which "regulated expressive conduct." *NetChoice*, 34 F.4th at 1224. And in *NetChoice,* the Eleventh Circuit held that the statute regulated expressive activity when it, among other things, prohibited social-media companies from "removing or deprioritizing content or users" and required those companies "to disseminate messages that they find objectionable." *Id.* at 1222. The text of the statutes at issue here do not even arguably reference expressive activity. Thus, Disney's challenge rests *wholly and exclusively* on the subjective motivations of the lawmakers who enacted the statutes. *Hubbard* forecloses that challenge.

Nor can Disney invoke *Hubbard*'s narrow exception for statutes that, on their face, "single out" specific individuals. In *Hubbard*, the AEA attempted to rely on the Eleventh Circuit's earlier decision in *Georgia Association of Educators v. Gwinnett County School District*, 856 F.2d 142 (11th Cir. 1988). And in *Gwinnett County*, the Court denied a motion to dismiss a First Amendment retaliation claim based on the local school board's termination of its employees' ability to set up an automatic dues deduction for the teachers' union. *See Hubbard*, 803 F.3d at 1314.

But *Hubbard* held that "[t]he facts" of *Gwinnett County* "limit the holding of the decision to acts of governmental retaliation that explicitly single out a specific

9

group." *Id.* at 1314. "The crucial fact in *Gwinnett County*," the Court continued, "is that the school board did not adopt a generally applicable policy—it specifically singled out 'GAE-GCAE members'" by name. *Id.* (quoting relevant policy). The statute at issue in *Hubbard*, in contrast, did not single out a specific group. Instead, it prohibited public employees from setting up a payroll deduction for "an organization that uses any portion of those contributions for political activity." *Id.* at 1301 (quotation marks omitted). Therefore, "the *O'Brien* rule applie[d]." *Id.* at 1314-15.

*Gwinnett County* does not apply here for the same reasons. None of the statutes at issue here "explicitly single out" Disney. *Id.* at 1314. Nor do they "single out" Disney in fact. Disney has previously conceded as much—acknowledging that SB 4C applies to "five other special districts" and that HB 9B applies to *all* landowners in the District, not just Disney. *See* Opp. to CFTOD Defs.' Mot. to Dismiss, Doc. 60-1 at 58 (July 27, 2023). Therefore, these statutes are governed by *Hubbard*, for they do not "specifically" and "explicitly single out" Disney.

In sum, Disney's First Amendment challenge to HB 9B and SB 4C runs headlong into *Hubbard*. Because the "only basis for [Disney's] retaliation claim is the alleged retaliatory motive that [Florida's] lawmakers had when passing" these statutes, Disney's claim "is precisely the challenge that *O'Brien*," and the Eleventh Circuit's "decisions following it, foreclose." *Hubbard*, 803 F.3d at 1313. The Court

10

should therefore dismiss Disney's complaint.

### B. The First Amendment does not constrain Florida's decision to reconstitute state entities that exercise sovereign power.

"Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." *Gregory*, 501 U.S. at 460. Nevertheless, Disney asks this Court to enjoin the "reconstitution" of RCID's "structure" by Florida's elected lawmakers. SAC ¶ 117. But States have long had the power to determine who will exercise "important elective and nonelective positions whose operations go to the heart of representative government." *Gregory*, 501 U.S. at 463 (internal quotation marks omitted). "This rule is no more than a recognition of a State's constitutional responsibility for the establishment and operation of its own government." *Id.* at 462 (cleaned up). "It is a power reserved to the States under the Tenth Amendment and guaranteed them by that provision of the Constitution under which the United States 'guarantees to every State in this Union a Republican Form of Government.'" *Id.* at 463 (quoting U.S. CONST. art. IV, § 4 (brackets omitted)). The Speech Clause imposes no constraint on the State's exercise of that responsibility—no matter the State's motivation for doing so.

