## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

WALT DISNEY PARKS AND RESORTS U.S., INC.,

    *Plaintiff*,

    v.                          No. 4:23-cv-163-AW-MJF

RON DESANTIS, in his official capacity
as Governor of Florida, et al.,

    *Defendants*.

_____/

## STATE DEFENDANTS' MOTION TO DISMISS
## AND INCORPORATED MEMORANDUM OF LAW

In 1967, a sweetheart deal with the State vested Walt Disney Parks and Resorts (Disney) with unprecedented power to govern itself. That year saw the creation of the Reedy Creek Improvement District (RCID), a local-government entity that governed Disney's territory in central Florida. The District's governing structure exploited Disney's status as the majority landowner by giving landowners—mainly of course Disney—one vote per acre of land for each seat on RCID's governing board. The result was that Disney had the pleasure of selecting every member of RCID's board from 1967 to present—"as clear a case" of corporate capture "as this Court is ever likely to see." DE87 ¶ 10.

Special districts in Florida typically operate for limited governmental purposes—water-management services, for example. RCID's powers, however,

gave Disney carte blanche to govern itself. Local taxes? Disney set them. Building and safety codes? Disney set those, too. Caps on land development? Disney made the final call. Disney could exercise eminent domain, permitting it to annex territory even outside the District's borders, all without legislative approval. It could build and operate an airport, or even a nuclear power plant.

In 2022, the Legislature passed, and the Governor signed, a tandem of bills reining in RCID's outsized authority and reconstituting it as a new entity—the Central Florida Tourism Oversight District (CFTOD), the governing board of which would be selected not by a California corporation, but by the People's elected chief executive—the Governor—and confirmed by the People's representatives in the Senate.

In a last-ditch effort to reinstate its corporate kingdom, Disney has sued the Governor, the Secretary of the Florida Department of Economic Opportunity (now the Florida Department of Commerce), the, the CFTOD Board, and CFTOD's Administrator for First Amendment retaliation. Disney's claim is meritless for many reasons, not least of which is that "the First Amendment does not support the kind of claim [Disney] makes here: a challenge to an otherwise constitutional statute based on the subjective motivations of the lawmakers who passed it." *In re Hubbard*, 803 F.3d 1298, 1312 (11th Cir. 2015).

But first things first. The Court lacks jurisdiction over at least two defendants—the Governor and the Secretary—who are also immune from suit. Although Disney has grabbed headlines by suing the Governor, Disney—like many litigants before it who have challenged Florida's laws[1]—has no basis for doing so. Neither the Governor nor the Secretary enforce any of the laws at issue, so Disney lacks standing to sue them, *see City of S. Miami v. Governor of Fla.*, 65 F.4th 631, 643 (11th Cir. 2023); *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201–02 (11th Cir. 2021); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020), and they are improper defendants under *Ex parte Young*, *see Whole Woman's Health v. Jackson*, 595 U.S. 30, 43 (2021); *cf. Jacobson*, 974 F.3d at 1257. Moreover, insofar as Disney challenges the Governor's legislative acts, he is entitled to legislative immunity, which shields "both governors' and legislators' actions in the proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d at 1308.

---

[1] *See, e.g., Falls v. DeSantis*, No. 4:22-cv-166, 2022 WL 19333278, at *1 (N.D. Fla. July 8, 2022) (dismissing Governor from challenge to law he did not enforce); *Dream Defs. v. DeSantis*, 553 F. Supp. 3d 1052, 1078–79 (N.D. Fla. 2021) (same); *Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1137 (N.D. Fla. 2020) (same); *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1209 (N.D. Fla. 2020) (same); *see also* Notice of Voluntary Dismissal Without Prejudice of Claims Against Defendant Ronald D. DeSantis at 1, *Equal. Fla. v. Fla. State Bd. of Educ.*, No. 4:22-cv-134 (N.D. Fla. July 27, 2022), DE92.

## STATEMENT OF THE CASE

**1.** In Florida, "[s]pecial district[s]" are local-government entities that generally administer one or more discrete governmental functions in a "limited geographic" region. Fla. Stat. § 189.012(6); *see, e.g.*, Fla. Stat. §§ 298.001, 298.005 (describing water-management districts). Like all "[l]ocal governments," special districts are "creatures of the State without any independent sovereignty." *Fried v. State*, 355 So. 3d 899, 908 (Fla. 2023). Accordingly, the State may create, modify, or dissolve them—powers it exercises often.[2]

In 1967, the State determined that an undeveloped, 43-mile tract of land in central Florida would benefit from a special district. To that end, it modified a judicially created special district already operating in the area (the Reedy Creek Drainage District) and rebranded it under a new name: the Reedy Creek Improvement District. Ch. 67-764, § 1, Laws of Fla. (1967). From the start, Disney has been RCID's supermajority landowner, owning roughly 69% of the District's territory.[3]

---

[2] *See, e.g.*, *Gulf Coast Transp., Inc. v. Hillsborough Cnty.*, 352 So. 3d 368, 372–73 (Fla. 2d DCA 2022) (in which the State dissolved a special transportation district in Hillsborough County).

[3] Office of Program Pol'y Analysis & Gov't Accountability (OPPAGA), Report No. 04-81, *Central Florida's Reedy Creek Improvement District Has Wide-Ranging Authority* 2 (Dec. 2004), https://oppaga.fl.gov/Documents/Reports/04-81.pdf; *see also* DE87 ¶¶ 31–32.

The revamped District was unusual. Unlike most districts—which typically provide a particular government service—RCID had a lofty mandate to "experiment[]" with "new and advanced concepts" to "create favorable conditions" for a "recreation-oriented community" that would both cement Florida's "leadership as a tourist state" and encourage "newcomers [to] mak[e] Florida their permanent home." Ch. 67-764 at 4–5. To achieve those ends, RCID was given "broad authorities and rights typically reserved for municipal and county governments." OPPAGA Report at 3. For just a few examples, RCID had virtually "exclusive authority [over] the construction of public roads within the District," Ch. 67-764 at 2, "superced[ing]" that "of the State Road Department of Florida and of any other agency or authority of the State," *id.* § 10(2).[4] It could exercise eminent domain even outside the District's "territorial limits"—including "without limitation [upon] property owned by any other political body"—and was shielded from the eminent-domain power of other state entities. *Id.* § 9(5). It was exempt from the State's building and safety codes and could instead adopt codes of its choosing (called the "EPCOT Codes"). *Id.* § 23(2)–(3); OPPAGA Report at 4. It could use public funds to advertise "attractions within the District," Ch. 67-764, § 9(15), and could stretch its boundaries without any authorization from the Legislature, *id.* § 64(1). It could

---

[4] The State Road Department is now part of the Florida Department of Transportation. *See Fla. Dep't of Transp. v. Clipper Bay Invs., LLC*, 160 So. 3d 858, 864 (Fla. 2015).

build and own airports and develop "novel and experimental [transportation] facilities, such as moving platforms and sidewalks." *Id.* § 9(16). It could even generate and transmit "power through nuclear fission," and develop "other new and experimental sources" of energy. *Id.* § 9(17).

RCID's sweeping authority was not its only oddity. Its five-member board of supervisors was elected not by RCID's citizens, but by "landowners" in the District, *id.* § 4(5), and each landowner could cast one vote for roughly "every acre of land" it owned in RCID in every board-member election, *id.* As a result, Disney—RCID's vast-majority landowner—had an electoral monopoly for every board seat, empowering the corporation to hand-select its local regulator. And indeed, since RCID's creation, Disney's chosen candidate has won every board election. *See* OPPAGA Report at 2.

**2.** In 2022, the State determined that RCID was an anomalous entity long overdue for reform. It therefore passed SB 4C in April 2022, which set RCID and several other antiquated districts for dissolution effective June 2023. *See* Ch. 2022-266, § 1(2), Laws of Fla. Later, however, the State concluded that the best course was not to dissolve RCID, but to reform it—just as the State had reformed the Reedy Creek Drainage District to pave way for RCID years before. *See* Ch. 67-764, § 1.

The Legislature thus passed HB 9B. *See* Ch. 2023-5, Laws of Fla. (2023).[5] That bill renamed RCID the "Central Florida Tourism Oversight District" and eliminated the District's land-based electoral scheme in favor of a governing board appointed by the Governor and approved by the Senate. *Id.* §§ 1, 4. The bill also eliminated RCID's exemption from Florida's building and safety codes, *id.* § 10; its near-exclusive control over in-district roadways, *id.* § 9; its abnormal eminent-domain powers, *id.* § 8(5); its capacity to build airports and "novel" transportation facilities, *id.* § 8(14); its right to transform its boundaries without State approval, *compare* Ch. 2023-5, *with* Ch. 67-764 § 64(1); its power to use public funds to advertise "attractions" within the District, *compare* Ch. 2023-5, *with* Ch. 67-764, § 9(15); and its permission to generate and transmit nuclear power or other "experimental" energy sources, Ch. 2023-5 § 8(15).

On February 27, 2023, the Governor signed HB 9B into law and appointed the CFTOD Board members. DE87 ¶ 93. The bill took effect immediately.

**3.** Disney later filed this lawsuit against the Governor and the Secretary of the Department of Economic Opportunity (the State Defendants), along with the new CFTOD Board and CFTOD's Administrator (the CFTOD Defendants). At first, it sued the Defendants both for reorganizing RCID and for invalidating two contracts

---

[5] All references to HB 9B in this motion refer to sections of the amended CFTOD charter, not to the section numeration in HB 9B itself.

that purported to bequeath to Disney much of the sovereign powers previously reserved for RCID. *See* DE25 ¶¶ 176–220. But after Defendants filed their motions to dismiss, Disney amended its complaint to drop the contract-related claims, leaving only its claim that the State reorganized RCID in retaliation for Disney's speech. DE87 ¶¶ 114–24.

## LEGAL STANDARD

In deciding a motion to dismiss, the Court must "assume the veracity of well-pleaded factual allegations" but must not credit mere "labels and conclusions." *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022) (cleaned up). The well-pleaded allegations, "accepted as true," must be sufficient "to state a claim to relief that is plausible on its face." *Id.* (cleaned up). The alleged facts must be "more than merely *possible*, and a plaintiff's factual allegations that are merely consistent with a defendant's liability will not be considered facially plausible." *Id.* (cleaned up; emphasis in original). A claim is plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

For the reasons set forth in the CFTOD Defendants' contemporaneously filed motion to dismiss, the operative complaint fails to state a claim on which relief can

be granted. This motion raises several other independent bases for dismissal: Disney lacks standing to sue the Governor and Secretary, who are also immune from suit.

## I.  DISNEY LACKS STANDING TO SUE THE STATE DEFENDANTS.

The operative complaint fails to plead that Disney has standing to sue the State Defendants. *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). To show standing, Disney must establish "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citation omitted). Because "standing is not dispensed in gross," Disney must demonstrate standing "for each claim that [it] press[es] and for each form of relief that [it] seek[s]." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).

Disney asks this Court to "enjoin[] Defendants from enforcing" SB 4C and HB 9B—the laws reorganizing RCID and reinstituting it as CFTOD—and to declare those laws unenforceable. DE87 ¶ 124. But to establish traceability and redressability, Disney must show that the State Defendants have "the authority to enforce th[ose] particular provision[s] . . . such that an injunction prohibiting enforcement would be effectual." *Support Working Animals*, 8 F.4th at 1201 (citation omitted). Because neither the Governor nor the Secretary enforces SB 4C or HB 9B, Disney cannot meet its burden.

## A.    The Governor

**1.**    The sole legal connection that the Governor has to SB 4C and HB 9B is his authority to appoint members to CFTOD's Board. *See* Ch. 2023-5, § 4. But an official's appointment power is not enough to satisfy *Ex parte Young*'s more-relaxed "some connection" standard,[6] much less Article III's more-stringent traceability requirement. *See Falls*, 2022 WL 19333278, at *1 ("[T]he *Ex parte Young* analysis is, if anything, more lenient than Article III's traceability requirement . . . .").

Despite acknowledging as much in earlier filings, DE58 at 7–8, Disney has argued that this case is different because "the exercise of [the appointment] power *itself* causes" Disney to lose the "voting rights" that secured its electoral stranglehold over the District, *id.* (emphasis added).[7] But it was the Legislature, not the Governor, that repealed the 1967 RCID charter that animated Disney's electoral monopoly. *See* Ch. 2023-5, § 1. The Governor's appointment power is just one aspect of the governmental apparatus that the Legislature created to *replace* RCID's charter. The

---

[6] *See, e.g.*, *Peter B. v. Sanford*, No. 6:10-cv-767, 2010 WL 5684397, at *3 (D.S.C. Dec. 6, 2010) (collecting cases holding that appointment power does not satisfy *Ex parte Young*), *report and recommendation adopted*, No. 6:10-cv-767, 2011 WL 347019 (D.S.C. Feb. 1, 2011); *see also Equal. Fla.*, 2022 WL 19263602, at *8 & n.8; *Denton v. Bd. of Governors*, No. 4:22-cv-341, DE65 at 3–4.

[7] Disney has also suggested that the Governor's appointment power "chill[s]" its "constitutional right to speak." DE58 at 3, 5. But "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). It is not a redressable injury in its own right. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417–18 (2013); *see also Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 761 (11th Cir. 1991).

cause of Disney's alleged injury is thus not the Governor's "*enforcement*" of HB 9B's appointment provision, but the "very *existence*" of HB 9B's repeal provision. *Equal. Fla. v. Fla. State Bd. of Educ.*, No. 4:22-cv-134, 2022 WL 19263602, at *2 (N.D. Fla. Sept. 29, 2022) (plaintiffs lack standing to sue state actors for harms flowing from the mere existence of a law).

Disney has conceded as much in recognizing that the act of "stripp[ing]" its voting rights is distinct from the act of "replacing the locally-elected Board with a new Board appointed by the Governor." DE58 at 8. And that distinction is critical, because again, "standing is not dispensed in gross." *TransUnion LLC*, 141 S. Ct. at 2208. A plaintiff's asserted injury must be "fairly traceable to the defendants' conduct in enforcing the *specific statutory provision* they attack as unconstitutional." *California v. Texas*, 141 S. Ct. 2104, 2120 (2021) (emphasis added); *see also Granite State Outdoor Advert., Inc. v. City of Clearwater*, 351 F.3d 1112, 1117 (11th Cir. 2003) (plaintiff had standing to challenge a provision that harmed him, but lacked standing to challenge other provisions that did not). And the plaintiff must show that "enjoin[ing]" the defendant official from "enforc[ing]" that specific statutory provision would remedy the plaintiff's alleged harm. *Equal. Fla.*, 2022 WL 19263602, at *2.

Enjoining the Governor from appointing new district board members, however, would neither restore RCID's prior electoral scheme nor reinstate Disney's

electoral monopoly. *Id.* Because Disney's alleged voting injury flows solely from the provision dissolving its electoral monopoly—which Disney does not contend the Governor enforces—it cannot show that its injury is traceable to the appointment provision or that it would be remedied by an order enjoining that provision. *See Brokamp v. James*, 66 F.4th 374, 389 (2d Cir. 2023) (plaintiff lacked standing to challenge "entire licensing law" because she was harmed only by a discrete part of it). Enjoining the Governor would therefore "be [in]effectual," and thus, impermissible. *Support Working Animals*, 8 F.4th at 1201.

In arguing otherwise, the only authority Disney has mustered is a single case that the Ninth Circuit got wrong two decades ago. *See* DE58 at 9 (citing *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 699 (9th Cir. 1992)). Disney stressed *Eu*'s holding that a different threshold defense—the Eleventh Amendment—did not bar suit against a governor and secretary of state in a challenge to a statute prescribing the number of judges on the state superior court. *Id.* (citing *Eu*, 979 F.2d at 704). But that dubious holding does not speak to whether Disney has Article III standing to sue the Governor. *See Falls*, 2022 WL 19333278, at *1; *see also Jacobson*, 974 F.3d at 1256 (declining to extend *Ex parte Young* precedent to the standing analysis).

Not even Disney defended *Eu*'s tortured approach to Article III standing. In *Eu*, a plaintiff sued California's governor for a declaration that a statute prescribing the number of judgeships in Los Angeles County was unconstitutional because more

judgeships were necessary to manage the County's overburdened docket. Recognizing that the plaintiff's standing "may appear tenuous" because the governor was powerless to appoint more judges without additional legislation, the Ninth Circuit held (without state opposition) that the plaintiff had standing to sue the governor because the court "assume[d]" it was "substantially likely that the California legislature" would "abide by [the court's] authoritative" declaration, even though the legislature's "members [were] not all parties to th[e] action." *Eu*, 979 F.2d at 700–01.

The Eleventh Circuit has disavowed that reasoning. A party's standing must flow from "*the effect of the court's judgment on the defendant,*" not from "[a]ny persuasive effect a judicial order might have upon" nonparties. *Jacobson*, 974 F.3d at 1254 (quoting *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc)).

**2.** Disney has also claimed (without citation) that it has standing to sue the Governor because his public statements show that he is "functionally in charge" of the Board's actions, DE58 at 10, even though he has no power to remove board members at will, *see generally* Ch. 2023-5, Laws of Fla. In other words, Disney contends that mere political influence is sufficient to support standing. To the contrary, standing to challenge a statute turns on the exercise of governmental power, *i.e.*, *formal power* to enforce the challenged law. *E.g.*, *City of S. Miami v.*

*Governor of Fla.*, 65 F.4th 631, 643 (11th Cir. 2023) (analyzing *only* whether official had formal power to enforce challenged law); *Jacobson*, 974 F.3d at 1253 (same); *Support Working Animals*, 8 F.4th at 1201 (same); *Lewis*, 944 F.3d at 1301 (same). Were it otherwise, a plaintiff could drag anyone—lobbyists for example—with no relevant enforcement authority into countless lawsuits simply by claiming that they hold informal sway over those who do. *But see supra* 10 n.6 (collecting cases holding that plaintiffs could not sue appointing officials for the acts of those they appointed, even when the appointing official also had *removal* authority, *e.g.*, *Peter B.*, 2010 WL 5684397 (plaintiff could not sue governor for board's actions even though he could remove board members under S.C. Code § 44-20-210)); *see also Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022) (governor was not a proper defendant in a challenge to a law that he "publicly advocated" for because he could not enforce the law himself).

Disney's political-influence theory also faces insurmountable traceability and redressability problems. For example, "a plaintiff lacks standing to sue over a defendant's action if an independent source would have caused him to suffer the same injury." *City of S. Miami*, 65 F.4th at 645 (citation omitted). That is one reason an influential lobbyist is not a proper defendant; the challenger's alleged injuries are caused by someone else—the governmental official with enforcement power. Here, the CFTOD Board has "independent obligation[s]" under HB 9B to regulate within

the District. *See id.* at 643. Disney's injuries therefore are not traceable to any authority of the Governor, but to the Board's independent duty to "follow the law[s]" it is entrusted to execute. *Id.*; *see also Univ. Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1033 (6th Cir. 2022) (no standing to sue state attorney general when local officials had independent obligation to enforce the challenged law).

None of the Eleventh Circuit cases that Disney has cited hold otherwise. *See* DE58 at 15. In both *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988), and *Georgia Latino Alliance for Human Rights. v. Governor of Georgia*, 691 F.3d 1250 (11th Cir. 2012), Georgia's governor was a proper defendant because he was *formally charged* with enforcing the challenged parts of Georgia's criminal-justice system. *See City of S. Miami*, 65 F.4th at 644–45 (distinguishing *Luckey* and *Georgia Latino Alliance* on that basis in holding that plaintiffs lacked standing to sue Florida's Governor). The Governor, by contrast, has no comparable formal power.

Nor does Disney find footing in *Culinary Workers Union, Local 226 v. Del Papa*, 200 F.3d 614 (9th Cir. 1999). *See* DE58 at 15. A fractured panel there held that, even if California's attorney general lacked the power to enforce a criminal statute, her formal written threats to enforce the statute or to refer the case to local prosecutors sufficed to establish standing. *Id.* at 618. But Disney points to no such formal threats here. More fundamentally, the Eleventh Circuit has rejected *Del*

*Papa*'s haphazard approach to standing, *e.g.*, *City of S. Miami*, 65 F.4th at 643; *Jacobson*, 974 F.3d at 1253; *Support Working Animals*, 8 F.4th at 1201; *Lewis*, 944 F.3d at 1301, adopting instead the same view as the *Del Papa* dissent: Plaintiffs lack standing when the state defendant "has no power to" enforce the challenged law. *Del Papa*, 200 F.3d at 619 (Brunetti, J., dissenting).

Finally, Disney has suggested that the Governor will "indirectly" coerce the Board through his "suspension powers." DE58 at 10. But the Eleventh Circuit held in *City of South Miami* that the Governor's power to suspend local officials is no basis to sue him regarding a law enforced by those officials. 65 F.4th at 642–43. Much like that case, the complaint here "contains no [allegations]—*none*—that Governor DeSantis would use his suspension authority" to suspend Board members who do not follow his commands. *Id.* at 643. At most, the complaint highlights the commonsense fact that Governor DeSantis has appointed Board members with similar views on how best to regulate tourism in central Florida. *E.g.*, DE87 ¶ 94 (quoting Governor as saying, in reference to the Board, that "[w]hen you lose your way, you've got to have people that are going to tell you the truth"); *see also Kurowski v. Krajewski*, 848 F.2d 767, 770 (7th Cir. 1988) (Easterbrook, J.) ("Holders of the appointing authority may seek to ensure that [their appointees] agree with them" and may thus "consider [the appointees'] views . . . when making the appointment."). That is a far cry from plausibly alleging that the Governor will

suspend divergent Board members or that Board members are regulating Disney only to avoid suspension (rather than to comply with their "independent obligation[s]" under Florida law). *City of South Miami*, 65 F.4th at 645.

## B.    The Secretary

The only connection Disney has identified between the Secretary and the challenged provisions is his ministerial duty "to maintain the Official List of Special Districts." DE87 ¶ 18 (citing Fla. Stat. §§ 189.061, 189.012). But that mine-run bookkeeping act does not animate CFTOD or affect its powers; HB 9B does that. The Secretary's power to maintain that list has no effect on Disney's prior voting rights, which were dissolved not by action of the Secretary, but rather through HB 9B's repeal of RCID's old charter. *Supra* 10–13. And though Disney has vaguely referred to "constitutional injuries" when discussing the Secretary (DE58 at 12), it has never explained what those injuries are or how the Official List inflicts them.

Instead, Disney has argued that its harms are traceable to the Official List because the District is unlawful and "cannot be properly included on the Official List." DE58 at 12. But that merely restates the end-result of Disney's constitutional theory; it says nothing of what *concrete harm* Disney suffers from the District's placement on the Official List. No doubt, Plaintiffs often contend that unlawful acts should be undone, but Article III requires that the act be challenged by someone *actually harmed* by it. *See Granite State*, 351 F.3d at 1117 (plaintiff lacked standing

to challenge an act that did not harm him). And here, Disney's alleged harms flow not from recording the District in the Official List, but from the legislative provisions that reconstituted the District and endowed it with powers.

For similar reasons, Disney cannot show how its injuries would be redressed by erasing the District from the Official List. In that world, Disney would still lack the right to vote for the District's Board, and it would still be regulated by the reconstituted District. Since an injunction against the Secretary would "accomplish nothing, it should not issue." *Hartmann v. Fed. Rsrv. Bank of Phila.*, 55 F. Supp. 801, 810 (E.D. Pa. 1944); *see also Support Working Animals*, 8 F.4th at 1201 (court's injunction must "be effectual"). Federal courts can remedy concrete harms, not order erasure of legal enactments a plaintiff would rather have wiped from the law books. *See Jacobson*, 974 F.3d at 1255 (citing Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018)).

In its final effort to hitch the Secretary to this case, Disney has claimed that the Secretary has "direct statutory responsibility for supervising special districts and enforcing their compliance with law." DE58 at 16. Hardly. The Secretary does not have roving authority to patrol the constitutionality of special districts and their actions. He is responsible only for maintaining their presence on the Official List and supervising their compliance with procedural reporting requirements. *E.g.*, Fla. Stat. § 189.016. That limited authority is not a general power to "enforc[e] their

compliance with law." DE58 at 16. And even if it were, a state official's general duty to enforce the law does not establish standing to sue that official for a local entity's actions. *E.g.*, *Jacobson*, 974 F.3d at 1254; *Lewis*, 944 F.3d at 1300; *see also Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003).

## II. DISNEY'S CLAIMS AGAINST THE STATE DEFENDANTS ARE BARRED BY SOVEREIGN IMMUNITY.

The Eleventh Amendment bars federal-court litigation against the State unless the immunity is waived or validly abrogated by Congress. *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). Under *Ex parte Young*, 209 U.S. 123 (1908), there is an exception for suits seeking prospective injunctive relief against individual state officials who "enforce the law . . . at issue in the suit." *Grizzle*, 634 F.3d at 1319. But as described above, neither the Governor nor the Secretary enforces SB 4C or HB 9B. Those acts are enforced, at most, by CFTOD's Board and Administrator— entities animated by the tandem of SB 4C and HB 9B.

Disney's attempts to link the State Defendants to those laws are unpersuasive. Disney focuses on the Governor's role in signing SB 4C and HB 9B, *e.g.*, DE87 ¶ 17, but signing a law is not "enforcing" a law, *cf. Jacobson*, 974 F.3d at 1257; *Support Working Animals*, 8 F.4th at 1204, and the Governor is entitled to absolute legislative immunity for that act in any event, *infra* 21; DE49 at 19–24. Nor does the Governor's power to appoint CFTOD Board members establish an adequate connection to the challenged acts, *supra* 10 n.6 (collecting cases holding that the

power to appoint enforcing officials does not make the appointing official an *Ex parte Young* defendant); *see also Equal. Fla. v. Fla. State Bd. of Educ.*, No. 4:22-cv-134, 2022 WL 19263602, at *8 & n.8 (N.D. Fla. Sept. 29, 2022) (observing that an official's appointment power did not suffice to make him an *Ex parte Young* defendant, and that the plaintiffs had specifically "withdr[awn] their claims against the Governor because of Eleventh Amendment immunity, even though the Governor" had appointment power); *Denton v. Bd. of Governors*, No. 4:22-cv-341, DE65 at 3–4. The Governor's general power to suspend local officials, too, does not establish a sufficient enforcement connection under *Ex parte Young. See Women's Emergency Network*, 323 F.3d at 949 ("A governor's 'general executive power' is not a basis for jurisdiction in most circumstances."). Nor is the Secretary's clerical role of jotting CFTOD's name in the state record the type of enforcement responsibility that waives sovereign immunity. *Cf. Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532–33 (2021) (ministerial actors do not enforce laws).

The Court should thus dismiss the claims against the State Defendants on sovereign-immunity grounds. *See Tex. All. for Retired Americans v. Scott*, 28 F.4th 669, 672–74 (5th Cir. 2022) (dismissing Texas Secretary of State on sovereign-immunity grounds because he did not enforce the challenged provisions).

## III. TO THE EXTENT DISNEY CHALLENGES THE GOVERNOR'S LEGISLATIVE ACTS, ITS CLAIMS ARE BARRED BY LEGISLATIVE IMMUNITY.

Disney's complaint is chock full of allegations about the Governor's legislative actions. It alleges that the Governor "called on the Legislature to pass bills to punish Disney for its speech," DE87 ¶ 17; "signed [the bills] into law," *id.*; and "would not have promoted or signed" the bills "but for [a] desire to punish Disney," *id.* ¶ 119. The Governor has previously explained (DE49 at 19–24) that all those acts are legislative in nature, *see In re Hubbard*, 803 F.3d at 1308, and thus are protected by absolute legislative immunity, *see Women's Emergency Network*, 323 F.3d at 950.

In response to the Governor's argument, Disney disavowed any desire to challenge the Governor's legislative acts and insisted that it challenges only the Governor's *executive* actions: his appointment power and his purported control over the Board's actions. DE58 at 17–20. As for the claims that Disney still presses, Disney lacks standing to sue the Governor for those actions and has not overcome his sovereign immunity for the reasons discussed above.

## IV. DISNEY FAILS TO STATE A CLAIM.

Finally, the State Defendants adopt and incorporate the additional arguments raised in the CFTOD Defendants' motion to dismiss.

## CONCLUSION

For these reasons, the Court should dismiss the operative complaint, or at minimum, dismiss all claims against the State Defendants.

Dated: September 28, 2023

Respectfully submitted,

ASHLEY MOODY
  *Attorney General of Florida*

JOHN GUARD (FBN 374600)
  *Chief Deputy Attorney General*

JAMES H. PERCIVAL (FBN 1016188)
  *Chief of Staff*

*/s/ Henry C. Whitaker*
HENRY C. WHITAKER (FBN 1031175)
  *Solicitor General*

DANIEL W. BELL (FBN 1016188)
  *Chief Deputy Solicitor General*

DAVID M. COSTELLO (FBN 1004952)
  *Deputy Solicitor General*

**OFFICE OF THE ATTORNEY GENERAL**
The Capitol, PL-01
Tallahassee, FL 32399
(850) 414-3300
*henry.whitaker@myfloridalegal.com*

*Counsel for Governor DeSantis and
Secretary Kelly*

## CERTIFICATE OF COMPLIANCE

This motion complies with the requirements of Local Rule 7.1(F) because it contains 5,089 words.

*/s/ Henry C. Whitaker*
Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2023, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Henry C. Whitaker*
Solicitor General