# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

WALT DISNEY PARKS AND RESORTS,
U.S., INC.,

                 Plaintiff,

     v.

RONALD D. DESANTIS, in his official
capacity as Governor of Florida;
MEREDITH IVEY, in her official capacity
as Acting Secretary of the Florida
Department of Economic Opportunity;
MARTIN GARCIA, in his official capacity
as Board Chair of the Central Florida
Tourism Oversight District; MICHAEL
SASSO, in his official capacity as Board
Member of the Central Florida Tourism
Oversight District; BRIAN AUNGST, JR.,
in his official capacity as Board Member
of the Central Florida Tourism Oversight
District; RON PERI, in his official
capacity as Board Member of the Central
Florida Tourism Oversight District;
BRIDGET ZIEGLER, in her official
capacity as Board Member of the Central
Florida Tourism Oversight District; and
GLENTON GILZEAN, JR., in his official
capacity as Administrator of the Central
Florida Tourism Oversight District,

     Defendants.

Case No. 4:23-cv-00163-AW-MJF

## PLAINTIFF'S OPPOSITION TO CFTOD DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

BACKGROUND ...............................................................................6

    A.    For Decades, The Special District Created Enormous Public Benefits By Facilitating Disney's Development Of Its Private Property Into A World-Class Tourist Destination ..............................6

    B.    Disney Comments On Pending Legislation, Prompting State Retaliation ...............................................................8

    C.    The Governor And Legislature Hastily Dissolve The RCID ............10

    D.    In Their Haste To Punish Disney, The Governor And Legislature Ignored Obvious Adverse Consequences From Dissolving RCID, Forcing The State To Reconstitute RCID As A Governor-Controlled "State Receivership" ..................................13

    E.    Procedural History.............................................................16

LEGAL STANDARD...........................................................................17

ARGUMENT ...............................................................................17

I.    INQUIRY INTO THE CHALLENGED LAWS' MOTIVES IS NOT PROHIBITED..............................................................................18

    A.    *Hubbard* Does Not Apply To Attainder-Like Laws That Single Out One Entity For Unfavorable Treatment As Punishment For Its Protected Speech ..................................20

    B.    The *O'Brien/Hubbard* Limitation On Inquiry Into Hidden Legislative Motives Does Not Apply Here, Where The Motive Is Openly Admitted And Celebrated..................................26

II.    STATE LAWS RELATING TO GOVERNMENT STRUCTURE ARE NOT IMMUNE FROM CONSTITUTIONAL SCRUTINY .............27

CONCLUSION ...............................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC v. Elenis,*
143 S. Ct. 2298 (2023) ....................................................................2, 4

*Bailey v. Wheeler,*
843 F.3d 473 (11th Cir. 2016).................................................... 17, 25

*Bakalich v. Vill. of Bellwood,*
2006 WL 1444893 (N.D. Ill. May 17, 2006) ............................... 22, 25

*Beckwith v. City of Daytona Beach Shores,*
58 F.3d 1554 (11th Cir. 1995)...................................................4

*Bethune-Hill v. Va. State Bd. of Elections,*
580 U.S. 178 (2017) ................................................................ 18, 28

*Board of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,*
512 U.S. 687 (1994) .................................................................28

*Bond v. Floyd,*
385 U.S. 116 (1966) .................................................................29

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.,*
942 F.3d 1215 (11th Cir. 2019)..................................................3

*Christian Legal Soc'y of the Univ. of Cal., Hastings Coll. Of the L. v. Martinez,*
561 U.S. 661 (2010) .................................................................2

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
508 U.S. 520 (1993) .................................................................19

*Citizens United v. FEC,*
558 U.S. 310 (2010) ................................................................2, 4

*Crawford-El v. Britton,*
523 U.S. 574 (1998) .................................................................4

*Echols v. Lawton,*
913 F.3d 1313 (11th Cir. 2019) .................................................3

*Georgia Ass'n of Educators v. Gwinnett Cnty. Sch. Dist.,*
856 F.2d 142 (11th Cir. 1988).................................................3, 22

*Goldberg v. Whitman,*
743 F. Supp. 943 (D. Conn. 1990) .............................................22

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ...................................................................... 27, 28

*Hartman v. Moore*,
  547 U.S. 250 (2008) .............................................................................4

*Holloman ex rel. Holloman v. Harland*,
  370 F.3d 1252 (11th Cir. 2004) ...........................................................3

*Hunt v. Aimco Props., L.P.*,
  814 F.3d 1213 (11th Cir. 2016) .........................................................17

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. Of Bos.*,
  515 U. S. 557 (1995) ...........................................................................2

*Kurowski v. Krajewski*,
  848 F.2d 767 (7th Cir. 1988) ....................................................... 30, 32

*Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*,
  429 U.S. 274 (1977) ...........................................................................25

*NetChoice LLC v. Att'y Gen., Fla.*,
  34 F.4th 1196 (11th Cir. 2022) .............................................................4

*Perry v. Sindermann*,
  408 U.S. 593 (1972) .............................................................................3

*Rankin v. McPherson*,
  483 U.S. 378 (1987) .............................................................................3

*Renfroe v. Nationstar Mortg., LLC*,
  822 F.3d 1241 (11th Cir. 2016) .........................................................17

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
  515 U.S. 819 (1995) .............................................................................3

*Rucho v. Common Cause*,
  139 S. Ct. 2484 (2019) .......................................................................29

*Rutan v. Republican Party of Ill.*,
  497 U.S. 62 (1990) .............................................................................32

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ...........................................................................19

# TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*State v. Reedy Creek Improvement Dist.*,
216 So. 2d 202 (Fla. 1968) ...................................................................8

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ...........................................................................17

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ...........................................................................19

*United States v. O'Brien*,
391 U.S. 367 (1968) ..................................................... 20, 21, 26, 27

*United States v. Schwimmer*,
279 U.S. 644 (1929) .............................................................................2

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ...........................................................................27

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) .............................................................................1

*Wisconsin Education Association Council v. Walker*,
705 F.3d 640 (7th Cir. 2013)..............................................................26

**Statutes**

1967 Fla. Laws 256, Ch. 67-764...............................................................7

2023 Fla. Laws 2023-336, HB 1169........................................................25

2023 Fla. Laws 2023-6, HB 11B .............................................................25

2023 Fla. Laws 2023-7, HB 13B .............................................................25

Fla. Stat. § 189.072(2)(a) .......................................................................11

**Other Authorities**

Carlos Cristian Flores, *Gov. Ron DeSantis Stops In Greenville As Part Of Presidential Campaign*, WYFF4 (June 2, 2023),
https://www.wyff4.com/article/gov-ron-desantis-stops-in-south-carolina-part-of-presidential-campaign/44081754 ........................................................15

Jesse Watters Primetime, *We're Launching An Inquiry About Bud Light and InBev: Ron DeSantis*, FOX NEWS (July 21, 2023),
https://www.foxnews.com/video/6331582098112...............................15

# INTRODUCTION

Defendants are right about one thing:  this case involves "a frontal assault" on a "bedrock principle of our constitutional order."  CFTOD Defs' Mem. of Law in Supp. of Mot. to Dismiss Second Amended Complaint at 1, ECF No. 93-1 ("Mem.").  Governor DeSantis and his allies are engaged in an ongoing constitutional mutiny.  They openly reject the foundational First Amendment rule that a state cannot deploy its official powers to punish the expression of disfavored political viewpoints.  Consistent with that outlook, their motion to dismiss rests explicitly on the premise that states are free to wield the "structure and composition" of representative political institutions as cudgels against those who express opinions not acceptable to the ruling party.  Mem. 1.  That premise is not just legally unsupported, it is profoundly un-American.  The motion should be denied.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  In defiance of that cherished principle, the State of Florida has explicitly committed to prescribing which political viewpoints are allowed and to punishing

1

citizens whose speech "crosses the line" into unapproved territory.  Walt Disney

Parks and Resorts, U.S., Inc. ("Disney")—which has proudly called Florida home

for more than 50 years—is an especially prominent target of the State's attacks on

free speech, one with the resources to hold the State accountable for its

wrongdoing.  But if the State's strategy succeeds, Disney will assuredly not be the

last entity punished for espousing disfavored viewpoints.  If the line is not drawn

here, there is no line at all.

"Premised on mistrust of governmental power, the First Amendment stands

against attempts to disfavor certain subjects or viewpoints." *Citizens United v.*

*FEC*, 558 U.S. 310, 340 (2010).  The First Amendment "protects an individual's

right to speak his mind" even if "the government considers his speech . . . deeply

'misguided.'" *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023) (quoting

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574

(1995)).  Indeed, the "proudest boast of our free speech jurisprudence is that we

protect the freedom to express 'the thought that we hate.'" *Christian Legal Soc'y*

*of the Univ. of Cal., Hastings Coll. Of the L. v. Martinez*, 561 U.S. 661, 706 (2010)

(Alito, J., dissenting) (quoting *United States v. Schwimmer*, 279 U.S. 644, 654-55

(1929) (Holmes, J., dissenting)).  For that reason, "[o]ne of the most egregious

types of First Amendment violations is viewpoint-based discrimination," *Holloman*

*ex rel. Holloman v. Harland*, 370 F.3d 1252, 1279-80 (11th Cir. 2004), which "occurs 'when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the regulation,'" *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1240-41 (11th Cir. 2019) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-29 (1995)).

The same principle underlies "the right to be free from retaliation" for expressing a viewpoint a state wants to suppress. *Echols v. Lawton*, 913 F.3d 1313, 1320 (11th Cir. 2019). It is long-settled that "even though a person has no 'right' to a valuable government benefit, and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely," including the recipient's failure to conform to state-approved viewpoints. *Georgia Ass'n of Educators v. Gwinnett Cnty. Sch. Dist.*, 856 F.2d 142, 144 (11th Cir. 1988) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)); *see Rankin v. McPherson*, 483 U.S. 378, 383 (1987) (even where probationary employee "could have been discharged for any reason or for no reason at all," she could not be discharged "on a basis that infringes [her] constitutionally protected interest in freedom of speech"). "Official reprisal for protected speech offends the Constitution" not because the benefit itself is constitutionally inviolable, but because revoking the benefit for punitive reasons

3

"threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (quotation omitted); *see Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1563 (11th Cir. 1995) ("although a retaliatory discharge claim by a state employee involves the denial of the state-created benefit of employment, the right upon which a retaliatory government employment decision infringes is the right to free speech, not the right to a job"). Retaliation for protected speech "is thus akin to an 'unconstitutional condition' demanded for the receipt of a government-provided benefit." *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998).

These core constitutional principles apply fully to businesses, which, "like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster." *Citizens United*, 558 U.S. at 343 (quotation omitted). Speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech." *303 Creative*, 143 S. Ct. at 2316. Accordingly, "with minor exceptions," a state cannot tell businesses "what to say or how to say it." *NetChoice LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1203 (11th Cir. 2022).

Governor DeSantis disagrees. In his view, corporations in America must remain "merely economic[] actors," and when they dare to "become political" and

seek to "advance a political agenda" that does not conform to the ruling party's program, government power should be deployed against them to snuff out their disfavored views.  Second Amended Complaint for Declaratory & Injunctive Relief ¶ 89, ECF No. 87 ("SAC"); *see id.* ¶¶ 47-48, 50-51, 56, 58-60, 65, 72-73, 87, 90, 99, 105-107, 111-112, 103.  Disney has been the central target of the Governor's weaponized State—a retaliatory campaign he launched because, as his memoir declares, Disney "crossed a line" by expressing the wrong view in a political debate, which he views as a "textbook example of when a corporation should stay out of politics."  *Id.* ¶¶ 60, 90.

The retaliation against Disney for crossing the Governor's "line" was swift and severe:  for the explicitly-stated purpose of punishing Disney for its comments, the State immediately stripped Disney of its voting rights in the governing body that oversees Disney's use of its own private property.  In place of the longstanding landowner-elected board, the State installed a Governor-controlled board specifically charged with using its land-use powers to control Disney's speech. The new board's express mandate was to stop Disney from "trying to inject woke ideology" into its programming in favor of "the type of entertainment that all families can appreciate."  *Id.* ¶ 95.  To achieve that objective, the Governor declared that the board would use its powers to antagonize Disney and undermine

its interests.  For example, he announced that the board might approve use of Disney-adjacent property for development of rival "amusement parks" or even construction of a "state prison"—the "possibilities are endless." *Id.* ¶ 103. "Buckle up," he warned, there's "going to be more coming down the pike." *Id.* ¶ 101.

Defendants now seek what is, in effect, immunity for their openly retaliatory actions.  They contend that a legislature's retaliatory motive is exempt from judicial scrutiny *even if* it is publicly expressed and undiluted by other statements of lawful intent.  And they similarly contend that courts are categorically barred from examining the basis on which government institutions are established and structured, *even if* an unlawful objective is publicly declared.  Those contentions are as wrong as they sound.  For the reasons set forth in this memorandum, the motion should be denied.

## BACKGROUND

### A.   For Decades, The Special District Created Enormous Public Benefits By Facilitating Disney's Development Of Its Private Property Into A World-Class Tourist Destination

Before 1963, much of central Florida comprised undeveloped swampland. SAC ¶¶ 7, 31-32.  That year, Walt Disney began purchasing tens of thousands of acres of land in the area, with a vision to develop his property into a major theme park and world-class tourist destination.  *Id.*  Recognizing that massive public

6

benefits would flow from Disney's successful development of his property, in 1966 the State created the Reedy Creek Drainage District to facilitate Disney's efforts to drain the property so construction would be feasible.  *Id.* ¶ 32.  In 1967, the Legislature established the Reedy Creek Improvement District ("RCID"), with expanded authority over Disney's property, in the Reedy Creek Enabling Act ("RCID Act"), 1967 Fla. Laws 256, Ch. 67-764.  Because "the economic progress and well-being of the people of Florida depend in large measure upon the many visitors and new residents who come to Florida," the RCID Act tasked the District with fostering a new "recreation-oriented community" anchored by Disney's planned development of its property to spur additional growth in the area.  SAC ¶ 33 (quoting RCID Act at 4-5).  Like many other Florida special districts, RCID was governed by a board elected by the landowners whose property the district oversees, based on one-acre, one-vote principles.  *Id.* ¶¶ 39, 82.

The Legislature specifically found that the Act's vitally important public purpose of promoting effective development of private property could only be achieved "through a special taxing district" that centralized certain government powers over land-use regulation and infrastructure development.  *Id.* ¶ 33.  These powers included providing for "the reclamation, drainage and irrigation of land,"

"water and sewer systems and waste collection and disposal facilities," "public transportation and public utilities," and "streets, roads, [and] bridges." *Id.*

RCID was immediately challenged as an improper special deal for Disney that lacked adequate public benefits. *Id.* ¶ 34. The Florida Supreme Court squarely rejected that challenge, holding that RCID's "multi-purpose powers" were "essential to the realization of a valid public purpose," which was "essentially and primarily directed toward encouraging and developing tourism and recreation for the benefit of citizens of the state and visitors to the state generally." *State v. Reedy Creek Improvement Dist.*, 216 So. 2d 202, 205-06 (Fla. 1968).

RCID served the region for decades thereafter, leveraging Disney's development of its private property into broader regional economic growth. As RCID's primary landowner and taxpayer, Disney helped transform Central Florida into a thriving tourism hub. *Id.* ¶¶ 36-37, 38-39.

**B.   Disney Comments On Pending Legislation, Prompting State Retaliation**

Florida's Parental Rights in Education Act ("HB 1557") sparked vigorous public debate. *Id.* ¶¶ 40-41. As a Florida corporation with many thousands of affected employees and patrons, Disney chose to participate in the public discourse in opposition to the bill. *Id.* ¶ 42. On March 9, 2022, the then-CEO of Disney's parent company called Governor DeSantis personally to express concerns about

8

the bill.  *Id.*  In his memoir, the Governor says it was a "mistake" for Disney to speak out and explains that he warned the CEO that Disney "shouldn't get involved" because "it's not going to work out well for you."  *Id.* ¶ 43.

Disney was undeterred.  Its first public comments stated:  "To ALL who come to this happy place, welcome.  Disney Parks, Experiences and Products is committed to creating experiences that support family values for every family, and will not stand for discrimination in any form.  We oppose any legislation that infringes on basic human rights, and stand in solidarity and support our LGBTQIA+ Cast, Crew, and Imagineers and fans who make their voices heard today and every day."  *Id.* ¶ 45.  After the Governor signed the bill, Disney stated it "never should have been signed into law," and that its "goal as a company is for this law to be repealed by the [l]egislature or struck down in the courts."  *Id.* ¶ 46. In the Governor's view, this statement "crossed the line" and he pledged "to make sure we're fighting back" in response.  *Id.* ¶ 47.  As a result, he said, "[t]hings got worse for Disney."  *Id.* ¶ 48.

The Governor cited Disney's opposition to HB 1557 as a "textbook example of when a corporation should stay out of politics."  *Id.* ¶ 90.  He asserted that businesses have a duty to remain "merely economic[] actors," and that states must "stand up and fight back" when businesses seek "to advance a political agenda,"

"as Disney did." *Id.* ¶ 89.  The Governor reserved his ability to specially punish

businesses that do not conform their speech to his own preferred ideology,

emphasizing that he would wield official State power against them to make Florida

"the state where woke goes to die." *Id.*

### C.    The Governor And Legislature Hastily Dissolve The RCID

The Governor's first retaliatory strike was to dissolve the special district that

had long overseen Disney's use of its own property.  *Id.* ¶ 50.  His memoir

recounts secret plotting with legislative leaders, whom he solicited to join his plan

on the condition that they "work on this in a very tight circle" with "no leaks." *Id.*

"We need the element of surprise," he warned, "nobody can see this coming." *Id.*

As one legislative ally stated, the plan was to dissolve the District as a "fitting"

punishment of Disney for its choice to "embrace" a disfavored "ideology." *Id.*

The Governor was unambiguous:  dissolving the District would make clear that the

State was "not going to bend a knee to woke executives in California" any longer.

*Id.* ¶ 51.

The bill dissolving RCID—SB 4C—went from proposal to passage almost

overnight.  The Governor called a special extended session on April 19 to consider

the bill, which the Senate approved on April 20 and the House approved on April

21.  *Id.* ¶¶ 52, 64.  There was no meaningful legislative research or findings.

Whereas past bills dissolving other Florida special districts included various

provisions accounting for disposition of district property, assets, and debts, the

RCID dissolution bill included nothing of the kind.  *Id.* ¶¶ 61-62.  The legislative

analysis accompanying SB 4C did not discuss its economic impact, and the House

enacted its version in less than five minutes with no debate.  *Id.* ¶¶ 63-64.  Neither

Orange nor Osceola County was afforded an opportunity to study or analyze the

effect eliminating RCID would have on its residents and businesses.  *Id.* ¶ 64.

     To avoid triggering certain procedural impediments, SB 4C was nominally

written to encompass five other special districts—out of almost 2,000 statewide—

that also were created before promulgation of the 1968 Florida Constitution.  *Id.*

¶¶ 52-54.  The enacted bill provided that "any independent special district

established by a special act prior to the date of ratification of the Florida

Constitution on November 5, 1968, and which was not reestablished, re-ratified, or

otherwise reconstituted by a special act or general law after November 5, 1968, is

dissolved effective June 1, 2023."  *Id.* ¶ 57.[1]  Nothing in the sparse legislative

record reflects any concerns about these five pre-1968 districts.  In fact, the

Governor admitted that he only "found" the "handful of other districts" *after* his

---

[1] The bill contravened Florida law explicitly prohibiting the dissolution of an independent special district absent approval by a majority of the district's electors or landowners.  Fla. Stat. § 189.072(2)(a).

"staff worked with the legislative staff in the House" to target Disney and RCID. *Id.* ¶ 54.

The Governor and the Legislature were perfectly candid about the retaliatory motive underlying SB 4C, repeatedly stating in the public record that SB 4C was enacted specifically to punish Disney for its disfavored speech.  The day after expanding the special session to dissolve RCID, the Governor declared that "Disney and other woke corporations won't get away with peddling their unchecked pressure campaigns any longer."  *Id.* ¶ 56.  He said nothing about other long-standing districts.  He later added that while dissolving RCID would have been "unthinkable just a few months before," it became possible *only* because "Disney had clearly crossed a line" by opposing HB 1557.  *Id.* ¶ 60.  In signing SB 4C, the Governor emphasized that Disney's public statements had been "a provocation," and that dissolving RCID was part of the State's effort "to fight back against" Disney's opposition to his political agenda.  *Id.* ¶ 66.  The bill's House sponsor agreed: "You kick the hornet's nest, things come up.  And I will say this: You got me on one thing, this bill does target one company.  It targets The Walt Disney Company."  *Id.* ¶ 59.  A Senate supporter declared that "Disney is learning lessons and paying the political price of jumping out there on an issue."  *Id.* ¶ 65.

**D.    In Their Haste To Punish Disney, The Governor And Legislature Ignored Obvious Adverse Consequences From Dissolving RCID, Forcing The State To Reconstitute RCID As A Governor-Controlled "State Receivership"**

Given the haste to punish Disney by dissolving RCID, it is unsurprising that serious consequences were not considered and problems immediately arose.  In particular, dissolution would have required shifting liability for approximately $1 billion in outstanding District bond obligations from District taxpayers (mainly Disney) to the State.  *Id.* ¶¶ 68-69.  For months, the Governor and Legislature sat idle, seemingly without a plan for resolving the predictable bond problems created in their rush to make Disney pay a price for speaking out and angering the Governor.  *Id.* ¶¶ 74-76.

The Governor finally proposed a solution in October 2022 that eventually resulted in enactment of HB 9B, which reversed the District's dissolution and created a "successor agency" called the "Central Florida Tourism Oversight District" ("CFTOD") to "function essentially unchanged" from RCID, leaving intact all preexisting contracts, debts, bonds, and other liabilities.  *Id.* ¶¶ 77, 84. But there was one major difference:  the District's governing Board would no longer be elected by and accountable to District property owners, but instead would be appointed by the Governor and accountable only to him.  *Id.* ¶¶ 39, 77,

13

82-83.  The new Board would be "state-controlled" and function as a "state receivership."  *Id.* ¶¶ 79, 88.

The Governor and Legislature again were explicit that punishing Disney for its speech was the reason they eliminated local landowner voting rights in favor of unilateral Tallahassee control.  The Legislature "joined with the Governor in saying it was Disney's decision to go from an apolitical, safe 25,000 acres, and try to be involved in public policy" that motivated the new Board structure.  *Id.* ¶ 87. In other words, by enacting HB 9B, the Legislature was "saying" to Disney that by engaging in political debate, Disney had "changed the terms of our agreement, therefore we will put some authority around what you do."  *Id.*

The Governor likewise continued to reaffirm the State's retaliatory motive for granting him control over Disney's use of its own property.  In March of this year, the Governor's campaign circulated an email accusing "Woke Disney" of "echoing Democrat propaganda," *id.* ¶ 44, and the Governor published an opinion piece entitled "Why I Stood Up to Disney," which summarized his belief that governments should attack and undermine businesses that express certain political viewpoints.  *Id.* ¶ 89 n.58.  The Governor has continually reiterated the point, just recently reiterating that the State "[s]tood [u]p to Disney" specifically because it opposed his position on HB 1557 and that governments must "do battle" with

14

businesses when they express similar viewpoints.  Carlos Cristian Flores, *Gov. Ron DeSantis Stops In Greenville As Part Of Presidential Campaign*, WYFF4 (June 2, 2023), https://www.wyff4.com/article/gov-ron-desantis-stops-in-south-carolina-part-of-presidential-campaign/44081754.  He likewise recently boasted that when "corporations get involved in politics" and join others in "trying to change society," then "we"—the official apparatus of the State—"fight back against that. We did that against Disney and others, and that's important."  Jesse Watters Primetime, *We're Launching An Inquiry About Bud Light and InBev: Ron DeSantis*, FOX NEWS (July 21, 2023), https://www.foxnews.com/video/6331582098112.  The Governor has lauded his government's power to suppress disfavored political speech, declaring that "[s]ince our skirmish last year," Disney has "not made a peep."  SAC ¶ 112.

Given that overwhelming and unambiguous record, Defendants cannot in good faith deny the State's retaliatory motive in dissolving RCID and imposing a Governor-controlled receivership to regulate and disrupt Disney's preexisting property development plans.  Citing nothing, they assert that the Governor and Legislature "decided that the existing structure of RCID did not adequately serve the interests of the State of Florida, its voters, or the other individuals and entities who owned land within the District but lacked adequate representation."  Mem. 3.

The assertion is sheer post hoc fabrication, squarely at odds with both the extensive public record and the facts alleged in the complaint, which must be accepted as true.  For purposes of this motion—and in reality—there is no ambiguity:  RCID was dissolved specifically to punish Disney for expressing viewpoints disfavored by the State's ruling party, just as State leaders declared at the time, and just as Governor DeSantis continues to declare to anyone who will listen.

### E.    Procedural History

Taking the State's threats at face value, Disney entered contracts to secure its preexisting development rights and plans.  The State and the new Board retaliated by abrogating the contracts.  Disney filed suit to challenge both the abrogation of its contract rights and the elimination of its voting rights and other privileges.  Rather than defend its contracts before this Court, CFTOD sued in state court to invalidate the contracts.  Disney moved to dismiss CFTOD's state case as moot given the state statute specifically abrogating the challenged contracts, but the court allowed the challenge to proceed.  Because the state-court suit will now continue, Disney elected not to pursue parallel tracks on its own contract claims and thus withdrew those claims—and only those claims—from this suit.  Disney hardly "fled this venue," as Defendants assert.  Mem. 6.  Just the opposite:  it was *Defendants* who sought to avoid adjudication in this Court through their now-

16

abandoned abstention motion, and it is *Disney* that seeks to continue its core First Amendment challenge in this Court.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the Court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). "To survive a motion to dismiss, a complaint need only present sufficient facts, accepted as true, to state a claim to relief that is plausible on its face." *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1243 (11th Cir. 2016) (quotations omitted). In ruling on the motion, the Court may consider not only the complaint itself but also "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

## ARGUMENT

To state a First Amendment retaliation claim, the plaintiff must allege that "(1) he engaged in protected speech; (2) the defendant's conduct adversely affected the protected speech; and (3) a causal connection exists between the speech and the defendant's retaliatory actions." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016). The factual allegations of the complaint, taken as true, easily satisfy those

elements:  Disney engaged in protected speech in commenting on HB 1557; the State punished Disney's speech by eliminating its voting rights and imposing a "state receivership" Board to frustrate Disney's development plans and control its programming; and the State's actions were taken specifically for the purpose of coercing Disney and others into compliance with the State's political orthodoxy.

Defendants do not meaningfully contest the foregoing points.  They instead essentially claim immunity from liability, *even assuming* the State acted for the unlawful purpose of retaliating against Disney for violating the State's unwritten Speech Code.  First, they contend that even when evidence of unlawful animus is both overwhelming and undisputed—as it is here—courts are barred from considering such evidence in a challenge to a facially non-discriminatory law. Mem. 7-11.  Second, Defendants assert that laws relating to the structure of government are immune from First Amendment challenges.  Mem. 11-13.  Neither argument has merit.

## I.   INQUIRY INTO THE CHALLENGED LAWS' MOTIVES IS NOT PROHIBITED

Defendants first argue that under *In re Hubbard*, 803 F.3d 1298 (11th Cir. 2015), courts are categorically barred from considering the motives of a legislature in evaluating a challenge to a law that is facially non-discriminatory.  Mem. 7-11. But courts frequently inquire into legislative motive to determine whether a

facially constitutional statute was enacted for an impermissible purpose. *See*, *e.g.*, *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 179, 189-90 (2017) (in redistricting case, considering evidence of "actual considerations" underlying district lines because facially-neutral lines are unlawful "if race is the overriding reason for choosing one map over others"); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("Even if the hypothetical measure on its face appeared neutral as to content and speaker, its purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional."); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 540-41 (1993) (invalidating facially-neutral statute based on legislative record showing intent to discriminate against religious exercise); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 645 (1994) ("even a regulation neutral on its face" can have "manifest purpose" to "regulate speech because of the message it conveys").

*Hubbard* does not and could not tacitly overrule those decisions, and in any event it does not apply here for two reasons. First, *Hubbard*'s limitation on inquiry into legislative motive explicitly applies only to *generally-applicable* laws, not to laws targeted at an easily identifiable entity whose speech the state seeks to punish. Second, SB 4C and HB 9B differ dramatically from the laws in *Hubbard* and

similar cases in the scope and uniformity of the public legislative record developed
to justify enactment of the laws.

### A. *Hubbard* Does Not Apply To Attainder-Like Laws That Single Out One Entity For Unfavorable Treatment As Punishment For Its Protected Speech

The rule applied in *Hubbard* and invoked by Defendants does not apply to
targeted laws like SB 4C and HB 9B.

In *Hubbard*, one public-sector union challenged a generally-applicable law
that prohibited all state and local government employees from arranging for payroll
deductions to contribute to any organization that would use the contribution for
political purposes.  803 F.3d at 1301.  The union argued that the law had been
enacted for the impermissible purpose of retaliating against *that union specifically*
"for its past opposition to education policy proposals" advanced by state officials.
*Id.* at 1304.  The Eleventh Circuit held that the claim was not viable, citing other
appellate decisions rejecting similar challenges by individual unions seeking to
establish that generally-applicable payroll-deduction laws were secretly motivated
by a broad legislative desire to punish one particular union for disfavored speech.
*Id.* at 1313.  Like *Hubbard*, those decisions rejected such claims under the
principle stated in *United States v. O'Brien*, 391 U.S. 367 (1968), that courts will

not "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."  803 F.3d at 1312 (quoting *O'Brien*, 391 U.S. at 383).

As *Hubbard* itself acknowledges, the *O'Brien* principle is subject to "limitations."  *Id.* at 1312 n.14.  Most significantly, the principle does not apply when "the very nature of the constitutional question requires an inquiry into legislative purpose," including when needed "to determine whether the statutes under review were punitive in nature," similar to cases "involving . . . bill[s] of attainder."  *O'Brien*, 391 U.S. at 383 n.30.  Judge Posner's opinion in *Fraternal Ord. of Police Hobart Lodge No. 121, Inc. v. City of Hobart*, 864 F.2d 551 (7th Cir. 1988), elaborates the reasons that inquiry into legislative motive is permissible for targeted, attainder-like statutes.  When a statute operates "wholesale"—as most do—there are normally many reasons for enacting the law, and a broad category of affected parties is "somewhat more likely to have political remedies" to respond to the law.  *Id.* at 555-56.  But when a statute is "easily pinpointed against particular" actors, it is easier for a court to identify a punitive motive, and especially important to do so because an individual actor may not have an effective political response. *Id.*  For these reasons, statutes that "single out particular individuals or groups for benefits or burdens" are "subject to a more exacting scrutiny" under the First

Amendment, requiring the "more beady-eyed examination of motive" appropriate for attainder-like statutes. *Id.* at 554-56.

Many courts have recognized that *O'Brien*'s limits on legislative-motive inquiry do not apply to laws that pinpoint specific entities. Most importantly, in *Hubbard* itself, the Eleventh Circuit cited its own precedent in *Gwinnett County*, which held that a union could rely on improper legislative motive in asserting a First Amendment retaliation claim against a law that applied specifically to that union. *Hubbard*, 803 F.3d at 1314 (citing *Gwinnett Cnty.*, 856 F.2d at 144-45). According to *Hubbard*, inquiry into legislative motive was permissible in *Gwinnett* because the law was not "a generally applicable policy," but instead "specifically singled out" the union and eliminated only its benefit, making the *O'Brien* rule "inapplicable." *Id.* Other decisions similarly recognize that courts may consider legislative motive to determine whether attainder-like statutes were enacted to punish specific entities for disfavored speech. *See Hobart*, 864 F.2d at 556 (if statute were "directed just at the police," then "[l]egislators' motives would be admissible" on First Amendment challenge); *Goldberg v. Whitman*, 743 F. Supp. 943, 963-64 (D. Conn. 1990) (triable issue of retaliatory legislative motive where plaintiff was only regular beneficiary affected by part of defendants' adverse action); *Bakalich v. Vill. of Bellwood*, 2006 WL 1444893, at *9-*10 (N.D. Ill. May

17, 2006) (*O'Brien* "default rule" did not apply to First Amendment retaliation claim challenging ordinance that "regulated Police Department structure and nothing else").

That principle controls here.  Unlike the laws at issue in *O'Brien*, *Hubbard*, and similar cases, SB 4C and HB 9B were not generally-applicable laws that eliminated all special land-use districts in Florida or replaced all landowner-elected district boards with Governor-appointed bodies.  If they had, *Hubbard* might foreclose a retaliation claim even if there were stray legislative comments expressing support for the laws because of their adverse effect on Disney.  But the statutes were nothing like that.  SB 4C initially dissolved Disney's home district RCID and just five other special districts out of almost 2,000 statewide, and HB 9B restructured *only* RCID's governance to eliminate the voting rights of *only* RCID's landowners—principally Disney, which owns almost all the property in the District, SAC ¶¶ 38-39, 52-54, 82-83, as Defendants themselves emphasize, Mem. 3 (asserting that Disney "owned the vast majority of land within RCID" and exercised "complete control over the selection of RCID Board Members").  And in their extensive public record explaining and justifying both statutes, the Governor and his legislative allies uniformly equated RCID with Disney—indeed, their

entire *stated* purpose for acting was to eliminate *Disney's* electoral power within the District.

Against that backdrop, Defendants' assertion that SB 4C and HB 9B did not single out Disney (Mem. 10) borders on frivolous.  Out of nearly 2,000 special land-use districts statewide, the laws eliminated landowner voting rights and local accountability in favor of a Governor-controlled board *only* in Disney's home district.  And even now, Defendants expressly equate RCID with Disney itself. Mem. 13 ("The *de facto* governing body over the District was Disney itself[.]").  It is thus irrelevant that the laws did not explicitly *name* Disney as their target, as Defendants observe.  Mem. 12.  When a law in *substance* singles out one entity or group for special treatment, the concerns animating the *O'Brien/Hubbard* limitation on inquiry into the potential legislative motives underlying "wholesale" laws have no application.  *See supra* at 21.  What matters is whether the law is "easily pinpointed against [a] particular" actor, *Hobart*, 864 F.2d at 555-56, as the laws here plainly are.  Accordingly, the "more beady-eyed examination of motive" appropriate for attainder-like laws is warranted.  *Id.*[2]

---

[2] Defendants note that when SB 4C was initially enacted to dissolve RCID, it included five other special districts as well.  Mem. 10.  The point is irrelevant given HB 9B, which was addressed *only* to RCID.  In any event, SB 4C did not actually dissolve other districts.  It declared only that all affected districts *would* be dissolved *unless* "reestablished, re-ratified, or otherwise reconstituted" before June 1, 2023, SAC ¶ 57, and three of the other districts were quietly reconstituted by

It is irrelevant that, as Defendants observe, the State punished Disney's speech through *non*-speech measures that did not themselves directly regulate "expressive activity." Mem. 8-9. Retaliatory acts *often* operate that way—the government suppresses speech by imposing some non-speech punishment on the actor who expressed disfavored views. *See, e.g., Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 276 (1977) (alleged retaliatory act was refusal to renew teacher's contract with school board); *Bailey*, 843 F.3d at 477 (alleged retaliatory act was issuance of advisory warning to local law enforcement about former police officer); *Bakalich*, 2006 WL 1444893, at *2 (alleged retaliatory act was ordinance restructuring police department); *see also supra* at 22-23. And cases since *O'Brien* have consistently made clear that when a seemingly neutral, non-speech regulation operates in attainder-like fashion against an easily identifiable actor, it is entirely appropriate—indeed, essential to the protection of liberty—for courts to determine whether the government singled out the actor in order to suppress disfavored speech.

---

statute. *See* 2023 Fla. Laws 2023-7, HB 13B (Eastpoint Water and Sewer District); 2023 Fla. Laws 2023-336, HB 1169 (Hamilton County Development Authority); 2023 Fla. Laws 2023-6, HB 11B (Sunshine Water Control District).

**B.**     **The *O'Brien/Hubbard* Limitation On Inquiry Into Hidden Legislative Motives Does Not Apply Here, Where The Motive Is Openly Admitted And Celebrated**

The laws at issue here bear no resemblance to the laws at issue in *O'Brien*, *Hubbard*, and similar cases, where the existence of an impermissible motive was ambiguous, unknown, or both.  The challenge in *O'Brien* rested on comments about the law's purpose by "fewer than a handful of Congressmen"—just three, specifically—which in turn were affirmatively contradicted by "more authoritative reports of the Senate and House" committees detailing entirely permissible justifications for the statute.  391 U.S. at 384, 385-86.  The Eleventh Circuit's opinion in *Hubbard* does not cite *any* public statements expressing a retaliatory motive; rather, the subpoenas at issue sought to "uncover" a retaliatory intent that was otherwise unknown.  803 F.3d at 1307.  Likewise, the court in *Wisconsin Education Association Council v. Walker*, 705 F.3d 640 (7th Cir. 2013)—cited in *Hubbard*—held only that "one statement of a single legislator does not require invalidation of an otherwise viewpoint neutral and constitutional statute."  *Id.* at 652 n.10.

The extraordinary legislative record here is nothing like those cases.  Far from seeking to ferret out some hidden or opaque retaliatory motive, Disney's retaliation claim rests on the clear, consistent, and proud declarations of the State leaders who urged enactment of SB 4C and HB 9B.  *See supra* at 12, 14-16.  Their

26

public statements are underscored by the exceedingly rushed and irregular process employed to enact the statutes at the Governor's behest in direct response to Disney's speech. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.").  Unlike in *O'Brien* and similar cases, the Court need not "eschew guesswork" about unclear legislative motives, 391 U.S. at 384—no guesswork is required at all.

To put it simply, the fact that the Governor seized control over RCID to punish Disney for its disfavored speech is not genuinely disputed here.  The only contested issue is whether that openly retaliatory act was *permissible*, merely because political rights and representation are at issue, as Defendants contend.  As shown in the next section, that contention is incorrect.

## II.   STATE LAWS RELATING TO GOVERNMENT STRUCTURE ARE NOT IMMUNE FROM CONSTITUTIONAL SCRUTINY

Defendants next assert that state laws relating to the "structure" of government are categorically immune from First Amendment protections.  Mem. 11.  They are not.

Defendants mainly rely on various passages from *Gregory v. Ashcroft*, 501 U.S. 452 (1991), that observe in different ways that states have "the power to determine who will exercise 'important elective and nonelective positions whose

operations go to the heart of representative government.'"  Mem. 11 (quoting *Gregory*, 501 U.S. at 463).  Of course they do.  But this case is not about whether states have the basic power to establish state and local government structures.  It is about whether they may exercise that power *free from federal constitutional restraints*.  *Gregory* held only that a state's mandatory retirement age for judges did not violate a federal *statute* (the ADEA) or the Equal Protection Clause (which does not protect against age discrimination).  *Gregory* does not remotely suggest that the federal *Constitution* is categorically inapplicable to laws addressing state and local government structures.  To the contrary, *Gregory* expressly recognized that the "authority of the people of the States to determine the qualifications of their government officials is, of course, not without limit," and that "[o]ther constitutional provisions, most notably the Fourteenth Amendment, proscribe certain qualifications."  501 U.S. at 463.

Courts frequently entertain challenges to state laws establishing government structures that allegedly violate federal constitutional protections.  *See*, *e.g.*, *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 709-10 (1994) (invalidating special school district that violated Religion Clauses of First Amendment); *Bethune-Hill*, 580 U.S. at 181-83 (applying Equal Protection Clause

to state legislative electoral districts)[3]; *Bond v. Floyd*, 385 U.S. 116, 137 (1966)

(First Amendment limits state power to disqualify state legislator due to

legislator's public statements).[4]

As these examples show, laws addressing state and local government

structures are not immune from constitutional review.  And while RCID did not, in

fact, "exercise[] immense 'government authority,'" Mem. 13, the case for

constitutional immunity would not improve if it did.  Just the opposite:  when a

government entity wields significant power, it is all the *more* important for courts

to ensure the entity is established in accordance with our Nation's foundational

principles of democratic self-government.

---

[3] Defendants previously asserted that racial gerrymandering cases like *Bethune-Hill* support their position because *partisan* gerrymandering claims under the First Amendment are not judicially cognizable under *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019).  CFTOD Defs' Reply in Supp. of Mot. to Dismiss or Abstain at 32, ECF No. 81.  Defendants misunderstand *Rucho*.  The Supreme Court held in that case that even though the First Amendment *does* prohibit gerrymandering driven by an "impermissible partisan motivation" in certain circumstances, such claims cannot proceed only because there are no "judicially manageable" standards by which courts can distinguish between permissible and impermissible partisan gerrymanders.  139 S. Ct. at 2505.  By contrast, First Amendment retaliation claims challenging attainder-like laws are subject to settled, clear, and easily manageable judicial standards, as shown in the text.

[4] Defendants previously sought to distinguish *Bond* on the ground that the case involved only one legislator's seat, ECF No. 81 at 32, but the distinction is meaningless—seating an elected state legislator is obviously an act of sovereign self-definition, yet the First Amendment constrains state conduct nonetheless.

In addition to their misplaced reliance on *Gregory*, Defendants invoke an equally irrelevant principle about employment of government *officers* who exercise policymaking authority.  Again, nobody disputes that a state may "remove unelected policymaking officials from high office" or that elected leaders may employ senior officers "committed to implementing their political agenda."  Mem. 11-12 (quoting *Kurowski v. Krajewski*, 848 F.2d 767, 770 (7th Cir. 1988)).  But contrary to Defendants' submission, the hiring and firing of senior government policymaking officers is *not* the same as "determining the structure and composition of state *entities* that exercise immense government power."  *Id.*  As just demonstrated, courts routinely enforce the Constitution to prohibit states from structuring government entities on impermissible bases.  Were it otherwise, a state could redraw a city's boundaries for the explicitly stated purposes of segregating voters by race or religion, or punishing city voters for electing the Governor's rival as mayor, or wholly excluding one political party from local governance. Defendants do not cite a single case holding that a state's power to structure its governance entities is unconstrained by the federal constitutional protections that all state residents enjoy.  No such case exists because states typically are not so brazen as to make the basic structure of government a crass tool of political favoritism.

Unable to muster any precedent supporting their position, Defendants resort to a confused hypothetical that only underscores their misapprehension of the issues at stake in this case.  According to Defendants, "Disney's theory" would mean that if a state "decided to eliminate a particular state agency because the agency had become irrevocably politically hostile, individuals who share the political views of the former agency . . . could bring a Speech claim based on an alleged 'chill' of their political speech."  Mem. 12.  Disney's theory means no such thing.  RCID was not an internal bureaucratic agency—it was the political representative of local landowners, who for fifty years had elected the officials charged with regulating the use of their land, just as in most other Florida special districts.  In replacing RCID with a Governor-controlled receivership, the State eliminated landowner voting rights and local accountability of land-use regulators. "Disney's theory," in short, applies only to actions that *directly alter a citizen's rights*—it does not apply to internal agency reorganizations that only have, at most, arguable and attenuated effects on the morale of those who supported the incumbent agency's policies.

To be clear, of course, this case does not involve elimination of a "politically hostile" agency.  Defendants cite nothing indicating that the RCID Board took *any* positions on political issues relevant to the Governor, let alone positions hostile to

31

his views.  The only political disagreement was between the Governor and Disney, and it involved an issue that had *nothing* to do with RCID's authority over development of private property within the District.  The cases addressing hiring and firing of policymaking government officers are inapposite for this reason as well.  Those cases recognize that when political and policy opinions do *not* matter for a government position, the First Amendment prohibits the government from firing the employee for expressing disfavored political opinions.  *See*, *e.g.*, *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 (1990) ("The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate."); *Kurowski*, 848 F.2d at 770 (First Amendment "disables the government from firing a person based on his speech and political beliefs (and thus penalizing the employee for holding or advocating those beliefs) unless the beliefs are relevant to the job in question").  Even under Defendants' view that Disney and RCID were functionally equivalent, Defendants do not and cannot show that Disney's views on HB 1557 were in any way relevant to the efficient operation of RCID or the effective development of private property within the District.

32

## CONCLUSION

The motion to dismiss should be denied.

Dated:  October 30, 2023

Respectfully submitted,

ALAN SCHOENFELD
(*pro hac vice*)
New York Bar No. 4500898
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel. (212) 937-7294
alan.schoenfeld@wilmerhale.com

ADAM COLBY LOSEY
LOSEY PLLC
Florida Bar No. 69658
1420 Edgewater Drive
Orlando, FL 32804
Tel. (407) 906-1605
alosey@losey.law

*/s/ Daniel M. Petrocelli*

DANIEL M. PETROCELLI
(*pro hac vice*)
California Bar No. 97802
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Tel. (310) 246-6850
dpetrocelli@omm.com

JONATHAN D. HACKER
(*pro hac vice*)
District of Columbia Bar
No. 456553
STEPHEN D. BRODY
(*pro hac vice*)
District of Columbia Bar
No. 459263
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Tel. (202) 383-5285
jhacker@omm.com

*Attorneys for Plaintiff Walt Disney Parks and Resorts U.S., Inc.*

33

**CERTIFICATE OF WORD COUNT**

Pursuant to Northern District of Florida Rule 7.1(F), the undersigned counsel hereby certifies that the foregoing Plaintiff's Opposition to CFTOD Defendants' Motion to Dismiss Second Amended Complaint, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 7,147 words as measured by Microsoft Office for Word 365.

Respectfully submitted,

*/s/ Daniel M. Petrocelli*
DANIEL M. PETROCELLI