# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

WALT DISNEY PARKS AND
RESORTS U.S., INC.,

      Plaintiff,

v.

RONALD D. DESANTIS, in his official
capacity as GOVERNOR OF FLORIDA,
et al.,

      Defendants.

Case No. 4:23-cv-163-AW-MJF

**BRIEF OF THE LEADERSHIP NOW PROJECT AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel certifies that The Leadership Now Project is an unincorporated association of business leaders with no parent corporation and no stock.

<u>*/s/ Bradley K. Ervin*</u>
Bradley K. Ervin

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES .................................................................... iii

STATEMENT OF INTEREST OF *AMICUS CURIAE* ........................................... 1

INTRODUCTION ............................................................................. 2

ARGUMENT ................................................................................. 4

I.      Government Retaliation Against Businesses Threatens Basic Tenets
        of the American Marketplace and Economic Success. .................................. 4

        A.      Government Retaliation Jeopardizes Economic Growth and
                Deters Investment, Especially When It Interferes with Settled
                Expectations. ........................................................................... 5

        B.      Government Retaliation Hinders Businesses' Ability to
                Determine How to Respond to Customer, Employee, and
                Shareholder Interests. .............................................................. 7

II.     A Recent Increase in Government Retaliation Against Businesses for
        Their Constitutionally Protected Speech Chills Businesses'
        Responsiveness to Customer, Employee, and Shareholder Interests
        and Related Speech, Harming Economic Potential and Growth. .................. 11

        A.      Government Retaliation Creates a Chilling Effect on Business
                Responsiveness And Related Speech. ......................................... 12

        B.      Government Retaliation Compounds Political Risk for
                Businesses, Which Can Lead to Capital Flight and Undermine
                Economic Potential and Growth. ............................................. 20

CONCLUSION ............................................................................... 24

CERTIFICATE OF WORD COUNT .......................................................... 26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. FDA*,
　No. 2:22-CV-223-Z, 2023 WL 2825871 (N.D. Tex. Apr. 7, 2023) ...................18

*All. for Hippocratic Med. v. FDA*,
　78 F.4th 210 (5th Cir. 2023) ...................................................................18

*All. for Hippocratic Med. v. FDA*,
　143 S. Ct. 1075 (2023)............................................................................18

*Bd. of Cnty. Comm'rs v. Umbehr*,
　518 U.S. 668 (1996).................................................................................12

*Citizens United v. Fed. Election Comm'n*,
　558 U.S. 310 (2010).................................................................................12

*First Nat'l Bank of Bos. v. Bellotti*,
　435 U.S. 765 (1978).................................................................................12

*Ga. Ass'n of Educators v. Gwinnett Cnty. Sch. Dist.*,
　856 F.2d 142 (11th Cir. 1988) .................................................................12

*Perry v. Sinderman*,
　408 U.S. 593 (1972).................................................................................12

*Sturges v. Crowninshield*,
　17 (4 Wheat.) U.S. 122 (1819) .................................................................5

*Sveen v. Melin,*
　138 S. Ct. 1815 (2018).............................................................................5

**Executive Orders**

Exec. Order of Georgia Governor Nathan Deal Suspending the
　Collection of Sales and Use Tax on Jet Fuel (July 30, 2018)............................20

**Legislative Materials**

H.B. 1557, 124th Reg. Sess. (Fla. 2022) ...................................................6

S.B. 1978, 86th Leg., Reg. Sess. (Tex. 2019).............................................16

**Academic Materials**

Anat R. Admati, *Democracy and Prosperity Require Uncorrupted Governments*, Insights by Stanford Bus. (Feb. 14, 2020) ....................................5

Andrew S. Winston & Paul Polman, *Net Positive: How Courageous Companies Thrive by Giving More Than They Take* (Harv. Bus. Press 2021)..........................................................................................10

Babu John-Mariadoss, *Core Principles of International Marketing* (Wash. State Univ. 2018)......................................................................21

Frederick F. Reichheld & Phil Schefter, *The Economics of E-Loyalty*, Harv. Bus. Sch. (July 10, 2000)..............................................................8

Frederick F. Reichheld & W. Earl Sasser, Jr., *Zero Defections: Quality Comes to Services*, Harv. Bus. Rev. (Sept.-Oct. 1990) ...........8

George A. Riedel, *Dick's Sporting Goods: Getting Out of the Gun Business (A)*, Harv. Bus. Sch. Case Study 321-024 (revised Jan. 2022)..............8

Morning Consult, *Talent Trends & State Social Policies: 2023 Impact on Businesses in the U.S.*, Ctr. Bus. & Soc. Just. (Feb. 2023)...........................10

Paul W. Farris et al., *Marketing Metrics*: *The Definitive Guide to Measuring Marketing Performance* (2d ed. 2011)................................8

Quan Vu Le & Paul J. Zak, *Political Risk and Capital Flight*, 25 J. Int'l Money & Fin. 308 (2006) ..........................................................22

World Bank, *Doing Business: Enforcing Contracts* (May 2019) ............................5

**News Articles**

Alexa Lardieri, *FAA Investigates Texas, New York Airports Banning Chick-fil-A Restaurants*, U.S. News & World Report (May 28, 2019) ......................16

Amanda Holpuch, *Chick-fil-A Wades out of Gay Rights Debacle with Move to Cut Off Donations*, Guardian (Sept. 19, 2012).....................................14

Aris Folley, *Mississippi Law Enforcement Agency Says It Will No
  Longer Buy Nike Brand Following Kaepernick Ad*, The Hill (Sept.
  15, 2018) ................................................................................................17

Courtney Rickert McCaffrey, *How Political Risk Affects Five Areas at
  the Top of the C-Suite Agenda*, Ernst & Young (Oct. 29, 2020)..................21, 22

*Delta Explains Decision to Cut Ties with NRA*, WSB-TV (Feb. 25, 2018) ............19

Emery P. Dalesio & Jonathan Drew, *AP Exclusive: Price Tag of North
  Carolina's LGBT Law: $3.76B*, Associated Press (Mar. 27, 2017)..................23

Greg Turner, *Mayor Menino on Chick-fil-A: Stuff It*, Boston Herald
  (July 20, 2012) .........................................................................................14

Hal Dardick, *Alderman to Chick-fil-A: No Deal*, Chi. Tribune (July
  25, 2012) ..................................................................................................14

John Hamburger, *Chick-fil-A's Earnings Top $1 Billion for Second
  Straight Year*, Franchise Times (Apr. 13, 2023) .................................................13

K. Allan Blume, *'Guilty As Charged,' Cathy Says of Chick-fil-A's
  Stand on Biblical & Family Values*, Baptist Press (July 16, 2012)..................14

Kaitlyn Radde & Sarah McCammon, *Walgreens Won't Sell Abortion Pills in
  Red States That Threatened Legal Action*, NPR (Mar. 4, 2023) ........................18

Kim Bhasin, *Chick-fil-A Admits That It's Against Gay Marriage,
  Which Is 'Inviting God's Judgment on Our Nation,'* Bus. Insider
  (July 18, 2022) .........................................................................................14

Lynn La, *Newsom's Threat to Walgreens Fizzles*, CalMatters (Apr. 7, 2023) .......18

Mark Osborne, *San Antonio City Council Votes to Stop Chick-fil-A
  from Opening at Airport*, ABC News (Mar. 24, 2019) ......................................16

Michael M. Grynbaum, *Mayor Says Banning Chick-fil-A Is Wrong*,
  N.Y. Times (July 27, 2012) ......................................................................15

Patricia Rioux, *The Value of Investing in Loyal Customers*, Forbes
  (Jan. 29, 2020)...........................................................................................8

Richard Fausset, *Georgia Passes Bill That Stings Delta Over N.R.A. Position*, N.Y. Times (Mar. 1, 2018) ................................................................19

Robert Hart, *Georgia House Passes Bill Stripping Delta of a Multimillion Tax Break After It Slammed the State's New Voting Restrictions*, Forbes (Apr. 1, 2021) ....................................................20

Robert Safian, *Facebook, Airbnb, Uber, and the Struggle to Do the Right Thing*, Fast Company (Apr. 11,  2017) ........................................7

Susanna Kim, *PayPal Drops Plan to Build $3.6M Facility in NC Because of Controversial Law*, ABC News (Apr. 5, 2016) ..............................23

Toni Matthews-El & Cassie Bottorff, 14 Customer Retention Strategies That Work In 2023, Forbes (Aug. 22, 2022) ........................................9

**Press Releases**

Press Release, ACLU Illinois, *Statement on Chick-fil-A Matter* (July 26, 2012) ................................................................................................15

Press Release, Business Roundtable, Business Roundtable Redefines the Purpose of a Corporation to Promote 'An Economy That Serves All Americans' (Aug. 19, 2019) ..............................................7

Press Release, McDonald's USA, McDonald's President Criticizes California's Anti-Business Policies (Jan. 26, 2023)..........................................13

Press Release, PayPal, Statement from Dan Schulman, President & CEO, PayPal Withdraws Plan for Charlotte Expansion (Apr. 5, 2016) ......................23

Press Release, Walgreens, Walgreens and Mifepristone: The Facts (July 11, 2023) ..............................................................................18

**Letters**

Letter from Ken Paxton, Att'y Gen., Tex., to Ron Nirenberg, Mayor, City of San Antonio (Mar. 28, 2019)................................................................16

Letter from Over 100 Business Leaders to Gov. Pat McCrory (Mar. 31, 2016) ................................................................................................13

Open Letter from Business Leaders in Support of FDA's Authority to
    Regulate Medicines (Apr. 10, 2023)....................................................................22

Open Letter to President Joseph R. Biden & Congressional Leaders
    from Concerned Business Leaders Regarding Debt Ceiling
    Negotiations (May 16, 2023)..............................................................................22

U.S. Chamber of Commerce Letter to Members of the S. Comm. on
    the Judiciary Opposing S. 1094, the "Journalism Competition and
    Presentation Act (JCPA) of 2023" (June 15, 2023)............................................13

**Interviews and Commercials**

Guardian Sports, *Nike Releases Full Ad Featuring Colin Kaepernick*,
    YouTube (Sept. 7, 2018)....................................................................................17

Interview by Jennifer Kielman with Bryan Hughes, Senator (R-
    Mineola), in Tyler, Tex. (Jun. 13, 2019) ...........................................................16

**Social Media Materials**

Delta Airlines (@Delta), Twitter (Feb. 24, 2018, 8:32 AM)...................................19

Gov. Gavin Newsom (@GavinNewsom), Twitter (Mar. 6, 2023 1:32 PM)...........17

Lt. Gov. Casey Cagle (@CaseyCagle), Twitter (Feb. 26, 2018, 2:02 PM)............19

Mayor Ed Lee (@mayoredlee), Twitter (July 26, 2012 7:36 PM) .........................15

Mayor Ed Lee (@mayoredlee), Twitter (July 26, 2012 7:37 PM) .........................15

**Additional Materials**

Alena Darmel, *More and More Talent Ready to Leave Companies
    Over Misalignment of Values*, Sustainable Brands (Feb. 16, 2023)...................10

Chick-fil-A, *Culture & Values*.................................................................................14

Eugene Volokh, *No Building Permits for Opponent of Same-Sex
    Marriage*, Reason: The Volokh Conspiracy (July 25, 2012) .............................15

Jonathan H. Adler, *No Airport Concessions for Opponents of Same-
    Sex Marriage?*, Reason: The Volokh Conspiracy (Aug. 21, 2015) ...................16

Philip Meagher, *Corporate Governance 101: Understanding the Role of Shareholder Rights and Responsibilities*, LearnSignal (Jan. 16, 2023) .............11

Sophia Bernazzani, *Here's Why Customer Retention Is So Important for ROI, Customer Loyalty, and Growth* (Oct. 2019)..........................................9

## <u>STATEMENT OF INTEREST OF *AMICUS CURIAE*</u>

The **Leadership Now Project** ("Leadership Now") is a national membership organization of business leaders committed to ensuring that the United States has a strong democracy and economy.

Leadership Now offers its members at a State and national level an innovative model for sustained and strategic engagement to strengthen democracy.  Leadership Now supports a set of core principles that include defending the rule of law, increasing competitiveness in the political system to improve the quality of governance, supporting civic participation, and planting seeds for longer-term national growth and prosperity.  Preserving responsive, democratic government is critical to the American economy, central to the organization's mission, and touches the lives of all Americans.

## **INTRODUCTION**

In American society, the free market is nearly as revered as free speech. Over time, America's economy has become the most prominent measure of the Nation's success. Government retaliation is inimical to the Nation's commitment to a free market because it can interfere with the most basic tenets of the free-market system, such as competition and securing the settled expectations on which businesses act in the free market.

Competition is key to the free-market system for many reasons, including because it leads to innovation and creation. American businesses compete to produce the best goods and services of the greatest interest to customers at the lowest cost, as well as to attract productive employees and investors willing to provide capital to a business in exchange for potential financial returns. To gain and maintain a competitive edge, businesses may choose to adapt their products, services, and operations to respond to the evolving interests of their customers, employees, and shareholders. If businesses fail to adapt to these evolving needs, it can affect their overall competitive strength by limiting customer appeal, disrupting their workforce, and dissuading investment, all with consequences for their ultimate financial performance.

Government retaliation or threatened retaliation against businesses solely for what they may or may not say undermines the free market's success by replacing

2

accountability and consistency with uncertainty and instability.  If parties cannot trust the government to recognize and enforce their contracts and other commitments, parties will limit their business dealings or be forced to protect their investment through other means, such as arbitration, which may drive up the cost of innovation.  And if the government can punish businesses for the actions they take or the statements they make in response to interests of customers, employees, or shareholders, it necessarily hinders the exercise of business judgment that is key to competition.

Defendants' retaliatory government actions against Walt Disney Parks and Resorts U.S., Inc. ("Disney") for its constitutionally protected speech represent an egregious example of an increasing phenomenon that threatens to disrupt the free market.  Recently, government retaliation against other American businesses has included, among other things, city officials threatening to deny building permits to a business guided by Christian values because of that business's protected speech. Now, a governor has directly retaliated against a business by upending its settled expectations and depriving it of its ability to manage its land, assets, and operations. Although it may be appropriate for the government to adopt regulations that affect business practices, such as setting road safety requirements or adopting baseline health requirements, government action that is direct retribution based solely on an individual business's free speech is unconstitutional.

This alarming trend of intensifying unconstitutional government action must be stopped.  If left uncorrected, it risks becoming commonplace and compounding the chill already being felt in the marketplace.  This Court should deny Defendants' motions to dismiss because Disney has clearly alleged government retaliation against it for its constitutionally protected speech, in violation of the First Amendment.

## ARGUMENT

I.   **Government Retaliation Against Businesses Threatens Basic Tenets of the American Marketplace and Economic Success.**

Government retaliation undermines the stability and flexibility that the American economy needs to thrive.  Our free-market system relies on the government to protect businesses' settled expectations and ensure competition in that economy.  These well-established government functions allow, and indeed incentivize, American businesses to innovate and respond to the interests and needs of customers, employees, and investors.  This benefits the economy by keeping prices low, quality high, and variety abundant.  Government retaliation jeopardizes these benefits by upsetting settled expectations and thwarting businesses' competitiveness by forcing them to respond to the government's dictate rather than to the interests of their customers, employees, and shareholders.

A.   **Government Retaliation Jeopardizes Economic Growth and Deters Investment, Especially When It Interferes with Settled Expectations.**

Economic development and sustained growth rely in part on the government protecting and supporting businesses' reliance interests—protection that runs the gamut from enforcing contracts to administering justice and punishing fraud.[1]

Research demonstrates that societies benefit economically when parties can rely on the government to protect settled expectations. For example, countries in which parties can rely on the government to enforce contracts experience better credit markets, greater foreign investment, more secure tax revenues, and higher levels of economic development.[2] But if governments can retaliate against businesses by intentionally interfering with their contracts or otherwise upending their set expectations, such retaliation will unsettle parties' confidence in contracting

---

[1] Anat R. Admati, *Democracy and Prosperity Require Uncorrupted Governments*, Insights by Stanford Bus. (Feb. 14, 2020), https://perma.cc/WJS9-AQMV (noting the government "enable[s] markets" and "protect[s] stakeholders" by "enforcing contracts, ensuring competition, administrating justice, protecting rights, and dealing with fraud and deception when conventions, accepted business practices, or cultural norms fail to hold actors accountable to socially acceptable behavior"); *cf. Sveen v. Melin*, 138 S. Ct. 1815, 1827 (2018) (Gorsuch, J., dissenting) (explaining that the Founders understood that "treating existing contracts as 'inviolable' would benefit society by ensuring that all persons could count on the ability to enforce promises lawfully made to them—even if they or their agreements later prove unpopular with some passing majority" (citing *Sturges v. Crowninshield*, 17 (4 Wheat.) U.S. 122, 206 (1819))).

[2] World Bank, *Doing Business: Enforcing Contracts* (May 2019), https://perma.cc/38MU-W553.

and jeopardize future negotiations and agreements, threatening economic growth and investment.

That is what happened here. Disney contacted Florida Governor Ron DeSantis to express concern over the impact the State's proposed Parental Rights in Education Act, H.B. 1557, 124th Reg. Sess. (Fla. 2022), would have on Disney's business, customers, employees, and shareholders. Disney's 2d Am. Compl. ("2d. Am. Compl.") ¶¶ 40–42 (ECF No. 87). The Governor warned Disney that it "shouldn't get involved" because it would not "work out well for [Disney]." *Id.* ¶ 43. Shortly after receiving this warning, Disney World issued a public statement welcoming "ALL" guests to its park and formally opposing H.B. 1557 and "*any* legislation that infringes on basic human rights," "in solidarity and support [of its] Cast, Crew, and Imagineers." *Id.* ¶ 45. After H.B. 1557 became law, The Walt Disney Company stated that its "goal" was for the law "to be repealed by the [L]egislature or struck down in the courts." *Id.* ¶ 46.

In response to this constitutionally protected speech by Disney on an issue of public concern, *see id.* ¶ 41, the Governor retaliated against Disney by working with the Florida legislature to severely restrict Disney's authority to manage its own business, *see id.* ¶¶ 73, 89.

This case illustrates how government retaliation, especially when it interferes with a business's most important and foundational expectations, makes decisions

about investment and innovation much more difficult generally.  *Cf. id.* ¶ 12 ("Disney planned to invest over $17 billion in Walt Disney World over the next decade.  The Company estimated that those investments would create 13,000 new Disney jobs in that same 10-year time period.  The Company therefore sought to de-escalate the matter for nearly a year . . . [t]o no avail.").  Although the full impact of this specific retaliatory action remains to be seen, the uncertainty and market volatility created by the threat of similar retaliatory actions is likely to have impacts well beyond the targeted business to chill the entire market and to undermine the established and essential practices that sustain the American economy.

### B.   Government Retaliation Hinders Businesses' Ability to Determine How to Respond to Customer, Employee, and Shareholder Interests.

For businesses to drive "an economy that serves all Americans," they must be able to address the evolving interests of various stakeholders.[3]  Such responsiveness extends beyond product development.  Businesses must also determine how best to adapt their operations and practices to the ever-changing interests of their customers, to recruit and retain productive employees, and to attract investors.[4]  Government

---

[3] Press Release, Business Roundtable, Business Roundtable Redefines the Purpose of a Corporation to Promote 'An Economy That Serves All Americans' (Aug. 19, 2019), https://perma.cc/CH5Q-9GMA.

[4] *See, e.g.*, Robert Safian, *Facebook, Airbnb, Uber, and the Struggle to Do the Right Thing*, Fast Company (Apr. 11, 2017),   https://www.fastcompany.com/40397294/facebook-airbnb-uber-and-the-struggle-to-do-the-right-thing ("[C]ompanies   are

retaliation and the threat of such retaliation hinders businesses' flexibility to respond consistent with their business judgment, to the detriment of businesses' customers, workforce, investors, and overall financial performance. *See* 2d Am. Compl. ¶ 13.

Customer interests are an especially important factor in business judgments because experience has demonstrated that business efforts to cultivate existing customer loyalty leads to long-term economic return. Research suggests that businesses are 14 times more likely to sell a product to an existing customer than to a new customer.[5] And once committed to a company, existing customers are 50% more likely to try new products, on average spending 31% more than new customers.[6] Taken together, this contributes to significant long-term gain: a 5% increase in customer retention rates can increase profits by 25% to 95%.[7]

Realizing the economic benefits that existing customers bring, businesses

---

increasingly seeking to align their commercial activities with larger social and cultural values—not just because it makes them look good, but because employees and customers have started to insist on it."); George A. Riedel, *Dick's Sporting Goods: Getting Out of the Gun Business (A)*, Harv. Bus. Sch. Case Study 321-024 (revised Jan. 2022).

[5] Patricia Rioux, *The Value of Investing in Loyal Customers*, Forbes (Jan. 29, 2020, 6:00 AM), https://perma.cc/UM76-NF4D (citing Paul W. Farris et al., *Marketing Metrics*: *The Definitive Guide to Measuring Marketing Performance* (2d ed. 2011)).

[6] *Id.*

[7] Frederick F. Reichheld & Phil Schefter, *The Economics of E-Loyalty*, Harv. Bus. Sch. (July 10, 2000), https://perma.cc/55SK-J23B (citing Frederick F. Reichheld & W. Earl Sasser, Jr., *Zero Defections: Quality Comes to Services*, Harv. Bus. Rev. (Sept.–Oct. 1990), https://perma.cc/6E4Y-MXV4).

regularly solicit customer feedback and respond to it.[8]   Sometimes, responding may mean adjusting a product or service; in other contexts, responding may extend to the business issuing a statement addressing customer interests or current events.   When companies fall short or fail to effectively implement customer feedback, customers may take their business elsewhere.   The threat of government retaliation against businesses for such statements can interfere with businesses' ability to respond to customers.   That can limit businesses' implementation options and dampen their ability to retain customers.

In addition to customers, employees also shape the operations of the businesses for which they work and may affect the public speech of the company. To recruit, retain, and maintain a productive workforce—particularly with today's labor shortages—businesses must be able to exercise their full discretion when responding to employees' concerns, particularly because whether and when to respond to any specific request is a complicated decision that requires the weighing of company-specific factors.   Increasingly, Americans want to work for companies that share their values.   Recent studies show that 76% of Americans want to work

---

[8] Sophia Bernazzani, *Here's Why Customer Retention Is So Important for ROI, Customer Loyalty, and Growth* (Oct. 2019), https://perma.cc/6TC4-HMYV; Toni Matthews-El & Cassie Bottorff, 14 Customer Retention Strategies That Work In 2023, Forbes (Aug. 22, 2022, 12:00 PM), https://perma.cc/97LY-584M.

for companies that have a positive impact on the world.[9]  More than half of employees surveyed said that they would consider resigning from their jobs if their companies' values did not align with their own, and just under half indicated that they already had left a job for that reason.[10]  For many employees, knowing that their employer has common values is not enough.  Instead, employees are increasingly calling on their employers to "take[] actionable steps" to promote these values internally through workplace policies and practices and externally through investments, donations, and advocacy.[11]

The restraints that government retaliation put on business judgment also undermine a company's ability to work fully to the benefit of its shareholders.  Shareholders play a vital role in a company's growth by providing capital for future development.  Companies entice individuals and entities to invest by providing for the possibility of financial return, and give shareholders the opportunity to ensure that return by overseeing the company's management and approving major corporate

---

[9] *See* Alena Darmel, *More and More Talent Ready to Leave Companies Over Misalignment of Values*, Sustainable Brands (Feb. 16, 2023, 1:00 PM), https://perma.cc/J448-KS28 (citing Andrew S. Winston & Paul Polman, *Net Positive: How Courageous Companies Thrive by Giving More Than They Take* (Harv. Bus. Press 2021)).

[10] *See id*.

[11] Morning Consult, *Talent Trends & State Social Policies: 2023 Impact on Businesses in the U.S.* at 3, Ctr. Bus. & Soc. Just. (Feb. 2023), https://perma.cc/2ZA9-LGNC.

actions.[12]  Shareholders range from individual families to pension plans investing the retirement funds of millions of employees, all relying on the investment performance of the shares that they hold to fund, among other things, retirement, college tuition, or a down payment on a house.  Government retaliation and the threat of such retaliation necessarily limit the exercise of a company's business judgment, which in turn prevents companies from managing their operations in a way that is most likely to increase the value of the company's shares.  These effects can directly impact the value of individuals' retirement and other savings, and can constrain a company's growth and development by deterring investors from additional investments, both of which affect the overall economy.

## II. A Recent Increase in Government Retaliation Against Businesses for Their Constitutionally Protected Speech Chills Businesses' Responsiveness to Customer, Employee, and Shareholder Interests and Related Speech, Harming Economic Potential and Growth.

Government retaliation against businesses for constitutionally protected speech threatens to disrupt the free market.  By taking adverse actions against a business for speech with which it disagrees, the government limits the views that a business can expound without fear of retribution, thereby overriding a business's ability to determine how best to respond to customer, employee, and shareholder

---

[12] Philip Meagher, *Corporate Governance 101: Understanding the Role of Shareholder Rights and Responsibilities*, LearnSignal (Jan. 16, 2023), https://perma.cc/D3R8-8Q89.

interests.  As described above, these limitations dramatically circumscribe business judgment, which in turn affects a business's bottom line.  This circumscription deters not only the targeted business from certain opportunities, perhaps from even staying in the market, but also other businesses, because fear of suffering similar adverse government action chills their inclination to respond to customer, employee, and shareholder interests as well.

**A.     Government Retaliation Creates a Chilling Effect on Business Responsiveness And Related Speech.**

It is well-settled that the First Amendment protects businesses' right to speak (or not to speak) and to petition the government on matters of public concern.  *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 355 (2010); *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776–77 (1978).  And although the government may deny a benefit to an entity "for any number of reasons, there are some reasons upon which the government may not rely"—most principally, the entity's "interest in freedom of speech."  *Perry v. Sinderman*, 408 U.S. 593, 597 (1972); *see also, e.g.*, *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996); *Ga. Ass'n of Educators v. Gwinnett Cnty. Sch. Dist.*, 856 F.2d 142, 144 (11th Cir. 1988).  With those protections in place, American businesses often speak on a variety of issues relevant to their operations and the interests of their customers, employees, and

shareholders.[13]

Despite this established constitutional protection, instances of government retaliation in response to protected speech have increased in recent years, with the harm to our system compounding each time.  Although the government retaliation against Disney is especially egregious, each retaliatory act from the government undermines American business and confidence in the market, no matter the government actor.

For example, during the past decade, local government officials in various cities have refused to allow the restaurant chain Chick-fil-A to enter or expand operations in their localities because of the restaurant's protected speech.  Chick-fil-A is a multi-billion dollar family-owned enterprise[14] that operates its business based on founder Truett Cathy's belief that "Biblical principles . . . were also good

---

[13] *See, e.g.*, U.S. Chamber of Commerce Letter to Members of the S. Comm. on the Judiciary Opposing S. 1094, the "Journalism Competition and Presentation Act (JCPA) of 2023" (June 15, 2023), https://perma.cc/7JQY-9GFS (opposing bill for immunizing publishers from antitrust violations); Press Release, McDonald's USA, McDonald's President Criticizes California's Anti-Business Policies (Jan. 26, 2023), https://perma.cc/Z7RL-L8GD (criticizing California's passage of AB257, calling the State "a dramatic case study of putting bad politics over good policy"); Letter from Over 100 Business Leaders to Gov. Pat McCrory (Mar. 31, 2016), https://perma.cc/56RH-7U6E (supporting repeal of North Carolina's H.B. 2).

[14] *See* John Hamburger, *Chick-fil-A's Earnings Top $1 Billion for Second Straight Year*, Franchise Times (updated Apr. 13, 2023), https://perma.cc/PFY5-3TD4.

business principles."[15]   Consistent with this mission, Chick-fil-A has donated

substantial sums of money to religiously affiliated organizations over the years,

some of which opposed same-sex marriage.[16]   Attention was brought to the issue

when, in 2012, Chick-fil-A's then-President and Chief Operating Officer Dan Cathy

expressed opposition to same-sex marriage, stating that "we are inviting God's

judgment on our nation" by "hav[ing] the audacity to define what marriage is."[17]

Days later, mayors and other city leaders in Boston,[18] Chicago,[19] and San

---

[15] Chick-fil-A, *Culture & Values*, https://perma.cc/7HJY-XC7T (archived July 19, 2023).

[16] *See, e.g.*, Amanda Holpuch, *Chick-fil-A Wades out of Gay Rights Debacle with Move to Cut Off Donations*, Guardian (Sept. 19, 2012, 1:00 PM), https://perma.cc/R4SZ-QYQX.

[17] Kim Bhasin, *Chick-fil-A Admits That It's Against Gay Marriage, Which Is 'Inviting God's Judgment on Our Nation,'* Bus. Insider (July 18, 2022, 3:47 PM), https://perma.cc/4PST-NCGN; *see also* K. Allan Blume, *'Guilty As Charged,' Cathy Says of Chick-fil-A's Stand on Biblical & Family Values*, Baptist Press (July 16, 2012), https://perma.cc/9T4H-RCTN.

[18] Boston Mayor Thomas M. Menino vowed to block Chick-fil-A from building a storefront on Boston's Freedom Trail.  "We're an open city, we're a city that's at the forefront of inclusion," Menino told The Boston Herald, "[a]nd we're not going to have a company, Chick-fil-A or whatever the hell the name is, on our Freedom Trail."  Greg Turner, *Mayor Menino on Chick-fil-A: Stuff It*, Boston Herald (July 20, 2012, 12:00 AM),  https://perma.cc/GQ58-JQLW.

[19] Chicago Alderman Proco "Joe" Moreno announced that he would block Chick-fil-A's effort to build a second Chicago store.  "You have the right to say what you want to say," Moreno said at the time, "but zoning is not a right."  Hal Dardick, *Alderman to Chick-fil-A: No Deal*, Chi. Trib. (July 25, 2012, 12:01 AM), https://perma.cc/ATZ7-Z9SK.

Francisco[20] announced that they would prevent Chick-fil-A from expanding in their cities because of Mr. Cathy's comments.  Law professors,[21] the ACLU,[22] and other mayors[23] condemned these government leaders' comments as violations of the First Amendment.  Similar local government responses occurred in 2015 and again in

---

[20] In a series of tweets, Mayor Ed Lee said: "Very disappointed #ChickFilA doesn't share San Francisco's values & strong commitment to equality for everyone . . . Closest #ChickFilA to San Francisco is 40 miles away & I strongly recommend that they not try to come any closer."  @mayoredlee, Twitter (July 26, 2012 7:36 PM), https://perma.cc/5B89-P86Y; *id.* (July 26, 2012 7:37 PM), https://perma.cc/P2BK-C82Z.

[21] Eugene Volokh, *No Building Permits for Opponent of Same-Sex Marriage*, Reason: The Volokh Conspiracy (July 25, 2012, 1:24 PM), https://perma.cc/P6XV-P93N.

[22] Press Release, ACLU Illinois, Statement on Chick-fil-A Matter (July 26, 2012), https://perma.cc/4K4C-36GF ("In this instance, the Alderman is using his governmental authority to exclude a business from opening its doors simply because the corporate leadership has expressed anti-LGBT views in the public. This use of government authority simply is not permissible under our Constitution.").

[23] Michael M. Grynbaum, *Mayor Says Banning Chick-fil-A Is Wrong*, N.Y. Times (July 27, 2012), https://perma.cc/D95U-ZD3J (quoting then-New York City Mayor Michael Bloomberg: "It's inappropriate for a city government, or a state government, or the federal government to look at somebody's political views and decide whether or not they can live in the city, or operate a business in the city, or work for somebody in the city.").

2019, as the city councils of Denver,[24] Buffalo,[25] and San Antonio[26] voted against Chick-fil-A opening restaurants in their airports because of the company's "legacy" of anti-LGBTQ views.[27]   These retaliatory government actions motivated investigations of San Antonio and Buffalo under State[28] and federal[29] anti-discrimination laws, and inspired legislation in Texas to prevent adverse government actions based on religious affiliations.[30]  As the sponsor of the Texas "Save Chick-fil-A Bill" explained, the legislation was necessary because other local businesses that "didn't have the reputation Chick-fil-A has or the support [it] ha[s]" needed reassurance that they would not be subject to retaliatory actions by the government based on their proclamations of faith.[31]  *Cf.* 2d Am. Compl. ¶ 15 ("Disney also

---

[24] Jonathan H. Adler, *No Airport Concessions for Opponents of Same-Sex Marriage?*, Reason: The Volokh Conspiracy (Aug. 21, 2015, 11:14 AM), https://perma.cc/FR5A-DXVX.

[25] Alexa Lardieri, *FAA Investigates Texas, New York Airports Banning Chick-fil-A Restaurants*, U.S. News & World Rep. (May 28, 2019, 2:50 PM), https://www.usnews.com/news/politics/articles/2019-05-28/faa-investigates-texas-new-york-airports-banning-chick-fil-a-restaurants.

[26] Mark Osborne, *San Antonio City Council Votes to Stop Chick-fil-A from Opening at Airport*, ABC News (Mar. 24, 2019, 1:08 AM), https://perma.cc/9CER-SQQP.

[27] *Id.*

[28] *See* Letter from Ken Paxton, Att'y Gen., Tex., to Ron Nirenberg, Mayor, City of San Antonio (Mar. 28, 2019), https://perma.cc/GRA8-ZZ4J.

[29] *See* Lardieri, *supra* note 25 (outlining the Federal Aviation Administration's investigation into San Antonio and Buffalo airports).

[30] *See* S.B. 1978, 86th Leg., Reg. Sess. (Tex. 2019).

[31] *See* Interview by Jennifer Kielman with Bryan Hughes, Senator (R-Mineola), in

knows it is fortunate to have the resources to take a stand against the State's retaliation—a stand smaller businesses and individuals might not be able to take when the State comes after them for expressing their own views.  In America, the government cannot punish you for speaking your mind.").

Officials at the State level have also retaliated against companies engaged in constitutionally protected speech.  In 2018, Nike started an advertising campaign featuring former San Francisco 49ers quarterback Colin Kaepernick.[32]  In response, the Commissioner of Mississippi's Department of Public Safety announced he would ban the Department from buying Nike products, taking the view that:  "As commissioner of the Department of Public Safety, I will not support vendors who do not support law enforcement and our military."[33]

And just this year, the California Governor announced that California would stop doing business with Walgreens[34] after the company announced that it would not

---

Tyler, Tex. (Jun. 13, 2019) (8:21–41), https://perma.cc/4VU8-PXVA ("Think about this: they picked on Chick-fil-A.  A company that everybody loves, very sympathetic.  What if it was Joe's Taco Stand or Jim's Window Cleaning Service, that no one knows about? . . . Some local business that didn't have the reputation Chick-fil-A has or the support they have, we wouldn't even know about it.").

[32] Guardian Sport, *Nike Releases Full Ad Featuring Colin Kaepernick*, YouTube (Sept. 7, 2018), https://youtu.be/-grjIUWKoBA.

[33] Aris Folley, *Mississippi Law Enforcement Agency Says It Will No Longer Buy Nike Brand Following Kaepernick Ad*, The Hill (Sept. 15, 2018), https://perma.cc/CZ2V-HE3M.

[34] @GavinNewsom, Twitter (Mar. 6, 2023, 1:32 PM), https://perma.cc/S5W7-

distribute the abortion medication mifepristone in 21 States that had threatened the pharmacy with legal liability if it tried to dispense the medication within those States.[35] Although the Governor's planned action against Walgreens could not have immediate effect due to contracts that the State of California had with the company,[36] reports after his announcement have indicated that other retail pharmacies have remained silent as to whether they will dispense mifepristone.[37] While the government is free to select with whom it will do business, it cannot categorically refuse to do business with a company based on the company's First Amendment protected speech.

---

HH7B ("California won't be doing business with @walgreens -- or any company that cowers to the extremists and puts women's lives at risk.  We're done.").

[35] Kaitlyn Radde & Sarah McCammon, *Walgreens Won't Sell Abortion Pills in Red States That Threatened Legal Action*, NPR (Mar. 4, 2023, 4:15 PM), https://perma.cc/RCY5-PL3X.

[36] Lynn La, *Newsom's Threat to Walgreens Fizzles*, CalMatters (Apr. 7, 2023), https://perma.cc/P8WR-NC2G (noting that California is "legally bound to continue doing business with Walgreens through the State's massive Medicaid program").

[37] *See* Press Release, Walgreens, Walgreens and Mifepristone: The Facts (updated July 11, 2023), https://perma.cc/PA4C-LBED (observing that "[s]ome major retail pharmacies have not yet indicated if they will even participate in the FDA program to dispense mifepristone" and that "[s]everal major retail pharmacies have not indicated whether they will seek certification at all").  Such silence could be attributable to any number of factors, including ongoing litigation regarding FDA's approval of mifepristone. *See All. for Hippocratic Med. v. FDA*, No. 2:22-CV-223-Z, 2023 WL 2825871 (N.D. Tex. Apr. 7, 2023) (staying FDA's 2000 approval of mifepristone and related agency action), *aff'd in part and rev'd in part*, 78 F.4th 210 (5th Cir. 2023), *stayed in full*, 143 S. Ct. 1075 (2023).

And of equal concern, State actors have retaliated against businesses when they attempt to take a neutral position in an ongoing public dispute. Following the 2018 mass school shooting at Marjory Stoneman Douglas High School in Parkland, Florida, Atlanta-based Delta Airlines announced on Twitter that it would stop offering discounted flight rates to members of the National Rifle Association.[38] The airline explained that it "support[ed] the 2nd Amendment," but its decision "reflect[ed] the airline's neutral status in the current national debate over gun control amid recent school shootings" and was intended to keep the company "from entering this debate."[39] In response to Delta's announcement, the Lieutenant Governor of Georgia declared he would "kill any tax legislation that benefits @Delta unless the company changes its position and fully reinstates its relationship with @NRA."[40] Days later, Georgia lawmakers passed—and the Governor signed—a bill stripping Delta of a $50 million jet fuel sales tax exemption.[41] Although the Governor later

---

[38] @Delta, Twitter (Feb. 24, 2018, 8:32 AM), https://perma.cc/M3S8-H5HL ("Delta is reaching out to the NRA to let them know we will be ending their contract for discounted rates through our group travel program. We will be requesting that the NRA remove our information from their website.").

[39] *Delta Explains Decision to Cut Ties with NRA*, WSB-TV (Feb. 25, 2018, 1:53 PM), https://perma.cc/M8N2-CSA6.

[40] @CaseyCagle, Twitter (Feb. 26, 2018, 2:02 PM), https://perma.cc/9JLR-QB6G ("I will kill any tax legislation that benefits @Delta unless the company changes its position and fully reinstates its relationship with @NRA. Corporations cannot attack conservatives and expect us not to fight back.").

[41] Richard Fausset, *Georgia Passes Bill That Stings Delta Over N.R.A. Position*,

signed an executive order suspending collection of the tax, the explicit government threat to business remains even though, in this instance, the Governor recognized that eliminating the jet fuel tax exemption would "plac[e] Georgia airports at a competitive disadvantage" against other airline-hub States.[42]

While State and local governments have increasingly sought to punish businesses for exercising their First Amendment rights, this case involves an alarming new step:  Defendants, as State officials, have used the coercive power of the State to limit a company's ability to manage its own property.  If left to stand, this egregious violation of Disney's rights threatens to undermine business dealings now and in the future.

### B.   Government Retaliation Compounds Political Risk for Businesses, Which Can Lead to Capital Flight and Undermine Economic Potential and Growth.

Although litigation by a business against the government for its retaliation in violation of the First Amendment may provide some relief for targeted businesses, that relief would be only after the fact and inadequate to eliminate the chill on the

---

N.Y. Times (Mar. 1, 2018), https://perma.cc/A59C-Y83M.

[42] Exec. Order of Georgia Governor Nathan Deal Suspending the Collection of Sales and Use Tax on Jet Fuel (July 30, 2018), https://perma.cc/CN9A-YN7E.  In 2021, the Georgia House passed a bill stripping Delta of its jet fuel tax break in response to Delta's criticism of the State's new restrictive voting laws.  The legislative session ended before the Senate took up the bill.  Robert Hart, *Georgia House Passes Bill Stripping Delta of a Multimillion Tax Break After It Slammed the State's New Voting Restrictions*, Forbes (Apr. 1, 2021, 8:11 AM), https://perma.cc/3HB4-WJ9Z.

speech already silenced.  Moreover, potential relief would come at a cost that many businesses smaller than Disney may not be able to support.  2d Am. Compl. ¶ 15. Such litigation also does little to alleviate the instability that government retaliation causes in the market.  The effects of such retaliation can never be truly known or quantified, but it certainly does not make those effects any less real.  *See id.* ¶ 89 (excerpt of *The Courage to Be Free* urging leaders to "stand up and fight back when big corporations" use "their economic might to advance a political agenda" and describing Florida as "the state where the economy flourishes because [it is] the state where woke goes to die"); *see also id.* ¶¶ 90, 112.  By jeopardizing basic tenets of American business, government retaliation eliminates a traditional and significant element of stability in the American economic system.  That additional uncertainty can deter investment and drive businesses to pursue opportunities elsewhere.

In today's global economy, a certain degree of economic risk to business follows from political change.[43]  For example, elections—even well-established elections in our democracy—tend to drive up the average weighted cost of capital because the results can affect foreign and domestic policy, which inevitably affects trade and business operations.[44]  Because businesses know to expect such risks from

---

[43] *See* Babu John-Mariadoss, *Core Principles of International Marketing* § 4.3 (Wash. State Univ. 2018), https://perma.cc/4PWZ-EW7X.

[44] Courtney Rickert McCaffrey, *How Political Risk Affects Five Areas at the Top of the C-Suite Agenda*, Ernst & Young (Oct. 29, 2020), https://perma.cc/86XT-XYMR.

elections, however, they can factor in anticipated response costs on the front end.

Unlike elections, government retaliation against businesses for constitutionally protected First Amendment activity risks much greater instability and unpredictability by attacking the settled expectations on which businesses rely. To compensate, businesses must invest more capital to secure their investments, which in turn drives up the costs of innovation and development.[45] This required additional investment reduces businesses' incentive to innovate, decreases shareholder returns, and increases customer costs.[46]

When political risk presents an impediment to the business operations of companies, the companies may choose to abandon the market and relocate elsewhere. Capital flight frequently accompanies political uncertainty, often with drastic consequences for the communities from which businesses depart.[47] For

---

[45] *Id.*

[46] *See, e.g.*, Open Letter from Business Leaders in Support of FDA's Authority to Regulate Medicines (Apr. 10, 2023), https://perma.cc/W5VM-239F (explaining that adding uncertainty to the "already inherently risky work of discovering and developing new medicines" will "reduc[e] incentives for investment" and innovation in biopharmaceutical industry); Open Letter to President Joseph R. Biden & Congressional Leaders from Concerned Business Leaders Regarding Debt Ceiling Negotiations (May 16, 2023), https://perma.cc/Z7GV-CADY (explaining how defaulting on the nation's debt would weaken our financial systems and jeopardize benefit payments).

[47] *See, e.g.*, Quan Vu Le & Paul J. Zak, *Political Risk and Capital Flight*, 25 J. Int'l Money & Fin. 308, 309 (2006).

example, in March 2016, PayPal announced plans to build a $3.6 million global operations center in Charlotte, North Carolina, bringing more than 400 skilled jobs to the region.[48]  But the next month, PayPal President and CEO Dan Schulman announced that PayPal would "seek an alternative location for [PayPal's] operations center" because North Carolina had enacted a law that would deprive "members of [PayPal's] teams" of "equal rights." [49]  By some estimates, North Carolina lost nearly $525 million in just one year from capital flight attributable to the political and social instability that the law caused.[50]

* * * *

The impact of the Florida government's retaliation against Disney for its constitutionally protected speech extends far beyond the specific facts of this case. It also chills incalculable investment by intimidating American businesses into silence.  And that necessarily infringes on the ability of American businesses to

---

[48] *See* Susanna Kim, *PayPal Drops Plan to Build $3.6M Facility in NC Because of Controversial Law*, ABC News (Apr. 5, 2016, 4:10 PM), https://perma.cc/A8DC-QFCF.

[49] Press Release, PayPal, Statement from Dan Schulman, President & CEO, PayPal Withdraws Plan for Charlotte Expansion (Apr. 5, 2016), https://perma.cc/6MRT-P9AP.

[50] Emery P. Dalesio & Jonathan Drew, *AP Exclusive: Price Tag of North Carolina's LGBT Law: $3.76B*, Associated Press (Mar. 27, 2017, 12:31 PM), https://web.archive.org/web/20170327182441/http://bigstory.ap.org/article/fa4528 580f3e4a01bb68bcb272f1f0f8/ap-exclusive-bathroom-bill-cost-north-carolina-376b.

exercise their business judgment to respond to the interests of their customers, employees, and shareholders.  All of this undermines economic growth by hindering competition, discouraging innovation, and irrevocably altering the fundamental practices of American businesses that have contributed profoundly to creating a robust and growing economy.

## **<u>CONCLUSION</u>**

For the foregoing reasons and those set forth in Disney's briefs in opposition, the Court should deny Defendants' motions to dismiss.

Dated: October 30, 2023        Respectfully submitted,

*/s/ Bradley K. Ervin*
Bradley K. Ervin (D.C. Bar No. 982559)
(*pro hac vice*)
Kendall T. Burchard (D.C. Bar No. 1781860)
(*pro hac vice*)
Adam W. Mitchell (D.C. Bar No. 1779654)
(*pro hac vice forthcoming*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
bervin@cov.com
kburchard@cov.com
amitchell@cov.com

*Counsel for Amicus Curiae The Leadership Now Project*

## <u>CERTIFICATE OF WORD COUNT</u>

According to Microsoft Word, the word processing system used to prepare this brief, there are 5,473 total words contained within the brief.

_/s/ Bradley K. Ervin_
Bradley K. Ervin