# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

WALT DISNEY PARKS AND
RESORTS U.S., INC.,

<em>Plaintiff</em>,

v.

RONALD DESANTIS, in his official
capacity as Governor of Florida, <em>et al</em>.,

<em>Defendants</em>.

Civil Action No. 4:23-cv-163-AW-MJF

# BRIEF OF AMICUS CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS IN SUPPORT OF PLAINTIFF WALT DISNEY PARKS AND RESORTS U.S., INC.

**DISCLOSURE STATEMENT OF AMICUS CURIAE**
**THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS**

The undersigned counsel certifies that Amicus Curiae the Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

Dated:  October 31, 2023                    Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*
THEODORE J. BOUTROUS, JR.
(*PRO HAC VICE*)

## TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................ ii

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF AMICUS CURIAE ...........................................................1

SUMMARY OF ARGUMENT ...................................................................4

ARGUMENT ...............................................................................................9

    I.    The First Amendment prohibits the government from retaliating against a speaker as Defendants allegedly retaliated against Disney. ...............................................................................................9

        1.    The central purpose of the First Amendment is to promote robust  public discourse and the free flow of information. ................9

        2.    The First Amendment's clearest command is that the government  cannot regulate speech based on disapproval of a specific viewpoint. ...........................................................................12

    II.    Courts can and do invalidate laws motivated by impermissible animus regardless of whether that motive is apparent on the face of the law. ...............................................................................................14

        1.    It is well-settled that state action retaliating against specific speakers for their protected speech is invalid under the First Amendment...............................................................................15

        2.    Courts regularly assess the motive of legislators. .............................18

    III.  In order to protect constitutionally mandated First Amendment interests, the Court should acknowledge that Plaintiffs have established a prima facie case of retaliation against their protected speech...............................................................................................22

    IV.  This Court should not permit admittedly pretextual justifications to defang the First Amendment.................................................................26

CONCLUSION ..........................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arkansas Writers' Project, Inc. v. Ragland,*
    481 U.S. 221 (1987)...................................................................................12

*Bethune-Hill v. Va. State Bd. of Elections,*
    580 U.S. 178 (2017)...................................................................................19

*Buckley v. Am. Const. L. Found.,*
    525 U.S. 182 (1999).....................................................................................7

*Carey v. Brown,*
    447 U.S. 455 (1980)...................................................................................11

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010)...............................................................7, 11, 12, 13

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
    142 S. Ct. 1464 (2022)...............................................................................11

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
    473 U.S. 788 (1985)...................................................................................18

*Counterman v. Colorado,*
    143 S. Ct. 2106 (2023)...............................................................................10

*Dream Defenders v. DeSantis,*
    553 F. Supp. 3d 1052 (N.D. Fla. 2021) ..............................................20, 21

*El Día v. Rossello,*
    165 F.3d 106 (1st Cir. 1999).......................................................................3

*FCC v. League of Women Voters of Cal.,*
    468 U.S. 364 (1984)............................................................................10, 11

*First Nat'l Bank of Boston v. Bellotti,*
    435 U.S. 765 (1978)..............................................................................1, 11

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Ga. Ass'n of Educators v. Gwinnett Cnty. Sch. Dist.*,
856 F.2d 142 (11th Cir. 1988) ....................................................16, 17

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974).........................................................................10

*Gomillion v. Lightfoot*,
364 U.S. 339 (1960).........................................................................19

*Greater Birmingham Ministries v. Sec'y of State for Ala.*,
992 F.3d 1299 (11th Cir. 2021) ......................................................19

*Louisiana ex rel. Gremillion v. NAACP*,
366 U.S. 293 (1961).........................................................................12

*Hartman v. Moore*,
547 U.S. 250 (2006)...................................................................15, 16

*Holloman ex rel. Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004) ......................................................12

*In re Hubbard*,
803 F.3d 1298 (11th Cir. 2015) .................................................26, 27

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020).........................................................4

*McCullen v. Coakley*,
573 U.S. 464 (2014).........................................................................10

*McMahon v. City of Panama City Beach*,
180 F. Supp. 3d 1076 (N.D. Fla. 2016) ..........................................13

*Members of the City Council v. Taxpayers for Vincent*,
466 U.S. 789 (1984).........................................................................13

*Meyer v. Grant*,
486 U.S. 414 (1988).........................................................................10

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977).........................................................................16

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*N. Miss. Commc'ns, Inc. v. Jones,*
792 F.2d 1330 (5th Cir. 1986) ............................................................................3

*N.Y. Times Co. v. United States,*
403 U.S. 713 (1971)..........................................................................................2

*NAACP v. Button,*
371 U.S. 415 (1963)......................................................................................1, 10

*Neb. Press Ass'n v. Stuart,*
427 U.S. 539 (1976)...........................................................................................7

*NetChoice, LLC v. Attorney General, Florida,*
34 F.4th 1196 (11th Cir. 2022) ........................................................................11

*New York Times Co. v. Sullivan,*
376 U.S. 254 (1964)................................................................................8, 11, 12

*Nieves v. Bartlett,*
139 S. Ct. 1715 (2019).......................................................................................8

*Otto v. City of Boca Raton, Fla.,*
981 F.3d 854 (11th Cir. 2020) ...............................................................13, 14, 28

*Romer v. Evans,*
517 U.S. 620 (1996).........................................................................................19

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
515 U.S. 819 (1995)....................................................................................12, 13

*Rossignol v. Voorhaar,*
316 F.3d 516 (4th Cir. 2003) .............................................................................3

*Roth v. United States,*
354 U.S. 476 (1957).........................................................................................10

*Terminiello v. City of Chicago,*
337 U.S. 1 (1949).............................................................................................10

*Tex. Dep't of Cmty. Affairs v. Burdine,*
450 U.S. 248 (1981).........................................................................................20

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)..........................................................................7

*United States v. O'Brien*,
    391 U.S. 367 (1968).......................................................17, 18, 27, 28

*United States v. Windsor*,
    570 U.S. 744 (2013)........................................................................19

*Vessels v. Atlanta Indep. Sch. Sys.*,
    408 F.3d 763 (11th Cir. 2005) ........................................................20

### Other Authorities

Christina Pushaw (@ChristinaPushaw), Twitter (Apr. 21, 2022, 5:31
    PM)....................................................................................................25

Fatma Khaled, *Disney at Risk of Losing Its Own Government in
    Florida*, Newsweek (Apr. 1, 2022)....................................................24

H.B. 1557, 2022 Leg. (Fla. 2022) ...........................................................4

Hearing on HB 3C Before the Fla. H.R. State Affairs Comm., Special
    Session 2022C (Apr. 19, 2022)..........................................................24

Jacob Ogles, *Joe Gruters, Despite Special Session Votes, Still Sees a
    Beautiful Tomorrow with Disney*, Florida Politics (Apr. 22, 2022)...................24

Kirby Wilson & Jeffrey S. Solocheck, *DeSantis Signs So-Called
    'Don't Say Gay' Bill*, Tampa Bay Times (Mar. 28, 2022) ...................4

May 14, 2013 Letter from the Reporters Comm. for the Freedom of
    the Press to Att'y Gen. Eric Holder (May 14, 2013) ...........................3

Robert A. Caro, *The Passage of Power* (2012) .......................................2

Ron DeSantis, *The Courage to be Free* (2013) .................................23, 24

*S. Select Comm. to Study Governmental Operations with Respect to
    Intelligence Activities, Intelligence Activities and the Rights of
    Americans*, S. Rep. No. 94–755, bk. II (1976) .....................................2

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Walter Pincus & George Lardner, Jr., *Nixon Hoped Antitrust Threat Would Sway Network Coverage*, Wash. Post (Dec. 1, 1997)...............................2

## INTEREST OF AMICUS CURIAE

Amicus the Reporters Committee for Freedom of the Press is an unincorporated nonprofit association founded by journalists and media lawyers in 1970. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect and defend First Amendment freedoms and the newsgathering rights of journalists.

This case presents several issues of significant importance to journalists, news media organizations, and the public. Most importantly, Defendants ask this Court to depart from fundamental First Amendment precedent that prohibits government retaliation against a private speaker for commentary perceived by the state as critical—as Defendants have done here. As an organization dedicated to protecting the First Amendment freedoms of speech and of the press, amicus has a strong interest in ensuring the availability of relief when the government uses its vast authority in an unconstitutional manner.

The news media has a "special and constitutionally recognized role . . . in informing and educating the public, offering criticism, and providing a forum for discussion and debate." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 781 (1978). That role, while "supremely precious," is also "delicate and vulnerable." *NAACP v. Button*, 371 U.S. 415, 433 (1963). The news media's function as an independent check on government means that it may produce reporting perceived as

1

"embarrassing to the powers-that-be," *N.Y. Times Co. v. United State*s, 403 U.S. 713, 724 (1971) (Douglas, J., concurring), and the government may try to "censor the press" when it "censure[s] the Government," *id.* at 717 (Black, J., concurring).

Such efforts to leverage the state's powers against the press have occurred throughout American history and know no party or ideology. For instance, Lyndon Johnson forced the publisher of the *Houston Chronicle* to support Johnson's presidential candidacy to secure approval for a merger involving a bank the publisher also controlled. *See* Robert A. Caro, *The Passage of Power*, 523–27 (2012). The Nixon Administration threatened antitrust enforcement against broadcast networks to seek friendlier coverage of the administration. Walter Pincus & George Lardner, Jr., *Nixon Hoped Antitrust Threat Would Sway Network Coverage*, Wash. Post (Dec. 1, 1997), https://perma.cc/C42R-HKN8.

The government also has used other powers against journalists and news organizations in ways that undermine press independence. As the Church Committee documented in the 1970s, successive administrations engaged in the "wiretapping of newsmen" in a manner likely "to undermine the constitutional guarantee of a free and independent press." *S. Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, Intelligence Activities and the Rights of Americans*, S. Rep. No. 94–755, bk. II, at 201 (1976). That practice continued into the present. Under the Obama Administration, the Department of

Justice secretly subpoenaed telephone records of Associated Press journalists. *See* May 14, 2013 Letter from the Reporters Comm. for the Freedom of the Press to Att'y Gen. Eric Holder (May 14, 2013), https://www.rcfp.org/wp-content/uploads/imported/Media-coalition-letter-re-AP-subpoena.pdf.

The news media has persistently sought redress in the courts to protect its interests when subjected to retaliation by government officials. In *Rossignol v. Voorhaar*, for example, the Fourth Circuit rejected efforts to dismiss a suit under 42 U.S.C. § 1983 after sheriff's deputies organized a mass purchase, on the eve of an election, of a newspaper with reporting perceived as unfavorable to the sheriff's office. 316 F.3d 516, 527–28 (4th Cir. 2003). Notably, the court warned that the incident "belongs to a society much different and more oppressive than our own" and that "[i]f we were to sanction this conduct, we would point the way for other state officials to stifle public criticism of their policies and their performance." *Id.* In *El Día v. Rossello*, 165 F.3d 106, 109–10 (1st Cir. 1999), the First Circuit rejected a qualified immunity claim by the Governor of Puerto Rico sued by the island's largest newspaper and held it to be "obvious" that the withdrawal of substantial advertising spending from the newspaper for reporting perceived as critical—along with alleged promises to restore the spending in exchange for favorable coverage— was a clearly established violation of the First Amendment. *Id.*; *see also N. Miss. Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1337 (5th Cir. 1986) (vacating dismissal

3

of First Amendment retaliation claim by newspaper predicated on withdrawal of advertising). And news organizations brought claims after the Trump Administration suspended the press credentials of multiple reporters in response to their questioning of President Trump and an advisor during press events, making it impossible for those reporters to cover the White House. *See Karem v. Trump*, 960 F.3d 656, 657 (D.C. Cir. 2020).

Accordingly, the Reporters Committee, as an organization that represents journalists and advocates to protect their legal rights, respectfully writes to emphasize the importance of robust protections against First Amendment retaliation for all speakers, including members of the news media.

## SUMMARY OF ARGUMENT

In March 2022, the Florida Legislature considered and enacted a state law identified as House Bill 1557 that limits instruction on "gender identity or sexual orientation" in kindergarten through grade 3 or otherwise in a manner "that is not age-appropriate or developmentally appropriate."[1]   H.B. 1557, 2022 Leg. (Fla. 2022); *see also* Second Am. Compl. ("SAC"), Dkt. No. 87, ¶ 40.  While that law was under consideration by the Florida Legislature, and after Florida Governor

---

[1] Kirby Wilson & Jeffrey S. Solocheck, *DeSantis Signs So-Called 'Don't Say Gay' Bill*, Tampa Bay Times (Mar. 28, 2022), https://www.tampabay.com/news/florida-politics/2022/03/28/desantis-signs-so-called-dont-say-gay-bill/.

Ronald D. DeSantis signed it into law, speakers from across the political spectrum and around the country weighed in on what the law meant, what it would achieve, and whether it was good public policy. *See* SAC ¶ 50.

The Walt Disney Company ("Disney")—a global media company with a significant corporate presence in Florida—was one of the many commenters on the Florida statute. While House Bill 1557 was pending and after Governor DeSantis signed it, Disney and its subsidiaries issued statements expressing its opposition to the statute and committing to "supporting the national and state organizations working to achieve" the "repeal[]" of the law or obtaining a court order overturning it. *Id.* ¶¶ 45–46.

Governor DeSantis publicly said that he thought Disney had "crossed the line[.]" *Id.* ¶ 47. And the Governor pledged to "fight[] back" against Disney in response to its speech on a significant, high-profile public controversy affecting Disney's employees and business operations. *Id.*

Not long after these events, Governor DeSantis published a political memoir, *The Courage to Be Free*. His memoir included discussion of his thinking about Disney's political speech. He interpreted Disney's public comments as "a frontal assault on a duly enacted law of the State of Florida." *Id.* ¶ 48. And he also directly stated what happened next: because Disney engaged in core protected speech on public issues of the day, "[t]hings got worse for Disney," he wrote. *Id.*

5

The Second Amended Complaint alleges in detail that "[t]hings got worse for Disney" because the State of Florida took direct and immediate steps to make them worse.  Within months, the Florida Legislature had passed Senate Bills 1604 and 4C and House Bill 9B.  That package of legislation dissolved the Reedy Creek Improvement District, the 55-year-old governing jurisdiction and special taxing district specially created by the State of Florida in 1968 for Walt Disney World Resort and replaced it with a new oversight district with a board picked directly by the Governor.  *Id*. ¶ 17.

The allegations in the Second Amended Complaint present a vivid example of retaliatory government action taken expressly to punish protected speech on issues of significant public concern and importance—and to deter similar speech in the future.  As alleged, Governor DeSantis himself, along with a number of other Florida lawmakers, explained specifically and repeatedly that Florida was taking these steps to punish Disney for expressing opposition to a contentious law that Disney said directly affected its operations and personnel.  *See* SAC ¶¶ 46–47, 50–51, 58–60, 65–66, 71–73, 89–90, 94.

Disney's speech in opposition to that law falls squarely within the First Amendment's protections.  As the Supreme Court has explained, "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people.  The right of citizens to inquire, to hear, to speak, and to use

6

information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) (cleaned up). That principle is the bedrock of "[o]ur political system and cultural life" and government action that "stifles speech on account of its message, or that requires the utterance of a particular message" therefore "contravenes" the most fundamental of our constitutional rights. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). "First Amendment protection is 'at its zenith'" when, as here, the speech in question is "core political speech." *Buckley v. Am. Const. L. Found.*, 525 U.S. 182, 183 (1999) (quoting another source).

Defendants ask this Court to dismiss the Second Amended Complaint and allow allegations of brazen retaliation by the State of Florida for Disney's exercise of its First Amendment rights to go unchecked. But allowing the State of Florida's actions here to escape constitutional scrutiny would embolden public officials to retaliate against speakers—including journalists and news media organizations—for perceived criticism or unfair statements. Making the press vulnerable to such retaliation would threaten "an essential mechanism of democracy," *Citizens United*, 558 U.S. at 339, and would cause an "immediate and irreversible" impact on the First Amendment freedoms of journalists, *see Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). It would also violate what long experience has taught us to be the central meaning of the First Amendment: that speech the government perceives as

critical cannot be the subject of government sanction. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 276 (1964) (acknowledging the "broad consensus" that the Sedition Act of 1798, "because of the restraint it imposed upon criticism of government and public officials, was inconsistent with the First Amendment").

Defendants have argued, as relevant here, that Disney's claims should be dismissed because the alleged actions at issue would be permissible were they taken absent retaliatory motive. But the Second Amended Complaint includes a bounty of allegations that, taken as true as they must at this stage, make clear the outright retaliatory nature of the conduct at issue here. The Second Amended Complaint alleges that Governor DeSantis repeatedly said and wrote in his own memoir, and other Florida lawmakers echoed, that the actions against Disney were targeted and triggered by Disney's opposition to House Bill 1557. As alleged, the key actors in these events said clearly what they sought to achieve: to "make things worse" for Disney.

At a minimum, this Court should apply the burden-shifting framework regularly applied in First Amendment retaliation and many other contexts to require defendants to prove—not merely assert—a neutral, lawful purpose for challenged action, and permit plaintiffs in response to demonstrate that the proffered neutral rationale is in fact a pretext. *See, e.g.*, *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (observing that where plaintiffs made a "circumstantial demonstration" that

a retaliatory motive caused adverse government action, courts would "shift[] the burden to the defendant to show he would have taken the challenged action even without the impermissible motive"). Under that standard, the allegations in the Second Amended Complaint are more than a sufficient initial "demonstration" that Defendants retaliated against Disney in violation of the First Amendment.

The allegations in the Second Amended Complaint describe an extraordinary situation where the Governor and Legislature of the State of Florida specifically retaliated against Disney for its stated views on a specific public controversy. And the type of retaliatory action alleged here—an attempt to hit a perceived critic in the pocketbook—is particularly dangerous for journalists and news organizations. Without a check on state action of this kind, they will face the untenable and unconstitutional risk that watchdog journalism and coverage of public issues will lead to government actions of all kinds designed to punish and deter such reporting, all to the detriment of the free flow of information on matters of public concern that has long been the hallmark of our democratic system of government.

## ARGUMENT

## I.   The First Amendment prohibits the government from retaliating against a speaker as Defendants allegedly retaliated against Disney.

1.   The central purpose of the First Amendment is to promote robust public discourse and the free flow of information.

The right to speak freely—particularly, to engage in public and political

speech—is a fundamental tenet of American democracy.  It is what "sets us apart from totalitarian regimes." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). The First Amendment was fashioned to secure that right by protecting "an uninhibited marketplace of ideas." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 377 (1984)).  And it applies to *all* ideas—whether "unorthodox" or "controversial." *Roth v. United States*, 354 U.S. 476, 484 (1957).  Decades of Supreme Court precedent reflect this longstanding principle. *See, e.g.*, *Meyer v. Grant*, 486 U.S. 414, 421 (1988) ("The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.") (internal quotation marks and citation omitted); *id.* at 419 ("The First Amendment is a value-free provision whose protection is not dependent on the truth, popularity, or social utility of the ideas and beliefs which are offered.") (quoting *Button*, 371 U.S. at 445). And the Supreme Court has recently explained why:  "Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. . . .  The result is 'self-censorship' of speech that could not be proscribed—a 'cautious and restrictive exercise' of First Amendment freedoms." *Counterman v. Colorado*, 143 S. Ct. 2106, 2114–15 (2023) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974)).

These essential protections—which apply to all manner of expression—are most powerful for speech concerning issues of public significance, which is "at the

heart of the First Amendment's concern," *Bellotti*, 435 U.S. at 766, and "has always rested on the highest rung of the hierarchy of First Amendment values," *Carey v. Brown*, 447 U.S. 455, 467 (1980).  The central proposition that the First Amendment enshrines is the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  *Sullivan*, 376 U.S. at 270.  "The First Amendment helps to safeguard what Justice Holmes described as a marketplace of ideas.  A democratic people must be able to freely generate, debate, and discuss both general and specific ideas, hopes, and experiences. . . .  The First Amendment, by protecting the 'marketplace' and the 'transmission' of ideas, thereby helps to protect the basic workings of democracy itself."  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1476–77 (2022) (Breyer, J., concurring) (internal quotation marks and citation omitted).

These principles are "no less true because the speech comes from a corporation," like Disney or its subsidiaries, rather than from a natural person. *Bellotti*, 435 U.S. at 777; *see also Citizens United*, 558 U.S. at 339 (holding that First Amendment protections extend to the political speech of "both for-profit and nonprofit, both small and large, corporations"); *League of Women Voters of Cal.*, 468 U.S. at 375–76 (finding restrictions on "expression of editorial opinion" by noncommercial grantees of Corporation of Public Broadcasting violative of First Amendment); *NetChoice, LLC v. Attorney General, Florida*, 34 F.4th 1196, 1210

(11th Cir. 2022) ("Social-media platforms like Facebook, Twitter, YouTube, and TikTok are private companies with First Amendment rights, and when they (like other entities) disclose, publish, or disseminate information, they engage in speech within the meaning of the First Amendment.") (internal quotation marks and citation omitted).  Nor does it make any difference which of its many powers the government deploys to influence or suppress private speech.   Over our history, courts have confronted many different inroads on the broad compass for speech that the First Amendment secures, including—among others—civil penalties, *Sullivan*, 376 U.S. at 277; criminal penalties, *Citizens United*, 558 U.S. at 321; regulatory measures, *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293, 297 (1961); and selective taxation, *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 223 (1987).  All constitute unlawful "instruments to censor" that threaten to silence public discourse and pose a threat to the vitality of our democracy.  *Citizens United*, 558 U.S. at 340.

2. The First Amendment's clearest command is that the government cannot regulate speech based on disapproval of a specific viewpoint.

The First Amendment extends nearly absolute protection against government attempts to punish or control the specific views that a speaker expresses.  "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).  Discrimination based on viewpoint is thus "[o]ne of the most egregious types of First Amendment violations."  *Holloman ex rel.*

*Holloman v. Harland*, 370 F.3d 1252, 1279–80 (11th Cir. 2004); *see also Citizens United*, 558 U.S. at 340 ("[T]he First Amendment stands against attempts to disfavor certain subjects or viewpoints."); *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1109 (N.D. Fla. 2016) ("Viewpoint discrimination is an egregious form of content discrimination that courts will not tolerate.") (internal quotation marks omitted).  And it is equally clear that "the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression." *Rosenberger*, 515 U.S. at 828–29.  As the Eleventh Circuit has observed, "there is an argument that such regulations are unconstitutional *per se*; the Supreme Court has said that 'the First Amendment *forbids* the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 864 (11th Cir. 2020) (quoting *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)).

The Eleventh Circuit has struck down Florida laws precisely because they constituted viewpoint discrimination.  For example, in *Otto*, the Eleventh Circuit considered Boca Raton's and Palm Beach County's ordinances prohibiting therapists from "engaging in counseling or any therapy with a goal of changing a minor's sexual orientation, reducing a minor's sexual or romantic attractions (at least to others of the same gender or sex), or changing a minor's gender identity or

expression." 981 F.3d at 859. The court held that the ordinances "discriminate[d] on the basis of viewpoint," because they "codif[ied] a particular viewpoint—sexual orientation is immutable, but gender is not." *Id.* at 864. For that reason, the Eleventh Circuit found those ordinances were unlawful under the First Amendment. *Id.*

## II. Courts can and do invalidate laws motivated by impermissible animus regardless of whether that motive is apparent on the face of the law.

Defendants argue that nothing "on the face of [the] statutes themselves" renders the State of Florida's actions toward Disney unconstitutional and therefore Disney cannot bring a First Amendment claim based on the "purported illicit motive[s]" of the lawmakers who enacted them. CFTOD Defendants' Memorandum of Law in Support of Motion to Abstain or Dismiss, Dkt. 93-1, at 7 (hereinafter "CFTOD Brief"). Nothing could be further from the truth. It is an unremarkable, everyday analysis for a court, presented with what a defendant calls facially lawful conduct, to consider evidence establishing that the defendant violated the law. Courts regularly do so with respect to First Amendment retaliation claims just like those at issue here—and in many other familiar contexts such as Equal Protection and employment claims, among others.

At most, Defendants could argue that this Court should apply the burden-shifting framework familiar in similar contexts, where the initial burden would be on Disney to allege sufficient facts that, taken as true, would demonstrate that Defendants violated the Constitution by retaliating against Disney's protected

speech.  If it did so, then the burden would shift to Defendants to try to establish, on a fully developed record, that their conduct comported with the Constitution—with Disney then able to test that alternative explanation under rigorous scrutiny.

But under no circumstance is it enough for Defendants to merely claim—without allowing fact discovery to test that claim—that the State of Florida's unabashedly retaliatory conduct is immune from judicial review because the statutes at issue did not explicitly say they were enacted to target Disney for its opposition to House Bill 1557.  That position, if adopted, would shield virtually all retaliatory action, and, in other contexts, would threaten the ability of the press to vindicate its First Amendment rights in the face of brazen retaliation for its reporting.

In sum, it is essential that courts be able to inquire into and consider evidence of improper motive, precisely to guard against such efforts to stifle coverage and commentary on government activities.

1.   It is well-settled that state action retaliating against specific speakers for their protected speech is invalid under the First Amendment.

The Supreme Court has explained that "as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006).   "Some official actions adverse to such a speaker might well be unexceptionable if taken on other grounds, but when nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation

is subject to recovery as the but-for cause of official action offending the Constitution." *Id.* When plaintiffs make a "circumstantial demonstration" that "retaliatory animus" caused the "plaintiff's injury," the "burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of." *Id.* at 260–61. Or as the Court put it decades ago, once a plaintiff shows that "his conduct was constitutionally protected" and that adverse government action against him was "motivat[ed]" by a desire to retaliate against that conduct, the defendant must show "by a preponderance of the evidence that it would have" taken the same action against the plaintiff "even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

The Eleventh Circuit has expressly held that "[t]he Government may not retaliate against individuals or associations for their exercise of First Amendment rights by imposing sanctions for the expression of particular views it opposes." *Ga. Ass'n of Educators v. Gwinnett Cnty. Sch. Dist.*, 856 F.2d 142, 145 (11th Cir. 1988) (citation and internal quotation marks omitted). In *Gwinnett County*, the school board of Gwinnett County, Georgia, terminated a longstanding service that automatically deducted membership dues for a professional association of teachers employed by the Gwinnett County Board of Education. *Id.* at 143–44. The school board justified this termination decision by claiming a neutral rationale—"the

administrative cost of providing the service would be an unauthorized expenditure of public funds." *Id.* at 144. Plaintiffs challenging the termination submitted evidence that "the real reason for the termination of the dues deduction was . . . a desire to destroy" the professional association. *Id.*

As the Eleventh Circuit explained, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech"—otherwise, "his exercise of those freedoms would in effect be penalized and inhibited." *Id.* at 144–45 (citation omitted). And it found genuine issues of material fact as to whether the loss of the dues deduction service constituted the loss of a "valuable benefit" and whether the termination of that service was "retaliatory." *Id.* at 145. The court therefore reversed the grant of summary judgment. *Id.*

It is true, as the Supreme Court has held elsewhere, that courts pause before guessing at what may have motivated some legislators to vote for an otherwise-constitutional statute. *United States v. O'Brien*, 391 U.S. 367, 383–84 (1968). But in *O'Brien*, the conduct at issue—burning a draft card—was at most a case of speech fused with conduct, not pure speech. *Id.* at 376. It therefore could be regulated by a "sufficiently important governmental interest." *Id.* Further, the statute in question was a law of general applicability enacted well before the conduct at issue, and the record had only tenuous evidence of what purpose motivated the statute involved.

*Id.* at 369–70, 376, 385–86.  And the Supreme Court also has observed that a government action that otherwise comports with the Constitution may be impermissible where the government's "explanation" for that action is "merely a pretext for viewpoint discrimination" and the action was, in reality, "impermissibly motivated by a desire to suppress a particular point of view." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797, 812–13 (1985).  Further, this is not a case where the Court needs to guess at an impermissible motive.  Among other allegations, Governor DeSantis explicitly conceded in his own memoir that his and the legislature's efforts against Disney were in direct response to Disney's opposition to House Bill 1557.

Controlling constitutional precedent is unequivocal:  Any government action—no matter the instrument of state power involved—that singles out disfavored speakers, precludes them from expressing their views, or punishes them for having done so, is violative of the Constitution.  If not, the First Amendment would secure little freedom for expression at all.

2.    Courts regularly assess the motive of legislators.

Courts frequently consider whether government action was unlawful because it was motivated by a retaliatory purpose.  And First Amendment retaliation cases are not unique.  Courts routinely look past claimed neutral rationales in many contexts to hold that government conduct is unlawful when the true motive for that

conduct violated the law.  In other words, as the Supreme Court has observed, "[a]cts generally lawful may become unlawful when done to accomplish an unlawful end." *Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960) (citation omitted).  It is the responsibility and the ordinary practice of courts to police that line, no matter what rationale a government defendant offers.  *See, e.g.*, *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189–90 (2017) (invalidating a state legislative map under the Equal Protection Clause because of "the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not"); *United States v. Windsor*, 570 U.S. 744, 770 (2013) (striking down an act of Congress because it was "motived by an improper animus"); *Romer v. Evans*, 517 U.S. 620, 632 (1996) (finding that the "sheer breadth" of a state constitutional amendment was "so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects").

As in the First Amendment retaliation context, courts analyze laws under the Equal Protection Clause by applying a familiar burden-shifting framework: "Plaintiffs must first show that the State's decision or act had a discriminatory purpose and effect. . . .  Once discriminatory intent and effect are established, . . . the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this" unlawful intent.  *Greater Birmingham Ministries v. Sec'y of*

*State for Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) (internal citations and quotation marks omitted).

Employment litigation is another context where courts sort through plaintiffs' allegations of unlawful intent and defendants' arguments seeking to validate their conduct.  Under the *McDonnell Douglas* framework applicable in the employment context, a plaintiff challenging an adverse employment action "has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981).  "[I]f the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 253 (citation and internal quotation marks omitted).  And if the defendant carries that burden, the plaintiff "must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* Federal courts apply this "familiar" burden-shifting approach, *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767–68 (11th Cir. 2005), thousands of times a year in employment disputes nationwide.

Notably, and at the motion to dismiss stage, the Chief Judge of this Court recently applied a similar burden-shifting approach in *Dream Defenders v. DeSantis*, 553 F. Supp. 3d 1052 (N.D. Fla. 2021), involving First Amendment and Equal

Protection Clause challenges to House Bill 1, also known as Florida's "anti-riot" bill, which Governor DeSantis signed into law in April 2021.

The challengers argued that the statute in question was motivated by a racially discriminatory purpose, relying in part on "numerous statements made by Governor DeSantis" about the law and statements from Florida state legislators who "characterized the Act as a direct response to the Black-led protests advocating for racial justice and police reform that occurred throughout the summer of 2020." *Id.* at 1094. The Court held that these allegations were sufficient to survive the defendants' motion to dismiss on both First Amendment and Equal Protection grounds, holding that analysis of a state law allegedly motivated by an unlawful purpose "require[s] a fact intensive examination of the record, and therefore such a claim does not lend itself to dismissal in the pleading stages where the record is not fully developed." *Id.* (internal citation and quotation marks omitted). In particular, the Court noted that "the Governor's statements, coming from the official who allegedly played a substantial role in the promotion and promulgation of HB1, are highly relevant to establish an inference of discriminatory purpose. . . . At this stage in the litigation, such allegations are sufficient." *Id.* at 1095.

In each of these different areas of the law, including cases of retaliation against the press, when a plaintiff makes out a plausible preliminary case that an unlawful purpose animated the challenged act, courts require the government defendant to

21

show that its conduct would have occurred anyway without such a forbidden motive.
That is the test this Court should apply here.  What outcome this Court will reach
when it applies that analysis after fact discovery on a full record is a question that
does not need an answer today.  The only question now is whether Defendants should
escape, at the pleading stage, potential liability for the State of Florida's
acknowledged retaliation against Disney.  They should not.

## III.   In order to protect constitutionally mandated First Amendment interests, the Court should acknowledge that Plaintiffs have established a prima facie case of retaliation against their protected speech.

The facts alleged in the Second Amended Complaint, taken as true, make out
a prima facie case—based on allegations that Florida's leaders themselves
repeatedly and clearly said so in public—that the State of Florida sought to retaliate
against Disney and its subsidiaries because Disney expressed a view on a matter of
significant public moment that Florida's leaders disliked.  The Constitution does not
permit a State to engage in the conduct alleged.  A motion to dismiss is not the
appropriate place to adjudicate whether those allegations are true or false.  But taken
as true, those allegations amply satisfy the Plaintiff's obligation to make out a case
that it has been subject to unlawful First Amendment retaliation.

While Governor DeSantis and the Florida Legislature considered House Bill
1557, and after its enactment, Disney issued statements expressing its opposition to
that law and committing to work for it to be repealed or overturned.  *See* SAC ¶¶ 45–

46.  As with the government officials in the *El Día* and *Rossignol* cases, who used the levers of state power to retaliate against news organizations for coverage they deemed critical, the State of Florida, according to the Second Amended Complaint, swung into punitive action in response to Disney's protected speech.

Specifically, the Legislature passed and the Governor signed legislation that dissolved the Reedy Creek Improvement District.   SAC ¶ 17.   In addition to numerous statements by legislators acknowledging that this was meant to target Disney specifically, the Governor wrote in his memoirs that he only learned that other districts would be affected by the legislation after he worked with staff in the House to develop a plan to punish Disney.   SAC ¶ 54 (quoting DeSantis, *The Courage to be Free*, chapter 12).

The Second Amended Complaint details many other ways in which Governor DeSantis and Florida legislators allegedly registered their disapproval of Disney's protected expression on matters of public concern and explained that their reactions were motivated by, and targeted this specific speaker for, the views the speaker expressed in communicating its positions to the public:

- Representative Spencer Roach allegedly stated, "If Disney wants to embrace woke ideology, it seems fitting that they should be regulated by Orange County"[2];

- Representative Randy Fine allegedly said to the Florida House State Affairs Committee, "You kick the hornet's nest, things come up.  And I will say this:  You got me on one thing, this bill does target one company.  It targets The Walt Disney Company"[3];

- In his memoir, Governor DeSantis allegedly narrated his legislative campaign against Disney, writing, "Nobody saw it coming, and Disney did not have enough time to put its army of high-powered lobbyists to work to try to derail the bill. . . .  Disney had clearly crossed a line in its support of indoctrinating very young schoolchildren in woke gender identity politics"[4];

- Senator Joe Gruters, following the successful vote on Senate Bill 4C dissolving RCID, allegedly proudly exclaimed, "Disney is learning lessons and paying the political price of jumping out there on an issue"[5];

---

[2] Fatma Khaled, *Disney at Risk of Losing Its Own Government in Florida*, Newsweek (Apr. 1, 2022), https://www.newsweek.com/disney-risk-losing-itsown-government-florida-1693955.

[3] Hearing on HB 3C Before the Fla. H.R. State Affairs Comm., Special Session 2022C (Apr. 19, 2022) (remarks by Representative Randy Fine, sponsor of HB 3C, companion bill to SB 4C, starting at 1:13:00), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8085.

[4] Ron DeSantis, *The Courage to Be Free*, chapter 12 (2023).

[5] Jacob Ogles, *Joe Gruters, Despite Special Session Votes, Still Sees a Beautiful Tomorrow with Disney*, Florida Politics (Apr. 22, 2022), https://floridapolitics.com/archives/518669-joe-gruters-despite-special-session-votes-stillsees-a-beautiful-tomorrow-with-disney.

- Warning corporations against expressing disfavored viewpoints, Governor DeSantis's press secretary, Christina Pushaw, allegedly stated "Go woke, go broke."[6]

As alleged, the legislation challenged here singled out Disney, and Disney alone, to punish Disney for speaking out about major public issues about Florida's newly adopted law.

Nor is this merely an ordinary situation involving a squabble among politicians or the redistribution of political favors. Whatever ordinary presumption of regularity might attach to governmental action is more than rebutted here by the allegations in the Second Amended Complaint describing specific, unambiguous evidence of retaliatory animus inspired by core political speech about a public controversy. The extraordinarily candid admissions set out in the Second Amended Complaint from the Governor and other Florida leaders that they were in fact seeking to punish Disney for disagreeing with a Florida law far exceed the bar to plead a plausible case of First Amendment retaliation.

Because the threat of retaliation always hangs over the nation's newsrooms, it is essential that this Court upholds longstanding constitutional safeguards protecting speakers from harassment by government officials. Journalists and news organizations are particularly vulnerable to intimidation because reporting on

---

[6] Christina Pushaw (@ChristinaPushaw), Twitter (Apr. 21, 2022, 5:31 PM), https://twitter.com/ChristinaPushaw/status/1517254737401458690.

official activity routinely exposes them to the potential ire of public officials. If these officials believe they can punish their perceived critics as openly and unabashedly as is alleged in the Second Amended Complaint, the consequences for journalists and news media organizations—and the free flow of information to the public—would be dire.

## IV.   This Court should not permit admittedly pretextual justifications to defang the First Amendment.

The motions to dismiss nowhere deny that the actions at issue constitute First Amendment retaliation. Instead, Defendants point to the Eleventh Circuit's *In re Hubbard* decision and insist that their admitted attempts to punish Disney should be immune from constitutional protection. But in *Hubbard*, the Eleventh Circuit acknowledged the rule set down in *Gwinnet County*: governmental retaliation that "explicitly single[s] out a specific group" "support[s] an inquiry into the subjective motives of the legislators." *In re Hubbard*, 803 F.3d 1298, 1313–14 (11th Cir. 2015).

In *Hubbard*, unlike in *Gwinnett County*, Alabama enacted a "generally applicable" law that applied to an entire class of entities—all public-sector unions in the state—with no evidence that the statute was actually motived by retaliatory intent. *Id.* at 1314. The Eleventh Circuit explained why *Gwinnett County* was distinguishable: in *Gwinnett County*, the school board action at issue "single[d] out a specific group"; the action singling out that group "came after the superintendent

26

clashed with the [group] over its representation of school system employees before the board"; and "[t]he board members admitted that they had [taken the action at issue] for those reasons." *Id.*  In other words, the Eleventh Circuit has laid down a clear and administrable rule:  in the absence of evidence that a law is intended to retaliate against an identified target, neutral and generally applicable statutes are not subject to First Amendment claims.  But where a statute does "single out" a target— and evidence shows it is designed to retaliate against that target—the constitutional inquiry proceeds. *Id*.

There can be no serious question whether the Second Amended Complaint amply alleges that the State of Florida targeted Disney to retaliate against its dissenting speech.  It is plain from the content and context of these statutes, Governor DeSantis's repeated public comments and memoir, the debate in the Legislature, and public comments by Florida legislators and members of the Central Florida Tourism Oversight Board.  All are undisguised expressions of retaliatory intent catalogued in the Second Amended Complaint.

Nor can Defendants find any help from the Supreme Court's *O'Brien* decision, which is categorically different from this situation in ways that support denying the motion to dismiss here.  In *O'Brien*, the Supreme Court reinstated the conviction of a Vietnam War protestor who burned his draft card at a protest, violating a statute imposing criminal liability for such conduct.  391 U.S. at 369,

386.  First, the Court held that burning the draft card at most constituted an example

of "'speech' and 'nonspeech' elements [] combined in the same course of conduct,"

a form of conduct which can be regulated by a "sufficiently important governmental

interest."   *Id.* at 376.   This is a far cry from the open, self-confessed viewpoint

discrimination against core political speech at issue here—something the Eleventh

Circuit has said is probably "unconstitutional *per se*."   *Otto*, 981 F.3d at 864.

Second, the law at issue in *O'Brien* was a generally applicable statute enacted

well before the conduct at issue and that had nothing to do with the speaker or his

arguably expressive conduct.   *O'Brien*, 391 U.S. at 369, 370.   There is no

comparison between that statute and the government conduct at issue here, which

the Second Amended Complaint alleged was prompted by, and aimed at, Disney's

speech on a public controversy.   And third, in *O'Brien* there was practically no

evidence of why the statute in question had been enacted in the first place.   *Id.* at

385–86.   Here, according to the Second Amended Complaint, Governor DeSantis

and multiple other Florida leaders repeatedly made clear in public comments—and

Governor DeSantis even explained in his memoir—that the state's actions were

intended to punish Disney.

Defendants do not even try to argue that the laws were *not* motivated by

retaliation—nor could they at the motion to dismiss stage, where the allegations in

the Second Amended Complaint must be taken as true.   Instead, Defendants try to

immunize this alleged conduct entirely from judicial review.  Were that the law, First Amendment retaliation claims, even in the face of manifest evidence of retaliatory motive, would be much more difficult to bring, jeopardizing well-established constitutional protections strengthening the independence of the press.

## CONCLUSION

This is a significant First Amendment case.  One of the world's largest companies has alleged that a state openly acted to punish it for speaking out on issues of public concern—and the State has admitted as much.  The motions to dismiss should be denied.

Dated:  October 31, 2023

THOMAS & LoCICERO PL

*/s/ Carol Jean LoCicero*
Carol Jean LoCicero (FBN 603030)
601 South Boulevard
Tampa, FL  33606
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
clocicero@tlolawfirm.com

  - and -

Daniela B. Abratt (FBN 118053)
915 Middle River Drive
Suite 309
Fort Lauderdale, FL 33304
Telephone: (954) 703-3418
Facsimile: (954) 400-5415
dabratt@tlolawfirm.com

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*
THEODORE J. BOUTROUS, JR.
*(PRO HAC VICE)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
TBoutrous@gibsondunn.com

CONNOR S. SULLIVAN
*(PRO HAC VICE)*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone: (213) 351-2459
CSSullivan@gibsondunn.com

BRUCE D. BROWN
KATIE TOWNSEND
GABE ROTTMAN
REPORTERS COMMITTEE FOR

29

FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
bruce.brown@rcfp.org
ktownsend@rcfp.org
grottman@rcfp.org
*Counsel for Amicus Curiae*

## **CERTIFICATE OF WORD COUNT**

Pursuant to Northern District of Florida Rule 7.1(F), I HEREBY CERTIFY that the foregoing Brief Of Amicus Curiae The Reporters Committee For Freedom Of The Press In Support Of Plaintiff Walt Disney Parks And Resorts U.S., Inc., including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 6,753 words as measured by Microsoft Office for Word.

*/s/ Theodore J. Boutrous, Jr.*

THEODORE J. BOUTROUS, JR.

(*PRO HAC VICE*)

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 31, 2023, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

*/s/ Theodore J. Boutrous, Jr.*
THEODORE J. BOUTROUS, JR.
(*PRO HAC VICE*)
