UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

WALT DISNEY PARKS AND RESORTS U.S., INC.,

   *Plaintiff*,

v.                                       No. 4:23-cv-163-AW-MJF

RON DESANTIS, in his official capacity
as Governor of Florida, et al.,

   *Defendants*.
_____/

**STATE DEFENDANTS' REPLY
IN SUPPORT OF MOTION TO DISMISS**

After two rounds of briefing, one thing is clear: Disney misunderstands standing. Its response teems with majestic generalities about how the State Defendants "implement[], administer[], [and] enforc[e]" the challenged provisions. *E.g.*, DE98 at 2. But Disney must do more than generalize: It must identify some power the State Defendants exercise that would make an injunction against them "effectual." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). Disney has not. As for sovereign and legislative immunity, Disney has offered nothing to rebut the points made in the State Defendants' motion to dismiss, so the State Defendants rest on their earlier briefing. DE94 at 19–21.

# ARGUMENT

**DISNEY LACKS STANDING TO SUE THE STATE DEFENDANTS.**

Because Disney's alleged injuries are neither traceable to the State Defendants nor redressable by an injunction against them, it lacks standing. *Support Working Animals*, 8 F.4th at 1201.

### A. The Governor

**1.** Disney first contends that it has standing to sue the Governor for reorganizing RCID because its injuries are traceable to the Governor's appointment power. DE98 at 6–12. But to establish standing, Disney must show that the Governor's exercise of appointment power injures Disney, not just that it is allegedly unconstitutional. *See* DE94 at 13–14, 17–18; *Granite State Outdoor Advert., Inc. v. City of Clearwater*, 351 F.3d 1112, 1117 (11th Cir. 2003) (plaintiff had standing to challenge a provision that harmed him, but lacked standing to challenge other provisions that did not, no matter whether those provisions were unconstitutional); *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.").

Disney has not made that showing. It claims injury from the many actions that CFTOD's "governing structure" empowers the District to take in regulating Disney, such as "construct[ing] a state prison or develop[ing] a rival theme park." DE98 at 7–8. But Disney could not prevent CFTOD from doing any of that by enjoining the

Governor from appointing people. *See* DE94 at 10 n.6 (collecting cases holding that a regulator's actions are not traceable to the regulator's appointer even under the more-relaxed standard for overcoming sovereign immunity). Nor could this Court forestall those regulatory acts by accepting Disney's invitation to "invalidat[e] the reorganization laws and direct[] the Governor to rescind his . . . appointments." DE98 at 8. This Court cannot "invalidate" laws; it can only enjoin actors. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020) (citing Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018)). And it cannot order the Governor to "rescind" completed appointments, because the CFTOD board members do not serve at his pleasure. *See* Ch. 2023-5, § 4, Laws of Fla.; *State v. Giblin*, 124 So. 375, 377 (Fla. 1929) (citing *Marbury v. Madison*, 5 U.S. 137, 157 (1803)).[1]

Disney also reprises the sovereign-immunity analysis in *Los Angeles County Bar Ass'n v. Eu* to assert that the Governor has a "specific connection" to the laws restructuring RCID, which is supposedly all that "standing rules require." DE98 at 9–10 (citing 979 F.2d 697, 704 (9th Cir. 1992)). But that is not all that standing requires. As the Governor has thrice explained, a plaintiff must satisfy more than *Ex parte Young*'s "some connection" standard to establish traceability and

---

[1] All references to HB 9B in this reply refer to sections of the amended CFTOD charter, not to the section numeration in HB 9B itself.

3

redressability under Article III. DE94 at 12; DE82 at 4–5; DE49 at 17. Even Disney concedes that "the 'some connection' requirement of *Ex parte Young* is more lenient than the traceability and redressability requirements of Article III." DE98 at 19. *Eu*'s sovereign-immunity analysis therefore says nothing of whether there is standing to sue the Governor. *See Jacobson*, 974 F.3d at 1256 (declining to extend sovereign-immunity precedent to the standing context). That is why the Ninth Circuit separated its sovereign-immunity analysis from its standing analysis. *Compare Eu*, 979 F.2d at 700–01 (standing), *with id.* at 704 (sovereign immunity). And Disney still cannot bring itself to defend *Eu*'s standing analysis—no doubt because Eleventh Circuit precedent forecloses *Eu*'s imprecise approach to standing. DE94 at 12–13.

Disney responds that because it "claims injury from the elimination of landowner-voting rights . . . an order enjoining only [the Governor's] unlawful appointments" would provide it at least partial relief. DE98 at 10. But the Governor did not eliminate Disney's voting rights; the legislative act repealing RCID's prior electoral structure did that. DE94 at 11–12. The Governor also does not regulate Disney; CFTOD does that. DE94 at 14–15. Enjoining him would not provide even the "partial remedy" Disney seeks. DE98 at 10.

Finally, Disney claims that the Governor's appointment power "aggravates" the loss of its electoral monopoly because it causes Disney to be regulated by CFTOD, rather than by local city and county officials. DE98 at 10–11. But the act

4

of appointing CFTOD board members is not what separates Disney from its preferred local regulators—it is the *law* charging CFTOD with authority over Disney's land. *See* DE94 at 11–12; *see also* Ch. 2023-5, § 2 at 1–2. The redressability prong underscores the point: Were this Court to enjoin the Governor's appointment power, Disney *still* would not be regulated by local city and county officials; it would remain under CFTOD's authority. Once again, Disney's problem is not with the Governor's "enforcement" of HB 9B, but with "the law's very existence." *Equal. Fla. v. Fla. State Bd. of Educ.*, No. 4:22-cv-134, 2022 WL 19263602, at *2 (N.D. Fla. Sept. 29, 2022).[2]

2.  Disney also asserts that the regulatory acts of CFTOD's board are traceable to the Governor because he has "actual control over the [board's] actions." DE98 at 14 (emphasis omitted).[3] Yet Disney cites no case—nor is the Governor aware of one—in which a plaintiff has established standing to sue the appointer of a regulator because the appointer purportedly had informal control over that regulator.

---

[2] Disney contends that the analysis in *Equality Florida* is inapplicable both because "Disney claims injury from the Governor's exercise of appointment power" and because "Disney's alleged injuries flow directly from the statutes' actual implementation by the Governor." DE98 at 11–12. But as explained above, its injuries do not flow from the Governor's appointment power, so *Equality Florida* is on point.

[3] Disney has abandoned reliance on the Governor's suspension authority to establish standing. *Compare* DE58 at 10 (arguing in its first motion-to-dismiss response that the Governor was "indirectly" coercing CFTOD's board through his "suspension powers"), *with* DE98 (nowhere mentioning the Governor's suspension powers). That is for good reason—the Governor's suspension power is insufficient to establish traceability. DE94 at 16–17.

All of the cases Disney cites instead involved the "predictable effect of" *formal* government power on third parties. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (standing found when Secretary of Commerce's census questions would predictably lead third parties not to respond to the census); *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) (same when Fish and Wildlife Service's published opinion would predictably lead agencies to alter their conduct); *see also* DE94 at 13–14 (collecting Eleventh Circuit standing cases involving formal government power).

It is unsurprising that Disney has been unable to muster a case to support its novel theory. Were it accepted, "a plaintiff could drag anyone—lobbyists for example—with no relevant enforcement authority into countless lawsuits simply by claiming" that they informally control those who do. DE94 at 14. Top-level officials would risk having to defend laws that they have no formal power to enforce by touting their administrations' achievements, and to be ordered to do things they have no power to do. Worse, Disney's theory presumes that board members will simply stop regulating Disney once the Governor is enjoined from ordering that they do so. But Disney forgets that HB 9B "independent[ly] obligat[es]" the board to regulate Disney, no matter what the Governor orders. DE94 at 14–15. So enjoining the Governor would not halt the board's regulatory efforts, and thus, would not provide the relief that Disney seeks. *See City of South Miami v. Governor*, 65 F.4th 631, 643–45 (11th Cir. 2023); *see also Universal Life Church Monastery Storehouse v. Nabors*, 35

6

F.4th 1021, 1033 (6th Cir. 2022) (no standing to sue state attorney general when local officials had independent obligation to enforce the challenged law).

### B. The Secretary

Disney agrees that the Secretary's sole connection to the District is his responsibility to include the District on the Official List of Special Districts. DE98 at 15. But Disney still does not explain how its "injuries are directly traceable to the Secretary's executive determination that CFTOD" should be included on the Official List. DE98 at 15. The List does not empower the District to regulate Disney; HB 9B does that. *See* Ch. 2023-5, §§ 1–2, 7. Inclusion on the List also is not a prerequisite to the District's existence or exercise of its powers; that again is governed by HB 9B. *See id.* And though the List triggers "reporting and qualification requirements," DE98 at 15 (collecting examples), those requirements merely charge the District with satisfying administrative obligations, like "forward[ing]" to the Secretary the operative law creating the District, or keeping the Secretary apprised of changes to the District's boundaries, *e.g.*, Fla. Stat. § 189.016(1)–(2). Those procedural burdens are not grants of power, and they have nothing to do with the only injuries asserted by Disney—the loss of its electoral stranglehold and future regulation by CFTOD's board.

Ignoring all that, Disney repeats its circular claim that its "injuries are directly traceable" to the District's placement on the Official List because "the Secretary

7

cannot include the District on the Official List as a lawfully constituted special district." DE98 at 15. As the Secretary has explained twice, "that merely restates the end-result of Disney's constitutional theory; it says nothing of what *concrete harm* Disney suffers from the District's placement on the Official List," or how removing the District from the list would redress Disney's harms. DE94 at 17; DE82 at 9.

In its last bid, Disney spills much ink explaining that standing is not a matter of "degree," and that even "ministerial duties" can establish traceability and redressability. DE98 at 16–18. But that misses the point. Even if ministerial duties can satisfy standing, the Secretary's ministerial duty of maintaining the Official List cannot, because the Official List does not inflict any of Disney's alleged injuries. DE94 at 17–19. The cases cited by Disney show why. In *Kilbourn v. Thompson*, 103 U.S. 168 (1880), the House sergeant-at-arms was a proper defendant because the "ministerial function of executing [an] arrest order" would cause injury to the plaintiff—an arrest. *See* DE94 at 17. So too in *Jacobson*, where the ministerial acts of individual Supervisors of Elections would lead voters to receive allegedly unlawful ballots. 974 F.3d at 1253, 1258. By contrast, the District's inclusion on the Official List neither eliminates Disney's voting rights, nor affects the District's ability to exercise its regulatory powers. So the List does not cause any of the injuries that Disney seeks to remedy.

## CONCLUSION

The Court should dismiss the operative complaint, or at minimum, dismiss all claims against the State Defendants.

Dated: November 9, 2023

Respectfully submitted,

ASHLEY MOODY
  *Attorney General of Florida*

JOHN GUARD (FBN 374600)
  *Chief Deputy Attorney General*

JAMES H. PERCIVAL (FBN 1016188)
  *Chief of Staff*

*/s/ Henry C. Whitaker*
HENRY C. WHITAKER (FBN 1031175)
  *Solicitor General*

DANIEL W. BELL (FBN 1008587)
  *Chief Deputy Solicitor General*

DAVID M. COSTELLO (FBN 1004952)
  *Deputy Solicitor General*

**OFFICE OF THE ATTORNEY GENERAL**
The Capitol, PL-01
Tallahassee, FL 32399
(850) 414-3300
henry.whitaker@myfloridalegal.com

*Counsel for Governor DeSantis and Secretary Kelly*

## CERTIFICATE OF COMPLIANCE

This motion complies with the requirements of Local Rule 7.1(F) because it contains 1,901 words.

*/s/ Henry C. Whitaker*
Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2023, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Henry C. Whitaker*
Solicitor General
