# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**WALT DISNEY PARKS AND**
**RESORTS U.S., INC.,**

    **Plaintiff,**

v.                                                                        Case No. 4:23-cv-163-AW-MJF

**RONALD D. DESANTIS, in his official**
**capacity as GOVERNOR OF FLORIDA,**
**et al.,**

    **Defendants.**

_____/

## **ORDER GRANTING MOTIONS TO DISMISS**

In 1967, Florida's Legislature created the Reedy Creek Improvement District (RCID), a special improvement district in Central Florida. *See* Ch. 67-764, Laws of Fla. The district is perhaps best known as the home of Walt Disney World, which has operated there for decades. And as the district's largest landowner, Disney[1] has effectively controlled the district's board, whose members were elected based on land ownership. That changed last year, after the Florida Legislature substantially amended the district's governing structure. Now, Florida's Governor selects the board members, subject to Senate confirmation. *See* Ch. 23-5, § 2(4)(1), Laws of Fla. As a result, Disney no longer controls the special improvement district in which

---

[1] This order will refer to Plaintiff Walt Disney Parks and Resorts, Inc., as "Disney," for short.

1

it operates. (That district is now called the Central Florida Tourism Oversight District, or CFTOD. *See id.* § 2(1).)

This change—which works to Disney's significant detriment—came after Disney publicly criticized another Florida law, the Parental Rights in Education Act. In Disney's view, this timing was no coincidence. Disney alleges that the Florida Legislature changed the district's governing structure to punish it for its speech. The issue in this case is whether the Legislature's action constituted unlawful retaliation against Disney's speech in violation of the First Amendment.[2]

Defendants are the Governor, the Secretary of Florida's Department of Commerce,[3] and all members of CFTOD's board. All Defendants moved to dismiss. The Governor and the Secretary argue lack of standing and Eleventh Amendment

---

[2] There are two legislative enactments at issue. In 2022, the Legislature enacted SB 4-C, which would dissolve "any independent special district established by a special act prior to the date of ratification of the Florida Constitution" unless the district was "reestablished, re-ratified, or otherwise reconstituted" before June 1, 2023. Ch. 22-266, § 1(2), Laws of Fla. Absent further legislative action, that would have dissolved RCID altogether. But in February 2023, through HB 9-B, the Legislature reenacted the RCID charter, while renaming the district and amending its governing structure. *See* Ch. 23-5, § 2(4)(1), Laws of Fla. The result is the new governing structure, which Disney challenges.

[3] In its Second Amended Complaint, Disney names "Meredith Ivey, in her official capacity as Acting Secretary of the Florida Department of Economic Opportunity." ECF No. 87. That department has since been renamed to the Department of Commerce, *see* Ch. 23-173, Laws of Fla., and J. Alex Kelly has replaced Ivey. He is therefore automatically substituted as Defendant. Fed. R. Civ. P. 25(d).

immunity. The CFTOD Defendants argue Disney's claim fails on the merits. After a hearing, and having carefully considered the parties' arguments, I now grant both motions.

In short, Disney lacks standing to sue the Governor or the Secretary, and its claims against the CFTOD Defendants fail on the merits because "when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose." *In re Hubbard*, 803 F.3d 1298, 1312 (11th Cir. 2015).

## I.

Before proceeding to the merits, a federal court must ensure that it has jurisdiction. "Article III of the United States Constitution limits the 'judicial Power'—and thus the jurisdiction of the federal courts—to 'Cases' and 'Controversies.'" *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc) (quoting U.S. Const. art. III, § 2). Because the standing doctrine is "an essential and unchanging part of the case-or-controversy requirement," *id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)), if Disney lacks standing, the court may not consider the merits of its claim, "no matter how weighty or interesting," *id.*

Standing requires three elements: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed

3

by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan*, 504 U.S. at 560-61). At this stage, all Disney must do is allege facts that—if true—would support each element. *See Lujan*, 504 U.S. at 561; *see also Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008) (noting need to "sufficiently allege[] a basis" for each element). But because "standing is not dispensed in gross," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), Disney must show standing as to each Defendant it has sued. As explained below, Disney has alleged enough for standing as to the CFTOD Defendants but not as to the Governor or the Secretary.

Before the legislative amendments, Disney enjoyed voting rights in the district that regulated its property. *See* ECF No. 87 ¶ 39. Now it does not. Now it faces land-use decisions by a board over which it has no control.[4] Disney's loss of control is enough to constitute a constitutional injury. And that injury is clearly traceable to the board that now makes land-use decisions affecting Disney. The last element—redressability—"often travel[s] together" with traceability, *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021), and is also

---

[4] These basic facts appear undisputed, but either way, the court accepts Disney's factual allegations as true at this stage. *See Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265 (11th Cir. 2012).

present here. An injunction precluding the CFTOD Board from exercising its authority would redress Disney's injury, at least in part.

The CFTOD Defendants argued, with some force, that an injunction could not restore the prior regime. An injunction could not, they argue, allow Disney to again elect its own governing board.[5] But "the relief sought need not be complete" for standing. *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 927 (11th Cir. 2023). Instead, even "the ability 'to effectuate a partial remedy' satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)). For now, it is enough to say that enjoining the CTFOD Defendants from exercising any authority would at least partially remedy Disney's asserted injury, which includes its operating subject to the new board's control. Disney has alleged enough to show standing to sue the CFTOD Defendants.

Disney has not, though, shown standing to sue the Governor or the Secretary. As to the Governor, Disney alleges traceability on two bases: the Governor's power to appoint CFTOD board members and the Governor's "actual control" over the CFTOD board. ECF No. 98 at 11-19. Neither basis works. To the extent the

---

[5] The CFTOD Defendants did not argue standing in their motion to dismiss. But at the hearing, they adopted the other Defendants' arguments that Disney lacked standing as to all Defendants.

5

Governor contributed to Disney's injury by appointing CFTOD board members, that action is in the past. Because Disney seeks injunctive relief, it must allege an imminent future injury, *see City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983), and it has not alleged facts showing that any imminent future appointments will contribute to its harm. The analysis could be different if the Governor had not yet made any appointments. But as things stand, if this court enjoined future appointments, Disney would face the same situation it faces now: it would be operating under the CFTOD board, over which it has no control. Stopping hypothetical future appointments would not redress any alleged imminent harm. *City of S. Miami v. Governor*, 65 F.4th 631, 643 (11th Cir. 2023) (finding no standing to sue Governor and noting that plaintiffs had to show Governor's appointment authority "would contribute to their alleged harm").

To the extent Disney contends the Governor is "exercis[ing] actual control over the District Board's actions," ECF No. 98 at 19, its argument fares no better. Allegations that the CFTOD board "operates as a 'state receivership' under the 'Governor's thumb,'" *id.*, are conclusory. Disney has not alleged any specific actions the new board took (or will take) because of the Governor's alleged control. In fact, Disney has not alleged any specific injury from any board action. Its alleged injury, as discussed above, is its operating under a board it cannot control. That injury would exist whether or not the Governor controlled the board, meaning an injunction

6

precluding the Governor from influencing the board would not redress Disney's asserted injury.[6] *See Support Working Animals, Inc.*, 8 F.4th at 1205 (finding no standing because even with a favorable decision, challengers "would remain in the same position they were in when they filed the operative complaint"). Disney has not shown standing to sue the Governor.

Disney also lacks standing to sue the Secretary. Disney struggled to articulate any injury attributable to the Secretary. At best, it contends that the Secretary's duties include "maintain[ing] the Official List of Special Districts." ECF No. 94 at 17 (quoting Fla. Stat. §§ 189.061, 189.012). But that list—or the Secretary's authority in keeping it—does nothing to affect the CFTOD Defendant's authority. Thus, even though ministerial duties can sometimes support standing, *see Strickland v. Alexander*, 772 F.3d 876, 886 (11th Cir. 2014), the Secretary's list-keeping duties here do not.[7]

---

[6] Moreover, because Disney's claim is that the laws are unconstitutional, the remedy would be precluding the law's enforcement. If the Governor were influencing or directing the board's action, he would not be *enforcing* the new law while doing so. *Cf. Jacobson*, 974 F.3d at 1255 (noting that "federal courts have no authority to erase a duly enacted law from the statute books" but may "enjoin executive officials from taking steps to enforce a statute" (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018))).

[7] Because Disney lacks standing to sue the Governor and the Secretary, I need not address those Defendants' Eleventh Amendment or legislative immunity arguments. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584-85 (1999) (noting how courts may "choose among threshold grounds for denying audience to a case on the merits").

7

Accordingly, Disney's claims against the Governor and the Secretary will be dismissed for lack of jurisdiction. The remaining question is whether Disney's claim against the CFTOD Defendants can succeed on the merits.

## II.

"As a general matter, the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (cleaned up). But it is settled law that "when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose." *Hubbard*, 803 F.3d at 1312. The Eleventh Circuit has "held that many times." *Id.* And this settled law forecloses Disney's claim.

In *Hubbard*, the Eleventh Circuit relied heavily on *United States v. O'Brien*, a leading First Amendment precedent. 391 U.S. 367 (1968). The *O'Brien* plaintiff burned his Selective Service registration certificate to protest the Vietnam War. *Id.* at 369. Charged with violating a statute that prohibited knowingly destroying such certificates, he claimed the statute was unconstitutional because its purpose was to suppress free speech. *Id.* at 370. But the United States Supreme Court rejected his claim. *Id.* at 383. It noted the "hazardous" nature of inquiring into legislative motive, and it declined to void a statute "essentially on the ground that it is unwise legislation

8

which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it." *Id.* at 383-84. In other words, because Congress could have criminalized burning draft cards for a legitimate reason, the Court would not consider Congress's actual motivation. It would "not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Id.* at 383.

The Eleventh Circuit applied that clear rule in *Hubbard*. 803 F.3d at 1301. After Alabama enacted a statute restricting payroll deductions for public-employee union dues, a public-employee union and others brought a First Amendment challenge. They contended the Legislature enacted the law to retaliate against the union plaintiff for its political speech. *Id.* at 1301. But on its face, the statute did "not implicate any constitutionally protected conduct," meaning it was facially constitutional. *Id.* at 1313 (quoting *Ala. Educ. Ass'n v. State Superintendent of Educ.*, 746 F.3d 1135, 1139 (11th Cir. 2014)). Plaintiffs' only basis for their claim was "the alleged retaliatory motive that Alabama's lawmakers had" in enacting the law. *Id.* And that was "precisely the challenge that *O'Brien*, and [Eleventh Circuit] decisions following it, foreclose." *Id.* More recently, in *NetChoice, LLC v. Attorney General of Florida*, the Eleventh Circuit reaffirmed the principle from *O'Brien* and *Hubbard*, explaining that "courts shouldn't look to a law's legislative history to find an

9

illegitimate motivation for an otherwise constitutional statute." 34 F.4th 1196, 1224 (11th Cir. 2022) (citing *Hubbard*).

A straightforward application of *Hubbard* resolves this case. As Disney appropriately acknowledges, the Legislature can determine the structure of Florida's special improvement districts. Disney does not argue that the First Amendment (or anything else) would preclude the Legislature from enacting the challenged laws *without* a retaliatory motivation. *Cf. O'Brien*, 391 U.S. at 384 (noting that "Congress had the undoubted power to enact" the challenged law). The laws here, as in *Hubbard*, do not facially "impinge on any constitutional rights." 803 F.3d at 1313. And as in *Hubbard*, the only basis for the claim here is that the Legislature had a retaliatory motive. So as in *Hubbard*, there is no "cognizable First Amendment claim." *Id.*

Disney resists this conclusion in several ways. But it cannot escape *Hubbard* or its holding.

### A.

First, Disney argues that notwithstanding *Hubbard*, "courts frequently inquire into legislative motive to determine whether a facially constitutional statute was enacted for an impermissible purpose." ECF No. 97 at 23-24. But it relies on race and religion cases, as well as cases involving statutes designed to regulate speech. *Id.* (citing *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178 (2017) (race-

based redistricting case); *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) (case involving law with "purpose to suppress speech"); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) (case involving legislative intent to discriminate against specific religious exercise); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) (case involving intent to suppress speech)). Those cases present different issues. *See Hubbard*, 803 F.3d at 1312 n.14 ("Our discussion of the *O'Brien* rule is limited to the context before us: a free-speech retaliation challenge to an otherwise constitutional statute."). The fact that other types of claims allow evaluation of legislative purpose does not undermine *Hubbard*'s application here. *Cf. NetChoice*, 34 F.4th at 1225 (noting that although "in the *free-exercise* context, it was appropriate to look beyond 'the text of the laws at issue' to identify discriminatory animus against a minority religion[,] . . . NetChoice hasn't cited—and we're not aware of—any Supreme Court or Eleventh Circuit decision that relied on legislative history or statements by proponents to characterize as viewpoint-based a law challenged on *free-speech* grounds"); *cf. Fraternal Ord. of Police Hobart Lodge No. 121, Inc. v. City of Hobart*, 864 F.2d 551, 555 (7th Cir. 1988) ("The political process is not impaired when legislators are merely forbidden to engage in invidious

11

discrimination. It *is* impaired when legislators are forbidden to favor their supporters and disfavor their opponents.").[8]

**B.**

Second, Disney contends that the challenged laws explicitly target it, making *Hubbard* inapplicable. The *Hubbard* principle does not apply when "a law is challenged as a bill of attainder." 803 F.3d at 1312 n.14; *see also O'Brien*, 391 U.S. at 383 n.30. And although Disney does not challenge the laws as bills of attainder, it labels the laws "attainder-like" and seeks to squeeze into the exception. ECF No. 97 at 25.

Disney primarily relies on the Eleventh Circuit's earlier decision in *Georgia Ass'n of Educators v. Gwinnett County School District*, 856 F.2d 142 (11th Cir. 1988), which allowed a First Amendment retaliation claim. But as *Hubbard* noted,

---

[8] In *NetChoice*, the court discussed *Turner, Church of Lukumi Babalu Aye*, and *Sorrell* but concluded that there was "not enough to overcome the clear statements in *Hubbard* and *O'Brien*." 34 F.4th at 1224. Moreover, although *Sorrell* and *Turner* involved free speech claims, they were not retaliation claims, and—at any rate—preceded *Hubbard*. Although Disney does not explicitly argue *Hubbard* was wrong, to the extent Disney contends *Hubbard* is inconsistent with *Sorrell* or *Turner*, *Hubbard* remains binding nonetheless. *See United States v. Fritts*, 841 F.3d 937, 942 (11th Cir. 2016) (noting that when it comes to binding Circuit precedent, "there is never an exception carved out for overlooked or misinterpreted Supreme Court precedent"); *Smith v. GTE Corp.*, 236 F.3d 1292, 1303 (11th Cir. 2001). Finally, in *Sorrell*, the Court looked specifically to the statute's "formal legislative findings" to "dispel 'any doubt' that the challenged statute was content-based." *See NetChoice*, 34 F.4th at 1225 (quoting *Sorrell*, 564 U.S. at 564-65). Here, Disney does not rely on "formal legislative findings" but only on the allegedly retaliatory motives of those who enacted the challenged laws.

12

the county's retaliatory action in *Gwinnett County* "explicitly single[d] out a specific group." *Hubbard*, 803 F.3d at 1314. The school board explicitly terminated automatic payroll deductions only for the "members of the Georgia Association of Educators . . . and its local affiliate, the Gwinnett County Association of Educators." *Id.* "That fact made *O'Brien* inapplicable because the *O'Brien* rule applies only where the law at issue is 'constitutional on its face.'" *Id.* (quoting *O'Brien*).

In other words, the *Gwinnett County* policy was not "constitutional on its face" because it explicitly singled out a discrete group. The law in *Hubbard*, on the other hand, was "constitutional on its face" because it did not. This was true even though the *Hubbard* plaintiffs claimed the law "was an unconstitutional act of governmental retaliation *against* [plaintiff] AEA for its past acts of political expression," *id.* at 1304 (emphasis added)—just as Disney claims that the laws here were an unconstitutional act of retaliation against it for its political expression. Thus, this case is like *Hubbard* and unlike *Gwinnett County*. *See Hubbard*, 803 F.3d at 1314 ("The facts of [*Gwinnett County*] limit the holding of the decision to acts of governmental retaliation that explicitly single out a specific group.").

Disney also argues that even if the laws do not explicitly target it, they come close enough to warrant a *Hubbard* exception. But there is no "close enough" exception. A law either explicitly singles out a specific group or it does not, and the laws here do not. In arguing otherwise, Disney relies on Judge Posner's opinion in

13

*Fraternal Order of Police Hobart Lodge No. 121 v. City of Hobart.* ECF No. 97 at 26 (quoting *Hobart,* 864 F.2d at 554). But that case—in which a First Amendment retaliation claim failed because the challenged law did *not* single out anyone—only undermines Disney's position.

In *Hobart*, the mayor and city council had adopted an ordinance requiring city employees to work at least 40 hours weekly. 864 F.2d at 553. The change made no difference to city employees who already worked regular hours, but "it made a big difference to Hobart's police." *Id.* Police officers and their union sued, contending that the mayor and council adopted the ordinance in retaliation for the police's political opposition. *Id.* Relying on the *O'Brien* principle, the court rejected the claim. It rejected an argument that the law "pinpointed" police, noting that "[n]o outside observer reading Hobart's 40-hour-a-week ordinance would suppose it directed against the police or any other definable group. It does not mention police . . . ." *Id.* at 554. Here, similarly, no one reading the text of the challenged laws would suppose them directed against Disney. The laws do not mention Disney.

Disney is left to argue that we should go beyond the laws' text and see what they do in operation. The principal problem with this argument is that it ignores *Hubbard*'s holding precluding retaliation claims against "facially constitutional" laws. 803 F.3d at 1312. But the secondary problem is that the laws' effects are not limited to Disney. The laws are directed at a special development district in which

14

Disney operates. But as Disney acknowledges, it is not the district's only landowner, and other landowners within the district are affected by the same laws. *See State v. Reedy Creek Imp. Dist.*, 216 So. 2d 202, 205 (Fla. 1968) (noting that "[s]uccessful completion and operation of the District no doubt will greatly aid the Disney interest and its contemplated Disneyworld project [but that] it is obvious that to a lesser degree the contemplated benefits of the District will inure to numerous inhabitants of the District in addition to persons in the Disney complex"). As for SB 4-C (the earlier law), it applies to "any independent special district established by a special act prior to the date of ratification of the Florida Constitution," a category comprising Disney's district and at least several others.

It is true that the laws did not affect all districts, and it is true (at least accepting Disney's allegations) that Disney faces the brunt of the harm. But Disney offers no support for its argument that the court is to undertake line drawing to determine just how many others a law must cover to avoid "singling out" those they affect most. Here, it is enough to say—as in *Hobart*—that the law "challenged in this case is not pinpointed against a named individual or group; it is general in its wording and impact." 864 F.2d at 556.[9]

---

[9] Although *Hobart* applied the *O'Brien* rule to reject the First Amendment challenge, it also offered some practical considerations. Allowing such challenges would subject seemingly all legislation

15

## C.

Third, Disney argues this case is unlike *Hubbard* and *O'Brien* because of the strength of the case—the clarity of the legislative purpose. Disney says that "[f]ar from seeking to ferret out some hidden or opaque retaliatory motive, Disney's retaliation claim rests on the clear, consistent, and proud declarations of the State leaders who urged enactment of SB 4C and HB 9B." ECF No. 97 at 31. But Disney cites no authority suggesting this is a meaningful distinction. To be sure, *Hubbard* points to evidentiary difficulties, discussing the likelihood of differing motives of the legislators. 803 F.3d at 1310. But the principle at issue "is founded not only on the difficulty of determining by forensic methods the motives of a collective body, but also on respect for the political process and on simple comity between departments of government." *Hobart*, 864 F.2d at 554. Regardless, nothing in *Hubbard* suggests it is inapplicable when there is significant—or even overwhelming—evidence of illicit motivation. It says instead that there is no

---

to invalidation by a federal court upon evidence that the legislation, though on its face concerned only with the most ordinary matters of governmental administration, had actually been intended to punish the legislators' political opponents, or reward the legislators' friends with largesse obtained by taxes on their enemies. . . . The expansion of judicial review of legislation would be breathtaking. Yet the enlargement of the marketplace of ideas would be slight—maybe nonexistent.

864 F.2d at 555.

16

cognizable claim. Period. "What we are saying is that, as a matter of law, the First Amendment does not support the kind of claim [plaintiff] makes here: a challenge to an otherwise constitutional statute based on the subjective motivations of the lawmakers who passed it." *Hubbard*, 803 F.3d at 1312.

At the end of the day, under the law of this Circuit, "courts shouldn't look to a law's legislative history to find an illegitimate motivation for an otherwise constitutional statute." *NetChoice*, 34 F.4th at 1224 (citing *Hubbard*). Because that is what Disney seeks here, its claim fails as a matter of law.

### CONCLUSION

The motions to dismiss (ECF Nos. 93, 94) are GRANTED. The clerk will enter a judgment that says, "This case was resolved on motions to dismiss. Plaintiff's claims against the Governor and the Department Secretary are dismissed without prejudice for lack of subject matter jurisdiction. Plaintiff's claims against the Central Florida Tourism Oversight District board members are dismissed on the merits for failure to state a claim."

The clerk will close the file.

SO ORDERED on January 31, 2024.

s/ <em>Allen Winsor</em><br>United States District Judge