**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

```
WALT DISNEY PARKS AND RESORTS  )
US, INC,                       )
                               )
            Plaintiff,         ) Case No: 4:23CV163
                               )
        v.                     ) Tallahassee, Florida
                               ) December 12, 2023
RONALD D. DESANTIS, ET AL,     )
                               ) 9:30 AM
            Defendants.        )
_____)
```

**TRANSCRIPT OF MOTION PROCEEDINGS**
**BEFORE THE HONORABLE ALLEN C. WINSOR**
**UNITED STATES DISTRICT JUDGE**
**(Pages 1 through 75)**

Court Reporter:  KAIRISA J. MAGEE, RPR, CCR
111 North Adams Street
Tallahassee, Florida 32301
kairisa.magee.usfcr@gmail.com
*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

<u>APPEARANCES</u>:

For the Plaintiff:        O'MELVENY & MYERS, LLP
                          By:  DANIEL PETROCELLI
                               JONATHAN D. HACKER
                               Attorneys at Law
                               dpetrocelli@omm.com
                               jhacker@omm.com
                          1999 Avenue of the Stars
                          Suite 700
                          Los Angeles, California 90067


For Ronald D. DeSantis:   FLORIDA ATTORNEY GENERALS OFFICE
                          By:  DAVID M. COSTELLO
                               HENRY CHARLES WHITAKER
                               Attorneys at Law
                               david.costello@myfloridalegal.com
                               henry.whitaker@myfloridalegal.com
                          PL-01 The Capitol
                          Tallahassee, Florida 32399-1050


For Central Florida Tourism Oversight District:
                               COOPER & KIRK, PLLC
                          By:  CHARLES J. COOPER
                               DAVID H. THOMPSON
                               JOHN D. RAMER
                               Attorneys at Law
                               ccooper@cooperkirk.com
                               dthompson@cooperkirk.com
                               jramer@cooperkirk.com
                          1523 New Hampshire Ave NW
                          Washington, DC 20036

1                    **P R O C E E D I N G S**

2        (Call to Order of the Court at 9:30 AM on the  12th day of

3    December, 2023.)

4              THE COURT:  Good morning, everyone.  Have a seat,

5    please.  All right.  We're near in Case No. 4:23cv163.  It's

6    Walt Disney Parks and Resorts v. Ronald D. DeSantis and others.

7    I'll start with the appearances for Plaintiff.

8              MR. PETROCELLI:  Good morning, Your Honor.  Pleasure

9    to be here.  Daniel Petrocelli for Plaintiff Walt Disney Parks

10   and Resorts.

11             MR. HACKER:  Good morning, Your Honor.  Jonathan

12   Hacker, also on behalf of the Plaintiff Walt Disney Parks and

13   Resorts.

14             THE COURT:  Good morning to both of you.

15             MR. COOPER:  Good morning, Your Honor.  Charles Cooper

16   here on behalf of the Defendant Central Florida Tourism

17   Oversight District.

18             THE COURT:  Okay.

19             MR. RAMER:  Good morning, Your Honor.  John Ramer also

20   here on behalf of CFTOD.

21             MR. THOMPSON:  Good morning, Your Honor.  David

22   Thompson also on behalf of the CFTOD.

23             MR. WHITAKER:  Henry Whitaker on behalf of the State

24   Defendants.

25             MR. COSTELLO:  David Costello on behalf of the State

1   Defendants.

2          THE COURT:  Good morning to all of you.  We have two

3   motions here, and I think it probably makes sense to do them

4   together to hear from each of the movants and then have a

5   response to everything and then rebuttal, but I don't know if

6   the parties have talked about doing it differently.  Any ...

7   okay.

8          Well, I don't know if the seating order, Mr. Cooper,

9   indicates the parties' preference in terms of sequence, but

10  you're welcome to start.

11         MR. COOPER:  Well, Your Honor, actually we had

12  discussed the possibility of going in reverse order and taking

13  the jurisdictional issues first.

14         THE COURT:  That will be fine too.

15         Mr. Costello, before you begin I noted in the brief

16  you adopted the merits arguments of the other Defendants.  Do

17  you intend to argue any of that today or --

18         MR. COSTELLO:  No, Your Honor.  With your permission,

19  I'd leave that to Mr. Cooper.

20         THE COURT:  That'll be fine.  Okay.

21         MR. COSTELLO:  Thank you, Your Honor.  Good morning.

22         Last year the State put an end to a sweetheart deal

23  that endowed Disney with a privately held local government of

24  unprecedented power.  That decision was critical to ensure that

25  Disney plays by the same rules as everyone else in central

1  Florida.  And when it comes to suing State officials in federal

2  court, Disney must also play by the same rules as every other

3  litigant.  It must sue an official who enforces a law that

4  causes Disney a harm that this Court can redress.  Yet, when it

5  comes to HB 90, the law reorganizing the Reedy Creek Improvement

6  District, that official is neither the Governor nor is it the

7  Secretary of Commerce.

8       For that reason, Disney lacks Article III standing to

9  sue the State Defendants.  And unless this Court has questions

10  about the other defenses raised in the State Defendants' motion,

11  I'd like to focus my discussion on standing because I think

12  that's the simplest way to resolve the State's case.  And

13  standing, of course, has three elements:  Injury in fact,

14  traceability, and redressability.  And, given that, I think it's

15  important to be crystal clear at the front about what Disney's

16  asserted injuries are.  And as the State understands it, Disney

17  asserts two injuries.

18       It first claims that it is subject to regulation by

19  CFTOD, which Disney contends was unconstitutionally comprised,

20  and its second injury is that it no longer has the power to hand

21  select its local regulator now that HB 90 has repealed our since

22  prior electoral scheme.  Neither of those injuries are traceable

23  to the State Defendants or redressable by enjoining them.

24       And I'd like to start with Disney's case against the

25  Governor.  Now, Disney has two theories for why I can sue the

1    Governor.  It contends its injuries are traceable to his

2    appointment power, and it also contends that the Governor

3    actually controls the Board and was effectively the one

4    regulating Disney.  I'd like to start with the appointment power

5    theory, and we've given many reasons in our briefs why Disney's

6    injuries are not traceable to the Governor's appointment power.

7    And I think the simplest way to resolve that theory of standing

8    is to recognize that enjoining the Governor's appointment power

9    does not redress Disney's harms.  If the --

10          THE COURT:  Would it if he hadn't made the

11   appointments already?

12          MR. COSTELLO:  I think that would be a harder case for

13   me, Your Honor, certainly.  You know, there would be an argument

14   about redressability.  I still think I'd be standing here before

15   you arguing that there's not traceability because in a case

16   where you're suing the State for the enforcement of a law that

17   really is enforced by a local regulator, cases like *City of*

18   *South Miami* and *Jacobson* tell us, you sue the local regulator;

19   you don't sue the State defendant.

20          But, of course, that's not our case here.  This is the

21   easier case because the Board has already been appointed.  It is

22   currently regulating Disney, and if you enjoin the appointment

23   power, that doesn't stop them from regulating, nor does it give

24   Disney back its prior electoral structure.  Has structure been

25   repealed by HB 9-B --

1          THE COURT:  Let me ask you a question about that as to

2    the District.  The new District, no one has challenged standing

3    there, but if they were enjoined, that wouldn't give them back

4    the former structure either.  Do you have a view on whether

5    there's standing as to the other Defendants?

6          MR. COSTELLO:  Well, two things, Your Honor.  I mean,

7    first, I agree with you that I don't think that there is any

8    redressability as to the specific injury of -- of Disney having

9    lost its ability to hand select its local regulator.  That's

10   just not a redressable injury even against the CFTOD Defendants.

11   Now, we don't have a position on whether there's standing to sue

12   the CFTOD Defendants on other grounds, and I'm sure that if

13   Mr. Costello has a position, he'll talk about that, but, to your

14   point, there is no redressable injury for that electoral injury

15   so to speak.

16          Now, Disney has two responses, I think, to our

17   redressability point.  It first contends that this Court can do

18   more than enjoin the appointment power.  It says that this Court

19   can order the Governor to rescind his appointments, but Disney

20   cites no -- no citation for that premise, and it's simply

21   incorrect.

22          HB 90 tells us in Section 45D that board members are

23   not removable at the Governor's will.  They don't serve at his

24   pleasure.  They're removable through the suspension and

25   removable process which allows the Governor to suspend for

1    enumerated reasons, and then the Senate to remove after a trial.

2    So the Governor does not have the power to remove board members,

3    and so that's not a viable theory of redress.

4              Now, Disney has another theory, as we understand it,

5    and it's that this Court could at least provide partial redress

6    if it enjoins the appointment power because that would put

7    regulatory control in the hands of Orange and Osceola County,

8    and Disney has voted for those entities that that would at

9    least, I guess, partially redress the burden injury.  But that

10   just misunderstands the extent of what -- of this Court's

11   injunction.  If this Court enjoins the appointment power,

12   regulatory control does not shift back to Orange and Osceola

13   Counties.  Indeed, if this Court enjoins CFTOD, regulatory

14   control does not shift back to Orange and Osceola Counties.

15             THE COURT:  That goes to my earlier question.  I don't

16   know if it's sort of like a revival theory or an idea that if

17   the current district members were enjoined from taking any

18   action that that would sort of revive a different form of

19   government or something like that.

20             MR. COSTELLO:  Exactly right, Your Honor.  It's really

21   a writ of erasure theory.  I mean, the idea would be that this

22   Court's order would erase HB 90's repeal of our since prior

23   electoral structure, and it simply would not.  So that's not a

24   viable theory of redress.  I think the only arguable theory of

25   redress -- or injury rather -- is that Disney is subject to

1    regulation by the board, but that the voting rights injury that

2    Disney asserts is simply not redressable.  So I think we can put

3    that to the side.

4            Now, we made many argument, of course, why there's no

5    traceability to the Governor's appointment power.  I'm happy to

6    get into those in granular detail, but I'm also happy to rest on

7    our briefs.  All I would add is that if you look at Disney's

8    responses -- and it's filed two now in this case -- Disney would

9    have this Court analyze traceability under the more relaxed --

10   some connection standard in sovereign immunity cases --

11           THE COURT:  You're not going to win or lose this issue

12   based on redressability and not traceability or vice versa, you

13   would agree with that; right?

14           MR. COSTELLO:  You know, I think here those -- those

15   prongs do merge, Your Honor, but there is a difference between

16   them.  I think that Disney has to show both.

17           THE COURT:  In the abstract here, I mean, is it

18   conceivable that the Court could say it's not redressable but it

19   is traceable as to the Governor, for example?

20           MR. COSTELLO:  No.  I don't think so.  Well, to be --

21           THE COURT:  Or the opposite?

22           MR. COSTELLO:  Yeah, I don't -- I think there might --

23   there could be an argument that the opposite would be true that

24   maybe there could be redress, but it's not traceable.  I don't

25   think the reverse could be true if I understand that it would be

1    redressable but not traceable.

2            But so -- and I just would conclude on traceability as

3    to the appointment power, Your Honor, that, you know, *Jacobson*

4    tells us that sovereign immunity is some connection standard is

5    a more relaxed standard, a bridge below the causation standard

6    for Article III, and so when Disney cites cases like you from

7    the Ninth Circuit and relies on its sovereign immunity

8    discussion, that really doesn't move the needle.  It has to do

9    more.  It has to show that its injury is caused by the

10   appointment power and redressable by enjoining it, and Disney

11   simply has not done that.

12           So unless this Court has other questions about the

13   appointment power, I'd like to turn to Disney's theory of actual

14   control, and this is the idea that the Governor is effectively

15   the one that's regulating Disney and is controlling the Board.

16   But the only -- the only formal connection that Disney cites

17   between the Governor and the Board is his appointment power.

18   Disney does not say any formal control that the Governor

19   exercises over the Board.

20           So Disney's theory really boils down to the idea that

21   the Governor just has informal influence and sway over the

22   board, and Disney cites not a case for the idea that informal

23   influence can suffice to establish traceability.  And, indeed,

24   that theory is foreclosed by both *Support Working Animals* and

25   *Jacobson*, and if I can briefly touch on both.

1          In *Support Working Animals* the plaintiff brought a

2     takings claim and contended that the passage of Florida's ban on

3     greyhound dog racing effectively took his property, and the

4     plaintiff sued the Attorney General on the idea that she had

5     played a major role while on the constitutional revision

6     commission in developing that greyhound dog ban.  She was the

7     brilliance behind the operation so to speak.

8          And the Eleventh Circuit rejected that theory of

9     traceability and said, Look, it doesn't matter if the Attorney

10    General played a major role in developing the policies that were

11    eventually enacted and caused the asserted harm.  Those policies

12    were executed by an independent party, by Florida's voters.  And

13    that's exactly the problem with Disney's theory here.  Disney's

14    theory is effectively that the Governor is the brains of the

15    operation and is calling all the shots, but at the end of the

16    day, those -- those decisions, those -- those policies are

17    executed by the Board.  And so the *Support Working Animals*

18    simply rejects this informal theory of standing.

19          And if I can briefly just touch on *Jacobson*, I think

20    *Jacobson* is the same thing.  In *Jacobson* a major part of the

21    theory was that you could get redress against the -- the

22    Secretary of State because she had substantial informal

23    influence over the supervisors of elections that enforced the

24    challenged law.  The District Court there, in fact, enjoined the

25    secretary to issue a guidance telling supervisors not to enforce

1    the law, and the Eleventh Circuit, in an opinion written by

2    Chief Judge Pryor, simply rejected that premise.

3         And so there is no informal power that the Secretary

4    could exercise to enforce her view of the law upon supervisors

5    of elections, so there is no redress.  And that's exactly what

6    we have here.  The Governor has no formal power over the Board.

7    There is no redress for enjoining the Governor.

8         Unless this Court has other questions about the

9    Governor, I'd like to touch on Disney's case against the

10   Secretary.  Disney bets its entire case against the Secretary on

11   the official list of special districts, but Disney has never

12   told us what harm the -- the District's presence on the official

13   list causes Disney or how removing the District --

14        THE COURT:  Well, I think the argument is that if it

15   comes off the list, it comes out of existence.

16        MR. COSTELLO:  Yeah, that's -- Your Honor, that's not

17   how I understand Disney's argument because that's -- that's

18   incorrect.  If you -- if you look at the Official List statute,

19   Section 189.061, it does not animate any of the District's

20   powers, and this is what -- we've gotten into a little bit of

21   a -- of a nomenclature fight in our briefs, but this is what we

22   mean when we say it is a ministerial function.  It's simply a

23   bookkeeping act.

24        If you look at Subsection 5 of 189.061, it says that:

25   *"The Secretary must keep the list on a publicly facing website*

1    *for all of the public to see,*" and the idea is that Florida has

2    many, many special districts.  They're passed by statute.  They

3    can also be passed by county ordinance.

4         The Secretary's job is to accumulate all of those

5    districts into an official list so the public can keep track and

6    so the Government can keep track, but the official list does not

7    animate the powers of those special districts.  CFTOD's powers

8    are animated by HB 9-B, and if this Court were to order the

9    Secretary to remove CFTOD from the list, CFTOD continues to

10   regulate.  It has no redress for Disney's harms.

11        THE COURT:  Is this like -- I know some -- sometimes

12   people sue the Secretary of State and challenge a statute

13   saying, Well, the Secretary of State is the official keeper of

14   the books or records, and so it's sort of --

15        MR. COSTELLO:  Yeah --

16        THE COURT:  Do you view that as the same type of

17   thing?

18        MR. COSTELLO:  -- I think that's right.  I think

19   that's right.  In the end it doesn't matter if, you know, that

20   an official is keeping records.  What the -- the plaintiff still

21   has to show how that recordkeeping is causing it harm.  So we

22   made this point in our briefs, Plaintiffs often say that acts

23   are unconstitutional, but they have to show how that allegedly

24   unconstitutional act causes the injury, and we don't think that

25   this bookkeeping function causes Disney any injury.

1            THE COURT:  Okay.

2            MR. COSTELLO:  Unless this Court has other questions,

3    I reserve --

4            THE COURT:  Sure.  One question.  You've raised the

5    Eleventh Amendment, but you don't have any argument that you

6    would succeed on that if you lost on the standing; right?  I

7    mean, it's -- it's sort of a coextensive argument.

8            MR. COSTELLO:  Yeah.  I think I'd have trouble

9    convincing you of that, Your Honor, given *Jacobson*, but what I

10   would say is that we think we would then, even under the

11   Eleventh Amendment, had we not made the standing argument.

12           THE COURT:  Okay.  Thank you.

13           MR. COSTELLO:  Thank you, Your Honor.

14           MR. COOPER:  Good morning again, Judge Winsor.

15   Charles Cooper again for the Central Florida Tourism Oversight

16   District.

17            As recently as a year and a half ago, Your Honor, in

18   the *NetChoice* case, the Eleventh Circuit reaffirmed what it had

19   held many times before, and in particular had held in the

20   leading *In re Hubbard* case, and it quoted the *Hubbard* case, Your

21   Honor, when it said that:  *"When a statute is facially*

22   *constitutional, a plaintiff cannot bring a free speech challenge*

23   *by claiming that the lawmakers who passed it acted in a*

24   *constitutional -- a constitutionally impermissible purpose."*

25            The *NetChoice* Court went on to say what that means:

1    *"Courts should not look to the law's legislative history to find*

2    *an illegitimate motivation for an otherwise constitutional*

3    *statute."*  Now, the plaintiffs in *NetChoice*, Your Honor, like

4    the plaintiffs before you, had urged the panel to look at

5    statements in the enactment history of that statute.  Statements

6    that they allege proved that it had a -- a viewpoint

7    discriminatory motivation, and those statements, Your Honor, the

8    Court quoted in its opinion.  And Your Honor they were pretty

9    graphic, some of them.  Essentially, to the effect that -- that

10   the big tech oligarchs that run the largest social media

11   platforms needed to be prevented from silencing conservative

12   speech in favor of radical leftist agendas.

13            So, Your Honor, there's -- there's statements

14   according -- according to the opinion that came from the

15   Governor and certain key proponents of the statute in that case.

16   But the Eleventh Circuit refused to inquire into the lawmakers'

17   motive- -- motivations saying that it was bound by the clear

18   statements in the *Hubbard* case and also in the United States

19   against *O'Brien*, Your Honor, the seminal Supreme Court case, the

20   draft card burning case, that is the root of all of these -- all

21   of these First Amendment free speech cases --

22            THE COURT:  Do you view *In re Hubbard* as expanding

23   *O'Brien* or just sort of reaffirming it?  And the reason I ask is

24   it seemed like -- you read *O'Brien*, and it seems like what the

25   Court's talking about there are the evidentiary difficulties of

1   proving the claim based on, you know, different legislators

2   having different views and things like that.  And then *In re*

3   *Hubbard* comes along and essentially says in a case that I think

4   is very helpful for you that there just is no such claim.

5         It doesn't really talk about the evidentiary

6   difficulties of proving a claim.  It just says there just kind

7   of can't be one, and I wonder if you had a view as to whether

8   that's saying more than O'Brien or -- or just applying it.

9         MR. COOPER:  Well, Your Honor, I think -- I think that

10  it -- it actually reads *O'Brien* to eliminate, essentially, a

11  First Amendment claim when what it is based on -- what it is

12  based on is excerpts and snippets from legislative history of --

13  of enactment history of a statute indicating some type of

14  motivation --

15        THE COURT:  Not just based on snippets, but based on

16  any sort of showing.  I mean, I think -- if we read *Hubbard* the

17  way you do, that even if there were a stipulation that a

18  particular act were -- were passed for the specific and sole

19  purposes of retaliating against somebody for their speech, there

20  would be no claim.  I mean, that's ultimately your position

21  based on *Hubbard*; right?

22        MR. COOPER:  That would be my position, Your Honor,

23  unless that stipulation appeared on the text of a statute when I

24  will get to *Gwinnett County*, and I'll -- I'll come back to that.

25        But -- but, Your Honor, again, the Plaintiffs in this

1   case are asking you to do precisely what the Eleventh Circuit in

2   *NetChoice* refused to do and some courts cannot do, which is look

3   to the legislative history of SB 4-C and of 9 -- of HB 9-B to

4   find an illegitimate motivation for those otherwise facially

5   constitutional statutes.  So, Your Honor, the -- the claim, the

6   free speech claim that's before you clearly satisfies both

7   elements of what I'm going to call The Hubbard Doctrine.

8          First, nowhere does Disney suggest that the facial

9   constitutionality of these statutes before you are subject to

10   the slightest constitutional doubt, and nor could it.  These

11   laws are, on their face and in substance, ordinary, standard,

12   regulatory provisions that regulate what?  They regulate special

13   districts.  They don't even regulate directly Disney.

14          The second element, Disney actually admits -- and it's

15   clear from their complaint and the briefing that they've placed

16   before you, and that is that their free speech challenge to

17   these laws is based entirely on the Florida legislature's

18   allegedly retaliatory motivation for the acts as reflected in

19   statements by certain proponents of -- of these statutes.  At

20   page 26 of their brief, Your Honor, they say this:  *"Disney's*

21   *retaliation claim rests on the clear, consistent, and proud*

22   *declarations of the State's leaders who urged enactment of*

23   *SB 4-C and HB 9-B."*

24          That dooms their free speech claim, Your Honor.  That

25   dooms it.  Again, both of these elements are -- are clearly

1   satisfied.  *Hubbard* itself, Your Honor, as well is even more

2   directly on point because it involved a claim of retaliation.

3   In *NetChoice* it was a claim of -- of viewpoint discrimination.

4   In *Hubbard* it was actually a claim of retaliation.

5           The Alabama Education Association challenged a statute

6   that had terminated the ability of public employees to use

7   payroll deductions to pay their dues to organizations that

8   engaged in political activity.  And the education association

9   argued that that was retaliatory against it because it had been

10  opposed to the then Governor's education policies, and they

11  included in their complaint, Your Honor, some very hostile

12  comments that the Governor had made about the AEA.

13          The Eleventh Circuit held flatly as your earlier

14  comment obviously suggested that AEA has not presented a

15  cognizable First Amendment claim.  So, yes, to the extent

16  there's any doubt from *O'Brien* whether or not there's some kind

17  of a threshold or level of -- of evidence of a retaliatory

18  motive, then Hubbard eliminates that --

19          THE COURT:  Does it better --

20          MR. COOPER:  -- cognizable claim.

21          THE COURT:  When Hubbard talks about the exception for

22  when someone's explicitly addressed in the statute, does that

23  have to be explicit in the text or -- the other side makes an

24  argument about, Well, this applies very narrowly, and it would

25  be different if it applied to all districts or something like

1    that.  I'm not sure, you know, where they would draw that line,

2    but if you had a statute that was on its face generally

3    applicable but only applied to one entity, and suppose it said,

4    you know, For any district that houses a theme park that has so

5    many acres, here's the answer, and if we stipulated that there's

6    only one entity that's affected by it, does that change anything

7    with respect to your *Hubbard* argument?

8           MR. COOPER:  Your Honor, it doesn't change anything

9    that changes the result in the case before you, because that's

10   not what we have, but I --

11          THE COURT:  No, I understand that.  I'm just -- and

12   there is -- there's agreement that this does -- this does apply

13   to some others.  They say not enough others, but there's

14   agreement this it applies to some others.

15          MR. COOPER:  Right.

16          THE COURT:  But I'm asking the question to just try

17   and understand *Hubbard* and your view of *Hubbard* and how that

18   would apply.  Because if you look at *Gwinnett*, it says what it

19   says, and then Hubbard distinguishes it by saying, Well, there

20   the particular union was explicitly addressed.  I don't know if

21   that was necessarily in the statute or if that was sort of what

22   was at issue, but -- but that's -- that's the question.

23          MR. COOPER:  Well -- and, Your Honor, it's not clear

24   from *Gwinnett* or from -- from *Hubbard* that the policy they

25   adopted was -- was in some kind of ordinance or -- or written

1    document.  But it is -- it is quite clear from *Hubbard* that --

2    and the -- and the key distinction of *Hubbard* is that this

3    policy was explicitly singling out, as they said, that specific

4    group.  So the plaintiff --

5              THE COURT:  That's what I mean.  I mean, what do they

6    mean by "explicitly," I guess, is my question.

7              MR. COOPER:  Well, they quote -- they actually quote

8    from the *Gwinnett* decision --

9              THE COURT:  Right.  But that's what *Gwinnett* meant by

10   "explicit"?  I guess that's what I'm -- that's what I'm trying

11   to understand --

12             MR. COOPER:  And, Your Honor, I -- I guess the way I

13   read *Hubbard* is that it -- is that the -- "explicitly" means

14   that the actual name of the plaintiff claiming retaliation has

15   to appear.  And that's the fact, I would argue, of *Gwinnett*, and

16   the *Hubbard* court said that case is distinguishable and limited

17   to its facts.

18             But -- but stepping back from that -- and I do

19   recognize that it would be very hard, I think, judicially to say

20   that it's got -- that the name of the target, if you will, has

21   to be explicitly on a piece of paper, if, in fact, as you've

22   suggested, the -- the paper describes its target in a way that

23   excludes all others.  I do think the important point is that it

24   singles out the individual, but we -- but, again, we don't have

25   a situation here where these laws have singled out this

1    Plaintiff.  And, Your Honor, coming back to your point about
2    Disney arguing, Well -- and conceding -- maybe if these had --
3    these laws had applied to all special districts, well, maybe
4    then we would be within *Hubbard*.

5            Your Honor, even *Hubbard* wasn't generally applicable
6    in that global sense.  *Hubbard* only applied to dues-collecting
7    organizations that then used those dues in political activity.
8    So it was a subset on its face, presumably, of -- of
9    dues-collecting activities and membership organizations such as
10   that.  The same is true of *Net-* -- *of NetChoice*.  The Court made
11   a specific point, in fact, that the statute at issue there
12   didn't apply to all social media platforms.  It only applied to
13   the largest that were specifically given, according to certain
14   revenue thresholds and certain membership or user thresholds.

15           So even those, Your Honor, were not generally
16   applicable in that sense.  So I think the only way you can read
17   the generally applicable is in -- is in conjunction with the
18   wording that immediately follows that which is singling out the
19   individual group or -- or person.  And that, too, I believe has
20   to be read with the -- with what I think is the real money
21   sentence in *Hubbard* which is that Gwinnett applies only to
22   allege, quote:  *"Acts of governmental retaliation that*
23   *explicitly single out a specif group."*

24           Of course it was a group there, but it would have to
25   be a person or a company.  But the point is, it has to be the

1    Plaintiff that's before you that's been singled out.  So, again,

2    Your Honor, here neither of the laws explicitly singles out

3    Disney.  Indeed, they don't even directly regulate Disney.  They

4    directly regulate special districts, Your Honor, again, which is

5    the -- the day-in-day-out activity of the Florida legislature.

6    But they don't single them out in effect either.  So even if --

7              THE COURT:  How do you -- how do you mean by that?

8              MR. COOPER:  Well --

9              THE COURT:  Just because they don't -- it applies more

10   than once --

11             MR. COOPER:  Yes, yes, Your Honor.  Because, first of

12   all, SB 4-C doesn't apply just to RCID.  It applied to six, and

13   these were six districts, Your Honor, the only six districts out

14   of 132 districts that had been established before the 1968

15   constitution and that had not come back to the legislature and

16   been re-established and, quote, modernized --

17             THE COURT:  Did it do the same thing vis-á-vis on six

18   in terms of making the board members elected --

19             MR. COOPER:  Oh.  Your Honor, I'm afraid the extent of

20   my knowledge on that is that three of the other five were

21   re-established.  They did come --

22             THE COURT:  You're talking about the first -- the

23   first law was the -- was the one that took all of them out.  It

24   was very short.  Then there's a second law -- comes along, and

25   that's where it reauthorizes this District, renames it, and puts

1    in new --

2             MR. COOPER:  Right.

3             THE COURT:  Okay.

4             MR. COOPER:  HB 9-B is the one doing all the work in

5    this case, Your Honor.

6             THE COURT:  Maybe I have them backwards then.

7             MR. COOPER:  Well, the first one, SB 4-C, it didn't

8    really take them all out.  All it did was give them one year.

9    It didn't affect their operations at all.

10            THE COURT:  It took them out effective a year later.

11            MR. COOPER:  It set them -- it required them to do

12   what three of them -- now four of them have done, which is be

13   re-established to reinstitute it.  That's the language used by

14   the legislature.  Because, again, 6 of 132 hadn't done that

15   since 1968.  They hadn't been looked at in well over 50 years.

16   Three of them have been re-established.  Two of them were indeed

17   dissolved.

18            They no longer served the -- the public interest that

19   these special districts were designed to serve.  So -- but I

20   can't tell you -- but I can certainly find out and tell you.

21   But as I speak I just don't know if -- if any of those boards

22   were one acre, one vote kind of boards or whether they were

23   changed to gubernatorial appointment.

24            THE COURT:  So you were saying it -- it was more --

25   you were talking about that first law.  I said them backwards in

```
 1   sequence, but the first one is the Senate bill, Senate Bill
 2   4-C --
 3              MR. COOPER:  Yes.
 4              THE COURT:  -- and it really has no function now as --
 5   relates to this challenge; right?
 6              MR. COOPER:  It has -- it has no function, Your Honor.
 7              THE COURT:  Okay.  So in terms -- in terms of what the
 8   law in Florida is relating to this District, the newer law did
 9   that --
10              MR. COOPER:  Yes.
11              THE COURT:  -- and we'd be in the exact same place if
12   they had just passed the new law and skipped the first one;
13   correct?
14              MR. COOPER:  That's -- that's right, Your Honor.
15   That's right.  Although, I think they have asked you to
16   invalidate --
17              THE COURT:  That's right.
18              MR. COOPER:  -- both of them because if -- if you just
19   take out HB 9-B, presumably that leaves SB 4-C, and it would
20   dissolve Reedy Creek if it remains standing.  So I think that's
21   the theory behind why they asked --
22              THE COURT:  And I'll ask them about that, but -- and
23   that gets to my questions to your colleague about whether it's
24   sort of a statutory revival theory or something, but I guess if
25   you take both of them away --
```

1          MR. COOPER:  Reedy Creek springs back to life.  I

2     guess -- I know that's what -- that's their theory.  But it

3     springs back -- does it spring back to life forever, Your Honor?

4     Is this First Amendment right that they claim to have to

5     construct their own regulatory body and to be --

6          THE COURT:  Well, that's not their -- they're not --

7     there was some talk in the papers about that.  That's not the

8     argument, though.  The argument is just that they have a right

9     to be not retaliated against, and so they would acknowledge, and

10    have, that if the legislature did this for a different purpose,

11    just a governance purpose or something like that, it would be --

12    it would be fine.  And I guess that's part of what *O'Brien* is

13    talking about, that the reason --

14          MR. COOPER:  Yes.

15          THE COURT:  -- have this claim is because you go back

16    and sort of have a, Okay, well, we're doing it for this kind of

17    thing --

18          MR. COOPER:  Or they can omit why they're doing it.

19    In other words, if they -- if they reenact it with, quote,

20    *"Wiser statements,"* as the *O'Brien* court said, there would be no

21    basis on which for a court to make any kind of judicial inquiry

22    or to suspect retaliation.  So -- but, Your Honor, the -- the

23    second point I want to make about the effect, HB 9-B does only

24    apply to the former Reedy Creek Independent District, but the

25    way in which it visits adverse treatment or negative treatment

1    on Disney is that it replaces a board that Disney controlled

2    through its voting control with a board appointed by the

3    State's -- appointed by the State elected governor, confirmed by

4    the State's elected senators.

5           But the -- but the elimination of that voting

6    authority extended to all voters, not just to Disney.  So, Your

7    Honor, the -- neither -- neither statute that is before you

8    explicitly or in effect singles out Disney.  And so, Your Honor,

9    the short of my argument is that this case is controlled

10   completely and inescapably by *NetChoice* and *Hubbard*, Your Honor,

11   and *O'Brien* as well --

12          THE COURT:  Okay.

13          MR. COOPER:  -- and --

14          THE COURT:  I do -- I do have a question.  So you

15   don't have any argument that they've not -- if you're wrong

16   about *Hubbard* that they've not pleaded sufficient allegations

17   about what the purpose was.  You're not presenting that

18   argument; correct?

19          MR. COOPER:  No, Your Honor.

20          THE COURT:  Okay.

21          MR. COOPER:  We -- although we have to accept their

22   factual allegations for purposes of this motion --

23          THE COURT:  Oh, sure.  In terms of what different

24   people said and things like that, you don't have to accept the

25   ultimate conclusion that this is what the purpose was --

```
 1              MR. COOPER:  Oh, oh --

 2              THE COURT:  That would not be a 12(b)(6) --

 3              MR. COOPER:  I'm not making that argument, but if

 4    you -- if I come back before you, because you deny my motion,

 5    then I will be making that argument.

 6              THE COURT:  Oh, sure.  They would ultimately have to

 7    prove that.  My question is, though, in terms of the sufficiency

 8    of -- sort of plausibly if -- if someone came in and said, We

 9    have one comment from one person in the -- in the house and so

10    we get past 12(b)(6), if there is no Hubbard issue.  I'm saying

11    hypothetically.  You're not making an argument that they've not

12    pleaded sufficient facts that if those actual facts were

13    accepted as true there would be a conclusion that the purpose

14    was retaliatory?

15              MR. COOPER:  Your Honor, I haven't made that argument.

16              THE COURT:  Okay.

17              MR. COOPER:  I -- to the extent that argument would

18    appeal to you, consider it being made here now.

19              THE COURT:  Fair enough.

20              MR. COOPER:  Because I -- because I have to tell you

21    that, in fact, what they have placed before you wouldn't come

22    close.  Only two of the individuals who they quote in their

23    Complaint actually made their statements in the context of a

24    legislative proceeding.  The rest of them are tweets and things

25    of this nature.  So --
```

1      THE COURT:  But those would be probative.  I mean, if

2  you had a case where you have a -- you have a factual inquiry

3  into what the legislature's overall purpose was and someone's

4  statement, whether it was in the legislative context or not, it

5  would be relevant, wouldn't it?

6      MR. COOPER:  Well --

7      THE COURT:  If someone says at a dinner party, I voted

8  for this for this reason, that would be probative if you're

9  trying to -- it may not be enough.  It was just one person, but

10  I didn't understand your answer.  Go ahead.

11      MR. COOPER:  And -- well -- and I have to acknowledge

12  that in *NetChoice* they talked about comments made in the

13  pre-enactment history that weren't limited to those made in a --

14  in a specifically legislative -- legislative preceding.

15      THE COURT:  Okay.  Wonder if you could talk just a

16  minute about this -- this standing as to your clients, and, I

17  mean, no one's challenged it, but I'm just sort of walking

18  through how the redressability would work, assuming there were a

19  claim that was meritorious.  Can you give me your view on

20  standing and how that would work?

21      MR. COOPER:  Well, to the extent they have -- and you

22  conclude they have placed before you and have articulated a

23  cognizable First Amendment claim --

24      THE COURT:  No, no.  They have to do it -- that's

25  the -- I mean, for purpose of standing, we assume they have a

1    First Amendment claim; right?

2             MR. COOPER:  Yes.  Yes, Your Honor.

3             THE COURT:  Okay.  So just assume for now that they

4    do.  Then, I mean, we would have to address the standing first

5    before even determining whether they have a --

6             MR. COOPER:  Of course, Your Honor.

7             THE COURT:  So I'm just asking there about -- you

8    know, if you assume they have an injury, how is that redressed

9    against the board members?  How does that -- what would an

10   injunction look like, things like that.  I'm just trying to

11   think through that.

12            MR. COOPER:  Your Honor, I don't think they've asked

13   for any kind of relief against board members.  What they're

14   asking for, as I read their papers and their Complaint, is a

15   declaration that these statutes violate the First Amendment

16   and -- and that they -- and an injunction against their

17   enforcement.

18            THE COURT:  But that would be the relief they would

19   want against the board members; right?  I mean, they're seeking

20   an injunction against the board members to stop them from

21   enforcing the statute, I guess, as I -- as I understand it.

22            MR. COOPER:  Yes.  Well, to stop them from enforcing

23   what they are arguing is an invalid nullity, statutes that were

24   in violation of the First Amendment and therefore were

25   nullities, and if that argument is sound, then I think their

1    argument is we haven't challenged the standing -- their standing

2    to advance this argument.  The Reedy Creek District, the RCID,

3    would never have been molested by these statutes, Your Honor.

4    It would still be in place.

5                THE COURT:  Okay.  Thank you.

6                MR. COOPER:  Thank you, Your Honor.

7                MR. PETROCELLI:  Your Honor, Daniel Petrocelli for the

8    Plaintiff.

9                THE COURT:  Good morning.

10               MR. PETROCELLI:  I agree.  I think what was behind

11   your question to Mr. Costello about whether redressability and

12   traceability go hand in hand.  I think Your Honor made that

13   observation that they are often intertwined and travel together

14   in the *Equality Florida* case.  And when you go through the

15   briefing -- and I certainly don't want to repeat all the

16   arguments.  When you really sort of see where it boils down to

17   in the reply brief of -- of the State Defendants, they really

18   focus on redressability, and they make the argument that there

19   is no injunction against the Governor -- and I'll deal with the

20   Secretary separately -- would be effectual because the -- in

21   part -- because the appointments have already been made.

22               But, Your Honor, that's -- that doesn't defeat -- that

23   doesn't defeat the -- our ability to get an effectual meaningful

24   injunction.  Just imagine if we were here the day before the

25   appointments were made.  We certainly would have redress by

1   enjoining the Governor from making those appointments, and if

2   those appointments are allegedly unlawful, certainly they

3   shouldn't be continued.  And the Court would have the power to

4   enjoin the maintenance of those unlawful appointments, but

5   beyond that, the Court would --

6           THE COURT:  But how would that work as to the

7   Governor?  I mean, you've sued the -- the people he's appointed

8   and argued that there should be an injunction saying they can't

9   take actions consistent with that appointment because the

10  appointment was unlawful.  So how would -- how would that not --

11  to the extent you want the board members to stop acting as board

12  members, how would an injunction against the board members not

13  be adequate?

14          MR. PETROCELLI:  Your Honor, an injunction against the

15  board members would be appropriate, but it would not defeat

16  standing and our ability to get redress from an injunction also

17  against the Governor to be clear.  It's not either/or --

18          THE COURT:  But what is the -- what is it that you

19  want the Governor to not do that you fear he might do?

20          MR. PETROCELLI:  Well, we don't want him to -- first,

21  we don't want him to make any further appointments.

22          THE COURT:  Okay.

23          MR. PETROCELLI:  He has the power to replace and

24  appoint new board members.  I believe there's already been one

25  replacement, Your Honor.  As you know -- and we chronicle it on

1    page 12 of our opposition brief -- the Government is effectively

2    controlling those board members through a whole series of

3    statements and actions.  We want an injunction stopping him from

4    doing that, Your Honor.

5            THE COURT:  I have a question about that, and maybe

6    this is more of a merits question.  But that's not part of your

7    claim; right?  I mean, your -- your ultimate claim is that the

8    two enactments are unconstitutional; correct?

9            MR. PETROCELLI:  Yes.

10            THE COURT:  You don't have a claim beyond that?

11            MR. PETROCELLI:  That's correct.

12            THE COURT:  In other words, if the enactments are

13    unconstitutional, you do not have a separate argument that the

14    Governor is retaliating further by instructing the board members

15    to do this or that; correct?

16            MR. PETROCELLI:  Not on this pleading, Your Honor.

17            THE COURT:  Okay.

18            MR. PETROCELLI:  The plead- -- the pleading alleges

19    that the statutes were unconstitutional because they were asked

20    for impermissible purposes to retaliate; right?

21            THE COURT:  Okay.

22            MR. PETROCELLI:  And the relief we're seeking is not

23    only a declaration to such effect but to enjoin those who are

24    involved in enforcing and implementing and administering this

25    unlawful set of laws.

1            THE COURT:  Okay.

2            MR. PETROCELLI:  The Governor is -- the Governor is

3    front and center in that, Your Honor.

4            THE COURT:  Because he's appointing people --

5            MR. PETROCELLI:  Because he's appointed --

6            THE COURT:  And because he's controlling the board

7    through -- through just sort of a bully pulpit kind of thing

8    or --

9            MR. PETROCELLI:  Well, it's more specific than that,

10   but if you can --

11           THE COURT:  Okay.

12           MR. PETROCELLI:  -- if you want to characterize it

13   that way, we lay it out on -- in our Complaint in a number of

14   paragraphs, largely cataloged on page 12 of our opposition

15   brief.  And -- and so for purposes of standing, Your Honor, if

16   the statutes are declared unconstitutional because they violate

17   Disney's First Amendment rights, the Governor must be enjoined

18   from acting to enforce them in any way, shape, or form.  He is

19   the only person --

20           THE COURT:  That's one of my questions.  How does he

21   enforce it?  You mentioned appointment, but then the other

22   aspect of that where he's putting pressure on the Board or

23   however you describe it, you've saying that's enforcement of the

24   statute?

25           MR. PETROCELLI:  It is, Your Honor.  It is.  He's the

1    only one in power and authorized by the statute to effectuate

2    these additional appointments, and these board members are

3    accountable to him, Your Honor, and --

4              THE COURT:  Okay.  But I'm just -- there has to be

5    something this Court would do that would remedy your harm;

6    right?  And so I understand the point about the appointments.

7    The injunction would say the Governor may not make any further

8    appointments; correct?

9              MR. PETROCELLI:  Right.

10             THE COURT:  But as to this other argument you're

11   making about his control, it would say -- it would say what,

12   that you're not to make recommendations --

13             MR. PETROCELLI:  Enjoined from giving further

14   direction or taking action to control the Board.  It would be as

15   simple as that.  And we cited the case law, Your Honor, that

16   establishes that for standing purposes de facto causality is

17   sufficient.  It doesn't have to be written into the text of --

18   of the statute as -- as the appointment power is expressly

19   prescribed.  But he's effectually in de facto control, and the

20   cases for standing purposes recognize that as a causal link.

21             And we believe that there's ample meaningful and

22   effectual relief against the Governor and that it would be -- we

23   would not be accorded significant relief if he were dismissed.

24   And also --

25             THE COURT:  You would not -- say that again.

1          MR. PETROCELLI:  We would not be accorded sufficient

2     relief if he were dismissed, if we were just left with an

3     injunction against CFTOD.  So, for example, he could appoint

4     another board member or he can continue to give direction.  So

5     we think --

6          THE COURT:  But if he couldn't -- I guess I don't

7     understand that.  If -- if the Board were enjoined from taking

8     any action, then any direction he gave them would be --

9          MR. PETROCELLI:  Well, he would be -- he wouldn't be

10    subject to the injunction.  There would be a practical effect,

11    Your Honor, but -- but he wouldn't be subject to the injunction

12    barring him from giving any direction or guidance or maybe to

13    others, maybe to the people employed by the Board.

14         THE COURT:  Well, you would -- I assume the injunction

15    you would want against the Board would cover employees of the

16    Board.

17         MR. PETROCELLI:  The one against the board members?

18         THE COURT:  Right.

19         MR. PETROCELLI:  Yes.  And we would want that to be

20    broad and -- and comprehensive, but -- but, again, it doesn't

21    negate the -- the need for relief against the Governor --

22         THE COURT:  I guess.

23         MR. PETROCELLI:  -- at the least, Your Honor, for the

24    purpose of preventing him from making any further appointments,

25    'cause that's right in -- Your Honor, I know, is struggling with

 1   the de facto control issue, and, again, we think that on a

 2   Motion to Dismiss accepting these allegations as true, we're not

 3   here to argue -- argue those facts.  But clearly we think we've

 4   alleged enough to show de facto control, but beyond that, Your

 5   Honor, he is -- he is the only one expressly authorized in the

 6   statute to appoint these board members, and he should be

 7   enjoined from doing so any further, at least that's the relief

 8   we're seeking.  And we would not be able to get that relief if

 9   he were dismissed from the case.

10          THE COURT:  I guess that's what I'm struggling to

11   understand.  So imagine a hypothetical where the Court says to

12   the board members, you're enjoined from taking any action.

13   Period.  I mean, that's -- that's what you would seek; right?

14   Right?

15          MR. PETROCELLI:  Yes.  I'm sorry --

16          THE COURT:  Okay.  So the board members are enjoined

17   from taking any action at all.  Then walk me through a harm that

18   the Governor could cause your client with that injunction in

19   place.

20          MR. PETROCELLI:  He may try to appoint another board

21   member, Your Honor.

22          THE COURT:  But that board member would be subject to

23   the same injunction; right?

24          MR. PETROCELLI:  Yes.  The Board would be subject to

25   the same injunction.  That's correct.  But I think that's -- I

1  think that's taking a more practical effect of the -- of the

2  analysis on -- on redressability.  I think the Court looks --

3  assumes the statute -- assume we had just sued the Governor.

4         THE COURT:  I'm sorry?

5         MR. PETROCELLI:  Assume we had just sued the Governor

6  and not the board members.  There clearly would be

7  redressability.  And so the fact that we've also named the board

8  members I don't believe is -- is a basis to negate

9  redressability.

10        THE COURT:  Okay.  I'm not sure I agree with you on

11  that -- on that last point that -- once the board members are in

12  place, but I -- but I understand your argument.  Okay.  I think

13  I've got it as to the Governor.  And you wanted to talk about

14  the Secretary.

15        MR. PETROCELLI:  On the Secretary, it's pretty simple,

16  Your Honor, it's not a mere bookkeeping function.  Putting --

17  making the decision to put CFTOD on the official list gives

18  CFTOD the imprimatur of the State, and it also triggers a number

19  of very important reporting and qualification requirements.  And

20  the Secretary oversees those requirements, including reporting

21  financial information such as revenues, expenses, and -- and

22  debt.

23        And, again, it's the Secretary alone who's charged

24  with those responsibilities.  And we claim we're being injured

25  by listing CFTOD on the official list and recognizing it as

1   the -- as the Governing body for the use of Disney's property

2   and -- and believe that the Secretary should be enjoined from

3   continuing to go maintain CFTOD on the official list.

4        THE COURT:  You heard my question to your colleague

5   about whether this is similar to suing the Secretary of State

6   over a statute that's challenged as unconstitutional because the

7   Secretary is the keeper of the books and the statutes.  How is

8   this different than that?

9        MR. PETROCELLI:  Because the Secretary has further and

10  deeper responsibilities here with respect to recognizing CFTOD

11  officially on behalf of the State.  In the matter that we

12  described in the brief with respect to the oversight, the

13  decision to put CFTOD on the list and triggering a number of

14  very important requirements that many State legislate- -- State

15  agencies and other public officials in this State rely on.

16       And so she has a meaningful role, and -- and, by the

17  way, to the extent that it is characterized as ministerial, I

18  think the *Jacobson* case says that doesn't defeat -- that doesn't

19  defeat Article III standing.  In that case they --

20       THE COURT:  I think you're right -- I think you're

21  right about that.

22       MR. PETROCELLI:  Okay.  Thank you.  Do you have any

23  further questions, Your Honor?

24       THE COURT:  I don't as to the Secretary or standing

25  generally.  Well, yeah, I do actually.  I wonder if you can talk

1  about -- no one's challenged standing as to the board members,

2  but walk me through -- maybe it's getting beyond the standing.

3  But walk me through the relief that you're seeking.  Is it a

4  revival concept?  I mean, if you prevail on this lawsuit, then

5  does the -- does a new board come along elected under the old

6  regime?

7           MR. PETROCELLI:  Well, if -- if both statutes are

8  declared unconstitutional, I think we're dealing with the old

9  Reedy Creek.

10           THE COURT:  Okay.  Under a statutory revival concept?

11           MR. PETROCELLI:  Effectively, yes, because the statute

12  that repealed Reedy Creek, which really was the first statute,

13  4-C, Senate 4-C, would be ineffective, functionally dead.  Let's

14  assume, though, that -- I think in answer to one of your other

15  questions, if we're just dealing with 9-B, all right, and that's

16  declared unconstitutional and the Board is and the Governor,

17  Secretary all are enjoined from acting in the furtherance of it,

18  what then happens?  Well, I think regulation of Disney's

19  property would default to local and county voters and officials

20  who would then decide, you know, what to do with it.

21           THE COURT:  Then there would be no -- no district?

22           MR. PETROCELLI:  Well, at that point there would -- if

23  we're -- if we're dealing with just 9-B, that would -- that's

24  true, and then --

25           THE COURT:  Okay.

1          MR. PETROCELLI:  -- the county and city would then

2    have to act with respect to regulating -- regulating the

3    property.

4          THE COURT:  But your -- your request at the end of the

5    case if you were successful would be to have an injunction

6    precluding any enforcement of any of the new laws.

7          MR. PETROCELLI:  That's correct.

8          THE COURT:  And then your view is, as a natural result

9    of that, there would be elections under the old regime or that

10   the Court would order those or something else or how --

11         MR. PETROCELLI:  It could be -- or it could just

12   default to the counties taking jurisdiction over the property.

13         THE COURT:  Okay.

14         MR. PETROCELLI:  As a practical matter, something --

15   something is going to happen to fill the void.

16         THE COURT:  Okay.  And, again, some of this goes

17   beyond where we are right now.  I'm just -- maybe it would be

18   helpful for me to understand -- understand this, but at the end

19   of the day your view on the standing as to the Board is real

20   simple that they're causing you harm by existing, and so you

21   want an injunction saying they can't exist anymore.

22         MR. PETROCELLI:  That's for sure.

23         THE COURT:  Okay.

24         MR. PETROCELLI:  Thank you.

25         THE COURT:  Good morning.

1          MR. HACKER:  Good morning again, You Honor.  John

2     Hacker for Disney.  In most First Amendment retaliation cases,

3     I'm sure you're aware, Your Honor, but the challenge is smoking

4     out the impermissible motives and separating it from other

5     potentially valid motives that might be involved.  This case, of

6     course, is so different precisely or at least largely because as

7     the State's Motion to Dismiss confirms, the State believes the

8     First Amendment does not even apply to its actions.

9          The State was completely explicit about its singular

10    motive.  It was clear and undiluted by other possible motives.

11    Disney's landowner elected special venues district was

12    eliminated and replaced with the Governor-controlled board

13    specifically to punish Disney for expressing political views

14    that, quote:  *Crossed the line,* and to enable the State to

15    control Disney's entertainment program- -- programming going

16    forward.

17         Disney's challenge to that act and the State's Motion

18    to Dismiss -- and by "the State" I mean all of the Defendants at

19    this point -- together present a stark question:  Can federal

20    courts constrain states from weaponing government power,

21    resources, and institutions to control private speech by

22    explicitly punishing those who express disfavored views?  Your

23    Honor, this is as clear a case of retaliation for protected

24    speech as I think any court is ever likely to see.  When the

25    federal courts cannot enforce a right to be free from

1    retaliation.  On the facts as alleged here, there's effectively

2    no right at all.

3         Now the State, you've heard this morning, offers two

4    reasons -- you've heard only one this morning -- offers two

5    reasons the Court cannot check the abuse of power that occurred

6    here.  The one focused on this morning is that the Court is

7    prohibited from even considering the motive underlying the

8    State's acts even though the singular intent to punish was

9    openly stated on the public record.  Second, and more broadly,

10   the State has argued that the First Amendment does not even

11   apply the State laws addressing the organization of state and

12   local government entities.  Both arguments are incorrect.  I'll

13   focus on the first one, which is --

14        THE COURT:  I think they're really -- they're really

15   kind of the same.  I mean, I don't think they're making that as

16   an independent argument, the second one.  It's somewhat framed

17   that way in the briefs, but -- but, I mean, you're not asserting

18   a First Amendment right to any sort of particular government

19   structure; correct, as a general matter?

20        MR. HACKER:  Not in this case correct.  That's

21   correct.

22        THE COURT:  Okay.

23        MR. HACKER:  But I do think --

24        THE COURT:  Go ahead.

25        MR. HACKER:  I think they're analytically separate,

1    and I take your point that sort of for subjective, atmospheric

2    reasons they're trying to work them together.

3           They're formally stated separately, and the formal

4    difference is that they would say -- and they do say in their

5    briefs -- forget -- you know, even if the motive is

6    completely -- in fact, if it's written into the text of the

7    statute as they say, they would say that under *Gregory v.*

8    *Ashcroft* federal courts are just disabled from reviewing a

9    challenge based on an explicitly, completely punitive measure,

10   because it's about local and state government, and *Gregory v.*

11   *Ashcroft* doesn't say that.  It says basically the opposite, and

12   there's not one court case anywhere else that said anything like

13   that.  So I'm happy to address that --

14          THE COURT:  Okay.  I guess I didn't understand them to

15   be addressing in that -- an argument or a claim that you're

16   making, but -- but you're saying you view it as a standalone

17   claim that there can never be any sort of -- *Hubbard* aside --

18   there can never be any sort of constitutional challenge to a

19   structure of government.  That's how you view the argument?

20          MR. HACKER:  I mean, I think that's -- that's my

21   understanding why there's two separate arguments.  Otherwise, I

22   don't think they would have made just -- again, I don't -- if

23   the Court thinks they're essentially the same, that's fine too,

24   because I do agree with Mr. Cooper that -- that their argument,

25   I think, really stands and falls on one's view of *Hubbard* and

1    *Gwinnett*.

2         THE COURT:  I think that's exactly right.  I think

3    that on the merits the issue is whether *Hubbard* precludes your

4    claim or not.  I think that's good, the whole issue.  Do you

5    agree on the merits?

6         MR. HACKER:  Yes.  I know -- I would put it as, you

7    know, *O'Brien* really ultimately -- and *Hubbard* as Your Honor

8    said, but yes --

9         THE COURT:  Sure.  And you don't have a -- when we're

10   talking about *Hubbard*, you don't have an argument that the --

11   that the statute is facially unconstitutional; right?  So, I

12   mean, where *Hubbard* talks about a facially unconstitutional

13   statute, you're in that universe here; right?

14        MR. HACKER:  Well, we don't -- we don't disagree that

15   a statute that reforms any special district, including Reedy

16   Creek, you know, there's a constitutional disability against

17   doing that.  There's no particular constitutional right to a

18   particular formation of district.  The constitutional right, as

19   Your Honor pointed out in your colloquy with Mr. Cooper, is to

20   be free from discrimination of various kinds.  They can no more

21   eliminate Reedy Creek and replace it with a -- a

22   governor-controlled board in order to punish Disney for its

23   speech than they could in order to punish Disney for being, you

24   know, owned by Catholics or being owned by black people,

25   whatever constitutional prohibition there is, is what --

1          THE COURT:  Well, *Hubbard* --

2          MR. HACKER:  -- the way they did.

3          THE COURT:  -- there was some talk about race cases

4    and things in the briefs, but, I mean, the law is that you have

5    this *Hubbard* principle that applies in free speech cases that

6    does not apply in race cases.  So somewhere along the line it's

7    been determined that you have different categories of cases

8    and -- and so when you say -- and you said in the brief, you

9    know, this is -- just like they can't have a statute that's

10   impermissibly based on race, they can't do one based on

11   retaliation.  And I think there is a -- a difference there.  So

12   I think the race cases almost have no utility here.

13          MR. HACKER:  And I don't want to be misunderstood.  I

14   was just making a point which -- I think reaffirming Your

15   Honor's point that the fact that we aren't claiming a

16   constitutional right, you know, to a particular shape of

17   District, is irrelevant.  That's not the claim.  The claim is

18   the constitution, in the same way that it imposes various

19   prescriptions on State action; right?

20          It doesn't matter if the underlying benefit or

21   underlying right or entitlement is not one that's of a

22   constitutionally -- what you're free from is certain types of

23   discriminatory animus.  Totally agree with you that *Hubbard*

24   establishes at least a different evidentiary framework for --

25   requires a different evidentiary framework for establishing and

1    determining what the impermissible animus is.

2          I don't know of any case that has said that a party

3    that is retaliated against by a statute or by a government

4    action sort of can't bring that claim, it is just categorically

5    forbidden from being -- bringing that claim.  *Hubbard* doesn't

6    say it; *O'Brien*, doesn't say it, and, as we know, *Gwinnett* says

7    the opposite as --

8          THE COURT:  *Hubbard* -- *Hubbard* is *Hubbard*.  *Hubbard*, I

9    mean -- I guess -- I guess I'm not sure what your view of

10   *Hubbard* is different with *Hubbard* than without it because,

11   again, a lot of your papers just talk about general First

12   Amendment principles and have the right to be free from

13   retaliation and things like that.  At some point you say,

14   Perhaps if it's applied more broadly, there might be a *Hubbard*

15   obstacle.  But -- but what is it that you -- that you view that

16   *Hubbard* does?

17         MR. HACKER:  So I -- I think *Hubbard* -- our principal

18   submission is that *Hubbard*, as Your Honor suggested, essentially

19   just restates *O'Brien*, which is a warning about -- an

20   appropriate warning about -- the fact that laws of general

21   applicability -- not just facially -- facially constitutional

22   laws -- but laws of general applicability are, you know -- you

23   have -- the courts have to be, at the least, very cautious

24   because a law of general applicability is presumptively enacted

25   for a multiplicity of reasons.  And you don't -- there's a huge

1     risk of error if you authorize courts and plaintiffs' claims to

2     come in and say, Well, this, you know -- a general taxation

3     law -- just trust me.  I'm going to try to prove that it was

4     done because they were mad at me personally.

5            And that's just going to clog the courts, and it's

6     very difficult to sort out but impermissible, and impermissible

7     based on, as Mr. Cooper said, snippets -- snippets of

8     legislative history or as in *O'Brien*, you know, three basically

9     offhand comments by the legislature -- legislators that were

10    contradicted by the authoritative committee reports explaining

11    the basis for the legislation; right?  So *O'Brien* recognizes

12    that for, you know, generally applicable laws those are

13    problems.

14           And Judge Posner's opinion in *Hobart* I think does a

15    nice job of explaining what it is about generally applicable

16    laws that are different from the targeted laws that *O'Brien*

17    itself and *Hubbard* explicitly say are different and remain

18    subject to judicial inquiry into motive to determine whether the

19    targeting was based on impermissible motive.  What Judge Posner

20    says is with respect to generally applicable laws -- first of

21    all, it's what I already mentioned.  They're generally subject

22    to presumptively likely to have been enacted for a bunch of

23    different reasons, you know, and different legislators may have

24    had different reasons for doing it.  So it's hard to identify.

25           And the second reason is there's more likely to be a

1    political remedy because of their effects.  By definition being

2    generally applicable it affects so many different entities and

3    parties and individuals.  They can form coalitions and amend it

4    or, you know, get it repealed.  And neither of those factors

5    that Judge Posner points out are truly with respect to targeted

6    laws like, not limited to, but like bills of attainder, which is

7    what *O'Brien* carves out.

8            With respect to targeted laws, you're, first of all,

9    much more likely to have specific motive 'cause you're talking

10   about effectively one entity.  And it's just going to be

11   easier -- you may not always get it right -- but it's going to

12   be easier to apply the usual *Arlington Heights* analysis,

13   identify motive, and -- and you don't have the same risk of

14   error with respect to the judicial inquiry.  And, second, when

15   you're talking about one single entity, you're just less likely

16   to have the same kind of political remedies that would be

17   available to large wholesale laws that affect, you know, large

18   groups of individuals.

19           So there's baked into -- this is not some narrow

20   exception that's just technical and sort of eye rolling, which

21   is the sense you get from the State's papers.  It's fundamental

22   to the point with respect to a targeted law, an attainder-like

23   law.  We just don't have the concerns that motivate *O'Brien* and

24   *Hubbard* itself.  And *Hubbard* itself --

25           THE COURT:  You use that -- the term attainder-like.

```
1    I mean, I think Hubbard is a little more specific about actual
2    bills of attainder.  You don't have any claim for -- for that.
3    I mean, so what makes something attainder-like?  Is this, again,
4    your, you know -- it's -- so kind of narrow but not -- not so
5    narrow that it only includes one person?
6              Is it -- I mean, in the Posner opinion it didn't
7    affect a whole lot of people there.  It was a pretty -- pretty
8    narrow -- I think there were 24 police officers or something
9    like that, if I'm thinking of the right case.
10             MR. HACKER:  But it was a -- you know, a general law
11   about the retirement system and the idea that, you know, whether
12   it affected -- whether it was done for -- you know, it doesn't
13   target those particular police officers, unlike the Goldberg
14   case in Connecticut -- right? -- where the Court allowed the
15   claim to go forward, but there was only one affected police
16   officer, but there was otherwise a facially constitutional and
17   seemingly generally applicable reformation of the City's --
18             THE COURT:  But -- again -- but is Hobart like here
19   where you have a law allegedly is designed to punish some subset
20   of people but in reality covers a somewhat broader but not
21   terribly broad group of people, including those that it had no
22   intention to punish; right?  And that's what you have here.  You
23   have an allegation that this was to retaliate against Disney,
24   but then it affects other people in the same way that it affects
25   Disney --
```

1          MR. HACKER:  So a couple of points about that --

2          THE COURT:  Sure.

3          MR. HACKER:  -- to answer your earlier question about

4   sort of attainder, I don't read, certainly not *O'Brien* or

5   *Hubbard* as saying, so it has to be literally a bill of

6   attainder.  I mean, that has to be right because *Gwinnett* wasn't

7   a bill of attainder case; right?  *Gwinnett* is just as much the

8   law as *Hubbard*.  In fact, what distinguishes *Gwinnett* -- it

9   doesn't -- couldn't have overruled it.  It says that's a

10  scenario where you can bring a retaliation claim when you

11  explicitly single out a particular entity.

12          What does it mean by that; right?  Does it have to be

13  named?  That certainly can't be right.  There's way too many

14  ways to get around, as Your Honor suggested, a requirement that

15  they actually be named.  You can just define it in a way to get

16  to, you know, the targeted entity.

17          If you look at the attainder cases, you can look up

18  what *O'Brien* itself says; you can look at what *Hobart* says.  The

19  standard, I think, borrowed from the attainder cases is, is the

20  target easily ascertainable?  What Hobart says, is it easily --

21  easily pinpointed?  I think that's the appropriate standard.  So

22  it's not just that it's somewhat more narrow or a little bit

23  more narrow or just a subset.

24          The question is applying just to a common sense and --

25  and the objective evidence in the context and the -- the terms

1    of the statute, can one pinpoint, ascertain the target of the

2    law.  That doesn't end the inquiry, and under *Gwinnett* it's not

3    like the fact that you've targeted the law in and of itself

4    establishes the constitutional violation.  So long as you can

5    easily pinpoint, easily ascertain the fact that an entity is

6    targeted, that's the explicit targeting.  If the law is written

7    in a way to make the target easily ascertainable, then you get

8    past that *Gwinnett*, *Hubbard* screen, and then you can get into

9    this little *Hubbard* -- *Gwinnett* and, I think, *Hubbard* that you

10   can get into then the kind of inquiry into motive to determine

11   whether or not the targeted law was, in fact, enacted to

12   retaliate against that target or was it enacted, you know, for

13   other permissible reasons.  That's just not an inquiry --

14            THE COURT:  But I thought that's where your claim

15   started.  You're saying now that -- that just looking at the

16   text of the statute you could identify who the target was?

17            MR. HACKER:  Certainly -- yes.  The text -- I do think

18   it's appropriate to look to others who have objective indicia.

19   And when the State in official statements and the Governor in

20   his own signing statement tells you what the target is and

21   there's contrary evidence -- right? -- I think those are -- are

22   contexts the Court is not prohibited from looking into.  We're

23   not, again, scraping through legislative history and finding,

24   you know, one offhand comment on a -- in a floor remark.

25            I mean, this is the absolutely consistent and

 1    uncontradicted message.  And in a number of admonitions from --

 2    going back to the *Child Labor Tax* case, I think it was Chief

 3    Justice Tag- -- Taft who said:  *"Courts must not blind*

 4    *themselves to facts who all others can see and understand."*  And

 5    more recently Chief Justice -- Chief Justice Roberts reminded us

 6    in Judge Finley's admonition that judges are not required to

 7    exhibit a naiveté from which ordinary citizens are free.

 8         When everybody knows, as I think everybody does, the

 9    target of the statute and, indeed, the purpose -- we're not even

10    at the purpose yet.  We're just talking about the target of the

11    statute.  Maybe that's why a legislator says, You got me there.

12    This legislation does target Disney.  And then look at the --

13    look to the actual text of the statute, particularly the second

14    enactment, HB 9-B.  That's directed solely at RCID.  That's the

15    only district of the six or of the 2000 --

16         THE COURT:  But that district comprises entities other

17    than Disney; right?

18         MR. HACKER:  Barely, Your Honor.  Barely.  Of the

19    entities --

20         THE COURT:  That's what I'm struggling with.  Your

21    argument seems to be, it doesn't have to relate only to Disney.

22    It has to relate -- it can relate to a little bit more but maybe

23    not too much more, and I guess that's where I'm not seeing any

24    of these cases where they draw a line like that.  I mean, I

25    guess if -- if there were a law that said, We're going to tax

1   all Florida theme parks in a certain way and you thought you

2   could prove that was specifically to retaliate against Disney,

3   would *Hubbard* bar that claim?

4          MR. HACKER:  If it was just all Florida theme parks, I

5   think it would be very difficult to establish on its face that

6   that's targeted at Disney.  RCID is --

7          THE COURT:  No, no, no.  I'm saying you have a -- you

8   have a claim -- you have a -- this is a hypothetical.  I'm not

9   saying -- the legislature passes a law that says all theme parks

10  are subject to this new tax in Florida.  The legislature makes

11  clear, not in the text of the stature but otherwise, that its

12  purpose is to retaliate against Disney.  And everyone stipulates

13  that Disney is the biggest theme park in the state.  I think

14  that that's true, but for purposes of my hypothetical, let's

15  assume it is.

16         Does *Hubbard* bar the claim?  You bring the same

17  retaliation claim here.  Does *Hubbard* bar it?

18         MR. HACKER:  I think it would be a case under Hubbard,

19  yes.  I mean, I don't want to commit to it because I'd want to

20  know more about the facts of how many theme parks and what

21  exactly format the statements are in and all that.  I think one

22  might have an argument based on the objective evidence, but I

23  don't want to get wrapped around the axle on that hard case

24  because I think this is so far from that example because --

25         THE COURT:  On a continuum.  And so you're saying that

1   somewhere a court would have to draw a line to say this one

2   covers not just the target of the retaliation but others but not

3   enough others to take it outside of -- or to -- to have it fall

4   under Hubbard.  That's your ultimate argument; right?

5           MR. HACKER:  I mean, on some level the law is always a

6   continuum; right?  There's very few on/off switches that really

7   work perfectly in any context of the law, and we already know

8   from this circumstance, from the, you know, attainder cases

9   themselves, they don't say, in fact, they explicitly decline to

10  say.

11          They explicitly reject the idea that the law has to be

12  targeted at a particular named entity.  The idea is whether or

13  not the targeted individual or group is, as I said, easily

14  ascertainable.  And it's absolutely ascertainable here as to

15  whether or not Disney was the target of the change to RCID, and

16  let me give you an example --

17          THE COURT:  You're saying that based on facts that are

18  -- based on things beyond the enactment itself; right?

19          MR. HACKER:  Not with respect to RCID.  It's referred

20  -- and the State refers to it as Disney's district.  Disney on

21  just a public record and as alleged in the Complaint is not just

22  the dominant property owner with voting rights, it owns

23  98 percent of the land and has 98 percent of the acres that are

24  entitled to voting rights.  So there's only two perc- -- less

25  than 2 percent of other landowners with voting rights, and what

1   that comes to, Your Honor, is literally six, six individual

2   entities other than Disney.

3           There are five more who are the board members who the

4   State itself argued were just agents of Disney.  Leaving them to

5   one side, it's Disney and six individuals out of -- what is

6   it? -- 23 million people in the State of Florida that were the

7   targets of this law, and you don't have to get into it all --

8   I'm not even getting into whether it's nefarious.  It's just the

9   fact that it's drawn so tightly around Disney it's exactly the

10  kind of a targeting that justifies further inquiry --

11          THE COURT:  Okay.

12          MR. HACKER:  -- so it takes you out of the *Hubbard* --

13          THE COURT:  I guess I had understood your papers to

14  not be contesting that it was a facially constitutional statute.

15  You were just looking at the purpose.  But now it sounds like

16  maybe you're saying just looking at the face that it -- it is

17  unconstitutional?

18          MR. HACKER:  No, no.  I'm sorry.  Just looking at the

19  face you can tell that it's targeted at Disney.  And that's --

20  that's *Gwinnett*; right?  So that's what gets us into the -- I

21  hesitate to call it the *Gwinnett* exception.  It's just, like,

22  the way the law works going back to *O'Brien* and the -- the

23  attainder in context.

24          THE COURT:  Okay.  So your view is that that's what

25  makes it explicitly targeting Disney under the --

1          MR. HACKER:  The near perfect fit --

2          THE COURT:  Okay --

3          MR. HACKER:  -- is that you can -- that's what gets

4    you outside of the *Hubbard* and *O'Brien* concern which applies --

5    I think the State will concede this.  I think they did concede

6    this -- that that only applies to generally applicable statutes.

7    Now, they would say that essentially all statutes -- I think

8    they did say it this morning -- but all statutes are generally

9    applicable.

10          Unless you literally say the word here "Disney," I

11   don't think the law could possibly support that, and I think the

12   cases are to the contrary when they're saying the question is

13   not whether it explicitly says Disney or Schmizney, the question

14   is whether the target is readily ascertainable.  And if it is,

15   than you get into the question as to whether or not that

16   target -- the reason for enacting the statute was in a

17   permissible motive or not.

18          THE COURT:  But then wouldn't -- wouldn't *Hubbard* have

19   said, you know, District Court, you've got to figure out looking

20   beyond the statute itself whether this was targeted at this one

21   teacher's union or something like that as opposed to saying

22   there's no cognizable claim here at all?

23          MR. HACKER:  I don't think so.  I mean, it did carve

24   out -- it did in *Gwinnett* -- said this isn't that kind of

25   situation.  And so --

1          THE COURT:  Because it was -- it's not explicit is

2    what they said.

3          MR. HACKER:  But it also wasn't carved out.  It wasn't

4    gerrymandered in any way towards that particular plaintiff.  It

5    was all of the public employee unions in the state of -- I think

6    it was -- Alabama that had -- was referred to as "check off" or

7    "payroll dues deduction"; right?  It was a generally applicable

8    law, and there wasn't an argument that it was tightly drawn and

9    defined a way -- defined in a way that would essentially -- I

10   don't think it has to literally, but essentially only include

11   that one particular employee union that the State was unhappy

12   with or allegedly unhappy with; right?

13         So it's -- there -- there is -- it can be facially

14   unconstitutional in the sense that when you look at it we can't

15   see whether or not they are retaliating.  That's true of most

16   retaliation statutes; right?  They -- they're just doing

17   something, depriving, taking away a benefit, you know, enforcing

18   a code, whatever it might be.  On its face it would be

19   permissible, and you have to do something -- and that's the

20   inside of *O'Brien* that's endorsed in *Hubbard*.

21         In an attainder-like case it's inherent in the nature

22   of the claim what they're implying in the motive.  And that's

23   why *O'Brien* says, Look, we don't mean to say you can never

24   inquire into motive because that would preclude all of the

25   constitutional claims that were inherent in the claim.  And it

1   specifically gives the example of attainder.  And I don't think

2   there is any reason to think from *O'Brien* and we know it's not

3   limited to literal attainder because that's *Gwinnett*.

4           THE COURT:  Let me ask this, though.  In the

5   targeting, when the Court's talking about otherwise

6   constitutional -- maybe I misunderstood what your argument was

7   here.  But if the legislature, again a hypothetical, had said.

8   We're going to target this one district for purely economic

9   reasons or because it's too big or because of this or that, no

10  First Amendment claim, that's constitutional; correct?

11          MR. HACKER:  Sure.

12          THE COURT:  And so -- so is that not what Hubbard

13  means when they say otherwise constitutional, something that

14  otherwise could have been?

15          MR. HACKER:  So I think -- I think, with respect, what

16  the -- the problem is really talking about *Gwinnett* and -- but

17  not *Hubbard*.  I think they fit together.  But a facially -- the

18  facial constitution -- facial constitutionality, it just says,

19  you know, doesn't draw a racial classification on the face of

20  it; right?  It's just a law that says, you know, We're going to

21  tax these people, and you don't know anything more about it.

22          THE COURT:  I took it to be a law that they could pass

23  if they were doing it for something other than First

24  Amendment --

25          MR. HACKER:  I agree with that, Judge.  That's what

1    I'm saying.  It's on its face you can't see anything wrong with

2    it.

3            THE COURT:  And this is -- this is that; right?

4            MR. HACKER:  Yeah, exactly.  On its face, but our

5    objection when we're talking about --

6            THE COURT:  That gets back to what I was saying

7    earlier.  I thought that's what you were saying in the papers.

8    You are saying that.  But just looking at this statute,

9    there's -- it's a -- it's a, quote:  *"Otherwise constitutional*

10   *statute,"* for purposes *Hubbard*.

11           MR. HACKER:  But -- yes.  But also for purposes -- and

12   this is so critical -- also for purposes of *Hubbard* and

13   *Gwinnett*.  It's otherwise constitutional.  That's fine.  But

14   it's also targeted --

15           THE COURT:  Got it.

16           MR. HACKER:  -- right?  And when it's targeted, you

17   get past the we-can't-inquire-into-motive.  When it's targeted,

18   you are allowed to inquire into motive.  Doesn't mean you win;

19   right?  It doesn't mean that you've established that the motive,

20   the targeting was for unconstitutional reasons.

21           You still have to prove that, and we will be able to

22   prove it.  We certainly alleged it.  But -- and the reason is,

23   as Judge Posner explained in -- in *Hobart*, when it's targeted,

24   it's easier for a court to sort out the possible different

25   motives, and there's much less risk of error; right?  So there's

1    sort of a two-step inquiry.  There's a facially constitutional

2    type.

3            Then, you know, you don't stop there.  You figure out

4    if it's a targeted law.  If it's targeted, then you can, you

5    know, go into motive and inquiry there, which the State, for

6    purposes of this motion, doesn't contest that we've adequately

7    alleged an improper motive.  The issue is, are we within the

8    *Gwinnett* rule.  I would call it the *O'Brien* rule that targeted

9    it as the main subject -- and it has to remain subject.  That's

10   what *O'Brien* says.  *Hubbard* recognized that they have to remain

11   subject to judicial inquiry and motive, 'cause that's the nature

12   of the claim.  And if you don't inquire into motive in a

13   retaliation case, you literally wouldn't have retaliation cases

14   because almost all retaliatory laws are otherwise generally

15   applicable.  They're just taking away some privilege, benefit --

16           THE COURT:  But so are cases that are subject to race

17   challenges in that there's no such carve out for that.  I

18   mean --

19           MR. HACKER:  Right.  I totally agree with that.

20           THE COURT:  I'm just saying at the end of the day --

21   you were talking a lot about in your case where -- in your

22   briefs, Well, you know the legislature, if they're right,

23   could -- could retaliate against people based on statements that

24   they've made, and I think *Hubbard* would say, at least in some

25   instances, they can as a practical matter because there's no

 1    cognizable claim in some instances.

 2            MR. HACKER:  And this is kind of what's going on in

 3    *Hobart*.  It's less of a concern with respect to general

 4    applicable laws because, you know, sure, it's at least

 5    theoretically possible that a generally applicable law that

 6    affects, you know, an entire population might be enacted for an

 7    impermissible reason.  But we don't worry as much because that's

 8    very unlikely given all of the, you know, potential effects on

 9    other entities and affected parties and constituencies.

10            We don't need to worry about it as much as we do with

11    respect to either race or religion.  There's just that

12    constitutional strict prohibition against laws motivated for

13    that reason.  With respect to speech claims and retaliation

14    claims, there would be way too much litigation if you were

15    trying to investigate the motive of generally applicable laws,

16    and it's less likely they're going to be problematic.

17            When it's targeted -- when it's targeted, first of all

18    they're much less common, so now they're flinging open the

19    courthouse doors to all sorts of harassing and intrusive

20    litigation.  And it's just much more likely -- again, not --

21    it's not a lay-down hand, but it's much more likely that a

22    targeted law like that that was enacted for impermissible

23    reasons.

24            To go back to your point about, like, you know, is

25    it -- how tight does it have to be.  You know, I'm happy with

1    the standard that is, like, a near perfect fit standard, because

2    that's what we have with respect to the HB 9-B.  It's really

3    only Disney and a couple others out of, you know, 22 million

4    residents of Florida.  But look at the -- the *Lukumi Babalu Aye*

5    case as a -- as a way, an example of how the courts have

6    recognized -- how the Supreme Court has recognized the ability

7    of courts to identify laws that are targeted, even though

8    they're written more broadly.

9           And *Lukumi* is a facially generally applicable law that

10   was -- that prohibited animal killing, but it was structured and

11   gerrymandered in a way -- this is what the opinion says -- that

12   targeted mainly Santeria practitioners and Santeria practices

13   but not only.  It definitely swept in other non-Santeria animal

14   killings, but the Court nevertheless recognized that that was a

15   law functionally, practically targeted at Santaria practices and

16   was unconstitutional for that reason.  Now, I know that's a

17   religion --

18           THE COURT:  Right.

19           MR. HACKER:  -- case, but that's just an example of

20   the way in which courts have recognized the ability -- and

21   exercised the ability to separate out cases that are -- you

22   know, that are written in generally applicable ways but are

23   gerrymandered or otherwise established and structured in a way

24   that as a practical matter are targeted at a particular entity.

25   And there really is -- again, just exercising just common sense

1 and recognizing what everyone else can see and understand, it's
2 perfectly clear that the -- that the laws here were targeted at
3 Disney, again, leaving the separate question which we'll prove,
4 you know, down the road as to what the -- what the motive was.

5      THE COURT:  Okay.  Are there cases that apply *O'Brien*
6 and do this kind of line drawing about what's close enough to be
7 targeted or not?

8      MR. HACKER:  Well, I mean, there are cases -- I mean,
9 certainly *Gwinnett* is an example, but there it was --

10      THE COURT:  -- Gwinnett didn't even -- didn't even
11 mention -- I mean, that's kind of a -- it's kind of a
12 non-sequence I think where we have *the Gwinnett* decision and
13 then *Hubbard* applies, and obviously I'm bound by *Hubbard's*
14 determination of what *Gwinnett* says or didn't say.

15      MR. HACKER:  Well -- but remember it's -- *O'Brien*
16 itself acknowledges this point; okay?  It's like bills of
17 attainder that has to be right that you can inquire into motive
18 in those circumstances.  So starting with *O'Brien*, then we have
19 *Gwinnett* applying that -- a principle without -- I recognize it
20 doesn't cite *O'Brien*, but it makes this point.  I mean,
21 Hubbard -- I mean, Judge Tjoflat is on both panels.  There's no
22 reason to think that *Hubbard* is somehow narrowing *Gwinnett*
23 beyond what *O'Brien* is saying.

24      It does observe -- and I absolutely recognize it
25 observes that it says "explicitly single out."  It doesn't say

1  by name.  And I think the only way to reconcile what Hubbard is

2  saying about Gwinnett with O'Brien and what was going on in

3  Gwinnett is that by *"explicitly single out"* it just means that,

4  you know, in the terms of the statute and other objective

5  explicit evidence that's not, you know, dinner party comment

6  kind of thing but the objective, contextual evidence like in

7  *Arlington Heights*.  Remember they were saying that, you know,

8  irregularities in the legislative process can tell you something

9  meaningful?

10          When you -- when the shape of the statute is tightly

11  focused around a particular entity and the objective evidence

12  confirms that, you know, then you can take the next step and

13  inquire into motive.  That's what was going on, I think, in

14  *Hubbard* and *Gwinnett* and *O'Brien*.

15          THE COURT:  Did *Hubbard* apply *O'Brien* correctly in

16  your view?

17          MR. HACKER:  I mean, I -- I don't want to be quoted as

18  complaining about the Eleventh Circuit decision.  I think the --

19  the best way -- I think you probably could reconcile this with

20  what's going on in *Hubbard*, because *Hubbard* was itself an

21  evidentiary case; right?  It was about getting evidence of

22  legislative --

23          THE COURT:  Two parts --

24          MR. HACKER:  I agree.

25          THE COURT:  In terms of the part that matters here, it

1    wasn't an evidentiary case at all.  It was a -- it was a --

2    essentially a 12(b)(6), you don't have a claim for these

3    reasons.  I mean, that's --

4         MR. HACKER:  I agree with the way Mr. Cooper first

5    answered the question which is, You don't have a First Amendment

6    claim when your claim is only based on snippets of legislative

7    history.  And I think that the -- my -- my interpretation of

8    it -- and I don't think I need to win this interpretation to win

9    this case 'cause I think it's ultimately about *O'Brien* and

10   *Gwinnett* and attainder-like statutes.

11        But my interpretation of that would be that in that

12   circumstance, you know, it doesn't matter how many legislators

13   -- or a bunch of individual legislators are saying, Yeah, in my

14   mind, you know, I was hoping to punish the union in -- that

15   union there, because you just can't bring a claim that's based

16   on that kind of subjective, you know, admission in a deposition.

17   What you need to do is focus on more objective indicia, and

18   that's what was going on in *O'Brien*.

19        Remember *O'Brien*, you know, objected to the fact that

20   it was just two offhand comment- -- maybe three offhand comments

21   of legislators and said the more compelling evidence was from

22   the -- the committee reports.  And there's just too much cases I

23   think that say that you are allowed to inquire into motive when

24   you're doing it on the basis of, you know, objective evidence

25   from so many different contexts.  And there's -- I would submit

1   there's no particular reason why it should be different in the

2   First Amendment context than the free speech context when you're

3   talking about objective evidence.  There is a risk of error -- I

4   totally get that -- when you're talking about individual

5   legislator statements.

6           So what's the point of taking four or seven

7   depositions of individual legislators with objective evidence,

8   which we have here in spades I think is in a different category.

9   You can leave all that to one side, Your Honor, because I think

10  it's absolutely clear from *Hubbard* and clear from *Gwinnett* and

11  clear from *O'Brien* that when you're talking about a law that's

12  targeted as this one is, legislative -- inquiry into motive is

13  not only permissible but mandatory.

14          THE COURT:  Thank you very much.

15          Rebuttal?

16          MR. COSTELLO:  Your Honor, my friend just clarified

17  that Disney's injury in this case is caused by the mere

18  existence of HB 9-B, and that this Court's order could redress

19  the injury by snapping the prior district back into place.  That

20  theory of standing is squarely foreclosed by *Jacobson* as this

21  Court recognized in *Equality Florida*.  This Court enjoins

22  actors.  It cannot erase laws.  And HB 90 has repealed the prior

23  district and put a new one in its place.

24          So if this Court enjoins any of the Defendants here,

25  it does not provide the relief that Disney seeks, and on that

1    theory of standing, it lacks standing to sue the Governor, the

2    Secretary, and also CFTOD.  So Disney does not have standing in

3    this case as we've learned from the presentation today, and I'd

4    like to just touch on a few other points that Disney's made

5    about the Governor and the Secretary --

6            THE COURT:  If the new structure is unconstitutional,

7    then why would an injunction prohibiting the new actors in that

8    new structure from acting, why would that not redress that harm

9    at least in part?

10           MR. COSTELLO:  So I think two things, Your Honor.

11   One, as I think Disney clarified today that its real gripe is

12   that there is a -- that it has lost its prior district and there

13   is a new one now in its place.  I think that's what

14   Mr. Petrocelli told you when he said that our -- our harm is

15   caused by the mere existence of the law, but even putting

16   that --

17           THE COURT:  Not the mere existence of it.  It's --

18   their harm is caused by the fact that you have commissioners who

19   are taking actions that affect Disney in a way that apparently

20   they don't like under a law that they say is unconstitutional.

21   So it's not -- it's not just the mere existence of it.  It's not

22   sort of a, you know, our feelings are hurt kind of law.

23           MR. COSTELLO:  Fair enough, Your Honor.  I don't think

24   that was what was just presented to you, but even on that

25   theory -- and Disney has not made any assertions in its

1    Complaint of any specific regulatory acts that the Board is

2    engaging in that harms Disney, and so we think that gives them a

3    significant completeness problem that would apply not just to

4    the Governor, not just to the Secretary, but also to CFTOD.

5              So just to touch on a couple of the points Disney

6    raised about the Governor, Disney said that if the Governor was

7    sued alone there would be standing, and that's simply incorrect.

8    The Governor is sued alone -- they're sued alongside State --

9    the CFTOD Defendants does not affect this Court's analysis.  And

10   I know that Disney placed great weight on the de facto

11   causali- -- causality language in *Department of Commerce*, but

12   *Department of Commerce* and *Bennett v. Spear*, which is the other

13   case Disney cites for this premise, both involve the formal

14   exercise of a government power that placed obligations on a

15   third party that was causing the injury in that case.

16             And here there is no formal government power that the

17   Governor exercises that places an obligation on board members

18   that would cause them to cause any of Disney's injury.  So there

19   is no de facto causality here.

20             And I'd also note, Your Honor, I -- Disney seemed to

21   suggest that this Court needs to enter an injunction against the

22   Governor to get -- afford complete relief, and I think Your

23   Honor correctly recognized that that's not true because an

24   injunction against the Board would run against the board members

25   in their official capacity.  And it would not matter if the

1    Governor appointed someone new to the seat.

2             And just to conclude with the Secretary, Disney had

3    argued that the Secretary has some deeper responsibilities or

4    some further -- further responsibilities as it relates to CFTOD,

5    but Disney hadn't explained what those are.  Instead it

6    continues to talk about the official list, and Disney, I think,

7    says that the official list triggers reporting requirements of

8    the Board.  But that's both wrong and irrelevant, Your Honor.

9             It's wrong because the official list does not trigger

10   any procedural reporting requirements.  Those requirements are

11   triggered by statute, by other statutes aside from the official

12   list, and we do not understand 189.061 to say that you only had

13   procedure reporting requirements if you are on the official

14   list.  So it does not trigger any requirements, but it's also --

15   that point's also irrelevant because those reporting

16   requirements are not powers; they're burdens.  They are burdens

17   that the district must comply with.  And so if this Court were

18   to enter a verdict that somehow removes those burdens from the

19   district, that doesn't help Disney's injury.  That just relieves

20   the district of responsibilities that it has to the State.

21            So for all of those reasons, Your Honor, we would ask

22   that this Court dismiss the Complaint against the State

23   Defendants and also against CFTOD.

24            THE COURT:  Thank you very much.

25            MR. COSTELLO:  Thank you.

1          MR. COOPER:  Your Honor, once again Charles Cooper.

2          I've just a few points to make in rebuttal to my

3    friend's comments.  The first one is this hypothetical about

4    Disney being owned by Catholics or Disney being owned by blacks.

5    *NetChoice* addresses that point, specifically -- in fact, many of

6    the -- of the arguments that have been presented to you by my

7    friend really are difficult -- very difficult to -- to square

8    with statements that come straight from the *NetChoice* case.

9          The Court recognized -- it cited Lukumi Babalu.  It

10   cited *Turner*.  It cited these other cases, and it said -- to be

11   fair to the Plaintiff's argument, there is some support for the

12   idea that -- that motivations -- legislative motivations can

13   play a part, but those all came from different constitutional

14   provisions.  As they say -- and Lukumi held that the free

15   exercise context -- in that context it was appropriate to look

16   beyond text of the laws at issue to identify discriminatory

17   animus against a minority religion.

18          But *NetChoice* hasn't cited -- and we're not aware

19   of -- any Supreme Court or Eleventh Circuit decision that relied

20   on legislative history by statements by proponents to

21   characterize as "viewpoint based" a law challenged on a free

22   speech ground.  And they italicized free speech right above

23   that.  You know, they said this support is, quote:  *"Not enough*

24   *to overcome the clear statements in Hubbard and O'Brien."*

25          First of all, Your Honor, the kind of dichotomy that

1   counsel presents to you between *O'Brien* and *Hubbard* was not seen

2   at all by the panel in *NetChoice*.  They discussed them both as

3   basically standing for the same rule of law, the one that

4   *Hubbard* then did elabor- -- elaborate on to be sure.  Now -- and

5   we know, of course, if there were race discrimination alleged

6   in -- any evidence of race discrimination in any of these

7   statutes, then, of course, that motivation could and would be

8   centrally important.

9           And, Your Honor, I want to call your attention to the

10  *City of Hobart* case because Judge Posner in that case explains

11  why there is a difference between religious-based type of

12  discrimination, race-based discrimination, and -- and the -- and

13  motivation -- and motivations that are political, Your Honor.

14  That's what the free speech clause embraces and targets, if you

15  will.

16          And, Your Honor, the political process, the democratic

17  process, the legislative process, can't -- it is inescapably

18  political.  And that's why there are these restrictions

19  recognized by the Supreme Court in *O'Brien* and by the --

20  uniformly through the courts of appeal when a free speech claim

21  is made that there has been improper retaliation in this

22  facially constitutional law that -- that was -- was motivated

23  by -- by exercise of free speech.

24          Your Honor, counsel here and in his briefing

25  repeatedly talks about attainder-like provisions.  The whole

 1    answer to that is footnote 14 -- excuse me -- of *Hubbard* where

 2    the Court recognizes that *O'Brien* recognized bill of attainder

 3    ex post facto laws and other penal constitutional provisions,

 4    which inherently require proof of purpose.  But the Court said,

 5    We're only speaking here to First Amendment and speech claims.

 6    Not -- and so the Court in *Hubbard* distinguished and recognized

 7    the distinction between a bill of attainder.

 8          The idea that there's some category of attainder-like

 9    provisions that dilute the strength or the meaning of the

10    *Hubbard* decision and the *NetChoice* decision just is not -- is

11    not a -- a valid proposition.

12          THE COURT:  So your view on that is just that the --

13    for better or worse the *Hubbard* -- the *O'Brien* exception

14    recognizing *Hubbard* would have to be an actual bill of attainder

15    or an ex post facto law or something like that?

16          MR. COOPER:  Yes, Your Honor.

17          THE COURT:  So we would never look at whether

18    something's super close or even, I guess, back to the initial

19    question, even if it, as a matter of fact, applied to only one

20    entity?

21          MR. COOPER:  Well, no -- well, I'm -- I am saying that

22    *Hubbard* recognized the exception that *Gwinnett County*

23    established without referencing *O'Brien*, without discussing any

24    of this, Your Honor.  And -- but it makes clear that that

25    except- -- exception requires singling out -- singling out

1    exactly the way that the educational association, the local

2    educational association was singled out in -- in *Gwinnett*.

3           In the *City of Hobart* the -- the provision was claimed

4    by the police to have been targeted at them because they had

5    opposed the outgoing regime and possibly contributed to its

6    electoral defeat.  But, Your Honor, in that case, Judge Posner

7    said.  This didn't single out the police.  It didn't pinpoint

8    the police.  It's very specific and included people in the fire

9    department.  It even included people in the police department

10   that had supported the outgoers.

11          So that -- the other point I want to reiterate, I

12   guess, here is that the understanding of "generally applicable"

13   that I think has been advanced by my friend it simply cannot be

14   squared with *Hubbard* and its language and with the facts of

15   *Hubbard*.  The provision at issue in *Hubbard*, it wasn't generally

16   applicable in the sense that counsel means.  As I mentioned

17   earlier, it was restricted to membership organizations that use

18   dues for political purposes.  It didn't embrace membership

19   organizations that used -- that did not use dues.  So on its

20   face it wasn't generally applicable in the sense that Counsel is

21   talking about.

22          And the same, again, is true of *NetChoice*.  It was not

23   at all generally applicable to all social media platforms, but

24   neither were they pinpointed or explicitly singled out, the --

25   the plaintiff for adverse legislative treatment.

1           And finally, I would just add that in the same way

2    that my friends for the Governor and the Secretary have adopted

3    our arguments on the merits, I want to adopt my friends'

4    arguments on standing.  He added to his list my clients the

5    board members, and I embrace that standing argument.  Thank you,

6    Your Honor.

7           THE COURT:  Thank you, Mr. Cooper.

8           All right.  Well, I want to thank all parties for

9    their arguments today.  I think this was helpful.  I'm going to

10   get an order out hopefully before too long.  It won't be next

11   week, but hopefully it will be in the next couple weeks.

12   Anything else we can address while we're all here together?

13   Plaintiffs?

14          MR. PETROCELLI:  No, Your Honor.  Thank you very much

15   for all the time you spent.

16          THE COURT:  Anything from the defense?

17          MR. COOPER:  No, Your Honor.

18          MR. COSTELLO:  No, Your Honor.

19          THE COURT:  Okay.  Well, court's adjourned.

20      (Proceedings concluded at 11:11 AM on Tuesday, December 12,
     2023.)

21

22

23

24

25

1                        *  *  *  *  *  *  *  *

2

3            I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.
4  Any redaction of personal data identifiers pursuant to the
   Judicial Conference Policy on Privacy are noted within the
5  transcript.

6

7

8
   /s/ Kairisa J. Magee                          12/17/2023
9  Kairisa J. Magee, RPR, CCR                    Date
   Official U.S. Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25