This same principle shields elected State officials from Speech Clause concerns when they remove unelected policymaking officials from high office. *See Elrod v. Burns*, 427 U.S. 347 (1976) (plurality op.); *Branti v. Finkel*, 445 U.S. 507,

11

517 (1980); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64-65 (1990). Therefore, officials who exercise "discretion concerning issues of public importance," *Gregory*, 501 U.S. at 467, or "wield[] the final authority of the government," *Kurowski v. Krajewski*, 848 F.2d 767, 770 (7th Cir. 1988), may be managed by a State's elected officials free from the constraints of the Speech Clause. "That is to say, the first amendment does not remove political beliefs from politics; it would undermine the democratic process to hold that the winners at the polls may not employ those committed to implementing their political agenda." *Id*. And just as the Speech Clause does not constrain elected State officeholders from determining which *individual officials* exercise immense government power, nor does it constrain elected State officeholders from determining the structure and composition of state *entities* that exercise immense government power.

Consider the alternative. Every time a State eliminates or restructures a state agency for policy reasons, some arguably interested private party could attempt to bring a Speech claim. For example, if the Governor and State Legislature decided to eliminate a particular state agency because the agency had become irrevocably politically hostile, individuals who share the political views of the former agency, on Disney's theory, could bring a Speech claim based on an alleged "chill" of their political speech. No precedent supports the proposition that the Speech Clause requires such federal judicial oversight of State elected officials making policy

12

decisions about how to structure their own government bodies.

Here, RCID undoubtedly exercised immense "government authority." *Gregory*, 501 U.S. at 460. It held the power to tax, the power to regulate building codes and utilities, and the power to regulate land use and economic development for 25,000 acres in Central Florida. *See supra*, at 2-3. And RCID was merely the *de jure* government entity wielding these powers. The *de facto* governing body over the District was Disney itself, which had exclusive control over the selection of RCID's Board members. *See supra*, at 3-4. The State of Florida's elected officials were therefore not constrained by the Speech Clause when deciding to revoke RCID's authority and to replace that body with a genuinely democratically responsive one through SB 4C and HB 9B. Disney may not use the First Amendment to block the revocation of that extraordinary authority by Florida's elected lawmakers, and Disney's challenge to these statutes should be dismissed.

## CONCLUSION

For these reasons, the Court should dismiss Disney's complaint.

| | |
|---|---|
| Dated: September 28, 2023 | Respectfully submitted, |

| | |
|---|---|
| Jason Gonzalez (No. 146854)<br>LAWSON HUCK GONZALEZ PLLC<br>215 S. Monroe Street<br>Suite 320<br>Tallahassee, FL 32301<br>Tel: (850) 825-4334<br>jason@lawsonhuckgonzalez.com | /s/ Charles J. Cooper<br>Charles J. Cooper (No. 248070DC)<br>David H. Thompson (No. 450503DC)<br>Peter A. Patterson (*Pro Hac Vice*)<br>Megan M. Wold (*Pro Hac Vice*)<br>John D. Ramer (*Pro Hac Vice*)<br>COOPER & KIRK, PLLC<br>1523 New Hampshire Avenue, N.W.<br>Washington, D.C. 20036<br>Tel: (202) 220-9600<br>Fax: (202) 220-9601<br>ccooper@cooperkirk.com<br>dthompson@cooperkirk.com<br>ppatterson@cooperkirk.com<br>mwold@cooperkirk.com<br>jramer@cooperkirk.com<br><br>*Counsel for Defendants Martin Garcia, Charbel Barakat, Brian Aungst Jr., Ron Peri, Bridget Ziegler, and Glenton Gilzean, Jr.* |

14

## CERTIFICATE OF WORD COUNT

Pursuant to Northern District of Florida Rule 7.1(F), the undersigned counsel hereby certifies that the foregoing Defendants' Memorandum of Law in Support of Motion to Dismiss, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 3,015 words as measured by Microsoft Office for Word 365.

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper